# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

Faresha Sims                           *

v.                                     *           Civil No. CCB-19-0295

University of Maryland Medical System   *
Corporation, et al.

## MEMORANDUM

Dr. Faresha Sims worked as a certified registered nurse anesthetist ("CRNA") at University of Maryland Medical Center ("UMMC") from April 8, 2013, until August 17, 2015, and was supervised by Linda Goetz, Director of Nurse Anesthetists. ECF 1, Compl., ¶¶ 4, 7. Sims alleges that she was discriminated against based on her race (black) and perceived disability, and that she was retaliated against based on her protected activity. Now pending are the University of Maryland Medical System Corporation ("UMMS") and Linda Goetz's (collectively, "defendants")[1] motion to strike Exhibit 1 to the complaint (ECF 12) and partial motion to dismiss[2] (ECF 13). The motions are fully briefed and no oral argument is necessary. For the reasons stated below, the court will grant the motion to strike, and will deny the motion to dismiss.

## FACTS AND PROCEDURAL HISTORY

Although Sims alleges ongoing discrimination and harassment dating back to the beginning of her employment, the events immediately leading to this litigation began on June 18, 2015. On that day, Sims alleges that, while on approved vacation leave, she was told by her

---

[1] Sims also filed her complaint against defendant Lisa Rowen, Senior Vice President of Patient Care Services and Chief Nursing Officer at UMMC. Rowen did not join in the motion to dismiss as she had not yet been served. ECF 13, Mem. in Supp. of Defs. Partial Mot. to Dismiss (hereinafter "Partial Mot. to Dismiss") at 1 n.1. Rowen has since been served and filed an answer to the complaint. ECF 20.
[2] The defendants seek to dismiss all counts of the complaint except for the claim of retaliation (Count V) against Linda Goetz and Lisa Rowen. As to Sims's Americans with Disabilities Act ("ADA") claims (Count III and Count IV), the defendants do not address the substance of the claims, but rather argue that the claims should be dismissed because they are only alleged against UMMS, which is an improper party.

1

supervisor, Linda Goetz, to immediately undergo a discriminatory fitness for duty ("FFD") exam and drug testing. Compl. ¶¶ 26–29. Goetz told Sims that she needed to take a drug test because her "behavior had changed" and that she would be fired if she refused. *Id.* ¶¶ 28–29. Goetz did not provide any other explanation at the time, although according to Sims, Goetz later asserted that she believed that Sims was diverting drugs from the hospital because she "works frequently." *Id.* ¶ 36. Under threat of termination, Sims signed a form consenting to the FFD exam, and urinated in a plastic cup while being watched by an Employee Health Services staff member. *Id.* ¶¶ 30–31.[3] Dr. Melissa Frisch, the medical director at Employee Health Services, later declared Sims fit for duty, as the drug and alcohol tests were negative[4] and there were no findings of impairment. *Id.* ¶¶ 51–52.[5]

After the drug test on June 18, 2015, Sims filed a race discrimination complaint with the Executive Leadership office. *Id.* ¶ 35. She alleges that four days later, on June 22, 2015, she met with Employee Assistance Program counselor Jan Buxton, who advised Sims to quit "before they ruined Sims's career in retaliation for her discrimination complaint." *Id.* ¶ 47. Then, on June 24, 2015, Sims met with Lisa Rowen, Senior Vice President of Patient Care Services and Chief Nursing Officer, who "scolded" her for filing a race discrimination complaint and threatened her that she would "experience adversity for bringing" the complaint. *Id.* ¶¶ 56–57. On June 27, 2015, Sims escalated her race discrimination complaint to Robert Chrencik, UMMS President and CEO. *Id.* ¶ 60.

A few days later, Sims spoke with Detective Walter Brown, a UMMC Investigator, on

---

[3] According to Sims, on June 19, 2015, Lisa Rowen emailed Goetz telling her to make sure she had "perfect documentation" to justify requiring Sims to undergo the FFD exam and drug testing, as she had a feeling "your documentation will be viewed by a lot of internal people and external agencies." Compl. ¶¶ 53–54. Sims alleges that this is evidence of an attempted cover-up of discrimination, and is also evidence of retaliation.
[4] It is not clear from the complaint when Sims took an alcohol test.
[5] Although the timeline is somewhat unclear from the complaint, it appears that Sims had previously met with Dr. Melissa Frisch on the day Sims took the drug test, and at this meeting Sims told Frisch that she believed that the FFD and drug test were discriminatory. Compl. ¶ 33.

2

the phone, regarding "unusual things" "happening to her away from work" and forwarded him emails about her discrimination complaint. *Id.* ¶¶ 61, 64. According to Sims, Brown falsely told her he was a police officer. *Id.* ¶ 61–62. Brown later wrote a memorandum about the call, "falsely and maliciously attributing statements to Dr. Sims that purportedly caused UMMC to question Sims's ability to safely care for patients." *Id.* ¶ 65. Sims alleges that Brown and/or UMMC fabricated the statements in the memorandum in retaliation for Sims filing a discrimination complaint, and that Brown was promoted to a higher position the same day that he issued the memorandum. *Id.* ¶¶ 67, 69. Based on the memorandum, UMMC suspended Sims from work, *id.* ¶ 76, although Sims alleges that they did not take any of the steps they should have taken, including reporting Sims to the Maryland Board of Nursing, if they actually had a "good-faith belief that Dr. Sims may have a mental impairment that might make her unable to safely care for patients." *Id.* ¶ 73. Sims alleged the suspension was retaliation and also a violation of the ADAAA "for regarding her as disabled." *Id.* ¶ 77. According to Sims, she met with Human Resources personnel Neddra King and Nicole Leyba on July 8, 2018, and in the meeting, King conditioned Sims's return to work on her withdrawing her discrimination complaint. *Id.* ¶¶ 78, 82.

UMMC referred Sims to the Employee Assistance Program ("EAP") on July 10, 2015. *Id.* ¶ 86. On July 13, 2015, Sims sent UMMS[6] an email informing them that the EAP referral was harassment and retaliation, and stating she would be "utilizing the assistance of EEOC." *Id.* ¶¶ 88–89. According to Sims, the next day, she was changed from paid to unpaid suspension. *Id.* ¶ 90. On August 9, 2015, Sims was terminated, as UMMC considered her refusal to go to EAP as a resignation, *id.* ¶ 101–02, even though, according to Sims, UMMC policy provides that an employee can always refuse an EAP referral, *id.* ¶ 104. The termination was upheld by

---
[6] It is not clear from the complaint who at UMMS she emailed.

3

Vice President of Human Resources Paula Henderson, although she considered it to be a "voluntary resignation." *Id.* ¶¶ 113, 115.

Dr. Sims alleges that similarly situated CRNA's were treated more favorably than her. For example, a white male CRNA was allowed to keep working despite being observed sleeping on the job while administering anesthesia and having controlled drugs and needles in his locker, *id.* ¶¶ 125–32, and was only made to take an FFD exam after anesthesiologists reported that he seemed unsafe, *id.* ¶ 131.[7] Another CRNA, a white female, was reported by an anesthesiologist for mishandling narcotics and behaving unethically to hide the fact that drugs were missing, yet was not required to undergo an FFD or drug testing, and continued providing patient care. *Id.* ¶ 150.

In her complaint, Sims also alleges discriminatory failure to hire. According to Sims, she requested "prior to hiring and throughout her entire employment to be hired and trained in Shock Trauma, but it never happened" even though Goetz continued "hiring, transferring, and training non-black CRNAs to work in Shock Trauma." *Id.* ¶¶ 157–58. Sims alleges several non-black CRNAs were allowed to train in Shock Trauma even though they had less experience and were hired after Dr. Sims. *Id.* ¶ 160. According to Sims, UMMC alleged that Sims was not allowed to transfer or train in Shock Trauma because she was hired for General Operation Rooms ("GOR"), but other non-black CRNA's hired to work in GOR were transferred to and/or trained for Shock Trauma. *Id.* ¶ 161. Sims alleges that there were no black full-time nonmanagerial CRNAs hired, trained, or transferred to work in Shock Trauma during Sims's employment. *Id.* ¶ 164.

Sims alleges that Goetz and University of Maryland Medical System Corporation ("UMMS") discriminated against her based on race, in violation of Title VII of the Civil Rights

---

[7] This CRNA was later fired. Compl. ¶ 132.

Act of 1964, 42 U.S.C. § 2000e *et seq.*, and Section 1981, 42 U.S.C. § 1981, by failing to hire or train her in shock trauma (Count I); by making her take an FFD exam and drug test (Count II); and by subjecting her to a hostile work environment (Count VI).[8] Sims also alleges that UMMS violated the Americans with Disabilities Act ("ADA") by subjecting her to the medical examination and disability-related inquiries (Count III), and by harassing and discriminating against her based on her perceived disability (Count IV). Lastly, she alleges that UMMS, Rowen, and Goetz retaliated against her in violation of Title VII (as to UMMS) and § 1981 (as to UMMS, Rowen, and Goetz) (Count V).

The defendants seek to dismiss UMMS[9] from the action, and to dismiss Counts I, II, and VI of the complaint for failure to state a claim. They also seek to strike Exhibit 1 to the complaint, which is the Baltimore City Community Relations Commission's written findings of probable cause.

## STANDARD OF REVIEW

Motion to Strike: Per Federal Rule of Civil Procedure 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic.'" *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001).

Motion to Dismiss: To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a

---

[8] Sims's claims under Title VII are against UMMS only, while her § 1981 claims are against UMMS and Goetz.
[9] Dismissing UMMS from the action would also dismiss Counts III and IV, which are only alleged against UMMS.

5

plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

In order to survive a motion to dismiss under Title VII or under § 1981, the plaintiff must plausibly allege facts that satisfy the elements of the cause of action under Title VII or § 1981, but she need not make out a *prima facie* case. *McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015) (Title VII); *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017) (Section 1981).

## ANALYSIS

**Motion to Strike:**

The court will strike Exhibit 1 to the complaint, the Baltimore City Community Relations Commission's ("BCCRC") written findings of probable cause. *Lindsey-Grobes v. United Airlines, Inc.* is instructive. There, the court held that the complaint and

> the related exhibits go far beyond what is necessary for Plaintiff to satisfy the requirement that she plead that she exhausted her administrative remedies and that her complaint was timely filed in federal court. Moreover, [the complaint's] references to the EEOC's findings and the Defendant's refusal to conciliate are not even relevant to these

6

threshold issues of exhaustion and timeliness. Nor are they probative of the allegations in Plaintiff's complaint, which are entitled to a *de novo* review by the District Court.

No. GJH-14-00857, 2014 WL 5298030, at *3 (D. Md. Oct. 14, 2014) (and collecting cases)[10]. Further, *Castro v. De Marne & Day, Inc.*, to which Sims cites, is distinguishable. There, the court declined to strike two paragraphs of the complaint regarding the EEOC findings. Civil Action No. TDC-14-2746, 2015 WL 3764856, at *3–4 (D. Md. June 12, 2015). In contrast to the two paragraphs at issue in *Castro*, Sims has attached the entire BCCRC's written findings of probable cause to her complaint.[11] As in *Lindsey-Grobes*, these findings are irrelevant at this stage.[12] Accordingly, the court will grant the motion to strike Exhibit 1 to the complaint.

**Motion to Dismiss:**

<u>University of Maryland Medical System Corporation ("UMMS")</u>: The defendants allege that UMMS is not a proper party to the action, as Sims worked for UMMC, not UMMS, and they are separate legal entities. According to Sims, UMMS owns and operates UMMC, and UMMS is interchangeable with UMMC. Compl. ¶ 5.[13]

At this stage, the court does not have enough information to determine the relationship between UMMS, UMMC, and Sims, particularly at the time of the events in the complaint. Sims alleges that UMMS and UMMC are the same entity. According to the defendants, "UMMS and UMMC previously operated as a single entity" but in 2014 "the Maryland legislature authorized a separate legal entity to operate UMMC and to form its own Board of Directors," citing Md. Code Ann., Educ. § 13-303. ECF 22, Reply to Pl.'s Opp'n to Defs.' Partial Mot. to Dismiss

---

[10] Unpublished cases are cited for the soundness of their reasoning, not for any precedential value.
[11] Sims also references in her complaint that both BCCRC and the EEOC found probable cause of discrimination. Compl. ¶¶ 13–14. The defendants do not seek to strike these paragraphs.
[12] The BCCRC's findings, however, eventually may be admissible as evidence. *See Laber v. Harvey*, 438 F.3d 404, 421 (4th Cir. 2006).
[13] It is not clear why Sims did not name both UMMS and UMMC in her complaint. The defendants have stated that Sims could amend her complaint to name UMMC. ECF 22, Reply to Pl.'s Opp'n to Defs.' Partial Mot. to Dismiss at 5.

7

(hereinafter "Reply") at 4 n.1. It is not clear, however, when UMMC actually became a separate legal entity, so the court cannot determine whether "for the operative time period, [Sims] was employed by UMMC, a separate and distinct entity from UMMS," Reply at 4, or whether Sims was employed by the single entity of UMMS/UMMC. Therefore, the motion to dismiss UMMS will be denied without prejudice at this time.[14]

Discriminatory hiring and work assignments[15] (Count 1): Under Title VII and § 1981, the elements of a *prima facie* case for failure to hire are: (1) the plaintiff is a member of a protected group; (2) she applied to a specific position; (3) she was qualified for that position; and (4) she was rejected under circumstances that give rise to an inference of discrimination.[16] *Dallas v. Giant Food, Inc.*, 187 F. Supp. 2d 505, 509 (D. Md. 2002) (failure to hire or promote); *see also Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir. 2004) (failure to promote).

The defendants first argue that Sims did not apply to a specific position, as she only alleges that she requested "throughout her entire employment to be hired and trained in Shock Trauma."[17] The Fourth Circuit has held, however, that where employees are chosen for positions in an informal manner, such as being sought out by managers, and the employer fails to make its employees aware of vacancies, the application requirement may be relaxed. *Williams*, 370 F.3d at 430–31. According to Sims, she was on the "list to be transferred and/or trained in Shock

---

[14] The defendants also argue in their Reply that Sims failed to exhaust her administrative remedies under Title VII and the ADA because her charge of discrimination named UMMC, not UMMS. As explained above, the court does not have enough information to determine the relationship of UMMS and UMMC at the time of the events of the complaint or at the time the charge was filed. *See Marshall v. Anne Arundel Cnty., Md.*, Civil Action No. ELH-18-74, 2019 WL 568676, at *9–12 (D. Md. Feb. 12, 2019) (finding at the motion to dismiss stage that an employment discrimination claim against the County could continue based on the doctrine of "substantial identity," even though the plaintiff had named a State office in her EEOC charge) (collecting cases).

[15] It is not clear from the briefing whether the opportunity to work in Shock Trauma would be considered a "hiring" or a "transfer," but at this stage neither party contends that this distinction matters.

[16] Although the plaintiff need not make out a *prima facie* case at the motion to dismiss stage, the Fourth Circuit has considered the elements of a *prima facie* case in determining whether the plaintiff has plausibly stated a claim. *See Coleman v. Maryland Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

[17] Sims states in her complaint that she "emailed Goetz on March 5, 2012, requesting to be hired to work in Shock Trauma." Compl. ¶ 176. Sims appears to agree with the defendants that a claim based on this 2012 application would be untimely. ECF 19, Pl.'s Opp'n to Defs.' Mot. to Dismiss at 15–16.

8

Trauma" and Goetz "would always affirm" that "Sims's request was active." Compl. ¶ 177. Therefore, it appears that the application process was an informal one, and Sims need not show any formal application, at least at this stage.

The defendants also argue that Sims has not plausibly alleged circumstances giving rise to an inference of discrimination. Sims, however, alleges that "several non-black CRNAs [were] allowed to train in Shock Trauma even though they had less experience and were hired after Dr. Sims," *id.* at ¶ 160, and that UMMC told Sims she was not allowed to transfer or train in Shock Trauma "because she was hired for the General Operations Rooms ("GOR")" but that "several non-black CRNAs hired to work in GOR [] were transferred and/or trained to work in Shock Trauma," *id.* ¶ 161. Therefore, Sims has plausibly alleged circumstances giving rise to an inference of discrimination.

Finally, the defendants argue that Sims has not shown she was rejected from any open position in the relevant statute of limitations period, and her claim is thus time-barred. "In Maryland, a Title VII claim is untimely unless a charge of discrimination is filed . . . within 300 days of the unlawful employment action." *U.S. EEOC v. Phase 2 Investments, Inc.*, 310 F. Supp. 3d 550, 572 (D. Md. 2018). The statute of limitations under § 1981 is, at most, four years. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 291–92 (4th Cir. 2004).[18] The affirmative defense that a claim is time-barred is not typically considered at the motion to dismiss stage. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). Such a defense may be reached at this stage only "in the relatively rare circumstances where facts sufficient to rule on an

---

[18] The § 1981 claims are subject to either a four-year statute of limitations, or the most appropriate or analogous state statute of limitations, depending on whether the plaintiff complains of conduct before or after the formation of the contract. *Whitaker v. Ciena Corp.*, Civil Action No. RDB-18-0044, 2019 WL 1331438, at *3 (D. Md. March 25, 2019). The defendants appear to assume that for pre-formation claims, the most appropriate statute of limitations would be Maryland's three-year statute of limitations. Partial Mot. to Dismiss at 8; Reply at 6 n.2. At this point, it is not necessary to determine which statute of limitations applies.

9

affirmative defense are alleged in the complaint." *Id.*

Here, the court cannot determine, based on the allegations in the complaint, whether Sims's claim is time-barred. It is not clear from the complaint the date on which Sims was not selected for open positions in Shock Trauma, and when other individuals were hired or transferred. As the court cannot determine the date the alleged misconduct took place and when the statute of limitations began to run, it will decline to decide whether Count I is time-barred.

FFD and drug test (Count II): The elements of a disparate treatment claim under Title VII or § 1981 are: (1) membership in a protected class; (2) adverse employment action; (3) satisfactory job performance; and (4) that similarly-situated employees outside the protected class received more favorable treatment. *Cepada v. Board of Educ. of Balt. Cnty.*, 814 F. Supp. 2d 500, 510 (D. Md. 2011). "Although [the plaintiff] does not need to allege facts sufficient to establish a *prima facie* case under Title VII on a motion to dismiss, he nevertheless must plead facts sufficient to support a reasonable inference that an alleged adverse employment action was motivated by bias or discrimination." *Chang Lim v. Azar*, 310 F. Supp. 3d 588, 601 (D. Md. 2018).

Sims has plausibly alleged that the drug test and FFD exam were motivated by discrimination.[19] On their own, however, the drug test and FFD exam probably are not adverse employment actions. *Smith v. R.J. Reynolds Tobacco Co.-Packaging Div.*, No. 1:02CV00063, 2003 WL 355646, at *4 (M.D.N.C. Feb. 11, 2003) (drug test not an adverse change in employment status); *Liggins v. G.A. & F.C. Wagman, Inc.*, Civil Action No. 5:18-cv-38, 2019 WL 4039635, at *3 n.4 (W.D. Va. Aug. 27, 2019) (same); *Tcheskidova v. ITT Fed. Servs.*, Civil

---

[19] Sims alleges that Goetz's reasons for initiating the FFD exam, that Sims "works frequently," was pretextual because Sims had not worked frequently in the period immediately preceding the exam. Compl. ¶ 37. Further, she alleges that similarly situated individuals were not made to take FFD exams, *id.* ¶¶ 119–154, and that her job performance was satisfactory, *id.* ¶ 22.

10

No. AMD 07-91, 2008 WL 3085694, at *3 n.8 (D. Md. Aug. 1, 2008) (fitness for duty evaluation not an adverse employment action); *Giang v. Potter*, 369 F. Supp. 2d 763, 769 (E.D. Va. 2005) (same). Sims alleges in her complaint, however, that she was suspended as a result of the drug test and FFD exam, and asserts in Count II that her "work suspension" was "discriminatory on the basis of race." Compl. ¶¶ 199, 205. She argues that, as the FFD and drug test led to her suspension, it is an adverse employment action, Pl.'s Opp'n at 19–20, although the court notes that this is somewhat contradicted by the complaint, in which Sims states she was "declared fit for duty" and was instead suspended based on Walter Brown's memorandum. Compl. ¶¶ 52, 76.

The court need not decide now the relationship between the drug test, the FFD exam, and Sims's suspension.[20] As the rest of Sims's claims are going forward, the drug test, FFD exam, and suspension require additional discovery regardless of the eventual disposition of Count II. Accordingly, the court will deny without prejudice the motion to dismiss Count II.

Hostile Work Environment (Count VI): The elements of a hostile work environment claim under Title VII or § 1981 are: the plaintiff experienced harassment that is (1) unwelcome; (2) based on race; and (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Reed v. Airtran Airways*, 531 F. Supp. 2d 660, 668–69 (D. Md. 2008) (Title VII); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001) (elements are the same under § 1981 and Title VII).

The defendants argue that Sims fails to state a claim for hostile work environment because it is "largely a repackaging of her allegations regarding disparate treatment." Partial Mot. to Dismiss at 17. In support they cite *White v. City of Annapolis*, which found on a motion

---

[20] Even assuming that the FFD exam and drug test led to the suspension, it is not clear (and the court does not decide) whether this would transform the exam and test into an adverse employment action.

11

for summary judgment that the discrete acts cited by the plaintiffs did not show a hostile work environment, and *Qaiser v. Small Business Administration*, which granted summary judgment as to a hostile work environment claim for many reasons, including because "the hostile work environment claim arises from the same discrete actions alleged in Qaiser's adverse employment claims." *White*, Civil No. JFM-13-1330, 2015 WL 5009853, at *9, *12, *14, *17 (D. Md. Aug. 21, 2015); *Qaiser*, Case No. 1:15-cv-1627, 2016 WL 8711622, at *12 (E.D. Va. March 18, 2016). Although it is true that a plaintiff "cannot transform her separate and distinct claim for disparate treatment . . . into a hostile work environment claim, unless the facts alleged meet the separate criteria for a hostile work environment," *Bailey v. Int'l Paper*, Civil Action No. 2:11-03013-PMD-BM, 2012 WL 405713, at *3 (D.S.C. Feb. 8, 2012), the court does not take *White* and *Qaiser* to say that discriminatory acts that are actionable on their own cannot also be considered as part of the overall hostile work environment a plaintiff alleges she was subject to.

Sims alleges that Goetz told her that she was acting "argumentative and aggressive like the average black woman" when she refused an assignment sometime in the beginning of her employment, Compl. ¶ 292, that Goetz kicked Sims, *id.* ¶¶ 293–94, accused Sims of stealing drugs and forced her to undergo drug testing and an FFD (described above), and drafted a Performance Improvement Plan ("PIP") that altered Sims's work schedule,[21] *id.* ¶ 298. Although it is not clear whether Sims will be able to "clear [the] high bar in order to satisfy the severe or pervasive test," *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008), at the motion to dismiss stage and because the case will proceed to discovery in any event, Sims has sufficiently alleged her hostile work environment claim.

The defendants also argue that some of the alleged acts in Sims's hostile work environment claim are untimely. "A hostile work environment claim is composed of a series of

---

[21] It is not clear whether the PIP was ever implemented.

12

separate acts that collectively constitute one 'unlawful employment practice'. . . . Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116–17 (2002). The defendants do not dispute that at least some of the acts that Sims alleges form the hostile work environment occurred within the applicable time period and, at this stage, Sims has sufficiently alleged that the acts involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same people so as to be part "of the same actionable hostile work environment practice." *Id.* at 120.

## CONCLUSION

For the reasons stated above, the court will deny without prejudice the defendants' motion to dismiss, and will grant the defendants' motion to strike. A separate order follows.

12/10/19
Date

/s/ CCB
Catherine C. Blake
United States District Judge