## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISON

---

**FARESHA SIMS**,
212 Washington Avenue 1105
Towson, Maryland 21204,
Plaintiff,

v.

**UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION**
250 West Pratt Street
Baltimore, Maryland 21201,

    <u>Serve All Defendants on:</u>
    Megan M. Arthur
    General Counsel and Senior Vice President
    University of Maryland Medical System Corporation
    250 West Pratt Street
    Baltimore, MD 21201

and

**LISA ROWEN**, individual and official capacity
Senior VP of Patient Care Services & Chief Nursing Officer
University of Maryland Medical Center
22 South Greene Street
Baltimore, Maryland 21201,

and

**LINDA GOETZ**, individual and official capacity
Director of Nurse Anesthetists
University of Maryland Medical Center
22 South Greene Street
Baltimore, Maryland 21201,

and

**UNIVERSITY OF MARYLAND MEDICAL CENTER, LLC**
22 South Greene Street
Baltimore, Maryland 21201

Defendants.

---

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**
Case No. 1:19-cv-00295-CCB

**FIRST AMENDED COMPLAINT**
[Title VII, Section 1981, ADAAA]

## I.   NATURE OF ACTION

1.     Plaintiff Faresha Sims brings this employment discrimination action on the basis of race and disability discrimination, and retaliation, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 (e) et. seq. ("Title VII"), the Americans with Disabilities Act as amended ("ADAAA"), 42 U.S.C. §12101 et. seq., and 42 U.S.C. § 1981 ("Section 1981").

2.     Defendants failed to hire, transfer, or train Plaintiff in the R Adams Cowley Shock Trauma Center ("Shock Trauma").

3.     Defendants conducted a discriminatory medical exam, drug testing, and alcohol testing on Plaintiff Sims because of her race and a violation of ADAAA while she was off-duty on vacation leave; placed her on paid and unpaid suspension in retaliation for her discrimination and/or retaliation complaints; created and distributed a memorandum with malicious intent that attributed false statements to her for retaliatory purposes; regarded or perceived her as disabled with a mental illness and unable to perform her essential job function to retaliate against her; failed to investigate her additional and separate discrimination and retaliation complaints to retaliate against her; took disciplinary action against her for declining a referral to Employee Assistance Program (EAP) which is "always the employee's right to refuse the EAP" and "this will not result in disciplinary action"; considered her to have resigned from employment as pretext to retaliate; terminated her employment to retaliate; rescinded approval and refused her the normal appeal process to retaliate; failed to offer her a severance package to retaliate; and harassed her through a hostile work environment because of her race.

2

## II.   PARTIES

4.      Plaintiff Faresha Sims ("Plaintiff" or "Dr. Sims") is a black female residing in Baltimore County of Maryland. She is a certified registered nurse anesthetist ("CRNA"). Dr. Sims worked at University of Maryland Medical Center as an CRNA from April 8, 2013 to August 17, 2015. Her state license and national certification to practice was active and in good standing throughout her entire employment.

5.      The first-named Defendant is University of Maryland Medical System Corporation ("UMMS"), a private health care system that wholly owns and operates University of Maryland Medical Center ("UMMC"), a hospital in Baltimore, Maryland, in the county of Baltimore City. Hereafter, UMMS and UMMC will be used interchangeably. The fourth-named Defendant is University of Maryland Medical Center, LLC ("UMMC"), a hospital in Baltimore, Maryland, in the county of Baltimore City. University of Maryland Medical Center, LLC is operated exclusively for the purposes, benefit, and functions of UMMS. UMMS owns University of Maryland Medical Center, LLC and is directly involved in its operations. Every allegation hereafter against UMMS or University of Maryland Medical Center (UMMC) is exactly alleged against University of Maryland Medical Center, LLC (UMMC).

6.      The second-named Defendant is Lisa Rowen ("Rowen"), Senior Vice President of Patient Care Services and Chief Nursing Officer at UMMC, who is being sued under 42 U.S.C. § 1981, because she intentionally and directly retaliated against Dr. Sims in the enforcement of Sims's employment contract.

7.      The third-named Defendant is Linda Goetz ("Goetz"), Director of Nurse Anesthetists, who is being sued under 42 U.S.C. §1981, because she intentionally and directly discriminated and retaliated against Dr. Sims in the enforcement of Sims's employment contract.

3

## III.   JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction over this Complaint pursuant to

42 U.S.C. § 2000d-7 and 28 U.S.C. § 1331 because this action arises under the laws of the

United States.

9.      Venue is proper in the United States District Court for the District of

Maryland pursuant to 28 U.S.C. § 1391(b) because all of Defendants' actions and

omission giving rise to the claims in this Complaint occurred in the State of Maryland.

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

10.     Dr. Sims's Discrimination Charge was first submitted to Baltimore City

Community Relations Commission (BCCRC) on November 3, 2015.

11.     The submission included a completed three (3) page Equal Employment

Opportunity Commission (EEOC) Form 5 and a detailed thirty (30) page letter

elaborating her allegations of discrimination, harassment and hostile work environment,

and retaliation against Defendants.

12.     The Charge was noted as filed with Baltimore City Community Relations

Commission and EEOC on December 9, 2015. The charges number are E16C044 for

BCCRC and 12B-2016-00008 for EEOC.

13.     On June 20, 2018, BCCRC issued a Determination finding probable cause to

believe UMMC discriminated and retaliated against Sims. This agency provided a fifty-

one (51) page written finding investigative report. (See Exhibit 1, Stricken per ECF 28).

14.     On October 10, 2018, EEOC issued its Determination finding probable

cause to believe UMMC discriminated and retaliated against Sims.

4

15.    On October 31, 2018, EEOC issued Notice of Right to Sue. (See Exhibit 2).

16.    This Complaint is filed within ninety (90) days of Sims's receipt.

17.     Plaintiff Sims has satisfied all applicable administrative and procedural prerequisites.

## V.    FACTUAL ALLEGATIONS

### A. Sims was a Hardworking, Compassionate, and Competent Rising Star in Excellence at UMMC

18.    Dr. Faresha Sims was born and raised in rural Mississippi by parents who both were uneducated but hardworking. Dr. Sims's father died two years before she became a nurse, but she never forgot the important role nurses played in her father's life.

19.    The Virginia Commonwealth University (VCU) nurse anesthesia program has been ranked number one in the nation. She attended this program, earning a master and doctorate degree concurrently, and graduating with a cumulative grade point average of 3.9. She received many scholarships and awards at VCU, including the Clinical Excellence Award, which recognized her commitment to excellence.

20.    Dr. Sims was the only doctoral-prepared black CRNA at UMMC.

21.    Dr. Sims was awarded two prestigious awards at UMMC in recognition of her commitment to excellence. The awards were Rising Star of Excellence in Advanced Practice Nursing and Employee of the Month.

22.     Dr. Sims had a reputation at UMMC of consistently providing safe, high-quality patient care. It is undisputed, Dr. Sims's "performance of clinical duties and patient care was not at issue."

**B.  Supervisor Violates Policies and Guidelines to Require Sims to Undergo Discriminatory Alcohol and Drug Testing, While Off-Duty**

23.     Linda Goetz was the supervisor of Dr. Sims. This supervisor's conduct was imputable to UMMS and UMMC.

24.     On June 14, 2015, Dr. Sims provided anesthesia care for a simultaneous kidney-pancreas transplant procedure.

25.     It is undisputed, Dr. Sims provided safe, competent, and error-free anesthesia care that day.

26.     On June 18, 2015, Dr. Sims was on an approved vacation leave from UMMC, when her supervisor, Linda Goetz ("supervisor" or "Goetz") called her and left a voicemail, and then sent Sims a text to call Goetz.

27.     Dr. Sims returned her call. During the phone conversation, Goetz insisted Sims report to Goetz's office immediately and refused to explain.

28.     Dr. Sims assumed severe patient harm or death must have occurred, so she drove to UMMC and went to Goetz's office. When she arrived, Goetz stated Dr. Sims was called to UMMC to take a drug test. Sims requested an explanation for the probable cause drug test.

29.     Goetz informed that "[Sims's] behavior had changed," but that Goetz did not have time to explain. Goetz informed Sims that she would be fired if she refused

6

drug testing. Dr. Sims was escorted to Employee Health Services ("EHS") and directed to sign a form consenting to a Fitness for Duty ("FFD") and drug testing.

30.     Under threat of termination, Dr. Sims signed the consent form. She was taken to a room with a toilet but no door and given a plastic cup to urinate into. Prior to pulling down her underwear, Sims asked if it was necessary that she be watched while urinating.

31.     Dr. Sims was told that it was required the cup be watched at all times including while she urinated into it. Sims was severely humiliated and embarrassed as she pulled down her underwear and urinated on her hands and into a cup while being observed.

## C. Supervisor Refuses to Follow Policies and Mandates a Discriminatory Medical Exam of Sims, While Off-duty

32.     Dr. Melissa Frisch ("Dr. Frisch"), Medical Director of EHS, met with Dr. Sims in a private room in EHS to perform a medical evaluation of Sims. She begged Dr. Frisch to tell her the reason for FFD and drug test, but Dr. Frisch stated Goetz should have provided this.

33.     Dr. Sims informed Dr. Frisch that Goetz had provided no explanation, and that Sims was singled out, likely for illegal discriminatory reasons, and that someone should explain this process and give rationales before subjecting her to such an illegal and humiliating process.

34.     Dr. Frisch advised Dr. Sims to speak with Human Resources. Sims called twice the office of Neddra King ("King"), HR Business Partner, from EHS but got no

answer. Dr. Frisch then completed a medical examination of Dr. Sims and stated, "there's nothing there."

35.     Dr. Sims exited EHS and called Goetz, and again asked her the reason for FFD and drug test. Again, Goetz refused to explain. Dr. Sims went to Executive Leadership office suites, and there filed a race discrimination complaint with Suzanne Leiter on June 18, 2015. Suzanne Leiter was the Executive Assistant to Defendant Lisa Rowen.

**D.  Supervisor Knowingly Provided False and Fabricated Allegations to Justify Discriminatory Medical Examination and Drug Test**

36.     Goetz had alleged she observed Dr. Sims and believed she was under the influence of drugs. Goetz had alleged she had reasonable belief that Sims was diverting drugs, i.e. stealing drugs from the hospital and self-injecting them with a needle while at work, in part, because Sims "works frequently."

37.     Dr. Sims had only worked one (1) day at UMMC the week of FFD exam and worked two (2) days at UMMC the prior week.  From June 1-18, 2015, Dr. Sims only worked three (3) days at UMMC of the total eighteen (18) days. She was not working at UMMC on the day Goetz ordered her to UMMC for FFD and drug testing. She had not worked at UMMC the prior three (3) days.

38.     UMMC had surveillance cameras in the operating rooms that were on monitor displays and viewable at all times. Goetz never watched the surveillance monitors that were on and available to observe Dr. Sims while she was in operating rooms.

8

39.     Goetz violated and did not follow the policy, *Guideline for Suspicion of Controlled Substance Diversion*, because "[t]he Guidelines are just that, guidelines." This policy indicated the most appropriate next step was an audit of controlled substance transactions prior to FFD and drug testing.

40.     Dr. Sims's audit results would have eliminated any need for FFD and drug testing of Sims.

41.     The audit results revealed no indication or suspicion that Dr. Sims was diverting drugs.

42.     Goetz arbitrarily and intentionally decided to review the audit results afterwards.

43.     Goetz violated and did not follow at least three (3) of UMMC's own policies in order to complete an off-duty FFD and drug testing of Dr. Sims. The FFD policy stated an employee will be sent for FFD when "reports for duty, or is on duty" and appears unfit or under the influence of drugs or alcohol.

44.     Dr. Sims was not on duty when required to undergo FFD and drug testing. Sims never appeared under the influence of drugs or alcohol.

45.     Goetz submitted false and misleading information to justify an FFD and drug testing as pretext to discriminate against Dr. Sims because she is a black woman.

9

### E.  UMMC EAP Counselor Advises Sims to Quit or Prepare for Inevitable Retaliation Because of Her Race Discrimination Complaint

46.     On June 22, 2015, four (4) days after Dr. Sims filed a race discrimination complaint, Sims went to Employee Assistance Program ("EAP") and met with Jan Buxton ("Buxton"), EAP counselor.

47.     During that EAP session, Buxton admitted Goetz had wronged Dr. Sims but advised Sims to immediately quit working at UMMC before they ruined Sims's career in retaliation for her discrimination complaint.

48.     Buxton further told Dr. Sims that Sims was very smart, had a bright future ahead and would do well working at another hospital, but that Sims would endure retaliation if she continued working at UMMC.

49.     Dr. Sims was shocked and scared by Buxton's admission that retaliation against Sims was inevitable, and she told Buxton that it was her understanding she could make a discrimination complaint and remain on the job.

50.     Buxton informed she had previously worked in Human Resources, and said it is rare an employee is able to complain of discrimination and not be terminated in retaliation for the complaint.

51.     After the EAP meeting, on the same day, June 22, Dr. Frisch met with Dr. Sims and deemed her fit for duty without any accommodations.

52.     It is undisputed, the results of the drug and alcohol tests were negative, FFD had no findings of any impairment, and Dr. Sims was declared fit for duty and able to perform all her job duties as an CRNA.

**F. Defendant Lisa Rowen Threatens Sims's Employment Because She Complained of Race Discrimination**

53.     On June 19, 2015, one (1) day after Sims filed a race discrimination complaint, Defendant Lisa Rowen ("Rowen"), Senior Vice President of Patient Care Services & Chief Nursing Officer, sent an email to Goetz stating that Goetz should make sure she had "perfect documentation" to justify requiring Dr. Sims to undergo FFD and drug testing.

54.     Defendant Rowen stated this was because there would likely be an internal, external, and "EEOC" investigation. Rowen advised Goetz prior to any investigation to "[b]e extremely scrupulous with your documentation – I can't stress this enough….I have a feeling your documentation will be viewed by a lot of internal people and external agencies."

55.     Defendant Rowen's message to Goetz that she should reconsider or retro-document after the FFD was performed, because of a discrimination complaint or EEOC investigation could indicate a cover-up of discrimination —pretext— and/or retaliation.

56.     On June 24, 2015, six (6) days after Sims filed a race discrimination complaint, she met with Rowen about her race discrimination complaint. In this meeting, Defendant Rowen scolded Dr. Sims for filing a discrimination complaint against Goetz.

57.     During the meeting, Rowen also directly inflicted emotional harm upon Dr. Sims, by mockingly laughing at Sims and threatening that Sims would soon experience adversity for bringing this discrimination complaint.

11

58.     Dr. Sims directly asked Defendant Rowen if Rowen was threatening her job. Rowen laughed and asked Nicole Leyba, HR personnel, if she "heard a threat."

59.     Dr. Sims requested a meeting with Jeffrey Rivest, UMMC President and CEO, immediately after Defendant Rowen threatened her job for filing a complaint of discrimination, but he denied the request. He wrote, "Lisa [Rowen] has briefed me on your meeting and I have asked her to continue to serve as your point of contact as Human Resources investigates your complaints."

60.     On June 27, 2015, Dr. Sims escalated her race discrimination protest to Robert Chrencik, UMMS President and CEO.

## G. UMMC Investigator Receives Promotion and Salary Increase on Same Day He Creates a Retaliatory Memorandum Against Sims, to Fabricate a Mental Illness

61.     On June 29, 2015, Dr. Sims spoke over phone to "Detective Walter Brown" ("Brown"), UMMC Investigator, whom she was misled into considering a police officer. Dr. Sims told Brown some unusual things were happening to her away from work and she had gone to other police stations but was advised to inform a police officer at UMMC.

62.     Dr. Sims told Brown she was only willing to speak with him and seeking his assistance, if he was a police officer. Brown falsely reassured that he was.

63.     Dr. Sims told Brown she planned to utilize a lawyer to handle her race discrimination complaint and was only seeking the help of a police officer to ensure her personal safety.

64.     Brown told Dr. Sims to forward him all emails about her discrimination complaint. He acknowledged receiving the forwarded emails. Brown wrote, "Ms. Sims provided me with a series of emails to and from her to various staff members surrounding her issues."

65.     The next day, June 30, which was twelve (12) days after Sims filed a race discrimination complaint, Brown wrote a memo, falsely and maliciously attributing statements to Dr. Sims that purportedly caused UMMC to question Sims's ability to safely care for patients.

66.     UMMC alleged, "Ms. Sims's concerning statements to Mr. Brown indicated paranoia and distrust toward her supervisors that called into question her ability to perform her essential job functions."

67.     UMMC created that memo with fictitious and fabricated statements to regard Dr. Sims as having a mental illness to retaliate because she had complained of discrimination.

68.     Dr. Sims had told Brown that she had been discriminated against and had filed a complaint. Brown knowingly omitted the word discrimination from his memo. He alleged it was his personal preference to use the words "harassing" and "issues" instead of the word discrimination.

69.     It is undisputed, on the same day, June 30, that Brown created his memo which attributed false statements to Dr. Sims, he was promoted to Assistant Director of Security & Guest Services, without competition.

13

70.     Brown's salary increased, and he was retro-actively paid for a job title he had just received.

71.     Upon information and belief, Brown was entitled to a lump sum of money from UMMC on the day he created the memo against Dr. Sims.

72.     Brown's memorandum did not prompt UMMC to take actions as might be expected if they actually believed Dr. Sims may pose a direct threat to patients.

73.      For instance, UMMC did not report Dr. Sims to Maryland Board of Nursing which is a requirement if UMMC had a good-faith belief that Dr. Sims may have a mental impairment that might make her unable to safely care for patients.

74.     It is undisputed, Dr. Sims's "performance of clinical duties and patient care was not at issue," based on objective job performance.

75.     It is undisputed, UMMC did not report to any regulatory or licensing agencies any concern about Dr. Sims being unsafe despite knowing Sims had the same job duties and responsibilities at another hospital and continued providing patient care.

76.     UMMC suspended Dr. Sims from work allegedly because of Brown's memo, notwithstanding their own medical doctor's independent objective assessment from eight (8) days prior that Dr. Sims had no impairments and able to safely perform all job functions with no further evaluation necessary.

77.     UMMC removing Dr. Sims from work based on hearsay from a biased and tainted representative of UMMC twelve (12) days after Sims complained of discrimination is retaliation, and a violation of ADAAA for regarding her as disabled.

**H.  UMMC Continues Harassing, Discriminating, and Retaliating against Sims**

78.     On July 8, Dr. Sims met with Human Resources personnel King and Nicole Leyba ("Leyba"). At this meeting, Dr. Sims provided additional information to support her race discrimination claim and denied making various statements supposedly attributed to her by Walter Brown.

79.     HR did not share Brown's written report or memo with Dr. Sims, thus denying her the optimal opportunity to contradict it.

80.     Nonetheless, Dr. Sims objected to the retaliation being inflicted upon her by UMMS and UMMC, including Human Resources. She informed HR that she believed they were retaliating against her.

81.     At this meeting, King was smirking and disparaging toward Dr. Sims. King was unable to maintain a straight face and laughing when she shared with Sims the hearsay that Sims supposedly said her supervisors showed up at her home to harm her. Dr. Sims denied ever saying that and explained the hearsay was intentionally nonsense.

82.     At the end of this meeting on July 8, Dr. Sims asked King about returning to work as scheduled and King replied that Sims would need to reconsider her discrimination complaint. Dr. Sims replied that nothing would make her withdraw her discrimination complaint.

83.     A few hours later, King emailed Dr. Sims stating, "[y]ou're scheduled to work your shift tomorrow at 7am but as we discussed I need to discuss with Paula Henderson before you can return to work."

15

84.     Dr. Sims was removed from the work schedule within hours of informing King that she would not withdraw her discrimination complaint and accusing HR of retaliation.

85.     UMMS and UMMC removed Dr. Sims from her work schedule to punish and retaliate against her for not withdrawing her race discrimination complaint and/or accusing UMMS and UMMC of retaliation.

86.     On July 10, two (2) days after Dr. Sims met with HR to continue providing her allegations of discrimination, accused HR of retaliation, and denied statements Brown attributed to her, UMMC referred Dr. Sims to EAP.

87.     UMMC first-stated reason for the EAP referral was because, "Jan would like to talk to you about your concerns." (See Exhibit 3). Jan Buxton was a counselor in EAP.

88.     On July 13, 2015, Dr. Sims sent UMMS and UMMC the email "Harassment and Retaliation at UMMC" informing that the EAP referral was to harass and retaliate against her because of her discrimination claim and retaliation complaint.

89.     Dr. Sims stated further protected activity in this email:

The United States Equal Employment Opportunity Commission (EEOC) is required by law to conduct an objective and fair investigation. Federal anti-discrimination laws not only prohibit discrimination based on race as I have claimed but also prohibits harassment against individuals in retaliation for making a claim. I will be utilizing the assistance of EEOC to assist in my return to duty and deter further retaliation and harassment from Human Resources.

90.     In further retaliation the next day, July 14, Henderson emailed Dr. Sims that she was being changed from paid to unpaid suspension.

91.     Henderson's email also stated, UMMC questioned Dr. Sims ability to safely care for patients because of Brown's memo and that was the reason for the EAP referral.

92.     Henderson further wrote, "[y]ou previously submitted concerns regarding discrimination and retaliation by email and in-person. These concerns have been received and are being investigated."

93.     UMMC new reason for EAP referral was different from the reason four (4) days prior. UMMC new reason for EAP referral was supposedly because of Brown's memo. However, the EAP referral with the new reason was issued fourteen (14) days after the bogus memo but only one (1) day after Dr. Sims provided notice of her intent to utilize EEOC.

94.     Within one (1) day of Dr. Sims informing UMMC of her intent to utilize EEOC, UMMC offered Dr. Sims the "option" to continue her employment if she would request a leave of absence through Family and Medical Leave Act ("FMLA") paperwork certifying that she has a serious medical condition.

95.     Also, within that one (1) day, UMMC entered a false statement into HR records that Dr. Sims "had been out several days due to her illness" and should be mailed an unsolicited FMLA packet implying Dr. Sims had a serious medical condition.

96.     UMMC tried to coerce and entice Dr. Sims by offering to *pay* her if she got a doctor to certify she had a serious medical condition that made her unable to perform her job duties since their own doctor would not do it.

17

97. UMMC admitted, "[d]uring this time, Dr. Melissa Frisch, Director of Employee Health Services, was consulted, and she agreed that there was no need to have Ms. Sims meet with Employee Health again."

98. UMMC referred Dr. Sims to EAP to harass and retaliate against her because of a perceived disability sham they created because she complained of race discrimination.

99. UMMC exploited Brown's fabricated memo to insinuate and portray Dr. Sims as suffering from a mental illness that made her unable to perform her essential job duties which is both unlawful retaliation and a violation of ADAAA.

100. On August 9, 2015, Dr. Sims wrote to UMMS and UMMC that not allowing her to return to duty because she declined the EAP referral is "discriminatory and harassment under ADAAA" and she was being "regarded as disabled" by UMMS and UMMC for retaliatory purposes.

101. Eight (8) days after that email which was protected activity, UMMS and UMMC considered Dr. Sims to be separated from employment on August 17, 2015, supposedly because she refused the EAP referral originally issued on July 10, which was about five (5) weeks prior.

102. UMMC "[c]onsidered her refusal to be a resignation. The hospital previously had warned Ms. Sims that refusal to meet with EAP would lead to this result." UMMC position that Dr. Sims voluntarily resigned or was terminated for refusing the EAP referral is pretext to conceal unlawful retaliation.

103.    Dr. Sims provided notice she was not resigning and stated, "I am ready, willing, and capable to perform my CRNA job duties and ask for my immediate return to duty."

104.    UMMS and UMMC EAP provides that, "[t]he employee may refuse this referral and this will not result in disciplinary action. It is **always** the employee's right to refuse the EAP."[1] (**emphasis added**) (See Exhibit 4).

105.    UMMC created a sham of perceiving Dr. Sims as having a mental illness and harassed her because of the perceived disability to disguise retaliation.

106.    Stigmatizing and speculating that Dr. Sims had a mental illness that made her unable to perform her essential job functions without objective evidence, by itself, is a violation of ADAAA.

107.    Upon information and belief, UMMC has not terminated a single non-black CRNA for the refusal of the voluntary EAP.

108.    Upon information and belief, UMMC has not terminated a single CRNA who had not previously accused them of discrimination for the refusal of the voluntary EAP.

109.    UMMC initially approved allowing Dr. Sims the normal appeal process for terminations. On August 25, 2015, Neddra King informed Dr. Sims that Goetz and Rowen executed the order to fire Sims, therefore Goetz would respond to Sims's first step appeal, while Rowen would handle the second step.

---

[1] https://umms-eap.org/supervisors/

19

110.     Dr. Sims expressed to King that it was an inherent conflict of interest for Goetz to have decision-making power with her termination since Sims accused Goetz of race discrimination.

111.     Amy Fulmer, UMMC Director of Human Resources, responded and rescinded approval of Dr. Sims's normal appeal process alleging Sims's separation was "one of those situations" that should not be heard through the normal appeal procedure.

112.     Dr. Sims was only allowed to appeal to Paula Henderson, Vice President of HR, whom Sims had already accused of retaliating against her.

113.     Dr. Sims alleges that Henderson then added to the retaliation, by affirming and upholding the wrongful termination.

114.     On September 3, 2015, at the appeal meeting, Henderson and King alleged to Dr. Sims that she was not terminated from UMMC because there was no reason to terminate her because she had not violated any policies.

115.     Henderson and King informed Sims that UMMC considered her separation from UMMC to be a voluntary resignation.

116.     Dr. Sims did not voluntarily resign.

117.     UMMS and UMMC wanted Dr. Sims to believe it was a "voluntary resignation" to eliminate UMMS and UMMC's liability for retaliating and unlawfully terminating her employment since UMMS and UMMC had no legitimate non-discriminatory reason to terminate Dr. Sims's employment.

118.    At other times, when it was most beneficial to UMMS and UMMC, they considered Dr. Sims to have been terminated.

**I.   UMMS and UMMC Treats Similarly Situated Comparators Better Than Sims, Despite Worse Behavior**

119.    Goetz was the supervisor of all CRNAs at UMMC.

120.    All comparators working at UMMC had same or similar job descriptions and performed same or similar job duties in same or similar working environments, though some may have been classified as "contractors."

121.    The comparators were similarly situated CRNAs who performed the same job which required equal skill, effort, and responsibility, were performed under similar working conditions, and reported to the same supervisor.

122.    On May 7, 2015, Dr. Sims received a verbal warning corrective action, for having a disagreement with anesthesia resident(s) when she requested assistance with the workload. The resident(s) complained of being offended by Sims implying they had poor work ethic, and also because she did not remember all their names.

123.    Dr. Sims signed the verbal warning corrective action form and wrote on the form that she disagreed with the allegations but signed acknowledging receipt of the verbal warning.

124.    In comparison, a white male, CRNA-1, arrived to work around 4:50 a.m. for his 7 a.m. shift, and anesthesia resident(s) alleged CRNA-1 appeared belligerent, shaky, and disheveled. CRNA-1 admitted that when the anesthesia resident asked him "[w]hy are you here so early?", he replied, "[n]one of your damn business."

125.     A controlled drug substance audit was performed on CRNA-1, revealing large quantities of controlled drugs unaccounted for.

126.     Goetz alleged that CRNA-1 possessed controlled drugs and needles in his locker and had food and drink in the operating room while providing patient care which is a federal and hospital policy violation.

127.     Also, CRNA-1 was the subject of complaints about poor and unsafe patient care. He had allegedly received previous treatment for having a serious mental and/or drug impairment while working at UMMS and UMMC.

128.     Despite discipline, poor performance, patient safety complaints, 1-2 failed FFD, and a performance improvement plan ("PIP"), CRNA-1 was allowed to continue providing patient care in operating rooms.

129.     Goetz alleged she observed CRNA-1 sleeping on the job "at least three times," while administering anesthesia during surgical cases.

130.     Goetz did not issue formal discipline to CRNA-1 for sleeping while supposedly delivering anesthesia and monitoring patients.

131.      Goetz did not require CRNA-1 to undergo FFD or drug testing despite his history of severe impairment and treatment, until later when the anesthesiologists asserted that CRNA-1 seemed unsafe when in the operating rooms caring for patients.

132.     Only later was CRNA-1 finally terminated from employment based on his objective job performance.

133.    In comparison, Dr. Sims was examined and deemed medically *fit* for duty, but UMMC still purportedly concluded she might not be able to perform her essential job functions, and she was not allowed to resume providing patient care.

134.    UMMS and UMMC provided CRNA-1 with a severance package, which included changing his termination to a resignation, and providing him with three (3) additional months of salary and benefits.

135.    UMMS and UMMC did not offer Dr. Sims a severance package despite her prior stellar job performance to retaliate because of her protected activity.

136.    CRNA-2, non-black female, was documented as performing less than competently in one (1) of six (6) areas of essential job functions.

137.    A complaint was filed against CRNA-2 for abandoning her patient—who was under anesthesia— in the operating room, and for relying on an uncertified and uncredentialled person to provide anesthesia while CRNA-2 allegedly went to pick up her child.

138.    Under Maryland state law, an CRNA can lose her license for abandoning a patient because it is deemed patient endangerment.

139.    Goetz did not discipline CRNA-2 for patient abandonment or endangerment but instead, "[CRNA-2] was only verbally counseled not to do this in the future."

140.    Overall, there were at least eight separate allegations against CRNA-2. Two of the allegations included that she used inappropriate language at work and made multiple racially charged statements about "black people."

141.    Goetz never issued corrective action or disciplined CRNA-2 for any of the complaints against her, and UMMS and UMMC allowed CRNA-2 to continue providing patient care.

142.    In comparison, there were never any complaints of unsafe patient care against Dr. Sims, and she always met or exceeded job expectations on her performance evaluations.

143.    UMMC's disparate treatment against black CRNAs was not limited to Dr. Sims. Goetz had a pattern and practice of disciplining harsher because of race.

144.    CRNA-3, a **black** woman, was issued a written warning corrective action by Goetz for leaving the job early on one occasion when she was not assigned a patient.

145.    Goetz allegedly told CRNA-3 that because Goetz was issuing her a written warning corrective action, CRNA-3 would no longer qualify for tuition reimbursement from UMMC to assist her financially with obtaining her doctorate degree.

146.    In contrast to this treatment of CRNA-3, as noted, CRNA-2, a **non-black** female, was not issued any formal discipline even when she abandoned her job duty while she was supposed to be caring for a patient under anesthesia.

147.    CRNA-4, white male, was allegedly reported to have displayed unusual behavior for several weeks. He was allegedly described as short-tempered and demanding, and as having had an outburst with an anesthesiologist in a patient care area in which he was loud and used inappropriate language. Goetz reported she believed CRNA-4 may have relapsed because of his prior self-reported history of alcohol abuse.

148.     Goetz alleged she did not think "aggressive behavior" and "complaints from others" regarding behavior in a patient care area were signs of **drug** abuse when exhibited by this white male, CRNA-4, because he had previous problems with **alcohol**.

149.     However, when Dr. Sims had a less disruptive disagreement at work that was not in a patient care area, Goetz alleged that less egregious behavior was a sign of drug abuse even though Sims had no history of either alcohol or drug problems.

150.     CRNA-5, white female, was reported for mishandling narcotics. The anesthesiologist serving as the Patient Safety and Compliance Officer allegedly reported to Goetz that CRNA-5 had mishandled narcotics and behaved unethically to hide the fact that drugs were missing. Goetz did not issue a corrective action or require CRNA-5 to undergo FFD and drug testing. CRNA-5 continued providing patient care despite the drugs never being accounted for.

151.     UMMC responded, "[CRNA-5] was counseled for mishandling the narcotics," and that "[n]otably, CRNAs are not automatically sent for an FFD upon each instance of mishandling of narcotics."

152.     In comparison, there were never any allegations reported that Dr. Sims mishandled or had narcotics unaccounted for.

153.     These examples of disparate treatment show that Goetz violated UMMC policy and procedure to require Dr. Sims to undergo FFD and drug testing while off duty with no known mishandling of narcotics, but then failed to apply policy and procedure when non-black CRNAs demonstrated worse behavior or had more serious allegations against them.

Case 1:19-cv-00295-CCB Document 33-1 Filed 12/30/19 Page 26 of 49

154.     Goetz made decisions based on the race of CRNAs. There are more non-black similarly situated comparators that received more favorable treatment than Dr. Sims.

**J.   Supervisor's Pattern and Practice of Discriminating against Black Women**

155.     In a continuing violation, from the beginning until the end of Dr. Sims's employment, Goetz harassed Dr. Sims because of her race. Goetz had a practice of discriminating against black women.

156.     During Dr. Sims employment, 2013 to 2015, there were no black female CRNAs hired full-time to work in Shock Trauma.

157.     Dr. Sims requested prior to hiring and throughout her entire employment to be hired and trained in Shock Trauma, but it never happened.

158.     Goetz continued hiring, transferring, and training non-black CRNAs to work in Shock Trauma, but did not allow Dr. Sims this opportunity despite Sims's repeated and continuous requests to do so.

159.     Another black female, CRNA-7, requested multiple times to work in Shock Trauma but was also denied.

160.     There were several non-black CRNAs allowed to train in Shock Trauma even though they had less experience and were hired after Dr. Sims.

161.     UMMC alleged that Dr. Sims was not allowed to transfer or train in Shock Trauma because she was hired for the General Operation Rooms ("GOR"). However, there were several non-black CRNAs hired to work in GOR but were transferred and/or trained to work in Shock Trauma.

162. CRNA-6, white female, was transferred from GOR to work in Shock Trauma after Dr. Sims's repeated requests for the same opportunity.

163. UMMC's stated reason for not hiring, transferring, or training Dr. Sims to work in Shock Trauma is false and pretextual, intended to conceal the actual reason which was race discrimination.

164. Of the full-time nonmanagerial CRNAs hired, trained, or transferred to work in Shock Trauma during Dr. Sims employment, none of them were black.

165. Goetz had a pattern and practice of discriminating against black women in hiring, training, disciplining, and firing.

166. Around June 2013, Goetz had staffed up to or over capacity with CRNAs. Goetz selected CRNA-8, the most senior black female in GOR for layoff. CRNA-8 was the only CRNA laid off in GOR.

167. Around June 2015, Goetz had staffed up to or over capacity with CRNAs again, and on June 18, 2015, Goetz alleged the most senior black female CRNA in GOR, Dr. Sims, was most likely a drug addict for no valid reason.

**K. UMMC Spoliates Sims Peer Evaluations to Hide Goetz Discriminatory Actions**

168. UMMC refused to share Dr. Sims's peer evaluations with the Baltimore City Community Relations Commission ("BCCRC") during the investigation of Sims's charge of discrimination.

169. UMMC claimed even if the peer evaluations were positive it was irrelevant so they would not produce.

170. BCCRC served a subpoena on UMMC to retrieve the peer evaluations.

171.    UMMC then alleged Dr. Sims's peer evaluations were not available because they had been disposed of.

172.    UMMC intentionally spoliated Dr. Sims's peer evaluations because they were inconsistent with Goetz's false accusations that Dr. Sims appeared to be committing a crime at work and behaving like a drug addict.

## VI.    STATEMENT OF CLAIMS

### COUNT I:    RACE DISCIMINATION- Discriminatory Hiring & Work Assignments
[Title VII and §1981] against UMMS and UMMC; [§ 1981] against Goetz

173.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

174.    Defendant UMMS and UMMC discriminated against Dr. Sims on account of race by denying her opportunity to work in Shock Trauma.

175.    Dr. Sims was qualified to be hired, transferred, and/or trained to work in Shock Trauma.

176.    Dr. Sims emailed Goetz on March 5, 2012, requesting to be hired to work in Shock Trauma. Goetz acknowledged the request.

177.    Dr. Sims continued to request to be hired in Shock Trauma from 2012 through 2015. Dr. Sims would specifically ask Goetz if Sims was still on the list to be transferred and/or trained in Shock Trauma. Goetz would always affirm that Dr. Sims remained on the list and Sims's request was active.

178.    Goetz never hired, transferred, or trained Dr. Sims in Shock Trauma because of her race.

179.   Goetz continued hiring, transferring, and/or training non-black CRNAs in Shock Trauma even those with less education and experience than Dr. Sims.

180.   Accordingly, the denial violated both Title VII and Section 1981.

181.   As a result of the denied equal opportunity, Dr. Sims was denied valuable professional experience and training.

182.   Also, Dr. Sims was denied the additional financial compensation that Shock Trauma CRNAs could receive. For example, CRNAs that worked in Shock Trauma could make up to $1,200 extra each shift for staying beyond a shift.

183.   Dr. Sims suffered a significant loss of income and emotional harm from being discriminatorily denied an opportunity to work in Shock Trauma.

184.   UMMS, UMMC, and Goetz's actions of denying Dr. Sims the opportunity to work in Shock Trauma were deliberate, willful, malicious, reckless, and imposed in callous disregard of Sims's Title VII and/or §1981 rights, warranting an award of punitive damages.

**COUNT II:   RACE DISCIMINATION— FFD, Alcohol and Drug Testing**
[Title VII and §1981] against UMMS and UMMC; [§1981] against Goetz

185.   Dr. Sims re-alleges and incorporates each and every allegation of this Complaint.

186.   A Fitness for Duty ("FFD"), which included alcohol and drug testing, was disparately forced on Dr. Sims with no objective evidence that she was a direct threat or unable to safely perform her duties.

187.   UMMS and UMMC admits, Dr. Sims's "performance of clinical duties and patient care was not at issue."

29

188.    Dr. Sims was never accused during her entire employment at UMMS and UMMC of being unable to perform the essential job functions of her job as an CRNA based on objective job performance.

189.    Dr. Sims was always able to safely perform all her job duties as an CRNA her entire employment at UMMS and UMMC without any accommodations.

190.    UMMS and UMMC compelled Dr. Sims to pull down her underwear and be **observed** urinating into a cup because of innocent behavior that Goetz amounted to a felony.

191.    For example, Goetz stated that a behavior of Dr. Sims that Goetz had previously praised was the basis, in part, for suspecting that Dr. Sims was stealing drugs and self-injecting them while at work.

192.    Previously, on November 3, 2014, Goetz completed Dr. Sims annual performance evaluation. In the section of, "[b]riefly describe this CRNAs strengths:" Goetz wrote, "[c]onsistently volunteers to stay beyond her shift to help out. Great work ethic. Keep up the good work."

193.    Yet, when Goetz hired an abundance of non-black CRNAs and was staffed up to or over capacity, Goetz accused Dr. Sims, a black woman, of criminal activity because she "stays well beyond the end of her shift."

194.    In addition, Dr. Sims had emailed Goetz at the beginning of her employment on August 25, 2013, about two years prior to the FFD, informing Goetz that she works beyond her shift to learn and help out. Goetz acknowledged the email.

195.    Goetz never expressed any concerns to Dr. Sims that working beyond her shift was inappropriate.

Case 1:19-cv-00295-CCB Document 33-1 Filed 12/30/19 Page 31 of 49

196.    Goetz falsely claimed on June 18, 2015, she had observed Dr. Sims and had another supervisor do the same and that they agreed that Sims was most likely stealing her patients' drugs and self-injecting them while at work.

197.    It was later revealed that Goetz had not seen Dr. Sims in the operating rooms in months.

198.    The FFD policy of UMMC states, "[w]hen an employee reports for duty, or is on duty and appears to be unfit or appears to be under the influence of drugs and/or alcohol, the supervisor shall refer...for a Fitness for Duty Evaluation" and the FFD referral "must follow the procedure outlined in this policy."

199.    Dr. Sims was suspended from work due to Goetz's baseless and malicious accusation and suffered significant financial loss and emotional harm. As a direct and proximate cause of Goetz accusing Dr. Sims of a crime and being under the influence of drugs while at work, Dr. Sims had a financial loss of thousands of dollars.

200.    Dr. Sims was off-duty on a vacation leave on the day of FFD, thus the FFD with alcohol and drug testing was not job-related or consistent with business necessity, and a violation of UMMC own policies.

201.    Indeed, Defendant's Employee Health Services (EHS), Employee Assistance Program (EAP), and Human Resources (HR), all agreed it was unusual practice and inconsistent with policy to require an employee to undergo an FFD and drug testing while an employee is off-duty.

202.    Goetz knew her actions against Dr. Sims were unwarranted, so Goetz violated policy, submitted false and misleading allegations, refused to provide Sims an

explanation or rationale prior to FFD, and reviewed the controlled substance audit *after* the FFD and drug testing to harass Dr. Sims because of her race.

203.     Goetz did not require non-black CRNAs, with the same job duties and responsibilities to undergo the FFD process even when the circumstances surrounding them was the same or worse.

204.     Further, Goetz admitted she suspected Dr. Sims of drug abuse, in part, for the same reasons that she had previously alleged she did not think were signs of drug abuse when exhibited by a similarly situated white male, CRNA-4.

205.     Accordingly, the FFD, drug and alcohol testing, and work suspension were discriminatory on the basis of race, in violation of Title VII and Section 1981.

206.     UMMS's and UMMC's actions of suspending Dr. Sims from work and requiring her to undergo the FFD, alcohol, and drug testing because of her race were deliberate, willful, malicious, reckless, and imposed in callous disregard of Sims's rights, warranting an award of punitive damages.

### COUNT III: ADA — Prohibited Medical Examinations and Disability-Related Inquiries
[ADAAA] against UMMS and UMMC

207.     Dr. Sims re-alleges and incorporates each and every allegation of this Complaint.

208.     Dr. Sims always safely performed all her job duties as an CRNA her entire employment at UMMC without any accommodations.

209.     Dr. Sims was meeting UMMS's and UMMC's legitimate expectations in her job performance.

210.     Dr. Sims provided safe, high-quality care without any patient harm or errors her entire employment at UMMS and UMMC.

211.     Dr. Sims was competent and qualified at all times in her job position based on her objective job performance.

212.     At all times, Dr. Sims had the necessary prerequisites including education, certification, license, and credentialed clinical privileges. All of these were active and in good-standing throughout her entire employment.

213.     Prior to Goetz's false, misleading, and subjective speculation that Dr. Sims was committing a crime and self-injecting drugs at work, Sims was working full-time, full-duty, and performing the essential functions of her job position as an CRNA, without any accommodations.

214.     UMMS and UMMC admits that it relied upon Goetz's arbitrary speculation, which was false and unsubstantiated, to require Dr. Sims to submit to a medical examination, disability-related inquiries, and drug and alcohol testing, while off-duty.

215.     At UMMS and UMMC, Dr. Sims was always able to perform the essential function of her job as an CRNA without accommodations; and never posed a direct threat based on objective evidence.

216.     Medical examinations and alcohol testing that are not job-related or consistent with business necessity are prohibited under ADA. This protection applies to all employees not just those with disabilities.

217.     Specifically, the ADA provides:

[An employer] shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual

33

with a disability or as to the nature and severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C § 12112(d)(4); 29 C.F.R § 1603.13(b). The statutory language makes clear, this provision of the ADA applies to all employees, not just disabled employees.

218.    An inquiry is "job-related and consistent with business necessity" if an employer "has a reasonable belief, based on objective evidence, that...an employee's ability to perform essential job functions will be impaired by a medical condition." EEOC, Notice No. 915.002, Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (2000).[2]

219.    Dr. Sims was off-duty on vacation leave on the day of the required medical examination and alcohol testing. Goetz had no reasonable belief based on objective evidence, that: (1) Sims was on duty any day and unable to perform her essential job functions; or (2) Sims posed a direct threat.

220.    Therefore, the medical examination, disability inquiries, and alcohol testing for the FFD were prohibited medical exams because they were not job-related or consistent with business necessity.

221.    The protection afforded to Dr. Sims under ADAAA is not negated because she is a healthcare provider. Goetz did not violate the ADAAA rights of non-black CRNAs even when there was objective evidence that warranted medical examination, disability inquiries, and alcohol testing.

---

[2] http://www.eeoc.gov/policy/docs/guidance-inquiries.html

34

222. UMMS and UMMC admits, Dr. Sims's "performance of clinical duties and patient care was not at issue."

223. UMMS and UMMC requiring Dr. Sims to undergo a medical examination or alcohol testing without objective evidence that she was unable to perform her essential job duties or posed a direct threat was a violation of ADAAA.

224. UMMS's and UMMC's actions of requiring Dr. Sims to undergo prohibited medical examinations and disability-related inquiries without objective evidence while she was off-duty on vacation leave were deliberate, willful, malicious, reckless, and imposed in callous disregard of Sims's ADAAA rights, warranting an award of punitive damages.

### COUNT IV: ADA— Regarded As Disabled
[ADAAA] against UMMS and UMMC

225. UMMS and UMMC treated Dr. Sims as if she was unable to perform her essential job duties as an CRNA when UMMC removed her from work and placed her on suspension because Brown's memo purportedly indicated that Sims had "paranoia."

226. Dr. Sims had been declared fit for duty by UMMC own doctor and free of any physical, mental, or substance impairments on June 22, 2015.

227. Dr. Frisch, UMMC Medical Director of Employee Health Services, certified Dr. Sims fit for duty on June 22, after Sims was determined to not be under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects her ability to safely and competently perform her job duties as an CRNA.

228. Seven (7) days later, UMMC alleged Dr. Sims might have a mental impairment that would make her unable to safely care for patients without any

35

objective evidence to support their frivolous and malicious speculation, and contrary to their own medical doctor's determination.

229.   Dr. Sims was qualified to perform her job duties as an CRNA without accommodations and was legitimately meeting UMMC job performance expectations.

230.   Dr. Sims was placed on paid and unpaid suspension supposedly because Brown's memo, "[C]aused UMMC to question whether [Sims] [was] able to safely care for patients."

231.   UMMS and UMMC removal of Dr. Sims from work because UMMS and UMMC purports to have believed Sims could not safely perform her essential job duties without objective evidence is a violation of ADAAA, and also not credible.

232.   The FFD policy of UMMC states an employee may be required to "report to *Employee Health Services (EHS)* for an evaluation if he/she…may be unable to perform their job duties in a safe and effective manner," and FFD referral, "*must* follow the procedure outlined in this policy." *(emphasis added)*

233.   UMMS and UMMC admits, "[d]uring this time, Dr. Melissa Frisch, Director of Employee Health Services, was consulted, and she agreed that there was no need to have Ms. Sims meet with Employee Health again."

234.   UMMC never issued notice to Dr. Sims prior to termination that a second FFD was required or followed the FFD policy.

235.   UMMC did not remove other CRNAs from work based on the possibility or speculation of being unsafe that had not opposed discrimination or retaliation.

236. In addition to the similarly situated comparator, CRNA-2, that abandoned and endangered her patient under anesthesia and only received informal verbal counseling, there are other comparators that were unsafe and continued working in the operating rooms.

237. For example, CRNA-9, is a white male that was issued a formal corrective action for unsafe patient care.

238. Goetz wrote, "[n]ot checking blood is also a violation of policy and safe patient care." Administering the wrong blood to a person can result in the immediate death of that person within a few minutes due to ABO incompatibility reaction.

239. Even when CRNA-9's objective job performance could have resulted in the death of a patient, he was not removed from work like Dr. Sims even though her patient care was impeccable and lauded. CRNA-9 continued working in the operating rooms providing patient care despite his unsafe practice.

240. CRNA-1 was also treated more favorably like CRNA-9, because they were both white males whom had not complained of protected activity.

241. Goetz alleged she saw CRNA-1 sleeping in the operating rooms while providing anesthesia to patients "at least three times" and he was not immediately removed from work due to the possibility of being unsafe. When he was sent for FFDs based on objective job performance, he failed at least one (1) FFD because of a serious mental and/or substance impairment. He was allowed to continue working in operating rooms despite concerns that he was unsafe.

37

242.    Further, it is undisputed that Brown was promoted, and his salary increased by UMMS and UMMC on the day of his memo.

243.    It is also true that Brown had received notice of Dr. Sims's discrimination complaint prior to creating and distributing his retaliatory memo that caused her direct and proximate harm, including financial loss exceeding $1,000,000.

244.    UMMS and UMMC created a sham with a bogus memo to portray and stigmatize Dr. Sims as having a mental illness then harassed her with ill-will based on the perceived disability that they created to retaliate against her.

245.    UMMS and UMMC violated ADAAA by harassing, placing on paid and unpaid suspension, and terminating Dr. Sims because UMMS and UMMC perceived her to have a disability, even though she did not.

246.    UMMC harassed and regarded Dr. Sims as having a perceived disability by, among other things,: entering false statements into her HR records that she had been out of work for several days due to her own illness; trying to entice and coerce her through pay and threat of termination that she could continue her employment if she got a doctor to certify her as having a serious mental illness; trying to force her to go to the voluntary EAP to talk with a counselor; terminating her employment because of her refusal to attend the voluntary EAP which "[i]t is always the employee's right to refuse the EAP" and, "[T]his will not result in disciplinary action"; and refusing her the normal appeal procedure for terminations that is offered to non-disabled employees.

Case 1:19-cv-00295-CCB Document 33-1 Filed 12/30/19 Page 39 of 49

247.   UMMS's and UMMC's actions of perceiving and treating Dr. Sims as disabled were deliberate, willful, malicious, reckless, and imposed in callous disregard of Sims's ADAAA rights, warranting an award of punitive damages.

### COUNT V:   RETALIATON
[Title VII] against UMMS and UMMC; [§1981] against UMMS and UMMC, Rowen, Goetz

248.   Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

249.   It is undisputed, Dr. Sims engaged in protected activity immediately prior to the adverse actions that followed her race discrimination complaint.

250.   Paula Henderson, Vice President of Human Resources, wrote, "[y]ou also complained that the FFD referral was discriminatory and stated that you were subject to discrimination and harassment prior to the FFD." Henderson further stated, "[y]ou previously submitted concerns regarding discrimination and retaliation by email and in-person. These concerns have been received and are being investigated."

251.   Dr. Sims filed additional and separate complaints to UMMS and UMMC alleging disability discrimination and ongoing retaliation, but UMMS and UMMC failed to investigate her complaint of disability discrimination and retaliation, to further retaliate for her prior and separate complaint of race discrimination.

252.   Dr. Sims had notified UMMS and UMMC that she would be utilizing the EEOC.

253.   Among other things, defendants retaliated against Dr. Sims because of her race and/or disability discrimination complaints, and/or her retaliation complaints by: 1) placing her on paid and unpaid suspension; 2) drafting an PIP that altered Dr. Sims work schedule that would cause her a loss of thousands of dollars each month; 3)

creating a retaliatory memorandum that attributed false statements to her to portray a mental illness; 4) treating her as if she was disabled or posed a direct threat; 5) failing to investigate Dr. Sims's additional and separate complaints of disability discrimination and retaliation; 6) considering her to have resigned when she did not, ultimately terminating her employment for the refusal of the EAP which is voluntary, and refusal does not result in disciplinary action; 7) rescinding and refusing to provide her the normal appeal procedure; and 8) failing to offer her a severance package when offered to a similarly situated comparator that had not engaged in protected activity.

254.    All defendants were unrelenting in retaliating against Dr. Sims despite knowing her "performance of clinical duties and patient care was not at issue."

255.    The temporal proximity of Dr. Sims's protected activity protests to the adverse actions is so very close and profound.

256.    Defendants terminated Dr. Sims's employment, in violation of Title VII, Section 1981, and/or the ADAAA to retaliate against her for complaining of discrimination and/or retaliation.

257.    Rowen and Goetz were directly involved by directing and authorizing the termination of Dr. Sims employment to retaliate against her; and also, by directing and/or authorizing some or all of the adverse actions following the race discrimination complaint.

258.    As a result of the termination, Dr. Sims has suffered damages, both financial and emotional. Her financial damages exceed $1,000,000.

259.    Defendant Lisa Rowen, UMMC Senior Vice President of Patient Care Services and Chief Nursing Officer, advised Goetz to have "perfect documentation" to justify requiring Dr. Sims to undergo FFD and drug testing in anticipation of the "EEOC."

260.    Defendant Rowen wrote, "[b]e extremely scrupulous with your documentation – I can't stress this enough."

261.    Defendant Rowen was aware that the FFD and drug testing had been completed. Yet, Rowen advised Goetz to document after-the-fact because, "[I] have a feeling your documentation will be viewed by a lot of internal and external agencies."

262.    Goetz replied, "I get it now….I understand what you are saying, and I will document accordingly."

263.    Suspiciously, all of Dr. Sims peer evaluations, which were overwhelmingly positive and included daily evaluations from anesthesiologists and 360° peer evaluations, were disposed of even though many had just been received prior to the FFD referral.

264.    Yet, Goetz proffered the negative notes she had supposedly written and maintained in pristine condition throughout Dr. Sims entire employment.

265.    At all times after Dr. Sims complained that the FFD was discriminatory on the basis of race, Defendants Rowen and Goetz were directly involved in the retaliatory actions and decision-making about Dr. Sims.

266.    Jeffrey Rivest, UMMC President and CEO wrote, "[Rowen] has briefed me on your meeting and I have asked her to continue to serve as your point of contact as

Human Resources investigates your complaints....I will continue to monitor this matter through [Rowen]."

267.   At all times, Defendant Rowen had decision-making power over the adverse actions against Dr. Sims, and the authority to not allow the retaliation or to direct it.

268.   During the meeting on June 24, Defendant Rowen had threatened Dr. Sims's job and informed that Sims would soon find out what would happen to her for bringing a discrimination complaint against Goetz.

269.   Defendants Rowen and Goetz intentionally caused adverse actions to be taken against Dr. Sims in retaliation for her statutorily protected activity.

270.   Defendants Rowen and Goetz directly violated Dr. Sims's rights to contractual equality at her employment by participating, persuading, directing, advising, encouraging, and/or allowing all, or some, of the adverse actions after Sims's protected activity to retaliate against Sims.

271.   About five (5) months after Dr. Sims termination was final and unappealable, it was announced that Defendant Rowen was promoted to a new position and title, Chief Nurse Executive for UMMS.

272.   Both, UMMS, UMMC, and Lisa Rowen, failed to take all reasonable steps to prevent and redress discrimination and retaliation against Dr. Sims.

273.   All defendants' actions of retaliating against Dr. Sims were deliberate, willful, malicious, reckless, and imposed in callous disregard of Sims's rights warranting an award of punitive damages. UMMS and UMMC violated ADAAA, Title

42

VII, and §1981 to retaliate; and Defendants Rowen and Goetz violated §1981 to retaliate against Sims.

## COUNT VI: HOSTILE WORK ENVIRONMENT (RACE)
[Title VII and §1981] against UMMS and UMMC; [§1981] against Goetz

274.    Plaintiff re-alleges and incorporates each and every allegation of this Complaint.

275.    Supervisor Goetz's behavior and actions created a severe and pervasive hostile environment at UMMS and UMMC for Dr. Sims because of her race.

276.    UMMS and UMMC alleged that Goetz holding a job offer for Dr. Sims in 2013 until she retook and passed her national certification exam ("Boards") to practice as an CRNA negates Sims's allegations of racial animus.

277.    Dr. Sims failed her Boards by two (2) points on the first attempt. She believes this happened because she studied from books instead of the well-known commercial comprehensive reviews that most students utilize. Dr. Sims chose to study from books because she tries to avoid taking short-cuts in life.

278.    Dr. Sims immediately contacted and informed Goetz that she had failed her Boards and requested her hire date be postponed by 4-6 weeks to allow her time to study a commercial comprehensive review.

279.    Goetz immediately started yelling and berating Dr. Sims over phone because she had failed her Boards. Goetz said that Sims failure was a sign that she may not be good enough for a job at UMMS and UMMC.

280.    Goetz stated that she would not allow Dr. Sims 4-6 weeks to retake and pass her Boards. Goetz allowed Sims about two (2) weeks and put Sims on notice that

she would not be hired at UMMS and UMMC if she did not pass her Boards within about two (2) weeks.

281.    Dr. Sims explained to Goetz that Sims needed more than two (2) weeks to retake and pass the exam because she could no longer live on her college campus as she had during graduate school so she would need to move from Richmond, Virginia, to Towson, Maryland, with no furniture or bed and try to establish living conditions.

282.    Goetz said that was not her problem and that Sims should have thought about that before she foolishly failed her Boards.

283.    Dr. Sims moved to an empty apartment and slept on the floor at night and studied during the day for about two weeks. She had not been employed for about three (3) years due to attending graduate school. Thus, she had over $150,000 in student loans, barely any money, and an almost maxed-out credit card.

284.    Dr. Sims retook Boards in about two (2) weeks and passed with a score in the top percentile of her class. Her score increased by almost one-hundred (100) points.

285.    When non-black CRNAs faced difficult times or struggles, Goetz reacted more favorably toward them.

286.    For example, CRNA-10, non-black female, started working at UMMC and had many difficulties during orientation including complaints against her that she was not performing satisfactorily and was unsafe. Goetz worked directly alongside her in the operating rooms and offered her guidance and support.

287.    CRNA-11, white female, admitted to Dr. Sims and others that she felt some responsibility for the death of a patient at UMMC. CRNA-11 requested a meeting

to confide in Goetz that her actions may have played a role in the death of a patient. CRNA-11 told Sims that Goetz was very supportive during their meeting about the patient's death and told her not to worry about it that nothing would happen to her.

288.    Contrary to CRNA-10 and CRNA-11's treatment, CRNA-12 was a black male and forced to quit or terminated when he had difficulties and complaints against him during his orientation.

289.    Goetz treating black CRNAs worse because of their race is a pattern and practice that Dr. Sims observed throughout her entire employment.

290.    Soon after Dr. Sims passed Boards and began working at UMMC, Goetz went out of her way to humiliate Dr. Sims in the beginning days.

291.    Dr. Sims was explaining to Goetz that she had no experience and was unable to safely perform a procedure on a patient without negligently risking the patient's life, so she refused the assignment because a patient's life was at stake. Dr. Sims refused to knowingly take a chance on killing someone.

292.    Goetz told Dr. Sims that she was acting "argumentative and aggressive like the average black woman," because she refused the assignment.

293.    Indeed, Dr. Sims started crying due to the verbal abuse and threat that she would get fired if she ever refused to perform a procedure regardless of the risk, and her supervisor **kicked** her and told her to "put her big girl panties on" and "get out there and prove [herself]" worthy to work at UMMC.

294.    HR alleged that Goetz admitted she "kicked" the chair that Dr. Sims was sitting in but not Sims directly.

45

295.    Goetz did not require non-black CRNAs, with the same job duties, to take medically improper risks with patients' lives to prove they were worthy to work at UMMC or kick them while threatening their job.

296.    Goetz did not accuse similarly situated non-black CRNAs of stealing drugs or self-injecting drugs for the same or worse reasons than Dr. Sims.

297.    Goetz did not draft a Performance Improvement Plans (PIP) for similarly situated that had not violated a policy.

298.    Soon after Dr. Sims filed a race discrimination complaint, Goetz began drafting a Performance Improvement Plan ("PIP") that altered Dr. Sims's work schedule in such a way that Sims would suffer a financial loss of thousands of dollars each month. UMMS and UMMC wrote, "[a]nticpating Ms. Sims' return after drug screen and evaluation came back negative, Ms. Goetz and Ms. King had begun to draft a PIP...."

299.    At that time, both King and Goetz were aware of Dr. Sims discrimination complaint. King was supposedly investigating the discrimination and/or retaliation complaint at the time that she and Goetz were together retaliating against Dr. Sims.

300.    Goetz began making employment decisions based on Dr. Sims's race throughout Sims entire employment beginning at hiring and ultimately ending at termination.

301.    Goetz was the supervisor of Dr. Sims. This supervisor's conduct was imputable to UMMS and UMMC.

302.    Dr. Sims suffered emotional harm from the unwelcomed abuse that was because of her race.

303.    Dr. Sims's subjectively and objectively believed her work environment to be hostile.

304.    CRNA-3, a black woman, separately told Dr. Sims and BCCRC that she resigned from UMMS and UMMC because supervisor Goetz created a hostile work environment for black female CRNAs.

305.    Goetz created a workplace that was pervaded by harassment and severe abuse toward Dr. Sims by all of the allegations against Goetz in this Complaint, among other things. The workplace was intimidating, humiliating and stigmatizing. The hostile workplace environment posed a formidable barrier to Sims's participation in the workplace.

306.    As a result of Goetz's unlawful harassment and discrimination against Dr. Sims because of her race, Sims has suffered both emotional and financial harm throughout her entire employment at UMMC beginning with Goetz's failure to hire Sims in Shock Trauma in April 2013 to her termination in 2015.

307.    Goetz's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of Sims's Title VII and §1981 rights entitling her to punitive damages.

## VII.    PRAYER FOR RELIEF

**WHEREFORE, the Plaintiff, Dr. Sims, prays that the Court grant her the following relief:**

(a)    Full back pay, front pay, and benefits.

47

(b)     Compensatory damages, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional and consequential harms— including tax liabilities inflicted upon Dr. Sims on account of the necessity of bringing this action-- caused by Defendants

(c)     Punitive damages against Defendants, to punish their conduct and deter future recurrence.

(d)     Prejudgment and post judgment interest;

(d)     Reasonable attorneys' fees, expenses and costs;

(e)     Posting of notices on Defendants' premises notifying employees that Defendants have violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation;

(f)     Such other relief as the court shall deem just and proper.

### JURY TRIAL DEMAND

The Plaintiff demands a jury trial on all issues.

Original Complaint Filed:
January 30, 2019

Respectfully submitted,

_____
Faresha L. Sims, **Pro Se**
212 Washington Ave 1105
Towson, Maryland 21204
Telephone: (601) 519-8585
Email: faresha@yahoo.com
Pro Se Plaintiff Faresha Sims

First Amended Complaint Filed:
December 30, 2019

Respectfully Submitted,

_____
/s/
Jamie D. Travis (Bar No. 99692)
Gibbs Travis, PLLC
210 East Capitol Street, Suite 1801
Jackson, Mississippi 39201
Phone: (601) 487-2621
Fax: (601) 366-4295

48

jtravis@gibbstravis.com
*admitted Pro Hac Vice

Lorenzo Williams (Bar No. 249874)
Gary Williams Parenti Watson and Gary, PLLC
221 SE Osceola St.
Stuart, FL 34944
Phone: (772) 283-8260
Fax: (772) 287-8494
lw@williegary.com
*admitted Pro Hac Vice

Terris C. Harris (Bar No. 99433)
Maples Harris, PLLC
198 Charmant Place, Suite 2
Ridgeland, MS 39157
Phone: (601) 790-7600
Fax: (866) 860-3857
terris@maplesharris.com
*admitted Pro Hac Vice

Pat M Woodward Esq Counselor at Law (Federal No. 16620)
1783 Forest Dr. No. 330
Annapolis, MD 21401
Phone: (202) 246-4679
Fax: (410) 216-9812
patmwoodwardjr@gmail.com

**Attorneys for Plaintiff**