**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **FARESHA SIMS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:19-cv-00295-CCB** |
| **UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION, et al.,** | |
| **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated: May 3, 2021

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

/s/ Grace E. Speights
Grace E. Speights (Fed. Bar No. 05254)
Jocelyn R. Cuttino (Fed. Bar No. 21434)
Andrea N. Threet (pro hac vice)
1111 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001
grace.speights@morganlewis.com
jocelyn.cuttino@morganlewis.com
andrea.threet@morganlewis.com

Vishal H. Shah (pro hac vice)
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
vishal.shah@morganlewis.com

*Attorneys for Defendants*

DB1/ 120484861.19

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ............................................................................................. 1

II.    STATEMENT OF UNDISPUTED FACTS ................................................... 3

       A.    The Medical Center's Anesthesiology Department ............................... 3

       B.    Substance Abuse Issues in the Anesthesiology Field ........................... 4

       C.    Ms. Sims's Employment with the Medical Center ............................... 7

       D.    Ms. Sims's Behavioral Changes and Request for a First Fitness for Duty
             Evaluation ........................................................................................... 8

       E.    The Medical Center's Additional Concerns and Request for a Second
             Fitness for Duty Evaluation ............................................................... 13

       F.    Ms. Sims's Employment with Johns Hopkins .................................... 16

III.   LEGAL STANDARD .................................................................................. 16

IV.    ARGUMENT ............................................................................................... 17

       A.    Summary Judgment Is Warranted on Ms. Sims's Race Discrimination
             Claims ................................................................................................ 17

             1.    Ms. Sims's claim based on alleged discriminatory hiring and work
                   assignments fails because it is time-barred and does not involve
                   any adverse employment action. ............................................... 17

             2.    The fitness for duty referral likewise cannot form the basis of a
                   discrimination claim and, even if it could, there is no evidence that
                   it was motivated by racial animus. ............................................ 19

       B.    Ms. Sims's Disability Discrimination Claims in Counts III and IV Also
             Fail as a Matter of Law ...................................................................... 22

             1.    The requested fitness for duty evaluations were not impermissible
                   medical examinations because they were job-related and consistent
                   with business necessity. ............................................................ 23

             2.    Ms. Sims was not "regarded as" disabled when she was referred
                   for a second fitness for duty evaluation. ................................... 24

       C.    There Is No Evidence to Support Ms. Sims's Retaliation Claim ....... 25

       D.    Ms. Sims Has Not Established and Cannot Establish a Hostile Work
             Environment Claim ............................................................................ 26

       E.    Regardless of Whether Ms. Sims's Claims Have Merit, Her Claim for
             Back Pay Damages Is Foreclosed Because Her Damages Were Fully
             Mitigated ........................................................................................... 27

V.     CONCLUSION ............................................................................................ 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Allen v. Napolitano*,
774 F. Supp. 2d 186 (D.D.C. 2011) ..................................................................................26

*Anderson v. Liberty Lobby, Inc*.,
477 U.S. 242 (1986).............................................................................................16, 17

*Barnum v. Ohio State Med. Ctr.*,
Case No. 2:12-cv-930 (Doc. 81) (D. Ohio Feb. 24, 2015) ................................23, 25

*Barnum v. Ohio State Med. Ctr.*,
642 F. App'x 525 (6th Cir. 2016) .....................................................................24, 25

*Blair v. Ravenswood Village Health Ctr.*,
43 F. Supp. 2d 586 (S.D. W. Va. 1998), *aff'd*, 173 F.3d 849 (4th Cir. 1999) ........17

*Blasic v. Chugach Support Servs., Inc.*,
673 F. Supp. 2d 389 (D. Md. 2009) ...............................................................27

*Bryant v. Bell Atl. Md., Inc.*,
288 F.3d 124 (4th Cir. 2002) .........................................................................22

*Carroll v. Town of Univ. Park*,
12 F. Supp. 2d 475 (D. Md. 1997), *aff'd*, 155 F.3d 558 (4th Cir. 1998) ................20

*Evans v. Techs. Applications & Serv. Co.*,
80 F.3d 954 (4th Cir. 1996) .........................................................................18

*Flanary v. Baltimore Cty.*,
No. CCB-16-3422, 2017 WL 1953870 (D. Md. May 11, 2017) (Blake, J.)..........23

*Foster v. Tex. Health Sys.*,
No. CIV.A.3:99–CV–1217–L, 2002 WL 1461737 (N.D. Tex. June 30, 2002)......19

*Foster v. Univ. of Md.-E. Shore*,
787 F.3d 243 (4th Cir. 2015) .........................................................................25

*Grier v. Casey*,
643 F. Supp. 298 (W.D.N.C. 1986) ...............................................................20

*Haywood v. Locke*,
387 F. App'x 355 (4th Cir. 2010) ...................................................................22

*Holland v. Wash. Homes, Inc.*,
    487 F.3d 208 (4th Cir. 2007) ...................................................................................18, 19, 20

*Langerman v. Thompson*,
    155 F. Supp. 2d 490 (D. Md. 2001) ......................................................................................20

*McCain v. Waste Mgmt., Inc.*,
    115 F. Supp. 2d 568 (D. Md. 2000) ......................................................................................21

*McIntyre-Handy v. W. Telemarketing Corp.*,
    97 F. Supp. 2d 718 (E.D. Va.), *aff'd*, 238 F.3d 413 (4th Cir. 2000)......................................17

*Nguyen v. CNA Corp.*,
    44 F.3d 234 (4th Cir. 1995) ................................................................................................16

*Porter v. U.S. Alumoweld Co.*,
    125 F.3d 243 (4th Cir. 1997) ..............................................................................................23

*Ramos v. Healthcare, Inc.*,
    963 F. Supp. 2d 511 (E.D. Va. 2013), *aff'd*, 603 F. App'x 173 (4th Cir. 2015).....................22

*Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*,
    673 F.3d 294 (4th Cir. 2012) ..............................................................................................17

*Royal v. Kirschling*,
    No. CV CCB-19-2825, 2020 WL 1849712 (D. Md. Apr. 13, 2020) (Blake, J.), *aff'd*, 835 F.
    App'x 699 (4th Cir. 2021) ...................................................................................................24

*Semsroth v. City of Wichita*,
    548 F. Supp. 2d 1203 (D. Kan. 2008), *aff'd*, 555 F.3d 1182 (10th Cir. 2009) .......................19

*Spriggs v. Diamond Auto Glass*,
    242 F.3d 179 (4th Cir. 2001) ..............................................................................................16

*Sturdivant v. City of Salisbury*,
    No. 1:09CV468, 2011 WL 65970 (M.D.N.C. Jan. 10, 2011), *report & recommendation
    adopted*, 2011 WL 806381 (M.D.N.C. Mar. 2, 2011) ...........................................................19

*Tcheskidova v. ITT Fed. Servs.*,
    Civil No. AMD 07-91, 2008 WL 3085694 ......................................................................19, 23

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013)............................................................................................................25

*White v. BFI Waste Servs., LLC*,
    375 F.3d 288 (4th Cir. 2004) ..............................................................................................18

**STATUTES**

42 U.S.C. § 1981 ................................................................................................ *passim*

42 U.S.C. § 2000e ("Title VII")....................................................................... *passim*

42 U.S.C. § 2000e-5(g)(1) ...................................................................................27

Americans with Disabilites Act of 1990 ("ADA"),      42
    U.S.C. 12101 *et seq*................................................................................. *passim*

42 U.S.C. § 12112(d)(4)(A) .................................................................................23

42 U.S.C. § 12117.................................................................................................27

**OTHER AUTHORITIES**

29 C.F.R. pt. 1630, App. § 1630.14(c)................................................................23

https://www.aana.com/docs/default-source/wellness-aana.com-web-documents-(all)/substance-
    use-disorder-(sud)-in-the-workplace.pdf?sfvrsn=bf264bb1_2 ...................................5

Fed. R. Civ. P. 56(a) ...........................................................................................16

## MEMORANDUM OF LAW

Defendants University of Maryland Medical System Corporation (the "Medical System"), University of Maryland Medical Center, LLC (the "Medical Center"), Lisa Rowen, and Linda Goetz move this Court for summary judgment on all claims brought by Plaintiff Faresha Sims in this matter on the following grounds.

## I.    INTRODUCTION

Ms. Sims's employment with the Medical Center as a certified registered nurse anesthetist (CRNA) ended when she refused to confirm that she could safely provide anesthesia to patients after exhibiting concerning behavioral changes at work. Starting in May 2015, several of Ms. Sims's colleagues reported that she was displaying uncharacteristic aggression and mood changes, as well as refusing to leave the hospital at the end of her shifts. Under the Medical Center's policies and industry guidance, these behaviors are recognized indicators of substance abuse—a prevalent issue among anesthesia professionals—and they warrant a fitness for duty evaluation. A fitness for duty evaluation is not an accusation of drug abuse; rather, it is a measure meant to confirm that a medical professional is not a threat to patient safety. And initially, Ms. Sims did in fact confirm that she was not a threat and could return to work. But that confirmation was called into question when Ms. Sims did not return to work and instead engaged in more concerning behavior.

Ms. Sims called out sick after she was cleared to work and, while she was out, told an on-campus security officer and a human resources (HR) business partner that:

- She was "afraid to come to work" because her supervisors were "conspiring to hurt" her by having her following and attempting to run her off the road;

- She was receiving "prank phone calls and threats" from her supervisors;

- Her supervisors were showing up at her home and there was a "probable unauthorized invasion" at her apartment;

- Someone in a "high level" position at the Medical Center contacted the IRS, which then started harassing her about money; and

- She felt threatened and needed to secure protection.

Finding these comments concerning, HR and the Medical Center's director of employee health services felt that an additional mental health evaluation was warranted to again ensure that Ms. Sims could safely provide patient care. This time, however, Ms. Sims refused to submit to the evaluation. After giving her a month to complete the evaluation and return to work or apply for leave, the Medical Center deemed Ms. Sims's refusal to do either to be a voluntary resignation.

From these facts, Ms. Sims manufactures a claim that HR personnel and management—including the same manager who hired her and members of her protected class—conspired to discriminate against her based on her race. To believe Ms. Sims's theory, this Court would have to believe that eight of Ms. Sims's colleagues, a manager who supported her, HR professionals, and Medical Center personnel who had never even met Ms. Sims, or each other, all lied on multiple, distinct occasions for the sole purpose of orchestrating her termination. After extensive discovery, Ms. Sims has not unearthed any evidence to support her speculative theory, nor has she identified any facts that would raise an inference of discrimination. Rather, Ms. Sims challenges a legitimate business decision to do what was in the best interest of the Medical Center's patients, in accordance with applicable guidelines and procedures, and that decision should not be second guessed.

Ms. Sims's remaining claims similarly fail. First, she claims that the Medical Center's requests that she confirm her fitness for duty violated the ADA, but the ADA permits such requests when they are job related and consistent with business necessity. Ms. Sims's conduct raised concerns about her ability to safely perform the essential functions of her job, therefore

justifying the requests. Second, Ms. Sims cannot point to any evidence to suggest that she was "regarded as" having a disability and, therefore, she cannot establish a disability discrimination claim.

Finally, Ms. Sims brings claims for retaliation and hostile work environment that the evidence does not support. Ms. Sims impermissibly, and illogically, bases her retaliation claim in part on a decision that was made *before* she raised a complaint. In addition, she bases her hostile work environment claim on the request that she confirm that she was fit for duty, which does not rise to the level of a hostile work environment. Because Ms. Sims cannot point to any evidence to support her claims, there are no triable issues of material fact in this case, and the Court should grant summary judgment in favor of Defendants on each of Ms. Sims's claims.

## II.   <u>STATEMENT OF UNDISPUTED FACTS</u>

Defendants submit that the following facts are not in dispute or cannot be refuted with admissible evidence.

### A.   **The Medical Center's Anesthesiology Department**

The Medical Center provides a full range of health care services for the most critically ill and injured patients in the Mid-Atlantic region. (Ex. 13, Declaration of Linda J. Goetz ("Goetz Decl.") at ¶ 7.) The Anesthesia Department at the Medical Center provides anesthesia services to patients needing surgery, which involves the administration of drugs used to induce the temporary loss of sensation or awareness needed for surgery. (Goetz Decl. 8; Ex. 2, Excerpts from Deposition of Plaintiff Faresha Sims ("Sims Dep.") at 64:16-21.) The Anesthesiology Department administers approximately over 35,000 anesthetics to patients each year. (Goetz Decl. 9.)

Physicians (including attendings, fellows, and residents), certified registered nurse anesthetists (CRNAs), and other support staff, such as anesthesia technicians, work in the

Anesthesiology Department. (Goetz Decl. 10.) CRNAs are highly skilled, independent medical professionals who can administer anesthesia to patients. (Goetz Decl. 11.) CRNAs evaluate patients before surgery, consult with the surgical team, provide pain control and supporting life functions during surgery, and monitor the patient's recovery after surgery. (Goetz Decl. 12; Ex. 15.)

Defendant Linda Goetz serves as the Medical Center's Director of Nurse Anesthesia. (Goetz Decl. 2.) Ms. Goetz started working at the Medical Center in September 1999 and started working as the Director of Nurse Anesthesia in September 2007. (*Id.*) Among other responsibilities, Ms. Goetz maintains hiring and supervisory responsibility for all CRNAs at the Medical Center. (Goetz Decl. 14.) At all relevant times, Ms. Goetz reported to Defendant Lisa Rowen, who currently serves as the Senior Vice President for Patient Care Services and Chief Nursing Officer at the Medical Center. (Goetz Decl. 3; Ex. 4, Excerpts from Deposition of Lisa Rowen ("Rowen Dep.") at 26:1-4.) All nurse managers at the Medical Center report directly or indirectly to Dr. Rowen, who in turn reports to the Medical Center's CEO (who in 2015 was Jeffrey Rivest). (Rowen Dep. 26:5-18, 223:21-224:4; Goetz Decl. 4.)

B.    **Substance Abuse Issues in the Anesthesiology Field**

Substance abuse is much higher among anesthesia providers than other practice specialties, due in part to the inherently stressful nature of the field, as well as access to highly addictive drugs. This can pose significant safety risks to both the patient and the provider. (Goetz Decl. 13.) According to the American Association of Nurse Anesthetists (AANA), "Substance use disorder (SUD) is recognized as the No. 1 occupational hazard among anesthesia professionals. It is estimated that 10 to 15 percent of practicing CRNAs will struggle with

substance use disorders at some time during their career." (Ex. 16 at PL003344.[1]) As the AANA noted, "Early identification of substance-abusing anesthesia providers reduces harm to the abuser and the patients they might care for while impaired." (Ex. 17 at PL003364.) Changes that suggest possible substance abuse include mood swings; increased episodes of anger, irritability, and hostility; and refusing to be relieved at the end of one's shift or generally spending more time at the hospital without being asked to do so. (Ex. 18 at PL003349.)

The Medical Center's Fitness for Duty Policy (the "FFD Policy") provides a specific set of guidelines for supervisors when dealing with an employee who they suspect may be unfit for duty. (Ex. 19 at UMMC7; Ex. 6, Excerpts from Deposition of Susan Hussey ("Hussey Dep.") at 26:10-18 (explaining that policies are guidelines), 28:15-29:9.) A supervisor may require an employee to report to Employee Health Services for an evaluation if the employee "exhibits behaviors which indicate that the person may be unable to perform their job duties in a safe and effective manner." (Ex. 19 at UMMC7-8.)

Once a supervisor determines that a fitness for duty evaluation is necessary (e.g., because of abnormal behavior), he or she completes a fitness for duty evaluation request form. (Ex. 20 at UMMC12.) The supervisor submits the form to Employee Health Services and HR, and schedules an appointment with Employee Health Services for the evaluation. (*Id.*) If feasible before the fitness for duty evaluation, the supervisor and an HR Business Partner (HRBP) can meet with the employee to discuss the observed behaviors and ask for an explanation. (*Id.*) The supervisor and HRBP will also notify the employee of the appointment, the purpose of the evaluation, and the process, including how the employee will be paid during the time away from

---

[1]    Also available at https://www.aana.com/docs/default-source/wellness-aana.com-web-documents-(all)/substance-use-disorder-(sud)-in-the-workplace.pdf?sfvrsn=bf264bb1_2.

work pending return. (*Id.*) The supervisor then escorts the employee to Employee Health

Services for the evaluation. (*Id.*)

A fitness for duty evaluation includes an interview, a physical examination, and urine

drug and alcohol testing. (*Id.*). Depending on the circumstances, the specific nature of the request

for a fitness for duty evaluation may also require a review of medical records or an evaluation by

the Employee Assistance Program (EAP), which is staffed by trained behavioral health

professionals from University of Maryland Psychiatry Associates, P.A. (*Id.*; Ex. 11, Nos. 5 and

10; Ex. 5, Excerpts from Deposition of Dr. Melissa Frisch ("Frisch Dep.") at 43:8-11 (explaining

that an EAP evaluation "is mandatory" if it is "part of the fitness for duty evaluation"), 211:4-6.)

If after the fitness for duty evaluation Employee Health Services deems an employee fit for duty,

the employee is medically cleared to return to work, subject to any corrective action. (Ex. 20 at

UMMC13.) If not fit for duty, the employee cannot return to work and may undergo additional

measures, such as treatment. (Ex. 19 at UMMC9; Ex. 20 at UMMC13.)

The Medical Center also recognizes that employees may encounter personal problems

which may affect job performance. (Ex. 21 at UMMC26.) For issues like emotional problems,

marital difficulties, legal matters, financial pressures, alcoholism, drug addiction, or stress,

employees may choose to go to EAP for short-term counseling or referral for treatment. (*Id.*) If

an employee's job performance deteriorates and does not improve despite routine supervisory

interaction, a supervisor may formally refer an employee to EAP. (Ex. 21 at UMMC27.) A

distinction between the EAP Policy and the FFD Policy is that an EAP referral is not mandatory,

while an FFD referral is mandatory. (*Cf.* Ex. 19 at UMMC9 ("If the employee refuses to follow

through with a Fitness for Duty evaluation, the employee may be subject to corrective action up

to and including termination of employment."); *w.* Ex. 21 at UMMC28 ("The employee may

refuse to use the EAP despite a formal supervisory referral."); Frisch Dep. 43:8-11; Goetz Dep. 28:18-29:7.) An employee may refuse an EAP referral (but not an FFD referral), and the supervisor should document the refusal and proceed with normal corrective action. (*Id.*)

C.      **Ms. Sims's Employment with the Medical Center**

On June 5, 2012, Ms. Goetz interviewed Ms. Sims for a CRNA position in the general operating room (GOR) at the Medical Center, which is the only area where there were openings at the time. (Ex. 22 at UMMC39; Sims Dep. 90:24-25; Goetz Dep. 139:11-13.) On July 19, 2012, Ms. Goetz sent Ms. Sims an offer letter detailing certain requirements, including that Ms. Sims pass the board examination administered by the National Board of Certification and Recertification for Nurse Anesthetists within 60 days of completing her Master of Science in Nurse Anesthesia. (Ex. 23; Sims Dep. 91:1-3.)

Ms. Sims failed the CRNA board examination on her first attempt. (Ex. 10, No. 4; Ex. 24; Goetz Decl. 17.) Although Ms. Goetz could have rescinded Ms. Sims's job offer as a result, Ms. Goetz did not do so. (*Id.*) Instead, Ms. Goetz showed Ms. Sims compassion and held the position open for her so that she could take the board examination again, and she gave Ms. Sims tips for passing the exam. (*Id.*; Sims Dep. 98:4-7.) Ms. Sims ultimately passed the exam on or about March 25, 2013. (Ex. 25.) Although it was more than 60 days after she completed her master's program on December 22, 2012, Ms. Goetz waived that condition of Ms. Sims's offer so that Ms. Sims could keep the position. (Goetz Decl. 18; Ex. 25; Ex. 10, No. 6; Ex. 26.)

On April 8, 2013, Ms. Sims started as a CRNA in the GOR with a starting salary of $136,000 per year. (Ex. 23; Ex. 27.) She performed well initially, and Ms. Goetz nominated her for two awards: (i) the Nursing Week Rising Star of Excellence Award in May 2014; and (ii) the Employee of the Month Award in August 2014. (Ex. 10, Nos. 8 and 10; Ex. 28; Ex. 29; Ex. 30;

Ex. 31; Sims Dep. 116:5-13.) In the selection memorandum for the Employee of the Month

Award, Ms. Goetz explained her reasoning:

> Faresha consistently maintains the highest level of professionalism in her role as a
> CRNA. She is committed to compassionate, safe, quality patient care. She
> maintains respectful working relationships with her colleagues and is always
> available to lend a helping hand. Additionally, [Faresha] is always smiling, is
> positive and upbeat and readily volunteers for any assignment. This is a well
> deserved honor for Dr. Sims.

(Ex. 30; Ex. 31.) In Ms. Goetz's almost fourteen-year career as Director of Nurse Anesthesia at

the Medical Center, Ms. Goetz has awarded the Employee of the Month Award only twice: once

to Ms. Sims, and once to another CRNA in 2008. (Goetz Decl. 16.) The Employee of the Month

Award is the "highest honor and award offered to an employee by [the Medical Center's]

executive leadership." (Ex. 10, No. 24; Rowen Dep. 131:5-9.)

### D. Ms. Sims's Behavioral Changes and Request for a First Fitness for Duty Evaluation

On May 4, 2015, one of Ms. Sims's CRNA colleagues expressed concern to Ms. Goetz

that Ms. Sims's "direct, aggressive, [and] confrontation[al] method of delivery" was "caustic" to

the Medical Center's culture. (Ex. 32 at UMMC419.) Other colleagues, including resident

physicians, told Ms. Goetz by phone and by email that Ms. Sims's communications were

"explosive," "offensive," "rude," and voiced with "intensity". (Ex. 32 at UMMC419-420.) One

resident reported that Ms. Sims referred to him as "an *almost* doctor" and forgot (or refused to

learn) another doctor's name despite working with him regularly. (*Id.* (emphasis added); Sims

Dep. 169:2-6.) Another resident, after interacting with Ms. Sims, pleaded for the improvement of

"resident-CRNA relations". (Ex. 32 at UMMC420 ("The fact that she did not know the names of

the members of the call team spoke volumes considering the countless times we had worked

together and provided care for the same patients.").) Ms. Sims received a verbal corrective action

for this conduct on May 7, 2015. (Ex. 32 at UMMC421; Ex. 33; Ex. 12, No. 2.)

Attending physicians also expressed concern. On June 16, 2015, one attending asked Ms. Goetz, "What's going on with Faresha, is she okay?" (Ex. 32 at UMMC421.) After explaining that Ms. Sims looked "burnt out" and "tired," the same attending explained that Ms. Sims "is not the same Faresha that she was last year" and that "her personality has changed" as Ms. Sims was not her "same bubbly self." (*Id.*) On June 18, another attending physician described a situation where Ms. Sims refused to leave her shift even after her relief arrived, which Ms. Goetz confirmed the same day. (Ex. 32 at UMMC422 ("[W]e told her to leave, but she wouldn't.").) While a CRNA may occasionally stay 10-30 minutes beyond a shift, Ms. Sims stayed 2-3 hours beyond her shift at least three times within 30 days.[2] (Ex. 13, No. 1; Ex. 32 at UMMC421-422; Goetz Decl. 20; Goetz Dep. 184:19-185:16; Sims Dep. 132:21-133:1.) To Ms. Goetz, these interactions were a far cry from the "always smiling," "positive," and "upbeat" person that Ms. Goetz interviewed, hired, mentored, and nominated.

On June 18, 2015, Ms. Goetz shared these concerns with the Anesthesiology Department chair, Dr. Peter Rock. (Ex. 13 at Nos. 5 and 18; Ex. 32 at UMMC422.) Together, they decided that based on the feedback Ms. Goetz received about Ms. Sims's uncharacteristic behavior and her refusal to leave her shift, and based on the Medical Center's guidelines and AANA guidance, it was necessary to request a fitness for duty evaluation to ensure there were no substance abuse concerns. (Ex. 13 at Nos. 5 and 18; Ex. 32 at UMMC422.) Ms. Goetz consulted with Employee Health Services and HR and completed a fitness for duty evaluation request form, citing Ms. Sims's "aggressive behavior," "complaints from other employees," "suspected drug

---

[2]     While in prior years, including 2013 and 2014, the Anesthesia Department had asked for volunteers to work additional shifts due to extreme staffing shortages, by 2015, the department was fully staffed and working additional shifts was rare. (Goetz Decl. 19; Goetz Dep. 342:4-5.)

diversion," and staying "well beyond the end of her shift". (Ex. 32 at UMMC422; Ex. 34; Ex. 12,

No. 2.) In addition, Ms. Goetz cited the following reasons for her request:

- Multiple colleagues giving me feedback about her change in personality – described as "burnt out;"

- Refusing to hand off cases @ shift change;

- Staying well beyond end of her shift;

- Rumored to be working [full time] at [Johns Hopkins Hospital] while working every weekend here; and

- Disrespectful interactions [with] colleagues.

(Ex. 34.)

That same day, Ms. Goetz left Ms. Sims a voicemail and sent a text message asking

Ms. Sims to return her call so that they could meet before Ms. Sims returned to work for her next

shift. (Ex. 32 at UMMC422-423; Ex. 35.) Ms. Sims called back and offered to come after 5:30

p.m. or the following week. (Ex. 32 at UMMC422-423.) Ms. Goetz stated that they could meet

before 4 p.m. (when Employee Health Services closed) or wait until the following week. (*Id.*) If

the latter, then Ms. Sims could not return to work for her scheduled shifts but would be paid in

full for them. (*Id.*; Goetz Decl. 21.) Ms. Sims then offered to meet with Ms. Goetz at 3:30 p.m.

(Ex. 32 at UMMC423.) Ms. Goetz agreed and advised Dr. Melissa Frisch, the Director at

Employee Health Services, that she would have Ms. Sims submit to a fitness for duty evaluation

at around 3:40 p.m. (Ex. 32 at UMMC423.)

When Ms. Sims arrived at the Medical Center, she met with Ms. Goetz and Wanda

Walker-Hodges, the GOR manager. (*Id.*) Ms. Goetz explained to Ms. Sims that she wanted

Ms. Sims to undergo a fitness for duty evaluation with Employee Health Services and described

the reasons for the request. (*Id.*) Ms. Goetz also gave Ms. Sims the opportunity to ask questions

and explain her behavior. (*Id.*) Ms. Goetz and Ms. Walker-Hodges escorted Ms. Sims to

Employee Health Services, where Regina Hogan, Manager of Employee Health Services, further explained the process. (Ex. 32 at UMMC424.) Ms. Sims signed the necessary consent forms. (Ex. 36.) Ms. Hogan and Dr. Frisch then began the evaluation, which included an initial interview, physical examination, and urine drug and alcohol testing. Frisch Dep. 211:12-212:15. They also scheduled the EAP component of the fitness for duty evaluation for June 25. (Ex. 37 at UMMC151-152.) Ms. Sims's drug screen was negative. Frisch Dep. 213:18-20.

After Ms. Sims left Employee Health on June 18, she went to Dr. Rowen's office. (Ex. 38.) Dr. Rowen was not present, so Ms. Sims met with Dr. Rowen's assistant, Suzanne Leiter. (*Id.*) According to Ms. Leiter, Ms. Sims wanted to "go after Ms. Goetz's leadership" and asked to schedule a meeting with Dr. Rowen to "go up [the] chain of command". (*Id.*) Later that night, between 10:46 p.m. and 11:41 p.m., Ms. Sims separately emailed Ms. Goetz, Dr. Rowen, and Neddra King, HRBP, to request "probable cause" for the fitness for duty evaluation. (Ex. 39 at UMMC163; Ex. 40; Ex. 41.)

On June 21, Ms. Sims informed Dr. Frisch that she "was on the verge of a mental and emotional breakdown" following the fitness for duty evaluation, and she requested that the EAP component of the evaluation be rescheduled for June 22. (Ex. 42.) On June 22, Ms. Sims met with Jan Buxton, an EAP counselor. (Ex. 12, No. 2.) Based on the entire evaluation, Dr. Frisch cleared Ms. Sims to return to work as scheduled on June 26 and 28, but noted that Ms. Sims would remain out of work due to "personal illness." (Ex. 43; Ex. 44; Ex. 32 at UMMC434.)

The following week, Ms. Sims sent several emails and met with various personnel regarding the request:

- On June 19, Ms. Sims emailed Ms. King to claim that the evaluation lacked any basis and that Ms. Goetz was "abusing her position of power" to "further intimidate [me] with the hope of my termination of employment." (Ex. 41 at UMMC165.) Ms. Sims also claimed that she was being subjected to

"harassment, threats, intimidation, bullying, defamation of character, retaliation, and hostile work environment." (*Id.*) Ms. Sims then forwarded this email with Ms. King to Dr. Rowen as the "next chain of command." (Ex. 41.)

- On June 22, Ms. Sims met with Ms. King and another HRBP, Nicole Leyba, to discuss her concerns about Ms. Goetz and the evaluation. (Ex. 45 at PL002073-2075.) Ms. Sims, Ms. King, and Ms. Leyba scheduled a follow-up meeting on July 8. (Ex. 46.)

- On June 23, Ms. Sims emailed the Medical Center's then-CEO and President, Jeffrey Rivest; Dr. Rowen; and the Medical Center's then-Vice President of Human Resources, Paula Henderson. Ms. Sims wrote "to express extreme and sincere concern regarding unjust and illegal actions committed upon me by Linda Goetz. . ." Ms. Sims stated, "My life was abruptly disrupted and health affected on June 18 by a phony claim used to continue a hostile work-environment, bullying, threats, intimidation, harassment, defamation, slander, and discrimination. . ." (Ex. 47.)

- On June 24, Ms. Sims met with Dr. Rowen and Ms. Leyba to discuss Ms. Sims's concerns, including her claim that the evaluation was a "personal attack" and that Ms. Goetz was using the evaluation to "hurt" Ms. Sims. (Ex. 48 at UMMC464.) Among other discussion points, Dr. Rowen explained the Medical Center's need to act when anesthesia providers exhibit changes in behavior, especially given substance abuse issues in the field of anesthesiology. (Ex. 48 at UMMC465.) Dr. Rowen also explained that Ms. Sims should not take it as a "personal attack" and that she was happy that Ms. Sims passed the evaluation. (Ex. 48 at UMMC464-465.)

- On June 25, Ms. Sims emailed Ms. Goetz and Ms. Walker-Hodges to call out of her scheduled shifts on June 26 (Friday) and June 28 (Sunday) "due to sickness." (Ex. 32 at UMMC434.)

On June 27, Ms. Sims escalated her complaints to Robert Chrencik, then-President and CEO of the Medical System, and David Swift, then-Senior Vice President for HR and Chief HR Officer of the Medical System. (Ex. 49 at PL2008-2009; Goetz Decl. 6.) Ms. Sims complained that Ms. Goetz's leadership style was "fear and intimidation" and that she was "currently receiving prank phone calls and threats." (Ex. 49 at PL2008; Ex. 10, Nos. 27 and 28.) Ms. Sims explained, "UMMC executive leadership and HR executive [sic] have not yet realized the consequences of having Linda Goetz in a position of power for so long. She leaves a trail and

seems unaware that her behavior subjects herself and others within the institution to fines and jail sentences for violation of state and federal laws." (Ex. 49 at PL2008; Ex. 10, No. 28.)

    **E.**    **The Medical Center's Additional Concerns and Request for a Second Fitness for Duty Evaluation**

        On Sunday, June 28, 2015, when Ms. Sims was scheduled to work but called out sick, she visited the Medical Center's on-campus security office. (Ex. 50 at UMMC615.) According to Ms. Sims, the local police department recommended that she inform the Medical Center of issues she claimed to be experiencing that she had first reported to the police. (Ex. 46.) The next day, Ms. Sims discussed her concerns via telephone with Walter Brown, an on-campus security officer. (Ex. 50.) During that call, Ms. Sims claimed that:

- Ms. Sims felt "unsafe" and was "afraid to come to work" because of Ms. Goetz;

- Ms. Goetz and Ms. Walker-Hodges were "conspiring to hurt" Ms. Sims, including having her followed, attempting to run her off the road, and showing up at her home, and including a "probable unauthorized invasion" at her apartment;

- Dr. Rowen and HR were also involved in harassing her; and

- Someone "in a high level position" at the Medical Center contacted the IRS, and the IRS then started harassing her about money.

(Ex. 10, No. 19; Ex. 51.) Ms. Sims also forwarded to Mr. Brown the emails she sent to Dr. Rowen on June 18 and the email to Mr. Chrencik on June 27. (Ex. 40; Ex. 49.) The next day, on June 30, Mr. Brown sent a memorandum memorializing the call with Ms. Sims to Maurice Davis, Director of Security. (Ex. 51; Ex. 12, No. 16.)

        Mr. Brown also relayed Ms. Sims's allegations to Ms. King. (Ex. 12, Nos. 2 and 16.) In a later email exchange with Ms. King, Ms. Sims reiterated some of her concerns:

- "I must admit that I truly feel threatened and deem the need to secure protection more important than moving up our meeting."

- "I perceived the meeting with Lisa Rowen to be threatening and hostile."

- "I have been met with avoidance, threats, and further intimidation."

- "I am entitled to a fair process free of threats and intimidation."

- "I am receiving prank phone calls and threats."

- "As I have mentioned, I was only further threatened, intimidated, and humiliated."

- "I did tell [Mr. Brown] that the calls started after my meeting regarding my complaints and I shared the phone number of the caller(s) with [Mr. Brown]".

(Ex. 46; Ex. 10, No. 22.)

On July 10, Ms. King consulted with Dr. Frisch and determined that Ms. Sims's allegations, especially those relating to the "conspiracy" by Ms. Goetz and Ms. Walker-Hodges to hurt her (including showing up to her home and having Ms. Sims followed and run off the road), the "prank calls" and "threats", and the allegations regarding the IRS, again called into question her ability to safely care for patients. (Ex. 50; Ex. 12, Nos. 2 and 14.)

To again ensure that Ms. Sims could provide safe patient care after this new set of events, Ms. King and Dr. Frisch agreed that Ms. Sims should undergo another evaluation by EAP as part of a second fitness for duty evaluation. (Ex. 12, No. 2; Frisch Dep. 49:17-50:1.) From Dr. Frisch's perspective:

> "I had already assessed Dr. Sims. I had cleared Dr. Sims to return back to work. Dr. Sims did not return back to work. Dr. Sims displayed some concerning behaviors, and those behaviors were described to me, and based on that information the decision was made to refer Dr. Sims back to EAP."

(Frisch Dep. 49:17-50:1.)

The second evaluation only contained a mental fitness component because Ms. Sims already had a negative drug screen and physical exam during the first evaluation. (Ex. 12, No. 2.) Ms. King informed Ms. Sims of the second evaluation, which was scheduled for July 13.

(Ex. 52; Ex. 50; Ex. 12, No. 2.) Ms. King also told Ms. Sims that she would receive paid administrative leave for the shifts that she missed as part of this process. (Ex. 52; Ex. 50.)

Ms. Sims did not attend the second evaluation on July 13 and asked for an explanation of the underlying reasons. (Ex. 50; Ex. 52.) Ms. Henderson stepped in on July 14 and provided a comprehensive letter in response, explaining the background leading up to the second fitness for duty evaluation and the need for Ms. Sims to either reschedule her appointment or request a leave of absence. (Ex. 50.) Ms. Henderson explained, "If you do not reschedule your appointment with EAP or request a leave of absence within 15 days or, if necessary, another amount of time that we mutually agree to be reasonable, [the Medical Center] will consider you to have resigned your position." (Ex. 50.) The Medical Center gave Ms. Sims a full month to comply, but Ms. Sims did not schedule her appointment or request a leave of absence, and she refused the Medical Center's request to do so through her counsel. (Ex. 53; Ex. 54.) Because Ms. Sims would not submit to the second evaluation to confirm that she could safely provide patient care, and that her comments to Ms. Brown and Ms. King were not cause for concern, the Medical Center considered Ms. Sims to voluntarily resign and separated her from employment, effective August 17, 2015. (*Id.*; Ex. 12, No. 25.)

On August 23, Ms. Sims appealed the decision and it was upheld by Ms. Henderson on September 3 and communicated to Ms. Sims on September 10. (Ex. 55; Ex. 56; Ex. 57, Ex. 58.) On September 18, Ms. Sims sought additional review, and Keith Persinger, the Medical Center's Executive Vice President and Chief Operating Officer, upheld Ms. Sims's separation. (Ex. 59; Ex. 60.)

The Medical Center conducted a thorough investigation into Ms. Sims's complaints and found no evidence of discrimination, harassment, or retaliation. (Ex. 61; Ex. 50.) Mr. Brown also

investigated the security concerns that Ms. Sims raised directly to him and found that Ms. Sims's

claims, including the prank calls and attempts to run her off the road, were not substantiated. (Ex.

62.)

>    **F.      Ms. Sims's Employment with Johns Hopkins**

Ms. Sims started working part-time (or "casual") as a CRNA at Johns Hopkins in April

2014 while still employed with the Medical Center, and she continues to work there. (Ex. 8, No.

2; Ex. 9, No. 2; Sims Dep. 35:14-36:11, 37:16-38:4.) In December 2015, her employment at

Johns Hopkins became full-time. (Sims Dep. 36:12-14.) Ms. Sims has not submitted any job

applications, attended any interviews, or received any job offers outside of her employment with

the Medical Center and Johns Hopkins. (Ex. 8, No. 2; Ex. 9, No. 2; Sims Dep. 310:8-10.) Since

2014, Ms. Sims only received income from the Medical Center and Johns Hopkins. (Ex. 8, No.

3; Ex. 9, No. 3.)

## III.    LEGAL STANDARD

The Court may grant summary judgment if the evidence shows there is "no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Nguyen v.*

*CNA Corp.*, 44 F.3d 234, 236-37 (4th Cir. 1995). The existence of some alleged factual dispute is

not enough to warrant a trial—the fact must be material and the dispute must be genuine. *See*

*Anderson*, 477 U.S. at 247-48. A material fact is one that might affect the outcome of the suit

under the governing law. *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001)

(citations omitted). An issue about a material fact is genuine only "if the evidence is such that a

reasonable jury could return a verdict for the non-moving party." *Id.*

While the Court "must draw all justifiable inferences in favor of the nonmoving party,"

that "party cannot rely on mere belief or conjecture, or the allegations and denials contained in

[her] pleadings." *McIntyre-Handy v. W. Telemarketing Corp.*, 97 F. Supp. 2d 718, 729 (E.D. Va.), *aff'd*, 238 F.3d 413 (4th Cir. 2000) (internal quotation marks and citations omitted). Rather, the nonmoving party must produce sufficient evidence of specific facts demonstrating that a triable issue of fact exists. *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012). If the evidence produced by the non-moving party is "merely colorable, or is not sufficiently probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (citations omitted).

While the Court liberally construes filed by pro se plaintiffs, at the summary judgment stage, a pro se plaintiff "may not rest on [her] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue that must be tried before a jury." *Blair v. Ravenswood Village Health Ctr.*, 43 F. Supp. 2d 586, 586 (S.D. W. Va. 1998), *aff'd*, 173 F.3d 849 (4th Cir. 1999) (internal quotations and citation omitted).

## IV.  **ARGUMENT**

### A.  **Summary Judgment Is Warranted on Ms. Sims's Race Discrimination Claims**

Ms. Sims's claims for race discrimination under Title VII and Section 1981 are based on (i) the purported failure to hire her into or assign her to the shock trauma operating room (Count I); and (ii) the alleged discriminatory referral for a fitness for duty evaluation (Count II). Both counts are subject to summary judgment in favor of Defendants.

1.  Ms. Sims's claim based on alleged discriminatory hiring and work assignments fails because it is time-barred and does not involve any adverse employment action.

Ms. Sims's claim in Count I that she was not hired or allowed to work in the shock trauma operating room based on her race is both time-barred and not supported by any evidence.

First, Ms. Sims filed her charge of discrimination with the Baltimore City Community Relations Commission on December 9, 2015, and she did not allege that there were continuing acts of discrimination. (Ex. 63.) As set forth above, Ms. Goetz hired Ms. Sims on April 8, 2013 for a position in the GOR. To the extent that Ms. Sims claims that she should have been hired to work in shock trauma at that time, the statute of limitations on a failure to hire claim under Title VII would have expired 300 days later on February 2, 2014, nearly two years before she filed her charge. *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996). Even under a three-year statute of limitations for a failure-to-hire claim under Section 1981, Ms. Sims's claim expired on April 8, 2016, long before Ms. Sims filed her initial Complaint in this action on January 30, 2019. *See White v. BFI Waste Servs., LLC*, 375 F.3d 288, 291-92 (4th Cir. 2004). Any attempt by Ms. Sims to revive a time-barred claim based on the date of her hiring should be rejected.

Second, to the extent that Ms. Sims bases her claim on an alleged failure to transfer her to shock trauma during her employment, Ms. Sims has not identified any specific request that she made to work in shock trauma, nor has she identified any opening in shock trauma into which she could have been transferred. She also has absolutely no evidence of any comparator outside of her protected class being hired into shock trauma, which would be required to establish a prima facie case of discrimination.

Third, even if true, the alleged denial of an opportunity to work in shock trauma cannot be considered a discriminatory adverse employment action, which is required to prevail on a Title VII claim. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). An adverse employment action is a discriminatory act that "adversely affects the terms, conditions, or benefits of the plaintiff's employment." *Id.* (citation omitted). The "mere fact" that a job

assignment is less appealing "does not constitute adverse employment action." *Id.* (citation

omitted). At the Medical Center, the shock trauma operating room is only different from the

GOR in that it is "only about a third of the size or less of the" GOR. (Goetz Dep. 139:21-

140:15.) There is "no difference" in the total compensation package for CRNAs in shock trauma

as compared to the GOR. (Goetz Dep. 8:7-10.) An assignment to GOR instead of shock trauma

therefore cannot form the basis of a discrimination claim, and summary judgment on Ms. Sims's

claim is appropriate.

> 2.   The fitness for duty referral likewise cannot form the basis of a
>      discrimination claim and, even if it could, there is no evidence that it was
>      motivated by racial animus.

Ms. Sims cannot point to any evidence to support her claim that the fitness for duty

evaluation request was discriminatory. As an initial matter, courts in this and other circuits have

held that fitness for duty exams and drug tests are not adverse employment actions. *See*

*Tcheskidova v. ITT Fed. Servs.*, Civil No. AMD 07-91, 2008 WL 3085694, at *3 n.8 (D. Md.

Aug. 1, 2008 (Davis, J.) (fitness for duty evaluation not an adverse employment action);

*Sturdivant v. City of Salisbury*, No. 1:09CV468, 2011 WL 65970, at *5 (M.D.N.C. Jan. 10,

2011), *report & recommendation adopted*, 2011 WL 806381 (M.D.N.C. Mar. 2, 2011) (holding

that requiring employee to submit to a drug test did not qualify as an "adverse action" under the

standard established by the Fourth Circuit); *Foster v. Tex. Health Sys.*, No. CIV.A.3:99–CV–

1217–L, , 2002 WL 1461737, at *7 (N.D. Tex. June 30, 2002) (finding that a drug test was not

an adverse action when it did not impact pay, benefits, or compensation); *Semsroth v. City of*

*Wichita*, 548 F. Supp. 2d 1203, 1211 (D. Kan. 2008), *aff'd*, 555 F.3d 1182 (10th Cir. 2009)

("Generally, courts have rejected the argument that a fitness for duty examination, by itself,

constitutes materially adverse action.") (collecting cases); Memorandum Opinion, Doc. No. 27

(Dec. 10, 2019). Likewise, here, there is no evidence that the fitness for duty evaluation alone

would have impacted Ms. Sims's employment. Indeed, the purpose of the evaluation was to confirm that Ms. Sims could safely perform her job and, if Ms. Sims was fit for duty, then the evaluation should not have impacted her employment at all.

Further, Ms. Sims cannot present any evidence that the evaluation request was anything other than a precaution to ensure the safety of patients, much less that it was discriminatory. The Medical Center's guidelines, including the FFD Policy, and AANA guidance make it clear that medical providers must react swiftly when an anesthesiology professional like Ms. Sims displays uncharacteristic behavior and makes unusual comments that prompt the need to confirm that she can safely care for patients. This is not only a business decision, but also a potential life or death decision. If a court would not second guess the former, then the latter also should not be second guessed. *See, e.g., Carroll v. Town of Univ. Park*, 12 F. Supp. 2d 475, 485 (D. Md. 1997), *aff'd*, 155 F.3d 558 (4th Cir. 1998) ("[T]the role of the Court is not to assess the prudence of any particular job action."); *Langerman v. Thompson*, 155 F. Supp. 2d 490, 499 (D. Md. 2001) ("[C]ourts are not free to second-guess an employer's business judgment") (citation omitted); *Grier v. Casey*, 643 F. Supp. 298, 308 (W.D.N.C. 1986) ("The law is clear that an employer's reason for his action may be a good reason, a bad reason, a mistaken reason, or no reason at all as long as the decision was not based on . . . unlawful discriminatory criteria.").

There are myriad other reasons why Ms. Sims's discrimination claim is not viable. She cannot identify any similarly situated non-Black CRNAs who exhibited similar behaviors and were not asked to complete a fitness for duty evaluation (because there are none). Goetz Decl. 22. She has no evidence that Ms. Goetz did not honestly believe it was necessary to request the first fitness for duty evaluation. *See Holland*, 487 F.3d at 217–18 (finding that no reasonable juror could conclude the decisionmaker's reason was pretextual where plaintiff's evidence failed

to address whether the decisionmaker "did not honestly believe" that plaintiff engaged in the alleged misconduct). In fact, Ms. Goetz provided a clear explanation for her decision, testifying that:

> In a situation like this, I'm the director of the department, and part of my duties as director of the department is -- well, to hire CRNAs to make sure that they are fit to do the job and to ensure the safety of our patients. And that is a paramount duty.
>
> And when multiple people bring their concerns to me about any CRNA's behavior and behavior change that is a complete opposite of the way they were in the past, and it doesn't occur just on one occasion, but it occurs on a couple of occasions, that warrants some investigation.

(Goetz Dep. 213:11-21.)

Even if Ms. Sims could identify evidence that would challenge Ms. Goetz's reasoning, which she cannot, the fact that Ms. Goetz hired Ms. Sims, held her position open until she could pass her board exam, and nominated her for two employee awards squarely rebuts any presumption of discriminatory intent. In the Fourth Circuit, "when the same person hires an employee, and then takes an allegedly negative employment action, there is a 'powerful inference' that the alleged action was not motivated by discriminatory animus." *See, e.g.*, *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 574 (D. Md. 2000) (citations omitted).

Ms. Sims likewise cannot point to any evidence that would suggest that the second fitness for duty referral was discriminatory. The undisputed facts are that Mr. Brown, who did not know and had never heard of Ms. Sims prior to her contacting him in June 2015, found Ms. Sims's statements notable enough to forward to HR. Ms. Sims then made similar statements in an email to Ms. King, and Ms. King and Dr. Frisch agreed that the best course of action was to again confirm that Ms. Sims was fit for duty out of an abundance of caution. Ms. Sims may disagree with these conclusions, but mere disagreement is not sufficient to survive summary judgment because "a plaintiff may not simply allege that the employer's stated reasons were inaccurate

without also tethering (or enabling the court to tether) the employer's decision to the discriminatory reasons." *Ramos v. Healthcare, Inc.*, 963 F. Supp. 2d 511, 525 (E.D. Va. 2013), *aff'd*, 603 F. App'x 173 (4th Cir. 2015). Ms. Sims has not and cannot identify any basis for tethering the decisions of several employees to discriminatory reasons.

Lastly, Ms. Sims has referenced several supposed comparators in her Complaint and discovery responses in this case, but she cannot establish that any such individuals were similarly situated as a matter of law. Indeed, there is no record of any CRNA engaging in conduct similar to Ms. Sims and not being asked to undergo a fitness for duty evaluation or otherwise having the conduct addressed, and Ms. Sims certainly cannot identify anyone who was treated more favorably than she was under similar circumstances. To the extent that Ms. Sims relies on purported comparator evidence to support her claim, her claim must fail. *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.") (citations omitted); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 135 (4th Cir. 2002) (affirming summary judgment for employer on Title VII and Section 1981 claims where the employee failed to demonstrate that the employer treated similarly situated employees outside his class more favorably). For these reasons, the Court should dismiss Ms. Sims's claims.

**B.**   **Ms. Sims's Disability Discrimination Claims in Counts III and IV Also Fail as a Matter of Law**

Ms. Sims claims that the requested fitness for duty evaluations were impermissible medical examinations under the ADA that occurred because she was "regarded as" disabled. Both claims are unsupported and must fail.

1.    <u>The requested fitness for duty evaluations were not impermissible medical examinations because they were job-related and consistent with business necessity.</u>

An employer may require an employee to undergo a medical examination that is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). This provision "permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997) (quoting 29 C.F.R. pt. 1630, App. § 1630.14(c)). The fitness for duty evaluations that Ms. Sims challenges fall squarely within this exception.

The Medical Center has an obligation to the public to ensure that its workforce is both mentally and physically capable of performing the medical services it offers. In jobs where there is a unique responsibility to safeguard the public, fitness for duty evaluations have been routinely held to be job-related and consistent with business necessity. *See Barnum v. Ohio State Med. Ctr.*, Case No. 2:12-cv-930, at 14 (Doc. 81) (D. Ohio Feb. 24, 2015) ("Barnum [a CRNA] has a highly sensitive and important job—putting people to sleep for procedures—and it is undisputed that her coworkers were genuinely concerned about her state of mind when she was put on leave."); *Flanary v. Baltimore Cty.*, No. CCB-16-3422, 2017 WL 1953870, at *5 (D. Md. May 11, 2017) (Blake, J.) ("Police departments in particular have somewhat greater leeway under § 12112(d)(4)(A) in light of police officers' unique job responsibilities and their duty to safeguard the public."); *Tcheskidova*, 2008 WL 3085694, at *3 n.8 (explaining that "it is obvious that plaintiff's conduct required any responsible employer to investigate her mental and emotional health before returning her to duty at a military installation in an area of ongoing hostilities"). Given Ms. Sims's sensitive role as a CRNA and the concerns raised as a result of her uncharacteristic behavior and concerning comments, it was no doubt a business necessity to

confirm that she was not endangering the lives of patients by working while being unfit to do so.

Accordingly, the fitness for duty evaluations were permissible inquiries under the ADA.

> 2.    Ms. Sims was not "regarded as" disabled when she was referred for a
>        second fitness for duty evaluation.

Ms. Sims was not subjected to disability discrimination based on being "regarded as"

disabled. There is no evidence to suggest that the Medical Center regarded Ms. Sims as disabled.

Being "regarded as" disabled here means that an employer perceived the employee to be

impaired. *Royal v. Kirschling*, No. CV CCB-19-2825, 2020 WL 1849712, at *12 (D. Md. Apr.

13, 2020) (Blake, J.), *aff'd*, 835 F. App'x 699 (4th Cir. 2021)  An employee cannot merely point

to the fact that an employer had concerns about the employee's ability to perform a job and

referred the employee for an evaluation to make this showing—performance issues alone do not

suggest an impairment and therefore are not sufficient to show that an employee was "regarded

as" disabled. *Id.* ("Although the university placed her on medical leave pending a medical

evaluation, a request for a medical evaluation is not sufficient to show that the university

regarded Royal as disabled."). Other than questions about her behavior and performance,

Ms. Sims has not pointed to any other reason to suggest that the Medical Center regarded her as

disabled.

The Sixth Circuit's decision in *Barnum* is instructive. 642 F. App'x 525 (6th Cir. 2016).

There, like here, the medical center referred the plaintiff, a CRNA, for an evaluation after (i)

colleagues reported statements by the plaintiff that suggested suicidal thoughts (*e.g.*, "maybe I

should just put a gun to my head, maybe I should just not be here"); and (ii) a "gradual

escalation" of undocumented reports from surgeons, nurses, anesthesiologists, and other CRNAs

regarding her odd behavior, such as becoming frustrated when unable to adjust the height of the

operating table. *Id.* at 527-528. The plaintiff alleged that the medical center violated the ADA by "regarding" her as disabled.

The medical center and other defendants moved for summary judgment, which the District Court granted. *Id.* As it relates to the plaintiff's "regarded as" claim, the District Court explained that the medical center's requirement that the plaintiff undergo an examination did not amount to regarding her as disabled. *See Barnum*, Case No. 2:12-cv-930, at 12-15 (Doc. 81) (D. Ohio Feb. 24, 2015). The District Court, quoting *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804, 810 (6th Cir. 1999), reasoned that employers can require a mental examination of an employee after the employee exhibits unusual behavior:

> Given that an employer needs to be able to determine the cause of an employee's aberrant behavior, [evidence that the employer requested such examinations] is not enough to suggest that the employee is regarded as mentally disabled. As the district court ably explained, a defendant employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled.

*Id.* at 13. The Sixth Circuit explained that "no reasonable jury" could conclude that the medical center "regarded" the nurse as disabled under the ADA. *Barnum*, 642 F. App'x at 533. The same is true of Ms. Sims, and her regarded as claim therefore fails and should be dismissed.

### C.    There Is No Evidence to Support Ms. Sims's Retaliation Claim

Ms. Sims cannot succeed on her retaliation claims under Title VII and Section 1981 because she cannot establish that her alleged protected activity was the "but for" cause of her termination. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Ms. Sims made her first complaint of discrimination on June 19, 2015 following her first fitness for duty evaluation. Ms. Sims cannot establish that the subsequent fitness for duty request and termination would not have occurred "but for" her June 19 complaint because she cannot dispute that she made the comments that

prompted the second evaluation request or that her employment ended only after she refused to participate in the second evaluation. Absent any evidence that her comments were *not* the catalyst for the second evaluation and her termination, Ms. Sims's retaliation claim fails.

Ms. Sims's retaliation claim against Ms. Goetz and Dr. Rowen as individuals is even weaker. Neither Ms. Goetz nor Dr. Rowen referred Ms. Sims for the second evaluation. (Ex. 50; Ex. 12, No. 2.) Neither made the decision to terminate Ms. Sims's employment. (Goetz Dep. 9:5-16, 15:12-19 ("I was not involved in any meetings . . ."); Rowen Dep. 14:20-15:9; 16:7-15 ("A. I was not involved nor did I authorize the decision.").) And neither were involved in Ms. Sims's appeal process. (Goetz Decl. 25; Rowen Dep. 306:2-4.) Accordingly, Ms. Sims's claim for retaliation against Ms. Goetz and Dr. Rowen fails.

### D.  Ms. Sims Has Not Established and Cannot Establish a Hostile Work Environment Claim

Ms. Sims cannot demonstrate that she was subjected to a hostile work environment. There is no evidence (let alone race-based evidence) that Ms. Sims endured intimidation, ridicule, insult, or other behavior that was offensive, pervasive, severe, or abusive, as is required to make out such a claim. Instead, it appears that Ms. Sims simply disagrees with Ms. Goetz's management style. This type of disagreement does not support a hostile work environment claim. *See Allen v. Napolitano*, 774 F. Supp. 2d 186, 205–06 (D.D.C. 2011) (finding that "the majority of plaintiff's complaints relate to her immediate supervisor's management style," and "[b]eyond alleging less-than-ideal working conditions, plaintiff has not made sufficient allegations that defendant severely or pervasively altered and interfered with her employment"). Ms. Sims's hostile work environment allegations amount to mere disagreement with her manager and are not actionable under Title VII or Section 1981.

### E.     Regardless of Whether Ms. Sims's Claims Have Merit, Her Claim for Back Pay Damages Is Foreclosed Because Her Damages Were Fully Mitigated

Even if Ms. Sims could prevail on her claims, which she cannot, summary judgment nevertheless would be appropriate on Ms. Sims's claim for back pay. Under Title VII, Section 1981, and the ADA, a plaintiff has a duty to act with reasonable diligence to mitigate damages. 42 U.S.C. § 2000e-5(g)(1) (Title VII); 42 U.S.C. § 12117 (incorporating Title VII remedies); *Blasic v. Chugach Support Servs., Inc.*, 673 F. Supp. 2d 389, 402 (D. Md. 2009).

Here, Ms. Sims mitigated her damages in full by 2017. (Bierhanzl Decl. 9-10.) She admits that after her termination from the Medical Center, her only source of income was Johns Hopkins, and she transitioned from part-time employment to full-time employment at Johns Hopkins in December 2015, which resulted in an increase in hours and compensation. Ex. 8, No. 2 and No. 3; Ex. 9, No. 2 and No. 3.)

By 2017, Ms. Sims's actual earnings from Johns Hopkins exceeded her projected earnings at the Medical Center and have continued to increase:

**Potential Economic Losses for Ms. Faresha Sims**
**Conclusion: Plaintiff reaches economic parity in 2017**
**Recognition Bonus with UMMC based on Average of 2013, 2014, and Jan-May 2015 Recognition Bonus Percentage**

| Year Start | Year End | Percent of Year | Age | Lost Non-Bonus Wages | Lost Bonus | Lost Benefits | Total | Total Johns Hopkins Earnings | Projected JH Casual Earnings | Johns Hopkins Benefits | Total Offset | Net Difference (JH Earnings - UMMC Loss) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/18/2015 | 12/31/2015 | 37.26% | 35.6 | $50,257 | $20,560 | $4,603 | $75,421 | $48,652 | $16,764 | $3,162 | $35,050 | -$40,370 |
| 1/1/2016 | 12/31/2016 | 100.00% | 36.6 | $138,928 | $56,836 | $12,725 | $208,489 | $210,336 | $46,340 | $13,672 | $177,667 | -$30,821 |
| 1/1/2017 | 12/31/2017 | 100.00% | 37.6 | $143,096 | $58,541 | $13,106 | $214,743 | $266,711 | $47,730 | $17,336 | $236,316 | +$21,573 |
| 1/1/2018 | 12/31/2018 | 100.00% | 38.6 | $147,389 | $60,297 | $13,500 | $221,186 | $336,041 | $49,162 | $21,843 | $308,722 | +$87,536 |
| 1/1/2019 | 12/31/2019 | 100.00% | 39.6 | $151,810 | $62,106 | $13,905 | $227,821 | $342,778 | $50,637 | $22,281 | $314,422 | +$86,600 |
| 1/1/2020 | 7/31/2020* | 58.20% | 40.1 | $90,999 | $37,228 | $8,335 | $136,562 | $193,317 | $30,353 | $12,566 | $175,530 | +$38,968 |

*2020 is a partial year, consistent with Dr. Smith's calculation of past wages.
Note: Projected 2020 Johns Hopkins earnings are calculated using the same methodology as projected UMMC earnings.
    Full-year 2020 total compensation from Johns Hopkins is projected to be  $332,179

(Bierhanzl Decl. 9-10; Ex. 7.)

Even if Ms. Sims could survive summary judgment and prevail at trial, her claim for back pay is limited to $71,192. Accordingly, Defendants ask for summary judgment on this issue because there is no dispute that Ms. Sims increased the number of shifts and hours at Johns

Hopkins after her employment ended at the Medical Center, thereby fully mitigating her damages and eliminating any recovery beyond $71,192.

## V.   <u>CONCLUSION</u>

After an extended discovery period, Ms. Sims cannot point to any evidence to support her claims or to create a triable issue of material fact that would warrant a trial. Ms. Sims simply has no evidence to suggest that the requests that she undergo fitness for duty evaluations following drastic changes in her behavior were not only completely fabricated, but also discriminatory. She also cannot prove that Defendants have violated the ADA in any way, or that she was subjected to retaliation or a hostile work environment. Given the dearth of evidence to support Ms. Sims's claims, Defendants respectfully ask this Court to grant summary judgment in their favor on all of Ms. Sims's claims.

Dated: May 3, 2021

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

/s/ Grace E. Speights
Grace E. Speights (Fed. Bar No. 05254)
Jocelyn R. Cuttino (Fed. Bar No. 21434)
Andrea N. Threet (pro hac vice)
1111 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone: (202) 739-3000
Facsimile: (202) 739-3001
grace.speights@morganlewis.com
jocelyn.cuttino@morganlewis.com
andrea.threet@morganlewis.com

Vishal H. Shah (pro hac vice)
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
vishal.shah@morganlewis.com

*Attorneys for Defendants*