FILED
LODGED
ENTERED
RECEIVED

JUL 2 8 2021

CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DROP BOX

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FARESHA SIMS,

      *pro se* Plaintiff,

  v.

UNIVERSITY OF MARYLAND MEDICAL
SYSTEM CORPORATION, et al.

      Defendants.

Civil No. 1:19-cv-00295-CCB

**BRIEF IN OPPOSITION OF
MOTION FOR SUMMARY
JUDGMENT**

## *pro se* PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.      INTRODUCTION………………………………………..……………………1

II.     STATEMENT OF FACTS …………...……………………………………….3

        A.      Top 62 Triable Issues Of Material Fact That Preclude Summary Judgment …..….3

                1.      The Top 10 Most Crucial Dispositive Facts That Destroy The Defense…...3

                2.      Supervisor Does Not Allow Full-Time Black CRNAs In The Prestigious
                        Shock Trauma Center……………………...……………………………………4

                3.      Supervisor Twice Eliminates The Most Senior Black CRNA When
                        Fully Staffed……………………………………………...……………….…...4

                4.      Supervisor Makes False Accusations To Harass Black CRNA………..………5

                5.      Black CRNA Complains About Race Discrimination…………...………….5

                6.      Former Baltimore City Police Officer Creates a Retaliatory Memorandum
                        To Portray Black CRNA With Mental Illness……………………….…...….…5

                7.      University of Maryland Medical Center Recommends EAP
                        To Black CRNA……………………………………………………...…….…6

                8.      Black CRNA Complains About Retaliation…………………………...………7

                9       University of Maryland Medical Center Continues Retaliating By Purporting
                        To Question Whether Black CRNA Is Safe……………………...…….....7

                10.     University of Maryland Medical Center Medical Director Deemed
                        Black CRNA Mentally and Physically Fit for Duty…………………...……..8

                11.     University of Maryland Medical Center Terminates Black CRNA And
                        Pretends She Voluntarily Resigned To Whitewash The Retaliation……...….8

        B.      Supervisor Linda Goetz's Credibility In Dispute Because She Committed Perjury...10

III.    MOVING PARTY FAILS INITIAL BURDEN OF SUMMARY JUDGMENT…..………11

IV.     ARGUMENT……………………………………………………………………13

        A.      Black CRNAs Not Allowed To Work In The Prestigious Shock Trauma Center
                Because of Race…………………………………………………………...……..13

B.  Black CRNA Required To Undergo An Illegal Medical Exam With Drug And Alcohol Testing Because Of Race...................................19

C.  UMMSC Performs A Prohibited Medical Exam and Drug Testing On Black CRNA Because Supervisor Provides a False Accusation of Drug Abuse....................31

D.  Black CRNA Regarded As Disabled When She Complains About Discrimination and Retaliation...........................................................34

E.  UMMSC Blatantly Punishes Black CRNA For Opposing Discrimination and Retaliation..............................................................................36

    1.  The Sham: Walter Brown's June 30th Memorandum..........................38

    2.  The Mental-Illness: "Regarded As"................................................40

    3.  The Supervisory EAP Referral: Termination............................ ...41

    4.  The Secret Vengeance: Defendant Linda Goetz................................42

    5.  The Most Valuable Player: Defendant Lisa Rowen..............................43

F.  Goetz Says Dr. Sims Is "Argumentative and Aggressive Like the Average Black Woman"..............................................................................44

G.  Defendants' Argument To Limit Their Back Pay Liability to $71,192 Is Improper And Invalid On Summary Judgment.....................................50

V.  CONCLUSION...............................................................................51

## TABLE OF AUTHORITIES

Alabama v. United States,
        304 F.2d 583 (5th Cir.), aff'd 371 U.S. 37 (1962)

Allen v. Rumsfeld,
        273 F. Supp. 2d 695 (D.Md. 2003)

Anderson v. Liberty Lobby, Inc.,
        477 U.S. 242 (1986)

Aro v. Legal Recovery Law Offices, Inc.,
        D065422 (Cal. Ct. App. April 8, 2015)

Atkins v. Winchester Homes, et al.,
        1:06-cv-00278-CCB (D.Md. January 17, 2007)

Babb v. Maryville Anesthesiologist, P.C.,
        No. 19-5148 (6th Cir. 2019)

Barnett v. W.T. Grant Co.,
        518 F.2d 543 (4th Cir. 1975)

Barnum v. Ohio State University Medical Center, et al.,
        No. 15-3450 (6th Cir. February 19, 2016)

Bryant v. Aiken Reg. Med. Ctr.,
        333 F.3d 536 (4th Cir. 2003)

Celotex Corp. v. Catrett,
        477 U.S. 317 (1986)

Carlson v. Boston Scientific Corp.,
        No. 15-2440 (4th Cir. May 9, 2017)

Clark v. Coats & Clark, Inc.,
        929 F.2d 604 (11th Cir. 1991)

Dallas v. Giant Foods, Inc.,
        187 F. Supp 2d 505 (D.Md. 2002)

EEOC v. McLeod Health, Inc.,
        No. 17-2335 (4th Cir. 2019)

Furnco Const. Corp. v. Waters,
        438 U.S. 567 (1978)

Holland v. Wash. Homes, Inc.,
    487 F. 3d 208 (4th Cir. 2007) (dissenting)

James v. Booz-Allen & Hamilton, Inc.,
    368 F.3d 371 (4th Cir. 2004)

Murrell v. Ocean Mecca Motel, Inc.,
    262 F.3d 253 (4th Cir. 2001)

Nick's Garage, Inc. v. Progressive Casualty Insurance Co.,
    No. 15-1426 (2d Cir. 2017)

Nissan Fire & Marine Ins. Co. v. Fritz Companies,
    210 F.3d 1099 (9th Cir. 2000)

Reeves v. Sanderson Plumbing Prods.,
    530 U.S. 133 (2000)

Rock v. Norfolk and Western Railway Company,
    473 F.2d 1344 (4th Cir. 1973)

Shivers v. Saul,
    1:19-cv-02434 (D.Md. December 2, 2020)

Suggs v. 7-Eleven Inc.,
    8:14-cv-01903-DKC (D.Md. June 23, 2015)

Taylor v. Hampton Rds. Reg'l Jail Auth.,
    550 F. Supp. 2d 614 (E.D. Va. 2008)

Williams v. Giant Food, Inc.,
    370 F.3d 423 (4th Cir. 2004)

Wirtes v. City of Newport News,
    No. 19-1780 (4th Cir. April 30, 2021)

Wright v. Ill Dep't of Children and Family Services,
    No. 13-1552 (7th Cir. August 14, 2015)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

FARESHA SIMS,

          *pro se* Plaintiff,

     v.

UNIVERSITY OF MARYLAND MEDICAL
SYSTEM CORPORATION, et al.

          Defendants.

Civil No. 1:19-cv-00295-CCB

**INDEX**

FILED
LODGED                ENTERED
                      RECEIVED

JUL 2 6 2021

CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
NIGHT DROP BOX

---

## *pro se* PLAINTIFF'S INDEX TO MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

| Ex. 1 | #1 in the Nation Johns Hopkins Hospital VCU Nurse Anesthesia Program | Ex. 6 | Baltimore Magazine Feature Dr. Sims |
|---|---|---|---|
| Ex. 2 | Dr. Sims Receives Clinical Excellence Award from Johns Hopkins | Ex. 7 | July 10th Supervisory EAP Referral Form |
| Ex. 3 | Dr. Sims Receives Two Clinical Excellence Awards from UMMSC | Ex. 8 | UMMSC Supervisory EAP Referral Website |
| Ex. 4 | Dr. Sims's Academic Excellence at VCU | Ex. 9 | July 10th Supervisory EAP Referral & Involuntary Termination |
| Ex. 5 | American Association of Nurse Anesthetist Spotlight Dr. Sims | Ex. 10 | Termination Letter |

| | | | |
|---|---|---|---|
| Ex. 11 | UMMSC Pretends Dr. Sims Voluntarily Resigned & Imaginary Second Fitness For Duty | Ex. 20 | June 27 Dr. Sims Sends Policy Violation and Discrimination Email to UMMS Executive Leadership |
| Ex. 12 | Shock Trauma Job Opening and Waitlist | Ex. 21 | June 29 Dr. Sims Forwards Emails To Walter Brown About Discrimination |
| Ex. 13 | Information Hire Data For GOR and STC CRNAs | Ex. 22 | Walter Brown's June 30th Retaliatory Memorandum |
| Ex. 14 | Information Data For STC Transfers | Ex. 23 | UMMSC Second Position Statement |
| Ex. 15 | GOR Cross-Trained CRNA g_STC* | Ex. 24 | Dr. Sims Removed From Work Because of Walter Brown's Retaliatory June 30th Memorandum |
| Ex. 16 | UMMSC Reduction-In-Force Goetz Lay-Off Most Senior GOR Full-Time Black CRNA | Ex. 25 | Dr. Sims Removed From Work Same Day as Meeting With HR About Protected Activity |
| Ex. 17 | May 2015 Fully Staffed | Ex. 26 | July 13 Dr. Sims's EEOC Intent & July 14 Henderson's Retaliation |
| Ex. 18 | Goetz's July 18th Fitness For Duty Referral | Ex. 27 | Paula Henderson Seeking Reason To Punish Sims After Receiving Protected Activity |
| Ex. 19 | June 18 Dr. Sims Complains In-Person of Race Discrimination | Ex. 28 | Paula Henderson Informing UMMS Executive Leadership That UMMC Will Handle Dr. Sims |

| Ex. 29 | Paula Henderson Admits Dr. Sims's Emails Do Not Corroborate Walter Brown's June 30 Retaliatory Memo | Ex. 38 | Performance Evaluation Policy |
|--------|------|--------|------|
| Ex. 30 | UMMSC Third Position Statement | Ex. 39 | Keith Persinger Upholds Dr. Sims's Termination |
| Ex. 31 | Fitness For Duty Policy & Guideline for Suspicion of Controlled Substance Diversion | Ex. 40 | UMMSC First Position Statement |
| Ex. 32 | June 18-22 Fitness for Duty Evaluation of Dr. Sims | Ex. 41 | Dr. Sims Submits Charge of Discrimination to Commission on November 3, 2015 |
| Ex. 33 | June 18 Negative Drug and Alcohol Testing of Dr. Sims | Ex. 42 | STC Uniqueness of On Call Program, Education, and TAT Bonus |
| Ex. 34 | Dr. Sims Sends Email to UMMS and UMMC about Disability Discrimination and Retaliation | Ex. 43 | Months of Dr. Sims's UMMSC Work Schedule |
| Ex. 35 | EAP Policy | Ex. 44 | Goetz's Text Messages To Dr. Sims |
| Ex. 36 | Appeal Procedure | Ex. 45 | Dr. Sims's June 2015 Schedule at Johns Hopkins |
| Ex. 37 | Dr. Sims May 7th Verbal Warning Corrective Action | Ex. 46 | Weekend Pay Extra Incentive |

| | | | |
|---|---|---|---|
| Ex. 47 | Paycheck Loss of Income From Work Suspension | Ex. 56 | Dr. Sims's Statements To Walter Brown |
| Ex. 48 | Termination Vacation Payout | Ex. 57 | Walter Brown's Bankruptcy and Lawsuits |
| Ex. 49 | Medical Diagnosis of Acute Situational Reaction from Goetz's FFD Referral | Ex. 58 | Walter Brown's Lawsuit |
| Ex. 50 | Dr. Sims's Two Excused Absences from UMMSC | Ex. 59 | Walter Brown's LLC Company |
| Ex. 51 | Keith Persinger's Review with HR Prior To Upholding Termination | Ex. 60 | Lisa Rowen Email To Warn Linda Goetz To Document Prior to EEOC or Lawsuit |
| Ex. 52 | Dr. Sims's Email To Goetz That She Stays Beyond Her Shift | Ex. 61 | Goetz Request Meeting With HR To Discuss Dr. Sims Options |
| Ex. 53 | Dr. Sims's Performance Evaluation | Ex. 62 | Dr. Sims Request Meeting With CEO About Race Discrimination Complaint |
| Ex. 54 | Anesthesiologist's Evaluation of Dr. Sims | Ex. 63 | Lisa Rowen Directs HR To Punish Dr. Sims After Meeting About Race Discrimination |
| Ex. 55 | Definition of Paranoia | Ex. 64 | Lisa Rowen Confirming Her Intent To Terminate Dr. Sims |

| Ex. 65 | Dr. Sims's Email To Goetz To Discuss Controlled-Substance Handoff Practice | Ex. 73 | Goetz's FFD Causes Dr. Sims Emotional Distress |
|---|---|---|---|
| Ex. 66 | Filed Under Seal List of CRNA Names | Ex. 74 | Filed Under Seal CRNA-1 |
| Ex. 67 | Board Exam | Ex. 75 | Filed Under Seal CRNA-1 Resignation & Severance Pay |
| Ex. 68 | UMMSC Offer Letters | Ex. 76 | Filed Under Seal CRNA-2 |
| Ex. 69 | Only One Full-Time Black CRNA Working in STC in 2015 | Ex. 77 | Filed Under Seal CRNA-3 |
| Ex. 70 | Dr. Sims's Expectation To Be Hired Into STC | Ex. 78 | Filed Under Seal CRNA-9 |
| Ex. 71 | Non-Black CRNA Worse Behavior Towards Goetz | Ex. 79 | Filed Under Seal CRNA-13 |
| Ex. 72 | Goetz Refuses Dr. Sims Vacation Request and Approves For Non-Black CRNA | Ex. 80 | Filed Under Seal CRNA-22 |

| | | | |
|---|---|---|---|
| Ex. 81 | Filed Under Seal CRNA-23 | Ex. 90 | Deposition Excerpts of Melissa Frisch |
| Ex. 82 | Filed Under Seal CRNA-24 | Ex. 91 | Deposition Excerpts of Linda Goetz & UMMSC 30(b)(6) Goetz Pages 100 (394-397) and 101 (398-401) |
| Ex. 83 | Defendant Linda Goetz Responses | Ex. 92 | Deposition of Neddra King |
| Ex. 84 | Defendant Lisa Rowen Admission Responses | Ex. 93 | Commission's Interview of Wanda Walker-Hodges |
| Ex. 85 | UMMC, LLC Interrogatories Responses | Ex. 94 | Deposition Excerpts of Plaintiff's Economic Expert Witness Dr. Stan Smith |
| Ex. 86 | UMMS Interrogatories Responses | Ex. 95 | Filed Under Seal Declaration of CRNA-5 |
| Ex. 87 | Deposition Excerpts of Walter Brown | Ex. 96 | Declaration of Dr. Sims |
| Ex. 88 | Deposition Excerpts of UMMSC 30(b)(6) Nicole Leyba | Ex. 97 | Deposition Excerpts of Plaintiff Faresha Sims |
| Ex. 89 | Deposition Excerpts of 30(b)(6) Maurice Davis | Ex. 98 | Filed Under Seal CRNA-17 |

## I.     INTRODUCTION

Dr. Sims is a black female certified registered nurse anesthetist (CRNA). She is the only CRNA in the nation to receive a clinical excellence award from both a nationally ranked number one nurse anesthesia program– Virginia Commonwealth University, and a nationally ranked number one hospital– Johns Hopkins.[1]  The basis for the award from Johns Hopkins was that "she has clearly demonstrated an unparalleled level of clinical excellence and a commitment to our patients." [2]  Dr. Sims also received two awards from the University of Maryland Medical Center for clinical excellence– Rising Star of Excellence in Advanced Practice Nursing and Employee of the Month. Her peers nominated her because "she is committed to compassionate, safe, high-quality patient care." [3]  She was always an honor student and graduated with a cumulative grade point average of 3.9 on a 4.0 scale from Virginia Commonwealth University with a master's and doctorate degree in nurse anesthesia.[4]  She has been inducted into several honor societies. Dr. Sims is featured in her professional organization's national magazine, the American Association of Nurse Anesthetists, as the first student to be spotlighted in a column.[5]  She is also featured in Imagine magazine to inspire Baltimore's youth.[6]  Dr. Sims was a "rising star in the operating rooms at UMMC." [7]  She was the only black CRNA at the University of Maryland Medical Center with a doctorate degree.

The CRNAs and anesthesia residents are responsible for sharing the workload of completing preoperative anesthesia evaluations also called preops. On May 2, Dr. Sims completed ninety-nine percent of the workload and asked Jessie Keifer, an anesthesia resident, if he along with the other two anesthesia residents would complete the remaining one percent. Keifer agreed that the anesthesia residents would complete the remaining preoperative evaluations. On May 3, Dr. Sims began her 12-hour shift by entering the control room to determine her workload.[8] Keifer was scrolling through Yahoo!News on the work

---

[1] Rankings based on U.S. News & World Report.  Available at Ex. 1.

[2] https://anesthesiology.hopkinsmedicine.org/wp-content/uploads/2019/04/Update-from-the-Chief_032019-update.pdf Also at Ex. 2.

[3] Ex. 3.

[4] Ex. 4.

[5] https://www.aana.com/docs/default-source/foundation-aana-com-web-documents-(all)/faresha-sims-rn-bsn.pdf?sfvrsn=ca4d45b1_0  Also at Ex. 5.

[6] https://cty.jhu.edu/imagine/docs/2018/career-sims.pdf   Also at Ex. 6.

[7] Ex. 3 at MF0024

[8] Dates listed without a year are in 2015.

computer. Dr. Sims asked if they had a busy night. Blake Watterworth, an anesthesia resident, responded that they had a great night because they got to sleep all night. The preoperative evaluations from the previous day had not been completed as agreed upon. It was normal for CRNAs to do all the workload while anesthesia residents slept or scrolled the Internet. This was an ongoing frustration of CRNAs. Dr. Sims asked Keifer if there was a reason the remaining preoperative evaluations were not completed. Keifer immediately became defensive and explained that anesthesia residents should not have to do any of the shared workload because CRNAs get paid so much more money than anesthesia residents. Dr. Sims disagreed with his argument against working. She never yelled, screamed, or cursed– no one ever said that she did. No one ever complained of feeling threatened by Dr. Sims.

On May 7, Dr. Sims's supervisor, Linda Goetz– white female, issued a verbal warning corrective action to Dr. Sims for disputing with anesthesia resident. Forty-six days later on June 18, Dr. Sims was off duty on an approved vacation leave, but required to undergo a fitness for duty evaluation and an observed urine drug and alcohol test. Goetz exaggerated the verbal warning corrective action to support a fitness for duty referral. Goetz asserted that Dr. Sims had the type of "aggressive behavior" that warranted immediate drug and alcohol testing. Goetz also submitted trumped-up statements to support her fake accusation that Dr. Sims was stealing narcotics and self-injecting. Goetz provided false statements and fake accusations to require Dr. Sims to undergo a fitness for duty evaluation to harass and humiliate her because she is black. Goetz never required a non-black CRNA to undergo a fitness for duty evaluation because of a minor workplace disagreement. Goetz had a racially stereotypical belief and bias that Dr. Sims was "argumentative and aggressive like the average black woman."

On June 18, Dr. Sims complained that Goetz's fitness for duty referral was discriminatory and never worked another day at the University of Maryland Medical Center. Defendants purport that Dr. Sims voluntarily resigned. The evidence shows that Dr. Sims's employment was involuntarily terminated because she refused a supervisory EAP referral. Defendants admit they do not terminate employees for refusing a supervisory EAP referral. The evidence reveals that Dr. Sims's employment was terminated in retaliation for her complaints of discrimination and retaliation.

2

## II.     STATEMENT OF FACTS [9]

**A.     Top 62 Triable Issues Of Material Fact That Preclude Summary Judgment**

    **1.     The Top 10 Most Crucial Dispositive Facts That Destroy The Defense**

       1.     A supervisory EAP referral is not a fitness for duty evaluation. (Ex. 92. King Depo. 62:12-14.)

       2.     A supervisory EAP referral form was submitted to EAP regarding Dr. Sims, but not a second fitness for duty referral form. (Ex. 7; Ex. 90 Frisch Depo 83:3-6, 83:9-84:16; Ex. 92 King Depo. 62:12-63:13; Ex. 91 Goetz Depo. 275:14-276:11.)

       3.     Defendants permit employees the right to *always* refuse a supervisory EAP referral and no disciplinary action will be taken. (Ex. 8 ("The employee may refuse this referral and this will not result in disciplinary action. It is always the employee's right to refuse the EAP."); Ex. 90 Frisch Depo. 61:16-17; Ex. 92 King Depo. 48:15-20; Ex. 91 Goetz Depo. 29:2-7.)

       4.     Dr. Sims's employment was involuntarily terminated because she refused a supervisory EAP referral. (Ex. 9 at UMMC787 ("involuntary termination").)

       5.     Defendants pretend that Dr. Sims refused a "medical examination," but Jan Buxton in EAP cannot perform medical examinations. (Ex. 10; Ex. 90 Frisch Depo. 77:9-14.)

       6.     Defendants pretend that Dr. Sims refused a "second fitness for duty evaluation," but do not believe that a fitness for duty is a "medical examination." (Ex. 11 also at ECF 159-1, p. 19-20; Ex. 11 also at UMMSC Answer ECF 43, p. 31.)

       7.     Defendants pretend to not know the meaning of the word "medical examination." They say it is a vague and ambiguous term yet used it in Dr. Sims's termination letter. (Ex. 10; Ex. 86 UMMS Interrog. No. 2.)

---

[9] Defendants refused to produce most of the relevant evidence in this litigation despite a motion to compel. (ECF 66) After the Commission's probable-cause finding, Defendants stated the Commission "cherry-picked the facts it needed to get the outcome that it wanted" when "presented with a complicated set of facts." (Ex. 30 at PL5167.) So, to avoid Plaintiff from having all the relevant evidence, Defendants just refused to produce in this litigation to avoid liability for their unlawful acts. Plaintiff was able to secure some of the evidence from the Commission, but the Commission lost some of Defendants' evidence. For example, Defendants refused to produce, among many other things, their position statements, Walter Brown's employee file, and almost all comparators' evidence.

8.    The July 10th email specifically states the EAP appointment on July 13 was because Jan Buxton wanted to talk to Dr. Sims about Sims's concerns which were discrimination and retaliation. (Ex. 9 at UMMC563; Ex. 90 Frisch Depo. 83:9-84:16, 85:3-13.) ("Q. So was Neddra King's July 10, 2015 email to Dr. Sims a fitness for duty referral?  A. No. It was just simply a request to go to EAP.")

9.    Defendants never provided Dr. Sims written notice of a "medical examination" or "second fitness for duty evaluation" prior to termination. (Ex. 9; Ex. 90 Frisch Depo 83:9-85:13.)

10.    A "second fitness for duty" evaluation or second "medical examination" was not indicated or necessary. (Ex. 90 Frisch Depo. 55:14-56:9, 58:12-13, 61:6-10.)

## 2.    Supervisor Does Not Allow Full-Time Black CRNAs In The Prestigious Shock Trauma Center

11.    Goetz used a waitlist to make hiring decisions into Shock Trauma Center (STC). (Ex. 12; Ex. 96 Sims's Declare ¶ 11.)

12.    Goetz placed Dr. Sims on the waitlist in 2012 to be hired into STC. (Ex. 12 at UMMC39-UMMC40 (*See* Goetz's note that Dr. Sims wanted STC and #4 on STC waitlist.).)

13.    Goetz never hired, transferred, or cross-trained a full-time black CRNA into STC during Dr. Sims's entire employment– April 8, 2013 through August 17, 2015. (Ex. 13-15.)

14.    Goetz did hire, transfer, and cross-train full-time non-black CRNAs into STC during Dr. Sims's employment. (Ex. 13-15.)

## 3.    Supervisor Twice Eliminates The Most Senior Black CRNA When Fully Staffed

15.    The most senior GOR full-time black female, CRNA-8, was the only GOR CRNA that Goetz selected for lay-off in 2013 during a reduction-in-force. (Ex. 13; Ex. 16; Ex. 30 at PL3269.)

16.    Goetz retained two white males, CRNA-30 and CRNA-31, that she had just hired despite "UMMC financial challenges," but laid-off the most senior GOR full-time black female, CRNA-8. (Ex. 13; Ex. 16.)

17.    In May 2015, the GOR was fully staffed. (Ex. 17.)

4

18.    On May 7, Wanda Walker-Hodges, CRNA Manager– black female, told Dr. Sims that she was aware that Goetz was discriminating against Dr. Sims because of her race, and that Wanda was keeping notes and going to report it. (Ex. 97 Sims's Depo. 183:19-192:24.)

19.    On May 7, Wanda Walker-Hodges, CRNA Manager–black female, told Dr. Sims that Goetz was going to try to get rid of Dr. Sims because Goetz had hired "too many white CRNAs" and now wanted to "get rid of the most senior black CRNA" in the GOR "like she did before." (Ex. 97 Sims's Depo. 183:19-192:24.)

20.    Dr. Sims was the most senior GOR full-time black female CRNA on June 18– date of Goetz's FFD referral, and August 17– termination date. (Ex. 13; Ex. 17.)

### 4.    Supervisor Makes False Accusations To Harass Black CRNA

21.    On June 18, Goetz asserted twice that she believed Dr. Sims was diverting drugs, but Goetz never had an honest belief that Dr. Sims was diverting drugs. (Ex. 18; Ex. 83 Goetz Interview, p.4 [7:24-7:33]; Ex. 83 Goetz Interr., No. 6; Ex. 91 Goetz Depo. 181:8-182:9, 286:12-15, 299:15-21.)

22.    On June 18, Goetz wrote that she observed Dr. Sims having aggressive behavior warranting immediate drug and alcohol testing, but Goetz had not observed Dr. Sims at all. (Ex. 18.)

### 5.    Black CRNA Complains About Race Discrimination

23.    On June 18, Dr. Sims complained in-person of race discrimination.[10] (Ex. 19.)

24.    On June 23 and 27, Dr. Sims sent UMMC and UMMS executive leadership, respectively, an email with the subject line– Policy Violation and Discrimination. (Ex. 20)

25.    On June 29, Walter Brown– UMMC Investigator– became aware that Dr. Sims was complaining about race discrimination. (Ex. 21; Ex. 87 Brown Depo 62:12-16, 66:20-67:1, 67:12-68:12, 97:1-9.)

### 6.    Former Baltimore City Police Officer Creates a Retaliatory Memorandum to To Portray Black CRNA With Mental Illness

---

[10] Defendants reference that Dr. Sims used the word "personal attack." During the meetings about Dr. Sims's discrimination complaint, she explained to Rowen and Human Resources that she called it a "personal attack" because it was based on her race, a personal attribute, and not job performance. Henderson acknowledges in her July 14th letter that Defendants understood Dr. Sims to be complaining of and about discrimination.

26.     Walter Brown had been a police officer at the Baltimore City Police Department for seven years prior to becoming an UMMC Security Investigator. (Ex. 87 Brown Depo. 92:9-12, 93:7-11, 170:1-4, 170:12-14.)

27.     On June 30, Brown wrote a memorandum intentionally attributing false statements to Dr. Sims saying that she that Goetz "had her followed, attempted to run her off the road and showed up at her home." (Ex. 22; Ex. 96 Sims Declare ¶ 17 at PL5727-PL5728; Ex. 97 Sims Depo. 254:1-264:7.)

28.     On June 30, Brown was promoted to Assistant Director of Security and received a salary increase from $46,000 to $110,000 and a $50,000 lump-sum payment for "retro-pay." (Ex. 23 at PL5164; Ex. 57 at PL5914-PL5915; Ex. 87 Brown Depo. 106:11-15; Ex. 89 UMMSC Depo. 11:9-10.)

29.     On June 30, Dr. Sims was suspended from work purportedly because of Brown's memorandum. (Ex. 24 at UMMC640.)

**7.     University of Maryland Medical Center Recommends EAP To Black CRNA**

30.     On July 8, Dr. Sims met with Neddra King and Nicole Leyba in Human Resources to further discuss her race discrimination complaint. (Ex. 24.)

31.     During the meeting, Dr. Sims rejected King's advice to withdraw her race discrimination complaint, and Dr. Sims stated false statements by Brown were being attributed to her in retaliation for her race discrimination complaint. (Ex. 96 Sims Declare ¶ 15.)

32.     On July 8, about two hours after Dr. Sims stated her unwillingness to withdraw her race discrimination complaint and opposed retaliation, King sent Dr. Sims an email that she could not work the next day as scheduled. (Ex. 25.)

33.     On July 9, Dr. Sims responded that the forced leave because of her discrimination complaint was retaliation and pleaded for the "unlawful behavior" to halt. (Ex. 25.)

34.     On July 10, King sent Dr. Sims an email recommending that she go to EAP because Jan Buxton, EAP counselor, wanted to talk with Dr. Sims about her concerns which were discrimination and retaliation. (Ex. 9.)

35.     On July 10, King submitted a supervisory EAP referral form to EAP regarding Dr. Sims. (Ex. 7; Ex. 92 King Depo. 62:12-63:13; Ex. 90; Ex. 90 Frisch Depo 83:3-6.)

36.     Goetz completed the supervisory EAP referral form and King submitted it to EAP on behalf of Goetz. (Ex. 92 King Depo. 66:3-13.)

37.     A supervisory EAP referral is not mandatory. (Ex. 8; Ex. 90 Frisch Depo. 61:16-17.)

38.     It is *always* the employee's right to refuse a supervisory EAP referral and no disciplinary action will be taken. (Ex. 8.)

### 8.    Black CRNA Complains About Retaliation

39.     On July 13 at 6:39 a.m., Dr. Sims sent an email informing Defendants that she would be utilizing the EEOC to deter further retaliation from Human Resources. (Ex. 26 at PL2029-PL2030.)

40.     On July 13 at 7:35 a.m., Paula Henderson– Vice President of Human Resources– directed with high importance that three human resources employees find an email "in which [Dr. Sims] specifically related Lisa and Linda to the actions she was alleging occurred outside of work?" (Ex. 27.)

41.     On July 13 at 7:37 a.m., Henderson sent Robert Chrencik– UMMS President and CEO, and David Swift– UMMS Senior Vice-President & Chief Human Resources Officer– a direct reply to Dr. Sims's July 13th email to inform them ("Bob and David") that "[m]any of us are involved in bringing this to an appropriate resolution." (Ex. 28.)

42.     On July 13 at 7:45 a.m., Henderson admits that Dr. Sims does not state in email that Lisa and Linda were linked to the things occurring outside of work. (Ex. 29.)

### 9.    University of Maryland Medical Center Continues Retaliating by Purporting to Question Whether Black CRNA Is Safe

43.     On July 14, Henderson responded to Dr. Sims's July 13th email, and informed Dr. Sims for the first time that Defendants questioned her ability to safely care for patients. (Ex. 26 at PL4866-4867.)

44.     On July 14, Henderson "stepped in" and placed Dr. Sims on unpaid suspension.[11] (Ex. 26 at PL4867.)

---

[11] Defendants had already placed Dr. Sims on suspension on June 30. She was receiving some, not all, of her normal pay prior to Henderson "stepping-in" on July 14 and placing her on unpaid suspension.

45. Defendants purport that Dr. Sims had a mental illness called paranoia because Brown's memo indicated apparent paranoia and distrust of her supervisors. (Ex. 30 at PL5174 and PL5192.)

**10. University of Maryland Medical Center Medical Director Deemed Black CRNA Mentally and Physically Fit For Duty**

46. Dr. Sims underwent a fitness for duty evaluation from June 18-22 because of Goetz's FFD referral on June 18. (Ex. 18; Ex. 32.)

47. On June 18, Dr. Sims was required to submit to an observed urine drug and alcohol test, and the results were negative for both drugs and alcohol. (Ex. 33)

48. Dr. Melissa Frisch– UMMSC Medical Director– performed a medical examination of Dr. Sims and deemed her mentally and physically fit for duty on June 22. (Ex. 31; Ex. 32; Ex. 90 Frisch Depo 68:2-9, 159:12-18.)

49. UMMSC never believed that Dr. Sims was unsafe to provide patient care. (Ex. 90 Frisch Depo. 85:18-86:1(Q. After June 22, 2015 – you cleared Dr. Sims on June 22, 2015. After that date, did you ever believe that Dr. Sims might cause harm to patients? A. I did not.); Ex 90 Frisch Depo. 157:13-21, 158:1-6; Ex. 91 Goetz Depo. 285:6-10 (Q. During Dr. Sims's entire employment at UMMC, was she performing her essential job duties competently? A. Your clinical care while you were employed at UMMC was not called into question.); Ex. 92 King Depo. 95:18-21, 96:8-14, 133:20-134:2, 169:14-170:2 (Q. Did you have any concerns about Dr. Sims's ability to safely perform her job duties? A. No.); Ex. 91-C UMMSC 30(b)(6) Goetz Depo. 400:18-401-4.)

**11. University of Maryland Medical Center Terminates Black CRNA And Pretends She Voluntarily Resigned to Whitewash The Retaliation**

50. On August 9, Dr. Sims sent a letter via email to Defendants complaining of disability discrimination and retaliation. (Ex. 34.)

51. On August 19, Defendants terminated Dr. Sims's employment. (Ex. 9 at UMMC787; Ex. 10.)

52. Defendants do not terminate employees for refusing a supervisory EAP referral. (Ex. 8; Ex. 35 at UMMC28; Ex. 92 King Depo. 57:7-58:1.)

53.     Defendants terminated Dr. Sims's employment for refusing a supervisory EAP referral. (Ex. 9.)

54.     King told Dr. Sims that Goetz and Lisa Rowen– Senior Vice President of Patient Care Services and Chief Nursing Officer– who is Goetz's boss terminated Dr. Sims's employment. (Ex. 36 at UMMC454; Ex. 96 Sims Declare ¶ 6; Ex. 97 Sims Depo. 89:7-90:9.)

55.     Dr. Sims never had any job performance problems or patient care issues. (Ex. 30 at PL5188; Ex. 96 Sims Declare ¶ 7.)

56.     Dr. Sims's only corrective action ever was a verbal warning issued by Goetz on May 7 regarding a minor workplace disagreement between Dr. Sims and anesthesia resident. (Ex. 37; Ex. 23 at PL005162.)

57.     Dr. Sims's 2015 Annual Performance Evaluation was not performed even though policy required it to be completed within thirty days of due date, April 8, 2015, to assure Dr. Sims was given "meaningful feedback" about the performance of her job duties. (Ex. 38.)

58.     Defendants never produced Dr. Sims's 360-peer job performance feedback for her 2015 Annual Performance Evaluation despite a motion to compel because they spoliated evidence. (Ex. 23 at PL5163).

59.     Dr. Sims received very positive 360-peer evaluations for her 2015 Annual Performance Evaluation. Rex Huber submitted the highest ratings in all categories for Dr. Sims. Dr. Sims was performing the same or better than her 2014 Annual Performance Evaluation. (Sims Declare ¶¶ 8-9.)

60.     Keith Persinger– Executive Vice President and Chief Operating Officer– made the decision to promote Walter Brown on June 30– same day Brown wrote his memorandum that Defendants purport called into question whether Dr. Sims was safe to provide patient care. (Ex. 23 at PL5164; Ex. 22; Ex. 26 at PL4866; Ex 89. UMMSC Depo. 70:1-3.)

61.     Keith Persinger made the final decision to uphold Dr. Sims's termination. (Ex. 39.)

62.     Defendants allege that Dr. Sims voluntarily resigned to conceal unlawful retaliation, but her employment was involuntarily terminated. (Ex. 11 also at ECF 159-1, p. 20; Ex. 9 at UMMC787; Ex. 40.)

**B.**     **Supervisor Linda Goetz's Credibility In Dispute Because She Committed Perjury**

1.     Goetz testified that CRNA-5 did not continue working at UMMSC after CRNA-5 was accused of mishandling drugs, but CRNA-5 did. (Ex. 91 Goetz Depo. 86:1-6; Ex. 95 CRNA-5 Declare ¶ 14.)

2.     Goetz testified that she never saw CRNA-1 sleeping while providing anesthesia, but Goetz did at least three times. (Ex. 74; Ex. 91 Goetz Depo. 33:3-10.)

3.     Defendants' Ex. 32 (ECF 159-34 p. 1-23) which is Goetz's personal notes, is in dispute. (Ex. 97 Sims Depo. 181:2-183:5.) Goetz even testified that her notes are not always accurate. (Ex. 91 Goetz Depo. 147:14-15 ("What my notes say and what our conversations were could have been very different.").) For example, Goetz wrote in her notes on May 7 that Dr. Sims was told there would be another meeting to revisit her ongoing communication. None of that was documented on the verbal warning corrective action form nor was there another meeting because no one ever told Dr. Sims any of that. (*Id.*) UMMC Employee Performance Evaluation policy provides that the annual performance evaluation, not Goetz's notes, is the official record of how the employee is progressing toward the expected standards. (Ex. 38.)

4.     Goetz exaggerated and trumped up a minor workplace disagreement between Dr. Sims and anesthesia resident to try to justify a FFD. (Ex. 93 WWH Interview, p. 1 [1:43] – p. 3 [5:42] (*See* Wanda-Walker Hodges, CRNA Manager, explaining that it was a minor issue and not a big deal.) Dr. Frisch, UMMSC Medical Director, testified that the reason for Dr. Sims's May 7th verbal warning corrective action "generally would not be" an indication of drug diversion. (Ex. 90 Frisch Depo. 24:3-7, 25:2-11.) First, Defendants present inadmissible hearsay from a white male CRNA, Rex Huber. He worked nightshift and was not present during the day shift on May 3– the day of the minor workplace disagreement. (Ex. 96 Sims Declare ¶ 9.) Second, Defendants belabor the complaints of the anesthesia residents which Defendants summed up in two sentences as the "substance of complaint" for the Commission: (1) anesthesia resident was offended because understood Dr. Sims to be implying that the anesthesia residents had poor work ethic, and she did not know their names; and (2) anesthesia resident perceived Dr. Sims as using a rude tone and calling him an "almost doctor." (Ex. 23 at PL5162-PL5163.) And then the director of the anesthesia residents, Dr. Carol Hong, verbally informed Linda Goetz that the

10

anesthesia residents informed Dr. Hong that they did not like Dr. Sims's attitude regarding the shared workload. (*Id.*) Despite many disputes over those facts, none of those facts are material or dispositive because it could never justify Goetz's fitness for duty (FFD) referral of Dr. Sims because Goetz documented that the FFD referral was because Goetz supposedly believed that Dr. Sims was diverting drugs. (Ex. 97 Sims Depo. 162:8-163:22, 166:16-174:5, 176:16-177:20; Ex. 18.) Yet, Goetz never believed that Dr. Sims was diverting drugs. (Ex. 83: Goetz Interview p.4 [7:24-7:33], Goetz Interr., No. 6; Ex. 91 Goetz Depo. 181:8-182:9, 286:12-15, 299:15-21.)

## III.   MOVING PARTY *FAILS* INITIAL BURDEN OF SUMMARY JUDGMENT

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is not genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The movant bears the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Supreme Court emphasized that "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [the record] which it believes demonstrate the absence of a genuine issue of material fact." (*Id.*) "Plainly, a conclusory assertion that the nonmoving party has no evidence is insufficient. Such a 'burden' of production is no burden at all and would simply permit summary judgment procedure to be converted into a tool for harassment. (citation omitted).[12]" (*Id.*) The Ninth Circuit reversed summary judgment in favor of defendants when "the district court confused plaintiff's obligation at trial and plaintiff's obligation as a nonmoving party at summary judgment. At trial, a plaintiff must produce evidence in support of its claim to carry its ultimate burden of persuasion. But at summary judgment, a nonmoving party plaintiff has no obligation to produce anything until the moving party defendant has carried its initial burden of production." *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, page (9th Cir. 2000). The court further stated:

> A moving party may not require the nonmoving party to produce evidence supporting its
> claim or defense simply by saying that the nonmoving party has no such evidence. See Clark

---

[12] Justice Brennan's analysis of the burdens did "not disagree with the [majority's] legal analysis." 477 U.S. at 329. His disagreement was predicated solely on a differing perception of its application to the facts of the case. *Id.* At 334.

929 F.2d at 608 ("Even after Celotex it is never enough simply to state that the non-moving party cannot meet its burden at trial."). In a typical case, in order to carry its initial burden of production by pointing to the absence of evidence to support the nonmoving party's claim or defense, the moving party will have made reasonable efforts, using the normal tools of discovery, to discover whether the nonmoving party has enough evidence to carry its burden of persuasion at trial. See id. (noting that a moving party must "point to materials on file which demonstrate that a party will not be able to meet that burden").

(*Id.*) Rule 56(c)(1) states, in relevant part, "[a] party asserting that a fact cannot be [] genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations [], admissions, interrogatory answers, or other materials." "The Federal Rules of Civil Procedure require parties to cite all evidence in support of their positions at summary judgment, thus permitting a district court to limit its review to such cited materials. See Fed. R. Civ. P. 56(c)(1), (3)." *Carlson v. Boston Scientific Corp.*, No. 15-2440 (4th Cir. May 9, 2017). The Fourth Circuit refuses "to completely disregard the Federal Rules of Civil Procedure governing summary judgment motion practice." (*Id.*)

The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. *Celotex* did not change the general rule. *Celotex* simply holds that under certain circumstances the movant may meet its Rule 56 burden without negating an element of the non-moving party's claim and that under such circumstances it is sufficient to point to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden. Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial. This court is in a difficult position because of the way this case has been approached by both [defendant], as the moving party, and the district court. The district court never discussed whether [defendant] met its burden as the moving party on summary judgment.

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, page (11th Cir. 1991).

Defendants submitted an eleven-page argument section. They did not identify specific elements that were supposedly lacking to warrant summary judgment. Except for the individual liability claims of Rowen and Goetz and the improper "back pay damages" claim, Defendants cite to evidence *only* five times in their entire argument. All except one is Goetz's testimony. Goetz's credibility is in dispute, so Defendants' entire argument section is unsupported by the evidence. And all of Defendants' argument are conclusory and bare assertions that "Ms. Sims has no evidence." **Based on the rules and caselaw, it should be impossible for any part of Defendants' motion to be granted because of its "facial deficiency."** Nick's Garage, Inc. v. Progressive Casualty Insurance Co., No. 15-1426 (2d Cir. 2017)

> [U]nless the moving defendant cites portions of the record that show its entitlement to
> judgment, an assertion by the defendant that the plaintiff "has not produced any evidence,"
> without more, does not show that the plaintiff has insufficient evidence. Such a statement fails
> to show either that there is no genuine dispute as to any material fact or that the defendant is
> entitled to judgment as a matter of law. A defendant's motion for summary judgment based
> on such a statement should be subject to a motion to dismiss by reason of its facial deficiency,
> or to denial.

*Id.* at 16. "The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties – not the court." *Carlson v. Boston Scientific Corp.*

## IV.   ARGUMENT

### A.   Black CRNAs Not Allowed To Work In The Prestigious Shock Trauma Center Because of Race

Count I– Discriminatory Hiring & Work Assignments[13]. Defendants argue that summary judgment is warranted on Count I because it is allegedly time-barred and not an adverse employment action. Dr. Sims's discriminatory hiring and work assignments claim is timely and an adverse action.

Defendants also argue **without pointing to any evidence** that "Ms. Sims has not identified any specific request that she made to work in shock trauma, nor has she identified any opening in shock trauma into which she could have been transferred. She also has absolutely no evidence of any comparator[.]" Dr. Sims shows evidence of all of this.

---

[13] Transferring a GOR CRNA to STC requires hiring into STC, so transferring or hiring into STC is the same.

*Timely.* Count I is not predicated on the continuing violation theory, and Defendants make no argument that it is. Notwithstanding, Dr. Sims alleged continuing acts of discrimination when she submitted her charge of discrimination. On November 3, 2015, Dr. Sims submitted to the Baltimore City Community Relations Commission a 3-page charge of discrimination along with a 30-page cover letter with hundreds of exhibits, and the continuing action box was checked. (Ex. 41.) One of the Commission's investigator, Ms. Veronica Thomas, refused to approve the charge of discrimination because the continuing action box was checked. (Ex. 96 Sims Declare ¶ 10.) The investigator argued that the discriminatory action could not be "continuing" if it stopped in October and the charge was submitted in November. (*Id.*) For that reason only, the investigator insisted the charge of discrimination be signed without the continuing action box checked. (*Id.*) After a month of debating, Plaintiff signed the charge of discrimination without the continuing action box checked because all the information in the charge of discrimination and its accompanying documents allege the "dates discrimination took place" was from "4/13/2013" to "10/28/2015." All of that and the allegations in the charge of discrimination show Dr. Sims alleged there were continuing acts of discrimination.

Defendants argue that Dr. Sims cannot revive a time-barred failure-to-hire claim based on her hire date. Defendants do not argue that Dr. Sims did not complete a formal application because it is undisputed that Goetz used an informal waitlist to make hiring decisions in STC. (Ex. 96 Sims Declare ¶ 11.) Defendants omit the material fact that Dr. Sims had been on Goetz's waitlist to be hired into Shock Trauma Center (STC) from March 2012 to August 2015. (Ex. 12 at UMMC40.) Goetz used an informal application process– the waitlist– for hiring, transferring, and cross-training in STC. (Ex. 96 Sims Declare ¶ 11.) Goetz placed Dr. Sims on the waitlist in June 2012 to be hired into STC. (Ex. 12 at UMMC40; Ex. 91 Goetz Depo. 146:12-147:4.) Dr. Sims never requested to be removed from the waitlist. (Ex. 96 Sims Declare ¶ 12.) Dr. Sims repeatedly asked to work in STC throughout her entire employment and followed up consistently with Goetz by inquiring about being hired and cross-trained in STC. (Ex. 96 Sims Declare ¶¶ 12-13.) On or after February 19, 2015, Dr. Sims reminded Goetz that she was still wanting and expecting to be hired into STC. (*Id.*) Goetz told Dr. Sims that her name was still on the waitlist to be hired and cross-trained in STC, and Goetz promised to let Dr. Sims know when her turn came. (*Id.*) Dr. Sims inquired and followed up again about being hired or cross-trained on May 7, 2015 and Goetz told her that

14

she may not be a good fit for STC. (*Id*). Dr. Sims was on the waitlist to be hired and cross-trained into STC from her entire employment. (*Id.* at ¶ 11). Dr. Sims's termination letter is dated August 19, 2015 and is within the 300-day and four-year statute of limitations for Title VII and §1981, respectively. (Ex. 10.) Even if the count was limited to the days between February 19, 2015 to December 9, 2015, Dr. Sims's discriminatory hiring and work assignment claim is timely for both Title VII and §1981. Defendants misinterpret their referenced case, *White*, to apply a three-year statute of limitations under §1981. *White* explains precisely that "Section 1981 claims based on conduct occurring after the formation of an employment contract [] arise under the 1991 amendments[,]" and "are governed by the four-year federal statute of limitations set forth in 28 U.S.C. §1658. Dr. Sims's specific requests to be transferred (same as hiring) or cross-trained to STC on both February 19, 2015 and May 7, 2015, among others, were after the formation of an employment contract.

*Adverse Employment Action*. Defendants argue that even if Dr. Sims was not allowed to work in Shock Trauma Center that "denial of an opportunity" cannot be a discriminatory adverse employment action. Defendants' referenced case, *Holland*, supports Dr. Sims's position because an assignment in GOR was a "decrease in compensation" thus an adverse employment action. Goetz's testimony that there is no difference in compensation is false because only STC had (1) an On-Call program which provided an opportunity to make up to an additional $1,200 each on-call shift; (2) a TAT bonus program which provided extra pay based on turn-around-time (TAT) i.e., efficiency; and (3) prestige and unique training opportunities for career growth in the specialty of trauma. (Ex. 42; Ex. 91 Goetz Depo. 290:2-295:10, 296:16-297:1.) The GOR did not have any of that. (*Id.*) However, if a GOR CRNA was cross-trained in STC then that GOR CRNA had all of those opportunities when assigned to work in STC. (Ex. 96 Sims Declare ¶ 11). Goetz was the decision-maker on hiring, transferring, and cross-training CRNAs to STC.[14] She supposedly used her informal waitlist to make those decisions. (*Id.*) Goetz never hired or cross-trained Dr. Sims to STC despite Dr. Sims's repeatedly requesting for both. Dr. Sims stayed late working beyond her shift many times and was not paid for the extra time she worked. (Ex. 96 Sims Declare ¶ 19.) She

---

[14] A cross-trained GOR CRNA is hired in the GOR, but crosses over and works in STC. A cross-trained CRNA is a CRNA that has training in both the GOR and STC.

would have been paid for working beyond her shift if working in STC. (Ex. 42 at PL1381; Ex. 96 Sims Declare ¶ 19.) Further, the R Adams Cowley Shock Trauma Center at the University of Maryland Medical Center is the nation's first and only integrated trauma hospital.[15] "Shock Trauma is the heart of Maryland's exceptional Emergency Medical Services (EMS)– the first coordinated system in the country." [16] The STC CRNAs have the opportunity be on the GO-TEAM which serves as a specialized component of Maryland's statewide emergency medical system.[17] The team members undergo a unique core training curriculum. (Footnote 16.) The opportunity to be a part of Maryland's statewide emergency medical system and receive unique specialty training is only available to STC CRNAs, not GOR CRNAs. Dr. Sims was denied both the prestige and extra money that came only from working in the Shock Trauma Center.

*Prima facie*. Dr. Sims is a black female CRNA. She made requests through Goetz's informal application process– the waitlist– from March 2012 to August 17, 2015 to be hired into Shock Trauma Center. (Ex. 12.) Dr. Sims consistently followed up with Goetz about Dr. Sims's requests to be hired and cross-trained in STC. (Ex. 96 Sims Declare ¶¶ 12-13.) Goetz always confirmed that Dr. Sims was on the waitlist to be hired and promised on February 19, 2015 that she would let Dr. Sims know when her turn came to be hired or cross-trained in STC. (*Id.* at ¶ 12.) Dr. Sims followed up again on her request to be hired or cross-trained in STC on May 7, 2015, and Goetz informed Dr. Sims that she is "not a good fit" for STC. (*Id.* at ¶ 13.) Goetz assigned non-managerial, full-time GOR CRNAs in STC that had less education, except CRNA-21, and the same or less CRNA work experience. (Ex. 15 (*See* g_STC* CRNA: 10, 13, 14, 15, 21, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40.)[18]; Ex. 13 [19].) All these CRNAs were non-black. All the CRNAs that Goetz hired or transferred to STC from April 2013 to August 2015 were non-black and

---

[15] https://www.umms.org/ummc/health-services/shock-trauma

[16] https://www.ummsfoundation.org/site/SPageServer/;jsessionid=00000000.app260a?NONCE_TOKEN=D94B86E5FEED5854364D32E227BC15B9&pagename=STC_About

[17] https://www.umms.org/ummc/health-services/shock-trauma/healthcare-professionals/emergency-medical/go-team

[18] Ex. 15 shows g_STC* which means a GOR CRNA was assigned to work in STC.

[19] Last pages of Ex. 13 with pictures show master's versus doctorate degree. Also available at (p. 51.) https://www.medschool.umaryland.edu/media/SOM/Departments/Anesthesiology/About-Us/Annual-Reports/UMMSDeptofAnesAnnReport2013(2).pdf   and https://www.medschool.umaryland.edu/Anesthesiology/Faculty-and-Staff/Certified-Registered-Nurse-Anesthetists/Our-CRNAs/

had a master's degree, except CRNA-25, which was less education than Dr. Sims because she had two bachelor's, a master's, and doctorate degree. (*See* CRNA: 6, 25, 26, 27, 28 on Ex. 13 and Ex. 14.) Defendants never mention or argue that Dr. Sims was unqualified to work in STC. She had all the qualifications, including education, certification, and licensure, for a full-time CRNA position and cross-training in STC. Yet, she was never hired or cross-trained in STC. Non-black CRNAs with the same or less educational qualifications were hired and cross-trained into STC while Dr. Sims was on the waitlist. (Ex. 13-15.)

*LNDR*. Defendants have not proffered a legitimate nondiscriminatory reason for not hiring, transferring, or cross-training Dr. Sims in STC. Indeed, when there is no legitimate reason for the employer's action of rejecting an applicant, "it is more likely than not the employer, who we generally assume acts only with some reason, based his decision on an impermissible consideration such as race." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, page (1978).

*Pretext*. Defendants represented to the Commission that Dr. Sims and another full-time black female, CRNA-7, were both not allowed to work in STC because they were hired to work in the GOR. Defendants stated, "CRNAs are hired to work in either the hospital's General Operating Room ("GOR") or the Trauma Operating Room ("TOR"). Both Ms. Sims and [CRNA-7] were hired to work in the GOR; which is why they were not assigned to work the TOR."[20] (Ex. 40 at 5151.) Defendants also told the Commission that CRNAs do "not formally 'transfer' between the GOR and TOR, so transfer information is also irrelevant." (Ex. 23 at PL5161.) The reasons Defendants proffered to the Commission are false because a white female and white male, CRNA-6 and CRNA-25, were hired to work in the GOR and later transferred to work in STC on July 23, 2014 and January 11, 2015 respectively.[21] (Ex. 14.) There were at least five openings in STC during Dr. Sims's employment because Goetz, at least, hired three and transferred two CRNAs to full-time open positions in STC from April 2013 to August 2015. Goetz hired CRNA-26, CRNA-27, CRNA-28 and transferred CRNA-6 and CRNA-25. (Ex. 13; Ex. 14.) All these CRNAs were non-black. Goetz hired both CRNA-27 and CRNA-28 to STC on February 23, 2015. (Ex.

---

[20] The Shock Trauma Center (STC) and Trauma Operating Room (TOR) mean the same in this case.

[21] Again, transferring to STC was the same as hiring.

13.) They both had less education and less experience than Dr. Sims. Goetz's testimony that "the skill set of a CRNA comes into factor" in determining whether to hire a CRNA into GOR versus STC is false because Defendants' position statement explains the hiring qualifications are the same for STC and GOR. (Ex. 91 Goetz's Depo. 151:6-9; Ex. 23 at PL5161.) CRNA-27 and CRNA-28 did not have any CRNA experience when hired to STC on February 23, 2015 because both had just graduated with a master's degree, yet Dr. Sims had almost two years of CRNA experience at that time. Dr. Sims had a doctorate degree therefore had the same or more education than all the non-black CRNAs that Goetz hired or transferred into STC between April 2013 to August 2015. (Ex. 4.) Dr. Sims was also the only CRNA to receive UMMSC's highest award for clinical excellence of all the non-black CRNAs that Goetz hired or transferred into STC. Goetz cross-trained numerous full-time GOR CRNAs to STC during Dr. Sims's employment, and they were all non-black with less education or experience. (Ex. 15 (*See* g_STC*.) **Goetz never hired, transferred, or cross-trained a black CRNA to work full-time in Shock Trauma during Dr. Sims's entire employment.** (Ex. 13-15.) "In the problem of racial discrimination, statistics often tell much, and Courts listen." *Alabama v. United States*, 304 F.2d 583, 586 (5th Cir.), aff'd 371 U.S. 37 (1962).

*Analysis*. Although Defendants refused to produce Goetz's waitlist upon request despite a motion to compel, a document produced in discovery revealed that Dr. Sims was number four on the waitlist. (Ex. 12 at UMMC40.) It became known to Dr. Sims in the summer of 2015 that Goetz had intentionally deceived her about the informal waitlist process that Goetz used to make decisions about hiring and cross-training. (Ex. 96 Sims Declare ¶ 18.) The application element should be "relaxed" and Dr. Sims "treated as if she had actually applied for a" full-time CRNA position in Shock Trauma Center throughout her entire employment including on February 19, 2015 and May 7, 2015. *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430-31 (4th Cir. 2004). It would be unrealistic to require Dr. Sims to show an application when the hiring process itself and not just the decision making behind the process is implicated or suspected in the discriminatory hiring claim. (*Id.*)

Dr. Sims shows that her race discrimination claim for discriminatory hiring and work assignments is timely and constitutes an adverse employment action. Dr. Sims also proffers a prima facie case and pretext. Count I survives summary judgment as a matter of law because Defendants did not proffer a legitimate nondiscriminatory reason in their summary judgment memorandum for not hiring, transferring,

18

or cross-training Dr. Sims into STC. Count I also prevails on the facts because a reasonable jury could conclude Defendants' proffered reason to the Commission was false and discriminatory, or false to conceal discrimination. Inferring the Defendants' unlawful motive from an unpersuasive or false explanation "is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt."" *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000) (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)). "Once a plaintiff has established a prima facie case and shown the defendant's explanation to be false, the plaintiff need not submit additional evidence of discrimination unless 'no rational factfinder could conclude that the action was discriminatory.'" *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 258-259 (4th Cir. 2001) (quoting *Reeves*, 530 U.S. at 148)). Dr. Sims has provided sufficient evidence to show that Defendants' proffered reason to the Commission is false. She has also submitted additional evidence of discrimination. "As a result, a rational factfinder could conclude that the [defendants] explanation is pretext for discrimination." *Id.*

It is unlawful for an employer to limit or segregate its employees in any way which would deprive or tend to deprive any individual of employment opportunities because of race. 42 U.S.C. §2000e-2(a)(2). A district court ordered that an employer discontinue its informal or word-of-mouth hiring practices to remedy any prejudice sustained by black employees. *Rock v. Norfolk and Western Railway Company*, 473 F.2d 1344 (4th Cir. 1973). The Fourth Circuit affirmed the district's court finding that defendant had discriminatory hiring practices. (*Id.*) Goetz's informal waitlist hiring process is discriminatory because of its tendency to perpetuate the lack of full-time black CRNAs in the prestigious Shock Trauma Center. *Barnett v. W.T. Grant Co.*, 518 F.2d 543, 549 (4th Cir. 1975) (disapproving informal, word-of-mouth hiring practices).

## B.    Black CRNA Required To Undergo An Illegal Medical Exam With Drug And Alcohol Testing Because Of Race

Count II– Discriminatory FFD, Drug, and Alcohol Testing.  Defendants argue that Count II fails because Goetz's FFD referral was not an adverse employment action and was not discriminatory. Defendants only point to Goetz's declaration and deposition to support their argument. Goetz's credibility

19

is at dispute. Dr. Sims shows the June 18th FFD with drug and alcohol testing was an adverse employment action and discriminatory.

*Adverse Employment Action.* On June 18, Dr. Sims was on scheduled vacation leave. (Ex. 43 at PL5545.) Goetz called and texted Dr. Sims's personal cellular phone and mandated that Dr. Sims report to the hospital. (Ex. 44 at PL2106.) Dr. Sims was at her second job but left early so did not complete her shift because of Goetz's mandate. (Ex. 45.) Dr. Sims lost hundreds of dollars when she did not complete her scheduled shift at her second job on June 18 because of Goetz's FFD referral. (Ex. 45 at PL6028.)

Defendants placed Dr. Sims on suspension and cancelled two scheduled shifts, June 20 and 21, because of Goetz's FFD referral. (Ex. 32 at PL397.) Dr. Sims received about fourteen percent less for those two scheduled shifts because her normal extra pay for working weekend shifts was withheld. (Ex. 46; Ex. 47 at PL127 (*See* Bi-weekly pay from June 14 to 27.).) Twenty-four hours were paid at a lesser rate decreased by about $11 per hour since June 20 and 21 were paid from Dr. Sims's accumulated sick leave instead of regular weekend day pay. (*Id.*; Ex. 91 Goetz Depo. 352:1-15.) Dr. Sims lost hundreds of dollars when she was removed from her scheduled weekend shifts, June 20 and 21, because of Goetz's FFD referral. Dr. Sims also lost two sick days from her accumulated sick leave because Defendants used twenty-four hours, two twelve-hour shifts, of her sick time to pay her. (Ex. 47 at PL127.) Dr. Sims received about fourteen percent less pay since she did not receive her normal weekend incentive pay and lost two sick days because of Goetz's FFD referral.

Dr. Sims was scheduled to work June 22, 23, 24 at her second job. (Ex. 45 at PL6186). She lost at least $3,000 of pay when she had to cancel those three scheduled shifts at her second job because of Goetz's FFD referral. (*Id.*; Ex. 45 at PL6028.) Dr. Sims was required to be under evaluation from June 18 through 22. (Ex. 32 at PL397 and UMMC67.) Dr. Sims was diagnosed on June 21 with acute situational reaction because of the severe anxiety and physical symptoms caused by Goetz's FFD referral thus unable to work her three scheduled shifts at her second job (Ex. 45 at PL6186; Ex. 49 ("Anxiety Reaction").) After a bench trial, a trial court found a random drug test administered by an employer was unreasonable and outrageous causing two employees to suffer severe emotional distress. *Aro v. Legal Recovery Law Offices, Inc.*, D065422 (Cal. Ct. App. Apr. 8, 2015)

20

For several days, among other things, Dr. Sims was experiencing an increase in blood pressure and high heart rate, chest pain and heart palpitations, diarrhea, nausea, poor appetite, and insomnia. Dr. Sims had never felt so much anxiety that she could not manage, so she sought medical advice to avoid having a heart attack or stroke. Dr. Sims was scheduled to work June 26 and 28 at UMMSC (Ex. 43 at PL5545.) She called-out sick for those two shifts and received two excused absences. Dr. Sims rarely called-out. (Ex. 48 at UMMC1322 (*See* Dr. Sims used only four hours of sick leave in 2014.).)  The pay for those two shifts was deducted from Dr. Sims's sick leave so she lost two sick days (Ex. 43; Ex. 47 at PL127 and PL238.)

Paula Henderson, Vice President of Human Resources, wrote a letter on July 14 attempting to explain Defendants' purported reason for placing Dr. Sims on unpaid suspension. (Ex. 26 at PL4867.) Henderson's letter includes reference to Goetz's FFD referral. (*Id.* at PL4866.) Keith Persinger– Executive Vice President and Chief Operating Officer– upheld the termination of Dr. Sims's employment after considering information about Goetz's FFD referral. (Ex. 39; Ex. 51.)

*Discriminatory*. Goetz did not follow the Fitness for Duty policy that supervisors "must" follow. (Ex. 31 at UMMC7-UMMC8.) The policy required that Dr. Sims be on duty or reporting to duty and appearing impaired. (*Id.* at UMMC8; Ex. 90 Frisch Depo. 117:11-18, 119:12-120:1.)  Dr. Sims was off duty on approved vacation leave on June 18 when she was required to undergo the FFD evaluation. (Ex. 43.) Goetz did not follow the Guideline for Suspicion of Controlled Substance Diversion policy because "[t]he Guidelines are just that, guidelines." (Ex. 23 at PL5165.) The Guideline for Suspicion of Controlled Substance Diversion policy advised against a FFD referral because Dr. Sims did not appear impaired or have witnessed drug use. (Ex. 31 at UMMC156.) Contrary to Defendants' argument, Goetz did not follow any of UMMSC's policies or guidelines when she required Dr. Sims to undergo a FFD evaluation on June 18.

Goetz documented twice on the supervisor's FFD referral form that her reasoning for requiring Dr. Sims to undergo a FFD was because Goetz suspected that Dr. Sims was stealing controlled substances from the hospital for self-use– i.e., drug diversion. (Ex. 18.) Defendants baldly assert that Dr. Sims has no evidence that Goetz "did not honestly believe" that Dr. Sims was diverting drugs. Yet, Goetz admitted she did not honestly believe that Dr. Sims was diverting drugs. (Ex. 83: Goetz Interview p.4 [7:24-7:33], Goetz Interr., No. 6; Ex. 91 Goetz Depo. 181:8-182:9, 286:12-15, 299:15-21.) Goetz even listed false reasons to

21

support her fake belief that Dr. Sims was diverting drugs. (Ex. 18.) For example, Goetz documented that Dr. Sims "works frequently" yet Dr. Sims had only worked three days– 7, 13, 14– in the month of June when Goetz required a FFD evaluation on June 18. (Ex. 18; Ex. 43.) Goetz also documented on June 18 that she observed Dr. Sims having "aggressive behavior" warranting immediate drug and alcohol testing. (Ex. 18 ("Have you had another supervisor observe the Employee and concur with your observation?" Goetz checked yes.).) Dr. Sims was not at work on June 18, so Goetz had not observed Dr. Sims at all. (Ex. 43 at PL5545.) Goetz also purported that Dr. Sims's "uncharacteristic behavior" of staying beyond her shift to work was an indication of drug diversion. (Ex. 18.) Goetz knew that Dr. Sims had been staying beyond her shift throughout her entire employment. (Ex. 52.) Goetz indicated on Dr. Sims's 2014 Annual Performance Evaluation that "[c]onsistently volunteers to stay beyond her shift to help out" was a strength of Dr. Sims. (Ex. 53 at UMMC409.) Goetz never told Dr. Sims that her behavior of staying late was concerning or unacceptable. (Ex. 83 Goetz Admit, No. 12.) Goetz never discussed this behavior with Dr. Sims prior to the FFD referral. (*Id.*)

*Prima facie*. Dr. Sims is a black woman. She was required to undergo a FFD evaluation with drug and alcohol testing while off duty on approved vacation leave because of Goetz's fake belief and intentionally false accusation that Dr. Sims was suspected of drug diversion, and Goetz's false assertion of observing aggressive behavior that warranted immediate drug and alcohol testing. (Ex. 18.) Dr. Sims lost over $5,000 in pay when she could not work because of Goetz's FFD referral. (Ex. 43 at PL5545; Ex. 45; Ex. 46; Ex. 47 at PL127 (*See* Pay from Dr. Sims's accumulated leave– i.e., "Sick" pay.).) Dr. Sims lost thousands of dollars when she was removed from duty with reasoning related to the fitness for duty referral. (Ex. 26 at PL4866.) Dr. Sims lost millions of dollars when her termination was upheld after Keith Persinger's review of her corrective action statement which included Goetz's FFD referral. (Ex. 51 at UMMC192; Ex. 39.) Defendants never mention or argue that Dr. Sims was not performing any essential job function. Dr. Sims had no job performance problems, was meeting legitimate expectations, and performing all the essential functions of her job as a CRNA. (Ex. 30 at PL5188; Ex. 91 Goetz Depo. 231: 12-19, 285:6-10, 316:12-14, 337:13-338:2; Ex. 91 UMMSC 30(b)(6) Goetz Depo. 400:18-401:4; Ex. 96

Sims Declare ¶ 7.)[22] Goetz made false claims and phony accusations to support a fitness for duty referral. (Ex. 18; Ex. 83: Goetz Interview p.4 [7:24-7:33], Goetz Interr., No. 6; Ex. 91 Goetz Depo. 181:8-182:9, 286:12-15, 299:15-21.) Goetz did not suspect, much less falsely allege to suspect, drug diversion of non-black CRNAs when they displayed uncharacteristic behavior or worse. UMMSC did not provide supervisor Goetz any training on discrimination and retaliation. (Ex. 91 Goetz Depo. 259:13-16.)

*Same-Actor Theory*. Defendants argue that even if Dr. Sims demonstrates a prima facie case of discrimination, the normal inference of discrimination is rebutted by the same-actor theory.

> [Defendants] claim[] that the usual inference is inappropriate where, as here, the same person that hired the employee initially is also responsible for making further employment decisions regarding the employee. They argue that it is illogical for the same person that initially decided to hire an employee to then act in a discriminatory manner toward that employee in future employment actions. While such an inference may be illogical, and therefore inappropriate, in a situation where an employee is hired and fired from a single position by the same person, that is not the case here.

*Dallas v. Giant Foods, Inc.,* 187 F. Supp 2d 505 (D.Md. 2002). "It is not illogical for a supervisor that discriminates" to report a fake belief of drug diversion against a black CRNA, but not against non-black CRNAs. (*Id.*) "Thus, showing that whites were" treated more favorably "is sufficient to establish the fourth element of a prima facie case even though the same individual that hired Plaintiff[] also made the" discriminatory decision. (*Id.*)

*LNDR*. Defendants' proffered reason for Goetz's fitness for duty referral is that the hospital's guidelines require Goetz to react swiftly to confirm a CRNA's fitness for duty. The "uncharacteristic behavior" of Dr. Sims having a minor workplace disagreement, and her "refusal to leave her shift" made it "necessary to request a fitness for duty evaluation to ensure there were no substance abuse concerns."

*Pretext*. Goetz provided false reasons and fake assertions to support a FFD evaluation. Goetz documented twice on the supervisor's referral form that she suspected that Dr. Sims was diverting drugs, but later admitted she never believed that Dr. Sims was diverting drugs. (Ex. 18; Ex. 83: Goetz Interview p.4 [7:24-7:33]; Goetz Interr., No. 6.) Goetz falsely reported that she had observed Dr. Sims having aggressive behavior, but Dr. Sims was not at work on June 18. (Ex. 18; Ex. 43 at PL5545.) Goetz refused

---

[22] Defendants made a weak and illogical argument to the Commission that Dr. Sims did not have job performance problems or patient care issues because her alleged drug addiction was so strong that it motivated her to perform well at work so she could maintain access to her patients' drugs.

to follow UMMSC's policies and guidelines that advised against requiring Dr. Sims to undergo a FFD evaluation, but pretend the policies and guidelines required her to mandate a FFD evaluation. (Ex. 23 at PL5165; Ex. 31; Ex. 92 King Depo. 142:2-10, 145:15-146:7, 148:1-10.) Even when non-black CRNAs had uncharacteristic or unsafe behavior, Goetz did not suspect drug diversion. Goetz never alleged to believe that Dr. Sims was unsafe. Goetz could not have honestly believed that Dr. Sims was unsafe because of the minor workplace disagreement on May 3 because Goetz texted Dr. Sims on May 28 asking her to work an extra 12-hour nightshift. (Ex. 44 at UMMC893.) Dr. Sims's normal behavior of volunteering to work beyond her shift was known and lauded. (Ex. 52; Ex. 53 at UMMC409 ("Consistently volunteers to stay beyond her shift to help out. Great work ethic. Keep us the good work."); Ex. 54 ("Faresha volunteered to complete a case that went well beyond her shift to ensure quality care for the [patient], even though there was relief for her. She has a great work ethic and attitude.").) Goetz even documented that Dr. Sims's normal behavior of staying late was a strength of her job performance. (Ex. 53 at UMMC409.) Dr. Sims's behavior of staying late was never characterized as a "refusal to leave her shift" prior to Goetz seeking reasons to justify a FFD referral. Defendants destroyed the anesthesiologists' daily performance evaluations of Dr. Sims from 2015, and her 360-peer review job performance evaluations that had been completed by her colleagues just days prior to the fitness for duty evaluation. (Ex. 23 at PL5163 ("There is no factual or legal basis for the Commission's request for Ms. Sims' peer feedback….It would show only that the surveyed colleagues had positive things to say about her, which is not relevant with regard to the hospital's legitimate, non-discriminatory reasons for referring Ms. Sims for a FFD and later to EAP.").) Defendants repeatedly refused to produce the anesthesiologists' daily performance evaluations of Dr. Sims and her 360-peer review job performance evaluations from 2015 upon request despite a motion to compel. (ECF 66.) The Commission subpoenaed those performance evaluations and only then did Defendants inform that they had been destroyed. Goetz testified that the feedback "could always be printed out again" and was not "disposed of." (Ex. 91 Goetz Depo. 306:17:307-2, 357:5-7.)

*Comparators.* Goetz was the director of all CRNAs at the University of Maryland Medical Center which included the GOR and STC, Midtown Campus, and University of Maryland Rehabilitation & Orthopaedic Institute ("UMROI"). (Ex. 91 Goetz Depo. 293:13-17.) Goetz had a supervisory role with hiring and firing authority over all CRNAs at those locations. Goetz testified that it is her "paramount

duty" as director of CRNAs to make sure all CRNAs are fit for duty and safe because that is required of all CRNAs. (ECF 159-1, p. 26.) Goetz had the authority to refer any CRNA for a FFD. (Ex. 91 Goetz Depo. 234:13-235:7.) All comparators had the same job title of CRNA or nurse anesthetist which means the same. All comparators had the same or similar job tasks and responsibilities of a CRNA because all were CRNAs required to perform clinical duties and patient care satisfactorily or safely. Defendants admit that Dr. Sims's "performance of clinical duties and patient care was not at issue." (Ex. 30 at PL5188.) All similarly situated CRNAs shown as comparators had similar or worse behavior than Dr. Sims, yet Goetz did not require a FFD evaluation based on an honest or fake belief of drug diversion. Goetz dealt with all comparators but only required Dr. Sims, a black CRNA, to undergo a FFD because Goetz supposedly suspected drug diversion but never had an honest belief that Dr. Sims was diverting drugs.

CRNA-1, a non-black male, had a mental illness with unsatisfactory performance of clinical duties and had patient care issues. (Ex. 74; Goetz Depo. 59:15-60:8.) On October 24, 2007, Goetz saw CRNA-1 sleeping while providing anesthesia care to a patient. (Ex. 74.) Goetz said to CRNA-1, "it looks like you were cat napping?" (Ex. 74.) Goetz followed up with several anesthesiologists to see if they had witnessed CRNA-1 sleeping while providing anesthesia to patients and they all confirmed that they had witnessed the same. (74.) Goetz saw CRNA-1 sleeping while providing anesthesia to a patient "some weeks ago" prior to October 24, 2007 and did nothing. (Ex. 74.) On October 30, 2007, Goetz counseled CRNA-1 to walk around the room or request a break if he felt tired. (*Id.*) Goetz admits that it is impossible for a CRNA to provide safe anesthesia care while sleeping or with eyes closed, but she did not issue a corrective action or require a FFD evaluation of CRNA-1 at that time. (*Id.*; Goetz Depo. 36:6-37:2, 40:6-8.) On November 20, 2007, Goetz received e-mail communication of anesthesiologists expressing concern that CRNA-1 was unable to perform his job duties and "his shake is getting worse." (Ex. 74.) Tremors and shakes are a classic sign of drug use or withdrawal. One anesthesiologist questioned if they should always have someone with CRNA-1 to ensure CRNA-1 does not cause any patient harm. (*Id.*) On November 20, 2007, over a month after Goetz first witnessed CRNA-1 sleeping, Goetz referred CRNA-1 for a FFD but never suspected his behavior was related to drug diversion. (Ex. 74). Goetz wrote, "observed [CRNA-1] with his eyes closed during a surgical case – 10/24/07- also observed this behavior two times prior to this date." (Ex. 74.) Even after witnessing CRNA-1 provide unsafe patient care, Goetz allowed him to continue

25

providing patient care for over a month before referring for a FFD. On November 23, 2007, CRNA-1 was deemed unfit for duty and incapable of providing "direct patient care." (Ex. 74.) CRNA-1 later returned to duty. On April 18, 2011, he was issued a final warning corrective action and placed on a performance improvement plan for being "shaky and disheveled," having food and drink in the sterile operating rooms which is a violation of policy and OSHA (Occupational Safety and Health Administration) regulations, having a controlled substance, Ketamine, with needles in his locker, and "putting patient safety at risk." (Ex. 74.) Goetz allowed CRNA-1 to continue providing patient care even after his controlled substance audit from March to April 7, 2011 showed he had an alarming number of drug discrepancies for a controlled substance, Ketamine, that was found in his locker with needles. (Ex. 74.) Goetz allowed CRNA-1 to continue providing patient care for about a month after she wrote that CRNA-1 was "putting patient safety at risk." (Ex. 74.) Anesthesiologists provided Goetz written examples of CRNA-1's inability to perform his job duties throughout that entire month. (Ex. 74.) CRNA-1 did eventually cause patient harm. (Ex. 74.) He was terminated on May 16, 2011 because he could not perform his job duties, was hanging out in the break room at the hospital on his off day, and had numerous drug discrepancies– controlled substances unaccounted for. (Ex. 74.) On June 29, 2011, Defendants agreed to change CRNA-1's termination to a resignation and provide him severance pay. (Ex. 75.) Goetz never documented that she suspected that CRNA-1 was diverting drugs or required CRNA-1 to undergo a FFD evaluation for an honest or fake belief of drug diversion despite CRNA-1 having worse behavior than Dr. Sims who had a minor workplace disagreement with anesthesia resident.

CRNA-2, a non-black female, had problems performing her job duties and providing patient care throughout her employment from 2015 to 2018 because she was frequently missing when expected to be providing patient care. (Ex. 76.) Frequent breaks and missing at work are classic signs of drug diversion. A student registered nurse anesthetist complained that CRNA-2 was rude, cursed at her, "made multiple racially charged statement, specifically about 'black people'," unprofessional, and very difficult to work with. (*Id.*) The complaint continued that CRNA-2 "has been working an excessive amount of hours at UMROI" and is "stressed all of the time and her demeanor is very unpleasant." (*Id.*) The student also complained that CRNA-2 leaves the operating room for long period of time when she is supposed to in there providing anesthesia care to her patients. The student was very concerned that CRNA-2 "left the

26

facility to go pick her son up from school and [student] was left in a case alone for approximately 2 hours." (*Id.*) Patient abandonment is a crime in Maryland and providers are subject to lose their licensure for any instance of such. Goetz informally counselled CRNA-2 for patient abandonment and told her "At NO TIME are SRNAs to be left in the room alone. There must be a CRNA or MDA in the room at all times, no exceptions. This is our policy." (*Id.*) Goetz tried to cover up this crime and patient safety issue by explaining that CRNA-2 "left hospital for 2.5 hours to pick up her son" because the anesthesiologist said that she could. (*Id.*) Yet, Goetz never asked Dr. Sims if the anesthesiologist said that she could stay to finish her case– which he did– and referred Dr. Sims for a FFD evaluation because of a purported "refusal" to leave her patient. CRNA-3, a black female, left work about 1.3 hours early because she did not have a patient and Goetz issued CRNA-3 a written warning corrective action. (Ex. 77.) Goetz explained to CRNA-3 that because she was being issued a corrective action at the written warning level that she was an "employee not in good standing" and therefore would no longer be eligible to receive the hospital tuition reimbursement that CRNA-3 was receiving to assist with obtaining her doctorate degree. (*Id.*) CRNA-2, a non-black female, had much worse behavior than Dr. Sims or CRNA-3, both black female, yet not referred for a FFD evaluation or issued any corrective action. CRNA-2's behavior would have likely resulted in her losing her licensure due to the danger of patient abandonment, yet Goetz informally counselled CRNA-2, and coached her on how to talk professionally instead of cursing at others or making racially charged statements about "black people." (*Id.*) Goetz testified that CRNA-2 had "behavioral problems" and could still be overall competent to provide patient care even though she was less than competent on performing essential job functions. (Ex. 91 Goetz Depo. 170:1-172:14.) CRNA-2 consistently performed less than competent in several areas on her job performance evaluations yet was never referred for a FFD evaluation or issued corrective action. (*Id.*)

CRNA-5, a non-black female, was reported for suspected drug diversion because she mishandled narcotics in June 2014 and the controlled substance, Fentanyl, was missing. (CRNA-5 Declare ¶ 11; Ex. 91 Goetz Depo. 225:4-14.) Dr. Megan Anders, Department of Anesthesiology Patient Safety and Quality Officer, suspected that CRNA-5 was diverting drugs because CRNA-5 falsely documented in the medical record that she gave the patient more narcotics than she did to intentionally conceal missing narcotics. (Ex. 91 Goetz Depo. 70:20-71:4, 312:14-21.) CRNA-5's behavior was a classic sign of drug diversion, yet Goetz

27

never believed that CRNA-5 was diverting drugs. (Ex. 90 Frisch Depo. 7:9-17, 21:4-22:18, 71:19-21.) Goetz accused Dr. Anders of "jumping to conclusions" because Dr. Anders suspected that CRNA-5 was diverting drugs. (Ex. 91 Goetz Depo. 67:4-69:6.) Goetz provided CRNA-5 an opportunity to explain her behavior and never required CRNA-5 to undergo a FFD evaluation despite Dr. Anders's– Department of Anesthesiology Patient Safety and Quality Officer– suspicion of drug diversion. (CRNA-5 Declare ¶¶ 12-13.) The missing narcotics were never accounted for, yet Goetz allowed CRNA-5 to continue providing patient care without taking any precautions to confirm that CRNA-5 was fit for duty. (CRNA-5 Declare ¶ 14; Ex. 91 Goetz Depo. 78:5-8, 84:18-85:3.)

CRNA-9, a non-black male, was issued a final warning corrective action and placed on a performance improvement plan on June 12, 2012 because, among other things, he had a "verbal altercation" and did not check blood before giving to a patient which is a "violation of policy and safe patient care." (Ex. 78.) Not checking blood prior to administration is a serious violation because that can cause immediate patient death. Goetz documented that CRNA-9 violated at least two safety policies. (Ex. 78.) CRNA-9 had problems with performance of clinical duties and patient care issues, yet Goetz did not refer CRNA-9 for a FFD evaluation based on an honest or fake belief of drug diversion.

CRNA-10, a non-black female, had performance problems with clinical duties and patient care issues. (Ex. 91 Goetz Depo. 153:19-157:18.) Goetz received numerous complaints about CRNA-10 having poor clinical and patient care, so Goetz went into the operating rooms and worked alongside CRNA-10 to help her get better. (*Id.*) Goetz never referred CRNA-10 for a FFD to confirm she was fit for duty despite her clinical performance issues and poor patient care.

CRNA-13, a non-black male, was issued a final warning corrective action and placed on a performance improvement plan on October 2, 2015 because of "unprofessional and inappropriate conversation with his attending anesthesiologist in the operating room in front of the" entire team and awake patient. (Ex. 79.) "This interaction was reported by the surgeon, OR nurse and attending anesthesiologist." (*Id.*) Dr. Sims had a minor workplace disagreement that was not in the operating room or in front of a patient and was issued a verbal warning corrective action. CRNA-13's behavior was much worse, and he was issued a final warning corrective action, yet Goetz did not refer CRNA-13 for a FFD evaluation based on an honest or fake belief of drug diversion.

CRNA-22, a non-black male, was issued a verbal warning corrective action on April 14, 2015 for poor performance of clinical duties, poor patient care, and having an "unprofessional & disrespectful" communication style with Goetz. (Ex. 80.) CRNA-22 was never referred for a FFD evaluation based on an honest of fake belief of drug diversion.

CRNA-23, a non-black female, was issued a written warning corrective action on July 30, 2015 for poor and "toxic" performance that was a "continuing pattern of behavior" and "unprofessional." (Ex. 81.) Goetz never referred CRNA-23 for a FFD evaluation based on an honest or fake belief of drug diversion.

CRNA-24, a non-black male, was issued a verbal warning corrective action on August 1, 2017 for communication to leadership that violated policy. (Ex. 82.) Goetz never referred CRNA-24 for a FFD evaluation based on an honest or fake belief of drug diversion.

*Analysis.* Defendants cite a string of four cases and a memorandum opinion from this instant case that the FFD, drug, and alcohol testing on their own are likely not adverse employment actions. Goetz's FFD referral was not alone. Dr. Sims lost thousands to millions of dollars of income, and she experienced the most anxiety she ever had resulting in a medical diagnosis of acute situational reaction based on the anxiety and distressing physical symptoms. So, in this instant case, Goetz's FFD referral resulted in a "decrease in pay" which is an adverse employment action because it "affected the terms and conditions of Plaintiff's employment." *Shivers v. Saul* 1:19-cv-02434 (D.Md. December 2, 2020). An adverse employment action affects the terms, conditions, or benefits of employment. *James v. Booz-Allen & Hamilton, Inc.*, 368 F. 3d 371, 375 (4th Cir. 2004). A suspension that causes a decrease in pay affects "the terms, conditions, or benefits of her employment because she did not receive the pay she normally would have received[.]" *Allen v. Rumsfeld*, 273, F. Supp. 2d 695, 705-706 (D.Md. 2003). Goetz's FFD referral form and an article about impaired anesthesia providers were reviewed in the decision-making process to terminate Dr. Sims even though she had been deemed fit for duty and tested negative for drugs and alcohol. (Ex. 51; Ex. 32; Ex. 33). Goetz's FFD referral was also included in the "corrective action statement" to influence the termination– an adverse employment action. (Ex. 51; Ex. 39.) Although Defendants do not consider the FFD process to be a corrective action, Defendants included it as part of Dr. Sims's "corrective action statement" to improperly influence the termination for retaliatory purposes. (Ex. 31 at UMMC10; Ex. 51; Ex. 90 Frisch Depo. 186:6-11.) Goetz's FFD referral was reviewed and purportedly a "mediate step relied

upon" in the decision to place Dr. Sims on unpaid suspension and terminate her employment.[23] *Suggs v. 7-Eleven Inc.*, 8:14-cv-01903-DKC (D.Md. June 23, 2015). "Conduct short of an ultimate employment decisions becomes relevant if it is a 'mediate step relied upon for a true adverse employment action.'" *Id.* (quoting *Ruffin v. Lew*, No. PWG-11-2469, 2014 WL 48 4854972, at *8 (D.Md. Sept. 29, 2014).)

Goetz provided false reasons for the FFD referral. Zero (i.e., false reasons) multiplied by any number is still zero. **Goetz never had an honest belief that Dr. Sims was diverting drugs.** (Ex. 83: Goetz Interview p.4 [7:24-7:33], Goetz Interr., No. 6; Ex. 91 Goetz Depo. 181:8-182:9, 286:12-15, 299:15-21.).) A jury is entitled to disregard all of Goetz's purported reasons for the FFD referral under settled evidentiary principles including the maxim of falsus in uno, falsus in omnibus ("false in one thing, false in all"). *Holland* v. *Wash. Homes, Inc.*, 487 F.3d 208 (4th Cir. 2007) (dissenting). "See Black's Law Dictionary 491 (7th ed. 1999) (describing maxim as '[t]he principle that if the jury believes that a witness's testimony on a material issue is intentionally deceitful, the jury may disregard all of that witness's testimony"). (*Id.*) Notwithstanding, a reasonable jury could conclude from any of the following that Goetz had racial bias toward Dr. Sims: (1) Goetz not following policy and guidelines that advised against requiring Dr. Sims to undergo a FFD evaluation on June 18; (2) Goetz providing false statements and fake accusations to support a FFD; (3) Goetz using a verbal warning corrective action related to a minor workplace disagreement from about seven weeks prior to allegedly represent aggressive behavior that warranted immediate drug and alcohol testing; (4) Goetz's racial comment that Dr. Sims was "argumentative and aggressive like the average black woman;" (5) Goetz's previous decision to select the most senior black female, CRNA-8, as the only CRNA from the GOR to be laid-off during a purported reduction-in-force but thereafter hiring more non-black CRNAs; or Goetz treating similarly situated non-black CRNAs more favorably than Dr. Sims even when they have similar or worse behavior.

A reasonable jury could conclude that Defendants destroyed the anesthesiologists' daily job performance evaluations of Dr. Sims, and her 360 peer review evaluations that were completed several days prior to the FFD evaluation to cover-up discrimination because those evaluations were detrimental to Defendants' position because Dr. Sims's job performance was the same or better than ever.

---

[23] Defendants purport to have reviewed and relied on Goetz's FFD referral, but the evidence shows that their true reason was retaliation for Dr. Sims's protected activity.

Dr. Sims shows with supporting evidence that Goetz's FFD referral with drug and alcohol testing was an adverse employment action and discriminatory. Dr. Sims makes a prima facie case of discrimination, with and without comparators, and shows pretext. "However helpful a showing of a white comparator may be to proving a discrimination claim, it is not a necessary element of such a claim." *Bryant v. Aiken Reg. Med. Ctr.*, 333 F.3d 536, 546 (4th Cir. 2003). "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. Count II prevails because a reasonable jury could conclude the reasons for the FFD referral are false and discriminatory, or false to conceal discrimination.

## C.   UMMSC Performs A Prohibited Medical Exam and Drug Testing on Black CRNA Because Supervisor Provides a False Accusation of Drug Abuse

Count III– Prohibited Medical Exam.[24] Defendants argue **without pointing to any evidence** that Count III fails because Goetz's FFD referral was both job-related and consistent with business necessity. Defendants conclude that Dr. Sims's "sensitive role as a CRNA and the concerns raised as a result of her uncharacteristic behavior" made it "no doubt a business necessity" to confirm she was safe.[25] Supervisor Goetz's FFD referral on June 18 was not job-related or consistent with business necessity, and Defendants cannot raise this affirmative defense for the first time on summary judgment motion.

*Not Job-Related or Consistent with Business Necessity.* "The EEOC's enforcement guidelines state that for an employer-ordered medical exam to be job-related and consistent with business necessity, the employer must reasonably believe, based on objective evidence, that either (a) the employee's ability to perform an essential job function is impaired by a medical condition, or (b) the employee can perform all the essential functions of the job, but because of his or her medical condition, doing so will pose a 'direct threat' to his or her own safety or the safety of others." *EEOC v. McLeod Health, Inc.*, No. 17-2335 at 7-8 (4th Cir. 2019).

---

[24] Count III– prohibited medical examination– relates only to the FFD process from June 18-22 caused by Goetz's FFD referral because Plaintiff disputes there was ever a request for a "second fitness for duty evaluation."

[25] Defendants also mention "concerning comments" but that allegation was after Goetz's FFD referral on June 18.

The requisite reasonable belief must be based on objective evidence. Defendants never believed Dr. Sims had a medical condition or was diverting drugs. (UMMSC Interr., No. 2; Ex. 83: Goetz Interview p.4 [7:24-7:33], Goetz Interr., No. 6; Ex. 91 Goetz Depo. 181:8-182:9, 286:12-15, 299:15-21.) Thus, the fitness for duty evaluation from June 18-22 does not meet the criteria of job-related and consistent with business necessity. Defendants never pled the "direct threat" defense in their answers, or analyze the direct threat factors. They cannot do so for the first time in their reply brief. (*See Taylor v. Hampton Rds. Reg'l Jail Auth.*, 550 F. Supp. 2d 614, 619 (E.D. Va. 2008) (denying the defendant's summary judgment motion in part due to its failure to analyze the direct threat factors). Defendants did not plead in their answer the affirmative defense of job-related or business necessity so cannot for the first time on summary judgment motion.

*Analysis.* Defendants have never mentioned any essential job function that Dr. Sims might could not perform, or the "direct threat" defense. (Ex. 91 UMMSC 30(b)(6) Goetz Depo. 395:12-396:1.) Although there is no direct threat defense or argument in this instant case, the Fourth Circuit explains the correct way to analyze a "direct threat" defense argument.

> The district court adopted that framing, but we do not, because we think that adding the qualifier "safely" to the job function at issue muddles the analysis. The correct way to apply the EEOC's enforcement guidance in a case like this is to begin by asking: does the relevant job function (here, navigating to and within McLeod's campuses) qualify as essential? If the answer is yes, we then ask whether the employee is medically capable of performing the function without posing a direct threat to herself or others–i.e., whether the employee can perform the function safely.

(*Id.* at 8.) "[E]ven if it were beyond dispute that navigating to and within [employer's] campuses was an essential function of [employee's] job, we would still hold that [employer] is not entitled to summary judgment. A reasonable jury could conclude that when [employer] required [employee] to take a medical exam, the company lacked a reasonable belief– based on objective evidence []. This, too, makes summary judgment inappropriate." (*Id.* at 10.) Defendants have never identified which specific essential job function they believed Dr. Sims might be unable to perform. Indeed, Defendants never believed that Dr. Sims was unsafe. (Ex. 90 Frisch Depo. 85:18-86:1, 157:13-21, 158:1-6; Ex. 92 King Depo. 95:18-21, 96:8-14, 133:20-

32

134:2, 169:14-170:2.) Dr. Sims was performing her essential job duties and meeting her employer's legitimate expectations yet required to undergo a medical examination with drug and alcohol testing while off duty for reasoning that was not job-related and consistent with business necessity. Defendants have never argued that Dr. Sims was unable to perform any essential function or not meeting their legitimate expectations. (Ex. 91 UMMSC 30(b)(6) Goetz Depo. 395:12-396:1.) Defendants always considered Dr. Sims to be in "good standing." (Ex. 91 Goetz Depo. 281:21-282:12; Ex. 96 Sims Declare ¶ 14.) Accordingly, the FFD evaluation with drug and alcohol testing were prohibited by the ADAAA.

Defendants cite three cases that are inapposite. First, Barnum had suicide thoughts and suicidal ideation, and expressed this at work. *Barnum v. Ohio State University Medical Center, et al.*, No. 15-3450 (6th Cir. February 19, 2016). There was an instance when Barnum was unable to perform her job duties while taking care of a patient. (*Id.*) Defendants acknowledged that Dr. Sims had no clinical performance or patient care issues. (Ex. 30.) Second, in *Flanary* this Court denied a preliminary injunction of a police officer who experienced a "traumatic incident" of being attacked while on duty, and her partner shot and killed the assailant in response. Her employer was concerned about a known medical condition that she admitted was still affecting her. (*Id.*) Defendants admits they never even considered if Dr. Sims had a medical condition. (Ex. 86 UMMSC Interr., No. 2.) Third, "Tcheskidova's sole claim is that ITT violated her rights under Title VII when it terminated her in retaliation for her complaints of gender and national origin discrimination." (*Tcheskidova*, 2008 WL 3085694.) *Tcheskidova* does not involve a legal claim about a prohibited medical exam, and she admitted she was "unstable." (*Id.*)

Defendants' referenced case, *Barnum*, states the burden is on Defendants to show the June 18th FFD evaluation was "job-related and consistent with business necessity." *Barnum v. Ohio State University Medical Center, et al.*, No. 15-3450 at 11 (6th Cir. February 19, 2016). *See* also *Wright v. Ill. Dept. of Children & Family Servs.*, No. 13-1553, p. 16 (7th Cir. 2015) ("An employer bears the burden of establishing that an examination is consistent with business necessity, see *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007), and that burden is 'quite high,' *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 97 (2d Cir. 2003).") Defendants point to **no** evidence to carry their burden of showing the June 18th FFD evaluation was job-related and consistent with business necessity– an affirmative defense they never raised. Even if

33

Defendants had pled this defense, they would still be unable to carry their burden because Goetz's FFD referral was based on a fake belief of drug diversion.

## D.    Black CRNA Regarded as Disabled When She Complains About Discrimination and Retaliation

Count IV– "Regarded As" Disabled. Defendants make a bald assertion **without pointing to any evidence** that "[t]here is no evidence to suggest that the Medical Center regarded Ms. Sims as disabled."

*Prima facie Elements*. Defendants never mention any essential job function that Dr. Sims might be unable to perform. (Ex. 91 UMMSC 30(b)(6) Goetz Depo. 395:12-396:1.) Defendants purported to believe that Dr. Sims had a mental illness called paranoia because she did not trust her supervisors. (Ex. 30 at PL5174 and PL5192; Ex. 92 King Depo. 7:7-12.) Dr. Frisch testified that Dr. Sims did not need to come back for a second fitness for duty evaluation because Defendants only wanted to evaluate Dr. Sims's for a psychiatric disorder (i.e., mental illness). (Ex. 90 Frisch Depo. 55:14-56:9, 155:8-15.) King consulted with Dr. Melissa Frisch and together they determined that Dr. Sims had a mental illness called paranoia. (Ex. 30 at PL5174 and PL5192.)  "If this kind of 'smoking gun' evidence cannot get an employment discrimination plaintiff past summary judgment on the question of pretext, it is hard to imagine what could." *Babb v. Maryville Anesthesiologist, P.C.*, No. 19-5148 (6th Cir. 2019) (explaining that employer referring to CRNA's visual impairment prior to the adverse employment action could be direct evidence.)

Dr. Sims was placed on suspension, and ultimately terminated because Defendants purportedly believed she had a mental impairment. (Ex. 30 at PL5174 and PL5192.) Dr. Sims lost hundreds of dollars while on paid suspension from June 30 to July 12 because her normal weekend incentive pay was withheld. (Ex. 47 at PL238.) She lost thousands of dollars while on unpaid suspension from July 13 to August 19 because time was deducted from her vacation leave which she could have cashed out later. (Ex. 47 at PL238-PL241 and PL309; Ex. 48 at UMMC 1323.) She lost millions of dollars in income when she was terminated. Defendants never had a reasonable or honest belief, based on objective evidence, that Dr. Sims could not perform an essential job function. Dr. Sims was performing the essential functions of a CRNA, and there were never any complaints about her patient care. (Ex. 30.)

*LNDR*. Defendants allege that Dr. Sims was placed on suspension because of the "concerning comments" that she made to Walter Brown which he supposedly memorialized in his June 30th

34

memorandum.  Defendants argue that Dr. Frisch and King wanted to again ensure that Dr. Sims could safely provide patient care after Brown's memo purportedly called into question Dr. Sims's ability to safely care for patients. (Ex. 30 at PL5174 and PL5192.)

*Pretext*. Dr. Frisch and King testified that they never believed that Dr. Sims was ever unsafe. (Ex. 90 Frisch Depo. 85:18-86:1, 157:13-21, 158:1-6; Ex. 92 King Depo. 95:18-21, 96:8-14, 133:20-134:2, 169:14-170:2.) Defendants repeatedly discussed that Dr. Sims had a mental illness but never alleged any essential job function that would be affected by a mental illness. Defendants purport that their concern and reason for precluding Dr. Sims from working was because of a mental illness. (Ex. 30 at PL5174 and PL5192; Ex. 55; Ex. 92 King Depo. 7:7-12) Defendants were trying so hard to cover up retaliation that they provided direct (or circumstantial) evidence of disability discrimination. Neither disability discrimination or retaliation are legitimate nondiscriminatory reasons for a suspension or termination. Brown's memorandum was a sham intentionally used to portray Dr. Sims as having a mental illness. (Ex. 22; Ex. 97 Sims Depo. 254:1-264:7.) Brown wrote his memorandum on June 30, and on that same day his salary more than doubled and he received a $50,000 lump sum payment. (Ex. 22; Ex. 23 at PL5164; Ex. 57 at PL5914-PL5915; Ex. 87 Brown Depo. 106:11-15; Ex. 89 UMMSC 30(b)(6) Davis Depo. 11:9-10.) Defendants attempted to stigmatize Dr. Sims with a mental illness to humiliate and silence her complaints of protected activity. (Ex. 97 Sims Depo. 299:1-300:10.) Dr. Frisch and EAP evaluated Dr. Sims's mental health from June 18-22 and found no mental impairments or any other reason that she could not perform all her job duties. (Ex. 32 (Showing a psychiatric evaluation at PL367 and "MME"– mental evaluation– at PL370.); Ex. 90 Frisch Depo. 158:1-6, 159:12-160:16.) Defendants did not stop there because it was never about whether Dr. Sims could perform the essential functions of her job.

*Analysis*. Defendants did not proffer a reason in their memorandum for removing Dr. Sims from her scheduled shifts from June 30 to August 19 and placing her on suspension. Defendants only made a conclusory statement that Dr. Sims has no evidence. Defendants fail to shift the burden to Dr. Sims. As a matter of law, that renders summary judgment inappropriate on the "regarded as" claim. Notwithstanding, Dr. Sims provides both direct and circumstantial evidence that Defendants regarded her as disabled. Defendants purported to believe that Dr. Sims had a mental illness, but never believed she could not perform her essential job functions. "An employee is qualified if they 'can perform the essential functions

35

of the employment position [they] hold[] or desire[],' either 'with or without reasonable accommodations.' *Id.* at 892 n.2 (quoting 42 U.S.C. § 12111(8))." *Wirtes v. City of Newport News*, No. 19-1780 (4th Cir. April 30, 2021) (quoting *Laird v. Fairfax Cnty.*, 978 F.3d 887, 892 (4th Cir. 2020))." On June 22, UMMSC Medical Director, Dr. Frisch, determined that Dr. Sims could perform all the essential functions of her job. (Ex. 32 at PL400; Ex. 90 Frisch Depo. 158:1-6, 159:12-160:16.) Dr. Frisch's medical examination included an individualized assessment of Dr. Sims and a review of systems. During the mental health examination, Dr. Frisch assessed for psychiatric and behavioral impairments. She did not find any because there are none. (Ex. 32; Ex. 90 Frisch Depo. 160:10-16.) A reasonable jury could conclude that Defendants regarded Dr. Sims as disabled when they removed her from work because (1) their purported concern was pertaining to a mental illness not job performance; (2) Defendants never mentioned an essential job function that Dr. Sims might be unable to perform; and (3) Defendants never believed that Dr. Sims was unsafe. A reasonable jury could also conclude that Brown's memorandum was a sham used to falsely portray Dr. Sims as having a mental illness so that Dr. Sims could be removed from duty for a discriminatory or retaliatory reason.

Defendants argue that *Barnum v. Ohio State Med. Ctr.*, unpublished, from the Sixth Circuit is instructive. Dr. Sims has pointed out it is distinguished. *Babb v. Maryville Anesthesiologist, P.C.*, a more recent published case from the Sixth Circuit is instructive. *EEOC v. McLeod Health, Inc.*, published from the Fourth Circuit, is mandatory authority and binding. (reversing summary judgment for defendant because a reasonable jury could conclude it was not reasonable for defendants to believe plaintiff could not perform an essential job function.)

## E.    UMMSC Blatantly Punishes Black CRNA For Opposing Discrimination and Retaliation

Count V– Retaliation.  Defendants argue **without pointing to any evidence** that Dr. Sims's retaliation claim fails because (1) Dr. Sims cannot deny that she made the "concerning comments" to Brown on June 29; and (2) she cannot deny that her employment ended because she refused a "second fitness for duty evaluation." Dr. Sims has always denied: (1) making the statements in Brown's memorandum; and (2) refusing a "second fitness for duty evaluation."

Defendants argue that Dr. Sims's retaliation claim against Goetz and Rowen fails because (1) neither referred Dr. Sims for the "second fitness for duty evaluation"; (2) neither made the decision to terminate Dr. Sims's employment; and (3) neither were involved in Dr. Sims's appeal process. First, there was never a referral for a "second fitness for duty evaluation." (Ex. 7; Ex. 90 Frisch Depo 83:3-6, 83:9-84:16; Ex. 92 King 62:12-63:13; Ex. 91 Goetz Depo. 275:14-276:11.) Second, Defendants take an internally contradicting position that Dr. Sims voluntarily resigned, and that she was terminated by Human Resources. (Ex. 11; Ex. 86 UMMSC Interr., No. 11.) Neither is true. Henderson and King both worked in Human Resources and King testified that "Human Resources does not make decisions to terminate employees." (Ex. 92 King Depo 28:6-18, 32:16-33:8; 37:2-39:19.) Third, there was no *normal* appeal process. (Ex. 36 at UMMC543.) It was manipulated to conceal that both Rowen and Goetz were the decisionmakers who terminated Dr. Sims's employment. (Ex. 36 at UMMC454-455; Ex. 96 Sims Declare ¶ 6; Ex. 97 Sims Depo. 89:7-90:11.) Defendants retaliated against Dr. Sims for complaining about discrimination and retaliation by, and among other things: (1) creating a memorandum that attributed false statements to Dr. Sims to portray her as having a mental illness; (2) regarding Dr. Sims as having a mental impairment; (3) terminating her employment for refusing a supervisory EAP referral; (4) not allowing Dr. Sims to have a normal appeal process; and (5) failing to investigate her disability discrimination and retaliation claims.

A causal connection exists for all the prima facie cases of retaliation. "The Fourth Circuit has held that a 'causal connection' for purposes of demonstrating a prima facie case exists where the employer takes adverse employment against an employee shortly after learning of the protected activity." *Suggs v. 7-Eleven Inc.* quoting *Pepper v. Precision Valve Corp.*, 526 F.App'x 335, 337 (4th Cir. 2013).

Any purported concerns by Defendants about patient safety are pretextual. Goetz hired CRNA-17 to work in STC while he was under a criminal investigation for allegedly sexually assaulting a patient during childbirth. (Ex. 91 Goetz Depo. 160:6-169:18.) Even after CRNA-17 pled guilty to gross sexual imposition and patient abuse on December 16, 2013, he continued working at UMMSC providing patient care until a few weeks prior to March 11, 2014 when he was sentenced to county jail. (Ex 13; Ex. 98.) His wife, at that time, "couldn't fathom that the man that [she] loved, [her] husband, would drug and molest a pregnant woman." (Ex. 98.) Goetz was aware of the patient complaint and allegations against CRNA-17 prior to

hiring yet still hired him. (Ex. 91 Goetz Depo. 160:6-169:18.) Brown's memo attributing false "concerning comments" to Dr. Sims certainly was not worse or more concerning than the allegations against CRNA-17 of sexual abuse of a patient under anesthesia.[26] CRNA-17 had not complained of protected activity like Dr. Sims, so he was believed and treated more favorably. During Dr. Sims's employment, Defendants rarely exhibited genuine concern about patient safety. Defendants' top priority was covering up wrongdoing to escape liability. That was the culture at UMMSC. Brown created a memo attributing false statements to Dr. Sims and was paid and promoted on the same day. (Ex. 97 Sims Depo. 260:3-264:7.) Goetz and Rowen used Brown's memo to harass Dr. Sims and retaliate against her which is consistent with the corrupt culture of UMMSC.

### 1.    The Sham: Walter Brown's June 30th Memorandum

*Prima facie*. On June 29, Dr. Sims informed Brown of her race discrimination complaint against Goetz, and that she was getting a lawyer to assist her with filing a charge of discrimination with the EEOC. (Ex. 56; Ex. 87 Brown Depo 62:12:16, 66:20-67:1, 97:1-9.) Dr. Sims informed Brown that she had met with Rowen and spoken with Human Resources about her race discrimination complaint, and that Rowen was very upset with Dr. Sims because of her complaint. (Ex. 56; Ex. 97 Sims Depo. 251:20-252:2.) Brown requested that all emails regarding Dr. Sims's race discrimination complaint be forwarded to him. (Ex. 56 at ¶ 15; Ex. 21; Ex. 22; Ex. 96 Sims Declare ¶ 17.) Brown received and read those emails on June 29, and immediately communicated with Human Resources about Dr. Sims's race discrimination complaint. (Ex. 87 Brown Depo. 56:17-57:15, 67:12-68:12, 70:5-10, 75:12-19.) The next day, June 30, Brown created a memorandum attributing false statements to Dr. Sims. (Ex. 22; Ex. 97 Sims Depo. 245:4-252:19, 254:1-264:7; Ex. 96 Sims Declare ¶ 17.) She was suspended from work because of Brown's memo. (Ex. 24.) The temporal proximity between when Brown became aware of Dr. Sims's protected activity and retaliatory memo is one day.

*LNDR*. Defendants purport that they believed Dr. Sims made the "concerning comments" in Brown's memorandum.

---

[26] CRNA-17 was biracial and identified as a black male. Goetz hired him in STC prior to Dr. Sims's employment.

_Pretext_. Defendants were aware that Brown knew about Dr. Sims's discrimination complaint, but did not investigate to determine whether his June 30th memorandum was retaliatory. (Ex. 87 Brown Depo. 56:17-57:15.) Dr. Sims complained that Defendants were retaliating against her because of her race discrimination complaint. (Ex. 26; Ex. 34.) Defendants purport that Dr. Sims's emails complaining of discrimination or retaliation confirmed the statements in Brown's memo. Yet, even after Henderson directed her Human Resources' staff to find any email of such, they did not. (Ex. 27; 29.) Henderson was forced to acknowledge that none of Dr. Sims's emails corroborated Brown's statements. (_Id._) Defendants never investigated Dr. Sims's retaliation complaint. Although Defendants purport that they did investigate Dr. Sims's retaliation complaint, they do not know who did the investigation or the whereabouts of any of the documents or reports pertaining to the retaliation investigation. Defendants did not produce any documents pertaining to a retaliation investigation upon request or motion to compel.

Brown received his first and only job promotion at UMMSC on June 30. (Ex. 23 at PL5164; Ex. 87 Brown Depo. 115:3-6.) His salary increased from about $46,000 to $110,000, and he became entitled to about a $50,000 lump sum payment for "retro-pay." [27] (Ex. 23 at PL5164; Ex. 57 at PL5914-PL5915; Ex. 87 Brown Depo. 106:11-15; Ex. 89 UMMSC Davis Depo. 11:9-10.) Brown testified that discussions and preparation for his June 30 promotion began in 2014. (Ex. 87 Brown Depo. 254:6-13.) But he declared under penalty of perjury that he was not expecting any job promotions within the next year when he filed for bankruptcy and his debt discharged on November 18, 2014. (Ex. 57 at PL5915 and PL5920.) Brown committed perjury several times during his deposition. He testified that he had never been a party to a lawsuit. (Ex. 87 Brown Depo. 13:15-17.) He has been a party to several lawsuits. (Ex. 57 at PL5901-PL5902, PL5904, and PL5922; Ex. 58.) Brown testified that he does not have any other legal names, but he does. (Ex. 57 at PL5887; Ex. 87 Brown Depo 7:10-21.) Brown testified that he has never owned a business, yet there was a business registered in Maryland with him as the owner and a historical address of his. (Ex. 59; Ex. 87 Brown Depo. 20:2-4, 22:2-6.) Brown was a police officer at the Baltimore City Police Department for seven years and served as a witness for the State of Maryland for "dozens and dozens" of

---

[27] Defendants refused to produce Walter Brown's employee file or job application for his promotion. Plaintiff's evidence was received through the Commission. After the Commission issued a probable-cause finding, Defendants would not produce in litigation hardly any of the relevant information that they produced to the Commission despite a motion to compel. (ECF 66)

criminal cases, but he has committed perjury and is not credible. (Ex. 87 Brown Depo. 92:9-12; 93:7-11, 170:1-3, 170:12-14.)

### 2.    The Mental-Illness: "Regarded As"

*Prima facie* (retaliation). Defendants regarded Dr. Sims as having a mental illness to retaliate. On June 29, Dr. Sims informed Brown that she was getting a lawyer to assist her with filing a charge of discrimination regarding her race discrimination complaint. (Ex. 56; Ex. 96 Sims Declare ¶ 17.) On June 30, Brown created a retaliatory memorandum to portray Dr. Sims as having a mental illness. (Ex. 22; Ex. 97 Sims Depo. 254:1-264:7.) Defendants placed Dr. Sims on suspension on June 30 because of Brown's memo.[28] Dr. Sims lost hundreds of dollars because she lost her weekend incentive pay. (Ex. 46; Ex. 47 at PL238.) On July 13, Dr. Sims informed Defendants that she would be utilizing the EEOC to assist her with returning to duty and to deter any further retaliation. (Ex. 26 at PL2030.) On July 14, Paula Henderson– Vice President of Human Resources– "stepped in" and informed Dr. Sims that Defendants were placing her on unpaid suspension effective July 13, and confirmed that Defendants had received both discrimination and retaliation complaints from Dr. Sims. (Ex. 26 at PL4867.) She lost thousands of dollars because of the unpaid suspension.[29] (Ex. 47 at PL239-PL241 and PL309; Ex. 48 at UMMC1323.) The temporal proximity between when Defendants, including Human Resources, became aware of Dr. Sims's intent to utilize the EEOC and the unpaid suspension is the same day because Henderson made the unpaid suspension effective retro-actively to July 13 which is the same day that Dr. Sims provided written notice of intent to utilize the EEOC. (Ex. 26.)

*LNDR*: Defendants purport that they believed that Dr. Sims made "concerning comments" to Walter Brown.

*Pretext*: Defendants purport that the "concerning comments" in Brown's memo indicated that Dr. Sims had a mental illness even though she always asserted not making those comments. All the emails from Dr. Sims that Defendants rely on show that Dr. Sims did not make the same statements in Brown's

---

[28] About fourteen percent of Dr. Sims's normal pay was withheld because she did not receive her weekend incentive pay.

[29] All of Dr. Sims's normal pay was withheld and instead deducted from her accumulated paid time off which she could have cashed out later. (Ex. 7 at PL309; Ex. 48 at UMMC1323.)

memo. (Ex. 29 ("Faresha does not explicitly state that Lisa and Linda are linked to them.").) Dr. Frisch and King supposedly made the determination that Dr. Sims had a mental illness based on Brown's memo. (Ex. 30 at PL5174 and PL5192.) Yet, both Dr. Frisch and King testified that they never believed that Dr. Sims was ever unsafe to provide patient care. (Ex. 90 Frisch Depo. 85:18-86:1, 157:13-21, 158:1-6, 159:12-160:16; Ex. 92 King Depo. 95:18-21, 96:8-14, 133:20-134:2, 169:14-170:2.)

### 3.     The Supervisory EAP Referral: Termination

*Prima facie*. Dr. Sims and Human Resources– King and Nicole Leyba– met on July 8 about Dr. Sims's race discrimination complaint. (Ex. 24 at UMMC775.) Dr. Sims's rejected King's advice to withdraw her race discrimination complaint. ((Sims Declaration ¶ 15.) A few hours after the meeting on July 8, Human Resources told Dr. Sims that she could not work her upcoming scheduled shifts. (Ex. 25.) On July 10, King sent an email recommending that Dr. Sims go to EAP. (Ex. 9 at UMMC563.) It was not a fitness for duty referral but instead a supervisory EAP referral. (Ex. 90 Frisch Depo. 83:9-84:16, 85:3-7, 85:12-13.) ("Q. So was Neddra King's July 10, 2015 email to Dr. Sims a fitness for duty referral?  A. No. It was just simply a request to go to EAP.") On July 13, Dr. Sims informed Defendants, including Paula Henderson, that she would be utilizing the EEOC to get her back to duty and deter further retaliation. (Ex. 26 at PL2030.) The next day, July 14, Henderson "stepped in" and placed Dr. Sims on unpaid suspension and stated for the first time that Defendants questioned whether Dr. Sims was safe to provide patient care. (Ex. 26 at PL4866-PL4867.) On August 9, Dr. Sims sent an email complaining of disability discrimination and retaliation. (Ex. 34.) On August 19, Dr. Sims was informed by Defendants that she was terminated on August 17. (Ex. 10.) The temporal proximity between when Defendants, including Human Resources, became aware of Dr. Sims's protected activity and the termination is at most sixty days.

*LNDR*: Defendants purport that Dr. Sims voluntarily resigned and take the contrary position that Henderson and King in Human Resources made the decision to terminate Dr. Sims's employment. Defendants purport that Dr. Sims was terminated because she refused to undergo a "second fitness for duty evaluation."

*Pretext*: Dr. Sims denies that she voluntarily resigned. (Ex. 34 at UMMC656.) Defendants testified that Dr. Sims never submitted any notice that she was resigning. (Ex. 88 UMMSC 30(b)(6) Leyba Depo. 18:14-16.) Dr. Sims repeatedly requested to return to duty. (Ex. 34 at UMMC656.) King testified that

41

Human Resources does not make decisions to terminate employees. (Ex. 92 King Depo. 28:6-18.) Defendants never requested that Dr. Sims undergo a "second fitness for duty evaluation." Dr. Frisch and King never believed that Dr. Sims was unsafe or could not perform her essential job function. On July 10, King recommended that Dr. Sims go to EAP. (Ex. 9 at UMMC563.) On that same day, King submitted a supervisory EAP referral form to EAP. (Ex. 7; Ex. 90 Frisch Depo. 83:3-6; Ex. 92 King Depo. 62:12-63:13.) King testified that Goetz completed the supervisory EAP referral form. (Ex. 92 King Depo. 66:3-13.) Dr. Sims refused the supervisory EAP referral. Defendants admit an employee can always refuse a supervisory EAP referral and no disciplinary action will be taken. (Ex. 8; Ex. 35; Ex. 90 Frisch Depo. 61:16-17; Ex. 92 King Depo. 48:15-20, 57:7-58:1.) Defendants admit they do not terminate employees for refusing a supervisory EAP referral. Defendants terminated Dr. Sims's employment because she refused a supervisory EAP referral. (Ex. 9.) Defendants never requested a "second fitness for duty evaluation." Defendants pretend that Dr. Sims resigned because her discrimination and retaliation complaints were the but-for cause of termination.

### 4.   The Secret Vengeance: Defendant Linda Goetz

*Prima facie*: On June 18, Dr. Sims told Rowen's assistant that Goetz's FFD referral was discriminatory. (Ex. 19.) On June 19, Rowen warned Goetz that there would be investigations relating to Dr. Sims's discrimination claim. Goetz was supposedly under investigation for discriminating against Dr. Sims when Goetz completed a supervisory EAP referral form that King submitted to EAP on July 10. (Ex. 7; Ex. 92 King Depo. 66:3-13, 81:17-18.) Dr. Sims refused the supervisory EAP referral and was terminated. (Ex. 9.) Goetz and Rowen made the decision to terminate Dr. Sims's employment. (Ex. 92 King Depo. 32:16-33:8, 37:2-39:19, 81:17-18; Ex. 83 Goetz Interr., No. 21; Ex. 97 Sims Depo 89:1-90:11; Ex. 96 Sims Declare ¶ 6.) UMMSC did not provide supervisor Goetz any training on retaliation. (Ex. 91 Goetz Depo. 259:13-16, 260:5-12.)

*LNDR*: Defendants purport that Goetz was not involved with the second request which was the supervisory EAP referral, and she did not make the decision to terminate Dr. Sims's employment.

*Pretext*: Goetz completed the supervisory EAP referral form and submitted it to King who then submitted it to EAP. (Ex. 7; Ex. 92 King Depo. 66:3-13, 81:17-18.) Goetz requested a meeting with Human Resources to discuss Dr. Sims and her options because Goetz was concerned about Dr. Sims

returning to work after complaining about discrimination. (Ex. 61; Ex. 91 Goetz Depo. 334:1-16.) King told Dr. Sims on August 26 that Goetz and Rowen terminated Dr. Sims's employment. (Ex. 36 at UMMC454; Ex. 96 Sims Declare ¶ 6.) King said that Goetz and Rowen would do Step 1 & Step 2 of Dr. Sims's appeal process. (Ex. 36 at UMMC454.) On August 31, Defendants revoked approval of Dr. Sims having a normal appeal procedure to conceal that Goetz and Rowen were the decisionmakers. (Ex. 36 at UMMC543.) King testified that Goetz and Rowen could have been the decision makers that terminated Dr. Sims's employment. (Ex. 92 King Depo. 37:2-39:19.)

### 5.   The Most Valuable Player: Defendant Lisa Rowen

*Prima facie*: On June 18, Dr. Sims went to the executive leadership office seeking Rowen to file a complaint of race discrimination against Goetz. Rowen was out of the office so her assistant, Suzanne Leiter, took notes of Dr. Sims's allegations of race discrimination.[30] (Ex. 19.) Defendants accepted Dr. Sims's verbal complaint to Suzanne Leiter as a race discrimination complaint. On June 19, Rowen emailed Goetz and warned Goetz that she needed to prepare for internal and external investigations, lawsuit, and the EEOC regarding the June 18th FFD referral of Dr. Sims. (Ex. 60.) On June 24, Dr. Sims met with Rowen to discuss her complaint of race discrimination. (Ex. 62; Ex. 84 Rowen Admit, No. 1; Ex. 97 Sims Depo. 89:18-11, 216:6-15, 251:19-252:11) Rowen was hostile and threatening toward Dr. Sims. (Ex. 63 at UMMC624-625; Ex. 97 Sims Depo. 89:25-90:9, 251:19-252:11.) During the meeting, Rowen yelled and threatened that Dr. Sims was going to "see soon what was going to happen to you" for complaining about race discrimination and threatened Dr. Sims's employment. (Ex. 97 Sims Depo. 89:25-90:9, 251:19-252:11.)  Dr. Sims immediately requested a meeting with Jeffrey Rivest– former UMMC President and CEO, but he declined her request to meet. (Ex. 62.) After Rowen's meeting about Dr. Sims's race discrimination complaint, Rowen directed Goetz and Human Resources to issue Dr. Sims another corrective action and to place her on a performance improvement plan that would alter Dr. Sims's work schedule so she could not make as much money. (Ex. 63 at UMMC467, UMMC72-74 and UMMC238.)

*LNDR*: Defendants purport that Rowen was not involved with the second request which was the supervisory EAP referral and did not make the decision to terminate Dr. Sims's employment.

---

[30] Defendants refused to produce upon request Suzanne Leiter notes of Dr. Sims's race discrimination complaint.

*Pretext*: Rowen communicated with Human Resources and wanted to know how long was UMMSC going to be paying Dr. Sims because Rowen thought "we" were going to terminate Dr. Sims. (Ex. 64.) On August 26, King told Dr. Sims that Goetz and Rowen would do Step 1 & Step 2 of Dr. Sims's appeal process. (Ex. 36 at UMMC454.) On August 26, King told Dr. Sims that Goetz and Rowen made the decision to terminate Dr. Sims's employment. (Ex. 96 Sims Declare ¶ 6.) On August 31, Defendants revoked approval of Dr. Sims having a normal appeal procedure to conceal that Goetz and Rowen were the decisionmakers. (Ex 36 at UMMC543.) King testified that Rowen and Goetz could have been the decision makers that terminated Dr. Sims's employment. (Ex. 92 King Depo. 37:2-39:19.) Rowen admitted she authorized the termination of Dr. Sims's employment. (Ex. 84 Rowen Admit, No. 3.) "Individuals may be liable under Section 1981 when they 'authorize, direct, or participate in' a discriminatory act." *Atkins v. Winchester Homes, et al.* 1:06-cv-00278-CCB p. 18 (D.Md. January 17, 2007) (quoting *Manuel v. Int'l. Harvester Co.*, 502 F. Supp. 45, 50 (N.D. Ill. 1980.))

## F.     Goetz Says Dr. Sims Is "Argumentative and Aggressive Like the Average Black Woman"

Count VI– Racially Hostile Work Environment.  Defendants state in a conclusory manner and **point to no evidence** that Dr. Sims cannot demonstrate she was subjected to a hostile work environment because there is no evidence. As a matter of law, Defendants' bare assertion does not fulfil the moving party's burden. Accordingly, Dr. Sims's hostile work environment claim should survive summary judgment as a matter of law.

Goetz was Dr. Sims's supervisor from the beginning to the end of Dr. Sims's employment. Dr. Sims never welcomed Goetz's offensive and insulting behavior. Dr. Sims even requested that another CRNA be in attendance of Dr. Sims's meeting with Goetz to deter Goetz from verbally and physically attacking Dr. Sims like she did in 2013. (Ex. 65.) But at the beginning of the meeting, Goetz asked the CRNA to be dismissed and Goetz starting verbally attacking Dr. Sims. Goetz's unwelcomed behavior was related to Dr. Sims being of the black race.

Goetz had a stereotypical bias that Dr. Sims was argumentative, aggressive, and average because she told Dr. Sims at the beginning of her employment that she was acting "argumentative and aggressive like the average black woman." (Ex. 97 Sims Depo. 101:1-103:17; Ex. 96 Sims Declare ¶ 16.) These labels

44

are racially bias and can be used in the workplace to silence and shame black women from challenging racial inequality and demanding equal treatment.[31]   The labels perpetuate the "angry black woman" stereotype. (Footnote 31.) "Black women must overcome the angry black woman stereotype, which characterizes black women as bad-tempered, hostile and overly aggressive." [32]   The origin of the angry black woman stereotype is believed to stem from the 1950s when black women fought back against racism. (Footnote 32.) The angry black woman stereotype is used to strengthen the perceived purity of white womanhood. (Footnote 31.) Columbia University professor Kimberle Crenshaw shows in her research that the intersectionality of the black woman's experience is unique because the double minority status makes black women more vulnerable to further marginalization. (Footnote 32.) Former First Lady Michelle Obama said she was taken aback when she was labeled with the insulting description of "angry black woman." [33] Mrs. Obama stated, "[t]hat was one of those things that you just sort of think, dang, you don't even know me, you know? You just sort of feel like, wow, where did that come from? You think, that is so not me! But then you sort of think, well, this isn't about me." (Footnote 33.) It is about the bias and beliefs of the person that applies racial stereotypes. Dr. Sims did not exhibit any aggressive behavior and had outstanding job performance. (Ex. 3; Ex. 53; Ex. 54.) Yet, Goetz rated Dr. Sims as "average" in 2013. Goetz always rated Dr. Sims as "average" on performance evaluations. In May 2014 and August 2014, Dr. Sims received two awards for her excellence in job performance. One of the awards was the Employee of the Month which is the highest award offered by UMMSC. (Ex. 3.) Yet again, Goetz rated Dr. Sims as "average"– a 6 on a scale of 1-10– for her 2014 Annual Performance Evaluation. (Ex. 53.) In contrast, Goetz rated a non-black female, CRNA–2, who received less than competent on several job performance measures the same as Dr. Sims even though Dr. Sims never received less than competent on any measure. (Ex. 53; Ex. 76.)

Prior to Dr. Sims's employment, on March 8, 2013, she failed by two points her national certification board exam to become a CRNA. (Ex. 67.) Dr. Sims immediately called Goetz to ask if she could push back her start date. Goetz started yelling and berating Dr. Sims accusing her of being foolish

---

[31] https://en.wikipedia.org/wiki/Angry_black_woman
[32] https://www.forbes.com/sites/janicegassam/2019/05/31/overcoming-the-angry-black-woman-stereotype/?sh=57af26901fce
[33] https://www.cnn.com/2016/12/19/politics/michelle-obama-oprah-angry-black-woman/index.html

and unsmart. (Ex. 97 Sims Depo. 102:8-20.) Goetz was aware that Dr. Sims had a 3.9 cumulative grade point average from the number one ranked nurse anesthesia program in the nation, yet she continued to belittle and insult Dr. Sims. Goetz threatened to revoke the offer of employment if Dr. Sims did not pass the test in about two weeks. (Ex. 97 Sims Depo. 102:8-20, 329:24: 332:20.) When Dr. Sims spoke to Sharon Bidle, UMMSC's nurse recruiter, on that same day, Bidle apologized and said Goetz's behavior was inappropriate. Bidle informed Dr. Sims that UMMSC does not enforce the requirement to pass the national certification board within sixty days of graduation which is why sometimes it is not on the offer letter. (Ex. 68 at PL123.) Bidle stated it was more of a "formality" than a requirement. Further, Dr. Sims first attempt to pass the board exam was more than sixty days after the completion of her program in December 2012. (Ex. 4.) Goetz did nothing to waive this requirement because it was never enforced. Dr. Sims passed her boards on the second attempt with the least amount of questions and scored almost 100 points higher with that score being in the top ten percent of her class. (Ex. 97 Sims Depo. 332:4-14.)

At the very beginning of Dr. Sims's employment, while she was in orientation, Dr. Sims complained to Goetz that her non-black CRNA preceptors were putting Dr. Sims in dangerous patient care situations and not providing adequate training. (Ex. 97 Sims Depo. 103:18-106:4.) Goetz said she heard that Dr. Sims refused to perform a central line insertion. Dr. Sims confirmed that was true and explained she was not competent yet in that procedure which could cause patient harm especially since it was an emergency surgery and there was no time for Dr. Sims to practice on a patient that was crashing (deteriorating fast). Goetz completely flipped out and started screaming and yelling. (Ex. 97 Sims Depo. 101:18-103:17; Sims Declaration ¶ 16).  Goetz told Dr. Sims that she was likely out there acting "argumentative and aggressive like the average black women." (*Id.*) Dr. Sims was frozen and paralyzed with fear due to Goetz's rage toward her. As the verbal attack and insults continued, Dr. Sims burst into tears. Goetz then **kicked** her and told her to pull herself together and put her big girl panties on and get out there and "prove yourself worthy" to work at UMMCS. (*Id.*) Goetz told Dr. Sims that she was not allowed to refuse to do any procedure no matter how uncomfortable she felt or unsafe. Yet, the Nurse Practice Act requires that Dr. Sims not perform any procedure that she is not competent to perform. That is the standard of care for all healthcare professionals. Goetz altered the conditions of Dr. Sims's employment by mandating that she perform procedures even if unsafe or work elsewhere. Goetz

46

threatened that Dr. Sims may not be a good fit for UMMSC and might have to work at a smaller hospital. Dr. Sims was extremely humiliated and ashamed that Goetz was able to **kick** her. (Ex. 97 Sims Depo. 101:1-103:17; Sims Declare ¶ 16). On July 8, 2015, King said that Goetz denied kicking Dr. Sims and instead said Goetz kicked the chair that Dr. Sims was sitting in. Dr. Sims specifically remembers Goetz kicking her while in a rage. Dr. Sims was reluctant to complain about race discrimination because she knew retaliation would follow, and she would lose her job. And that is exactly what happened when Dr. Sims complained of discrimination and retaliation in 2015.

Dr. Sims requested from March 2012 to August 2015 to work in Shock Trauma Center (STC). Dr. Sims interviewed on June 5, 2012 and was expecting to be hired into STC. (Ex. 70.) There was an open full-time CRNA STC position. (Ex. 12 at PL997.) During Dr. Sims's entire employment, Goetz never hired, transferred, or cross-trained a full-time black CRNA into STC. (Ex. 13-15.) In 2014, another black female, CRNA–7, requested to work in STC but was never allowed. (Ex. 40.) Goetz restricted the number of black CRNAs working in STC. Goetz kept the full-time black GOR CRNAs segregated from the STC work area by never allowing them to cross-train in STC. In 2015, there was only one full-time black CRNA working in STC of the twenty full-time STC CRNAs. (Ex. 69.)

In 2013, Goetz selected one CRNA from the GOR to be laid off supposedly due to a reduction-in-force. Goetz chose the most experienced black female, CRNA–8, in the GOR and ended her employment. (Ex. 97 Sims Depo. 333:2-7.)

In 2014, Dr. Sims met with Goetz and informed Goetz that a white female, CRNA–15, was upset with Dr. Sims because she would not handoff narcotics. (Ex. 65.) Dr. Sims explained that she was following the policy but CRNA–15 was upset and said it was "stupid" that Dr. Sims was following the "stupid" policy. Goetz agreed with CRNA–15 and said it was "stupid" for Dr. Sims's to follow the policy because there are grey areas in policies. (Ex. 30 at PL5172; Ex. 97 Sims Depo. 232:19-234:2.) Dr. Sims explained to Goetz that it was a zero-tolerance policy and she did not feel comfortable violating the controlled substance policy. (Ex. 65 at PL1281-PL1282.) Goetz told Dr. Sims that her thought process was "stupid" and "illogical." (Ex. 30 at 5172; Ex. 97 Sims Depo. 232:19-234:2.)  Dr. Sims reminded Goetz that the pharmacy supervisor, Ganesh Kumarachandran, was a guest speaker at the CRNAs staff meeting to explain the zero-tolerance controlled substance policy. The pharmacy supervisor specifically stated that

47

sentence was bolded in the policy to reiterate that all controlled substances including "IV infusions [ ] must also be wasted at the end of the case or when relieved" based on which comes first. (Ex. 65 at PL1281.) The reasoning was there were so many drug discrepancies (unaccounted for narcotics) in the department, so they wanted to eliminate handing off controlled substances to better isolate and detect anesthesia providers with suspicious drug activity.  Goetz started yelling and making offensive insults that Dr. Sims was so difficult to deal with because she is so "argumentative" and "aggressive." (Ex. 91 Goetz Depo. 235:8-250:9.) Goetz mandated that Dr. Sims handoff her narcotics to other CRNAs, and not follow the zero-tolerance controlled substance policy. Dr. Sims was in fear of being physically hit again like before. (Ex. 96 Sims Declaration ¶ 16). Again, Goetz was altering the conditions of Dr. Sims environment by mandating that she does not follow the zero-tolerance controlled substance policy. On June 18, Goetz wrote she previously observed Dr. Sims's having "aggressive behavior" warranting immediate drug and alcohol testing when Dr. Sims disagreed with Goetz's interpretation of the controlled substance policy. (Ex. 91 Goetz Depo. 235:8-250:9.) Notwithstanding, Goetz admits that the policy does state in bold that that controlled substance must be wasted at the end of the case or when relieved. (Ex. 91 Goetz Depo. 249:4-8.) Goetz also testified that she may not have been familiar with the policy when she discussed with Dr. Sims and agrees that all anesthesia providers were required to adhere to the controlled substance policy which provided zero-tolerance for non-adherence. (Ex. 91 Goetz Depo. 242:14-19, 250:4-9.)

In October 2014, Dr. Sims reported to Goetz that a white female, CRNA–14, threw papers in Dr. Sims's face while handing off care of a patient. (Ex. 97 Sims Depo. 126:3-130:8.) CRNA–14 was frustrated that Dr. Sims was late to relieve her, but Dr. Sims was still with another patient prior to. Goetz told Dr. Sims that she did not want to get involved and advised Dr. Sims's to handle it. *(Id.)* Dr. Sims called CRNA–14 but she did not answer, so Dr. Sims sent her a text message. Dr. Sims informed CRNA-14 that as a black woman she could never be so rude and aggressive at work and get away with the same behavior, but she understood that CRNA-14 had that privilege because of her race. Dr. Sims informed CRNA-14 that if she ever threw anything at her again that she would report her to Human Resources. Goetz accused Dr. Sims of being "threatening" and "aggressive." *(Id.)* Goetz said that Dr. Sims could not report anyone to Human Resources without going through Goetz first. *(Id.)* Indeed, again Goetz altered the conditions of Dr. Sims's employment because non-black CRNAs were not required to go through Goetz to make a

48

complaint to Human Resources. Goetz was upset that Dr. Sims referred to racial inequality in the text message, but it was true. Dr. Sims was scrutinized closely by Goetz and had no margin of error, but non-black CRNAs were out of control and could do whatever they wanted with little or no consequences. On April 7, 2015 a non-black male, CRNA-22, had an "unprofessional" and "disrespectful" interaction with Goetz and was not referred for a fitness for duty evaluation. (Ex. 80.) On February 14, 2014, a non-black male, CRNA-29, told Goetz that if she was expecting CRNAs report to duty on a snow day then she needed to also report to duty. (Ex. 71.) That non-black CRNA was giving an award after that. (Ex. 71.) Goetz did not accuse any of those CRNAs of having "aggressive behavior" that warranted a FFD evaluation.

On June 18, 2015, Goetz was supposedly concerned about Dr. Sims working too much, yet she denied Dr. Sims's vacation request but granted it for a nonblack, CRNA-21. (Ex. 18; Ex. 72.) On June 18, Goetz maliciously required Dr. Sims to undergo a fitness for duty evaluation with urine drug and alcohol testing while she was off duty on vacation leave. (Ex. 18.) The normal conditions of employment did not require a CRNA to undergo a FFD evaluation while off duty. (Ex. 31.) Goetz mandated that Dr. Sims report to the hospital that day. Goetz provided a false accusation that Dr. Sims was committing a federal crime– stealing narcotics from the hospital and self-using. (Ex. 18.) Goetz accused Dr. Sims of being a drug addict based on false and trivial reasons to discriminate against her. (*Id.*) Because of Goetz's FFD referral, Dr. Sims experienced the most degrading and humiliating day of her life on June 18 when she had to urinate in a cup while being watched. (Ex. 96 Sims Declare ¶ 16.) Defendants admit in their answers that it was an observed urine drug test. (ECF 43, p. 4 ¶ 30.) Dr. Sims had to pull down her underwear and urinate on her hands while trying to catch urine in a cup while someone observed her the entire time. Dr. Sims felt the painful emotions of racism that overwhelmed her and felt her body go numb as her eyes filled with tears. (Ex. 96 Sims Declaration ¶ 16.) Dr. Sims felt that none of her education or accomplishments would ever be good enough to protect her from discrimination and that she would always be treated as a second-class citizen by Goetz. (Ex. 97 Sims Depo. 234:3-237:6.) As a result of Goetz's FFD referral, Dr. Sims was medically diagnosed acute situation reaction caused by the severe anxiety and associated physical symptoms. Dr. Sims did not work for several days at her second job and called out two days at UMMSC. Dr. Sims was experiencing chest pain, increased blood pressure and heart

rate, chest palpitations, nausea, diarrhea, and loss of appetite. Dr. Sims dangerously dropped unintentionally seven pounds of weight in less than 72 hours because she was not eating or sleeping as much and having diarrhea due to Goetz's FFD referral. (Ex. 73.) Dr. Sims was afraid every time she touched a controlled substance at her second job after Goetz's FFD referral. Dr. Sims had this post-traumatic fear that the police would suddenly rush in and take her to jail even though she was doing nothing wrong. (Ex. 96 Sims Declare ¶ 16.) Goetz's FFD referral severely altered Dr. Sims's conditions of employment and made the work environment unbearably abusive. (Ex. 97 Sims Depo. 234:3-237:6; Ex. 96 Sims Declare ¶ 16.) Dr. Sims's life has and will never be the same because of Goetz's FFD referral. (*Id.*) None of this would have ever happened if Dr. Sims's was not black.

For all these reasons, and more, Dr. Sims and any reasonable person that experienced this would believe the racial harassment by their supervisor was severe and pervasive enough to alter the conditions of employment and create an abusive environment. (Ex. 97 Sims Depo. 106:108:17.) The evidence reveals that Dr. Sims conditions of employment were altered numerous times throughout her employment.

## G.   Defendants' Argument to Limit Their Back Pay Liability to $71,192 is Improper and Invalid on Summary Judgment

Defendants argue that even if Dr. Sims prevails on her claims, their liability should be limited to $71,192. Defendants offer no caselaw to support their unfounded argument. They did provide caselaw that a plaintiff has a duty to mitigate but fail to connect their argument. Defendants' argument is misplaced and improper on a motion for summary judgment. Rule 56 provides, in relevant part, "[a] party may move for summary judgment, identifying each claim or defense [ ] on which summary judgment is sought." To the extent that Defendants are seeking summary judgment on Dr. Sims's "claim for back pay", they cannot do so because such a claim does not exist. Plaintiff believes, at best, Defendants have confused the law of their affirmative defense of failure to mitigate damages. And, at worst, Defendants have filed a frivolous motion for summary judgment that is facially deficient, misrepresent the facts and evidence, and misapplies the law.

Notwithstanding, Defendants are not entitled to summary judgment on Plaintiff's "claim for back pay." First, Dr. Sims could have continued increasing her compensation at both UMMSC and Johns Hopkins but-for the termination. (Ex. 97 Sims Depo. 309:14-310:4.) Dr. Sims's "transition" from "part-

time employment" to "full-time employment" reflects her status at Johns Hopkins for the computation of benefits such as health insurance. Employment status is not a reflection of her earning potential. Second, Plaintiff's economic expert has calculated her back damages to be millions of dollars. (Ex. 94 PL. Expert 54:9-55:23.) Third, Defendants' economic expert is not a vocational expert so it would be improper for him to opine on Dr. Sims's earning capacity. Defendants' expert cannot simply subtract the difference of a second job that Dr. Sims already had prior to the termination. The collateral source rule applies thus Defendants' economic expert has indeed miscalculated damages and offset it by millions of dollars without ever opining as to the reason. Fourth, Defendants' economic expert will likely be stricken by trial so there is little benefit to having a battle of the parties' economic expert on a summary judgment motion. But, again, Plaintiff's economic expert has properly calculated that Dr. Sims is owed at least $16 million. (*Id.*) These types of determinations are facts best decided by a jury.

## V.    CONCLUSION

Defendants fail the moving party's initial burden on summary judgment. Defendants did not point to any credible evidence or any evidence at all to support their arguments.  As a matter of law, Defendants' failure precludes summary judgment. Despite Plaintiff having no duty to produce any evidence because Defendants failed to shift the burden to Plaintiff, out of an abundance of caution she shows with evidence all the prima facie elements and pretext for all her claims. Plaintiff had no duty to present all the elements with pretext until Defendants pointed to evidence to meet their initial burden or trial. Based on the law and facts, Defendants' Motion for Summary Judgment should be denied entirely. Plaintiff respectfully requests that this Court allow the merits of Plaintiff's claim to be decided at trial.

The Court granted an increase to 45 pages for Plaintiff's response. (ECF 163.)

Faresha Sims, *Pro Se* Plaintiff
212 Washington Ave 1105
Towson MD 21204
(601) 519-8585
faresha@yahoo.com

## **CERTIFICATE OF SERVICE**

*Pro Se* Plaintiff, Faresha Sims certifies that on July 28, 2021, I delivered to the clerk's drop box a true and correct copy of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment to be filed on the docket.

Faresha Sims, *Pro Se*