## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**FARESHA SIMS,**

          **Plaintiff,**

    **v.**

**UNIVERSITY OF MARYLAND MEDICAL
SYSTEM CORPORATION, et al.,**

          **Defendants.**

**Case No. 1:19-cv-00295-CCB**

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Dated:  September 13, 2021

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

/s/ Grace E. Speights
Grace E. Speights (Fed. Bar No. 05254)
Jocelyn R. Cuttino (Fed. Bar No. 21434)
Andrea N. Threet (pro hac vice)
1111 Pennsylvania Avenue NW
Washington, D.C. 20004
Telephone (202) 739-3000
Facsimile: (202) 739-3001
grace.speights@morganlewis.com
jocelyn.cuttino@morganlewis.com
andrea.threet@morganlewis.com

Vishal H. Shah (pro hac vice)
1701 Market Street
Philadelphia, Pennsylvania 19103
Tel: (215) 963-5000
Fax: (215) 963-5001
vishal.shah@morganlewis.com

*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ..................................................................................................... 2

    A.   Defendants Carried Their Initial Burden Pursuant to Rule 56 ............................. 2

    B.   Summary Judgment is Warranted on Ms. Sims's Claim for Allegedly
        Discriminatory Hiring and Work Assignments (Count I) .................................... 3

        1.   The majority of Ms. Sims's allegations regarding discriminatory
            hiring and work assignments are time-barred. .......................................... 3

        2.   The denial of the opportunity to work in the Shock Trauma
            Operating Room is not an adverse action. ................................................. 4

        3.   Ms. Sims cannot prove that she was denied the opportunity to work
            in the Shock Trauma Operating Room for discriminatory reasons. .......... 6

    C.   Summary Judgment is Warranted on Ms. Sims's Claim for the Allegedly
        Discriminatory Referral for a Fitness for Duty Evaluation (Count II). ................. 8

        1.   The referral for a fitness for duty evaluation is not an adverse
            action. ....................................................................................................... 8

        2.   Ms. Sims cannot prove that the fitness for duty referral was
            discriminatory. ....................................................................................... 10

    D.   Summary Judgment Is Warranted on Ms. Sims's Claim of Disability
        Discrimination (Count III). ............................................................................. 13

        1.   The requested fitness for duty evaluation was job-related and
            consistent with business necessity. ......................................................... 13

    E.   Summary Judgment is Warranted on Ms. Sims's Claim that She was
        "Regarded As" Disabled (Count IV). ............................................................... 15

    F.   Summary Judgment Is Warranted on Ms. Sims's Claim of Retaliation. ............. 16

    G.   Summary Judgment Is Warranted on Ms. Sims's Claim of Hostile Work
        Environment ................................................................................................... 19

    H.   Summary judgment is warranted on Ms. Sims's claimed damages .................... 19

III. CONCLUSION ............................................................................................... 20

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abel v. Knickerbocker Realty Co.*,
846 F. Supp. 445 (D. Md. 1994) ..........................................................................13

*Babb v. Maryville Anesthesiologists P.C.*,
942 F.3d 308, 322-23 (6th Cir. 2019) ..................................................................15

*Blair v. Ravenswood Village Health Ctr.*,
43 F. Supp. 2d 586 (S.D. W. Va. 1998),
*aff'd sub nom.*, 173 F.3d 849 (4th Cir. 1999) ........................................................3

*Boyer-Liberto v. Fontainebleau Corp.*,
786 F.3d 264 (4th Cir. 2015) ...............................................................................19

*Carson v. Giant Food, Inc.*,
187 F. Supp. 2d 462 (D. Md. 2002) .....................................................................10

*Cody v. CIGNA Healthcare*,
139 F.3d 595 (8th Cir. 1998) ...............................................................................14

*Conroy v. N.Y. State Dep't of Corr. Servs.*,
333 F.3d 88 (2d Cir. 2003).....................................................................................15

*Cornell v. Council of Unit Owners Hawaiian Vill. Condos. Inc.*,
983 F. Supp. 640 (D. Md. 1997) ..........................................................................14

*DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.*,
268 F. App'x 236 (4th Cir. 2008) .........................................................................18

*Dallas v. Giant Foods, Inc.*,
187 F. Supp. 2d 505 (D. Md. 2002),
*aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003)...........13

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ...............................................................................18

*DeJarnette v. Corning Inc.*,
133 F.3d 293 (4th Cir. 1998) .................................................................................6

*EEOC v. Sunbelt Rentals, Inc.*,
521 F.3d 306 (4th Cir. 2008) ...............................................................................19

*Fulmore v. United Parcel Serv., Inc.*,
      No. 7:11-CV-18-F, 2013 WL 12430074 (E.D.N.C. Mar. 28, 2013) ........................................7

*James v. Booz-Allen & Hamilton, Inc.*,
      368 F.3d 371 (4th Cir. 2004) ..........................................................................................5

*Jones v. Baltimore City Bd. of Sch. Comm'rs*,
      No. CV ADC-18-3002, 2021 WL 147033 (D. Md. Jan. 14, 2021) ........................................17

*King v. Rumsfeld*,
      328 F.3d 145 (4th Cir. 2003) ..........................................................................................10

*Mackey v. Shalala*,
      360 F.3d 463 (4th Cir. 2004) ..........................................................................................4

*McCleary-Evans v. Md. Dep't of Transp.*,
      780 F.3d 582 (4th Cir. 2015) ..........................................................................................7

*McNaught v. Va. Cmty. Coll. Sys.*,
      933 F. Supp. 2d 804 (E.D. Va. 2013) ...............................................................................6

*Miller v. Maddox*,
      51 F. Supp. 2d 1176 (D. Kan. 1999) ................................................................................6

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
      875 F.3d 107 (2d Cir. 2017) ............................................................................................3

*Perkins v. Int'l Paper Co.*,
      936 F.3d 196 (4th Cir. 2019) ..........................................................................................17

*Peterson v. Air Line Pilots Assoc., Int'l*,
      759 F.2d 1161 (4th Cir. 1985) ........................................................................................13

*Shivers v. Saul*,
      No. CV JKB-19-2434, 2020 WL 7055503 (D. Md. Dec. 2, 2020)........................................9

*Stiles v. Gen. Elec. Co.*,
      986 F.2d 1415 (4th Cir. 1993) ........................................................................................6

*Thorn v. Sebelius*,
      766 F. Supp. 2d 585 (D. Md. 2011)..................................................................................8

*United Air Lines v. Evans*,
      431 U.S. 553 (1977)........................................................................................................3

*United States v. Terry*,
      No. 1:14MC42, 2017 WL 3446807 (M.D.N.C. Aug. 10, 2017)............................................1

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ............................................................................................17

*Verrier v. Sebelius*,
No. CIV. CCB-09-402, 2010 WL 1222740 (D. Md. Mar. 23, 2010) ........................................9

*Walker v. Md. Dep't of Info. & Tech.*,
No. CV CCB-20-219, 2020 WL 6393435 (D. Md. Nov. 2, 2020) ................................8, 9, 12

*Walker-Pittman v. Maryland Dep't of Transp.*,
No. CIV. CCB-14-202, 2015 WL 419806 (D. Md. Jan. 29, 2015) ........................................3

*Warren v. Halstead Indus., Inc.*,
802 F.2d 746 (4th Cir. 1986) ...............................................................................7

*Watson v. City of Miami Beach*,
177 F.3d 932 (11th Cir. 1999) ......................................................................14, 15

*Williams v. Giant Food Inc.*,
370 F.3d 423 (4th Cir. 2004) .............................................................................3, 4

## I.   <u>INTRODUCTION</u>

Nothing in Plaintiff Faresha Sims's 51-page brief sets forth enough evidence for a reasonable jury to return a verdict for her on any of her claims.[1] Boiled down, Ms. Sims asks this Court to second-guess business decisions by her manager because she disagrees with them and offers her own self-serving opinion to speculate that discrimination *could* be the reason for the alleged adverse actions. But Ms. Sims bears the ultimate burden to provide enough evidence to show that she *was* the victim of intentional discrimination—a burden that she fails to carry.

While Ms. Sims purports to assert facts supported by 98 exhibits, a peek behind the curtain reveals that most of her factual assertions are not supported by the evidence she cites, or worse, lack citations to the record altogether.[2] When stripped to its core, Ms. Sims's evidence consists of nothing more than her self-serving opinions and speculation about Defendants' motives. The law requires more, and Ms. Sims simply doesn't have it.

Indeed, Ms. Sims has not attempted to dispute, and cannot dispute, the following:

- Ms. Goetz hired Ms. Sims for a CRNA position in the General Operating Room at the Medical Center, held open her job when she failed her board exam, and nominated her for two distinct awards.

---

[1]   With her 51-page submission, Ms. Sims blatantly disregards this Court's Order limiting her Opposition Brief ("Opposition" or "Opp.") to 45 pages. On June 14, 2021, this Court denied Ms. Sims's request for leave to file an additional 20 pages, in addition to the 45 pages the Court previously permitted. ECF No. 167; ECF No. 163. Because Ms. Sims knew of the 45-page limitation and disregarded it anyway, Defendants request that the Court refuse to consider pages 46-51, or in its discretion, fashion some alternative sanction. *See United States v. Terry*, No. 1:14MC42, 2017 WL 3446807, at *1 (M.D.N.C. Aug. 10, 2017) (refusing to consider a party's submission exceeding the applicable page limitation, because the party knew of the limitation).

[2]   To help the Court decipher the factual and evidentiary quagmire in Ms. Sims's Opposition, Defendants prepared a chart of every factual allegation for which Ms. Sims provides a citation, along with an analysis of whether the purported citation supports Ms. Sims's factual allegation. *See* Ex. 70.

- Ms. Goetz, based on her own observations and colleagues' reports about Ms. Sims, referred Ms. Sims for a fitness for duty evaluation.

- Ms. Sims, after being cleared to return to work, later raised concerns to Security and Human Resources that warranted an additional mental health evaluation to ensure that she could safely provide care.

- Ms. Sims refused the evaluation for over a month.

- The Medical Center considered her refusal as a voluntary resignation and terminated her employment.

These are the material facts, and they are undisputed. Absent a genuine dispute, it is not appropriate for a jury to speculate about Ms. Sims's unfounded claim that Defendants concocted and carried out a complicated conspiracy to terminate her employment based on her race (despite knowing her race when hiring her) and to retaliate against her for complaining about it. Because there are no triable issues of material fact in this case, now is the time for Ms. Sims's claims to be decided as a matter of law. Defendants are entitled to summary judgment on all her claims.

## II.   **ARGUMENT**

### A.   **Defendants Carried Their Initial Burden Pursuant to Rule 56.**

Ms. Sims's argument that Defendants failed to carry their initial burden lacks merit. Opp. 11-13. Defendants moved for summary judgment "on each of Ms. Sims's claims" on the basis that there are no triable issues of material fact in this case, "[b]ecause Ms. Sims cannot point to any evidence to support her claims." Op. Br. 3. To carry their initial burden of production, Defendants set forth a comprehensive statement of facts—which Ms. Sims overlooks—that demonstrated that Ms. Sims cannot meet her burden to show that a genuine issue of material fact exists sufficient to defeat summary judgment. Defendants also identified essential elements that Ms. Sims cannot prove with admissible evidence. *See, e.g.*, Op. Br. 18-19 (no adverse action), 20-22 (not motivated by racial animus and identifying other weaknesses), 22 (fitness for duty evaluation was not impermissible), 23 (not "regarded as" disabled), 25 (no "but-for" causation),

2

and 26 (no "severe or pervasive" conduct). *See, e.g.*, *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 116 (2d Cir. 2017) (moving party only need to identify the motion's basis and portions of the record that it believes shows the absence of a genuine issue of material fact).

Accordingly, Defendants carried their initial burden, which now requires Ms. Sims to set forth sufficient evidence showing that there is a genuine issue for trial. *Blair v. Ravenswood Village Health Ctr.*, 43 F. Supp. 2d 586, 586 (S.D. W. Va. 1998), *aff'd sub nom.*, 173 F.3d 849 (4th Cir. 1999) (pro se plaintiff may not rest on her pleadings but must demonstrate that specific, material facts exist that give rise to a genuine issue that must be tried before a jury). As explained below, summary judgment is warranted on all of Ms. Sims's claims.

### B.    Summary Judgment is Warranted on Ms. Sims's Claim for Allegedly Discriminatory Hiring and Work Assignments (Count I).

#### 1.    The majority of Ms. Sims's allegations regarding discriminatory hiring and work assignments are time-barred.

As an initial matter, Ms. Sims claims that her discriminatory hiring and work assignments claim is not time-barred because of the continuing violation doctrine. But even aside from her failure to select "continuing violation" on the Charge she submitted, an alleged refusal to hire or denial of transfer is a discrete discriminatory act that requires a filing within the proscribed time period. *Walker-Pittman v. Maryland Dep't of Transp.*, No. CIV. CCB-14-202, 2015 WL 419806, at *6 (D. Md. Jan. 29, 2015) (Blake, J.); *Williams v. Giant Food Inc.*, 370 F.3d 423, 429 (4th Cir. 2004) (the continuing violation doctrine cannot save claims premised on a discrete act of discrimination); *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977) (a discrete act of discrimination that is untimely "is merely an unfortunate event in history which has no present legal consequences"). Thus, any failure-to-hire claim under Title VII and Section 1981 expired on February 2, 2014, and on April 8, 2016, respectively—long before Ms. Sims filed a Charge or a lawsuit. Op. Br. 17-18. While Ms. Sims can recover only for events that occurred after

February 12, 2015 under Title VII (300 days) and after January 30, 2015 under Section 1981

(four years), she cannot establish a prima facie case or show pretext for events after those dates.

### 2. The denial of the opportunity to work in the Shock Trauma Operating Room is not an adverse action.

To remedy the deficiencies in her prima facie case (Op. Br. 18-19), Ms. Sims argues that

the application requirement be relaxed because of an "informal waitlist" and that differences in

compensation and prestige between the two Operating Rooms can establish an adverse action.

As to the informal waitlist, Ms. Sims has no evidence whatsoever to support her

allegation that such a list existed. Her entire argument section references her own self-serving

opinion, which cannot defeat summary judgment. *Mackey v. Shalala*, 360 F.3d 463, 469-70 (4th

Cir. 2004) (noting that "[a] plaintiff's own self-serving opinions, absent anything more" are

insufficient to overcome summary judgment); *Williams*, 370 F.3d at 433 (same). Ms. Sims points

to handwritten scribble that states "STC #4 on the list GOR" (Pl. Ex. 12[3]) to support her claim,

but that document fails to corroborate any of Ms. Sims's claims about the supposed waitlist or its

use on personnel decisions. Aside from her own testimony, Ms. Sims offers no evidence to

explain what the word "list" refers to, or what "STC #4 on the list GOR" means. There is

absolutely no testimony from Ms. Goetz or anyone other than Ms. Sims that an informal waitlist

was used, where or how it was used, or that employees were not made aware of vacancies.

Rather, the evidence cited by Ms. Sims shows that the Department posted openings, which is

how Ms. Sims first applied. *See* Pl. Ex. 12 at PL990 ("I noticed that there was a job posting on

the website . . . "); *see* Pl. Ex. 12 at PL997 (showing job openings).

---

[3]     To avoid confusion, Defendants refer to the exhibits provided by Plaintiff as "Pl. Ex.,"
while continuing use "Ex." for the exhibits attached to their briefs.

Ms. Sims also cannot establish an adverse action through her claimed difference in compensation and her subjective views of "prestige." For the first, Ms. Sims claims that the possibility of working on-call shifts and Trauma Operating Room-specific bonuses shows a difference in compensation; however, this does not create a genuine dispute. As Ms. Sims's own exhibit shows, on-call CRNAs received $10 per hour for a 12-hour shift. Pl. Ex. 42/Ex. 73[4] at PL1178; Pl. Ex. 42 at PL3663. If a CRNA works a "call back" shift (*i.e.*, where the CRNA swiped out and is then called back to work) or a "late call" shift (*i.e.*, where the CRNA stays beyond their scheduled shift), then the CRNA could receive up to $1,200 for a 12-hour bonus shift. Ex. 73 at PL1381. The very same exhibit shows that, in comparison, CRNAs in the General Operating Room actually received more: $1,350 for a 12-hour bonus shift. *Id.* Aside from the mere existence of a TAT bonus, Ms. Sims fails to provide any evidence that shows amount or frequency of any TAT bonus, which she claims would show a material difference in compensation. Indeed, no evidence provided by Ms. Sims rebuts Ms. Goetz's testimony that there is "no difference" in the total compensation package for CRNAs that work in the Shock Trauma Operating Room versus the General Operating Room. Op. Br. 19 ("Q Is there any difference in total compensation package for CRNAs that work in Shock Trauma versus the general operating room? A No difference."); *see also James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004) (a reassignment that reduced an employee's eligibility to receive bonuses was not enough to constitute a significant detrimental effect). Although Ms. Sims speculates that a General Operating Room CRNA cross-trained in the Shock Trauma Operating

---

[4]     Ms. Sims only submitted portions of various exhibits. For the ones referenced by Defendants here, Defendants provided a full copy for the sake of completeness (Exs. 73-75).

Room could have worked in both and thus taken advantage of the various bonus programs, she fails to show that it was allowed or that any CRNA actually did so.

For the second, Ms. Sims's subjective belief that the Shock Trauma Operating Room is more "prestigious" than the General Operating Room also cannot establish an adverse employment action. *Miller v. Maddox*, 51 F. Supp. 2d 1176, 1190 (D. Kan. 1999) (prestige "is insufficient to establish an adverse employment action"). Thus, Ms. Sims cannot prove that the denial of the opportunity to work in the Shock Trauma Operating Room was an adverse action.

>   **3.     Ms. Sims cannot prove that she was denied the opportunity to work in the Shock Trauma Operating Room for discriminatory reasons.**

Assuming that Ms. Sims can establish a prima facie case, the burden shifts back to her to prove intentional discrimination, because Defendants have articulated a legitimate, nondiscriminatory reason:  Assignment into the General Operating Room or Shock Trauma Operating Room depends on the needs of the Anesthesia Department at that time (Ex. 71 at 396:12-397:4), and Ms. Goetz interviewed and hired Ms. Sims for a position in the General Operating Room, which was the open position that needed to be filled then.[5] *Id.* at 148:5-1; 145:18-146:1 ("When Dr. Sims was hired, she was hired to work in the general operating room. She was not hired with the condition that when an opening would be available in the trauma ORs, that she would change the location of her primary workplace."); Ex. 11 at No. 17.

Here, Ms. Sims cannot establish pretext, because she cannot show "*both* that the reason was false, *and* that discrimination was the real reason for the challenged conduct." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998). Ms. Sims attempts to show pretext by challenging a series of personnel decisions within the Department. *McNaught v. Va. Cmty. Coll.*

---

[5]     This burden is "relatively modest." *Stiles v. Gen. Elec. Co.*, 986 F.2d 1415 (4th Cir. 1993).

*Sys.*, 933 F. Supp. 2d 804, 824 (E.D. Va. 2013) (noting that a plaintiff's disagreement with a defendant's hiring decisions was insufficient to establish pretext and escape summary judgment). Ms. Sims has offered no evidence to show that the Department's business needs required her to work in Shock Trauma. She only speculates about the hiring/transfer decisions related to CRNAs 6, 25, 26, 27, and 28, as well as the fact that no Black CRNAs were hired to work in Shock Trauma over Ms. Sims's short, two-year career, while conveniently omitting that Defendants had just hired CRNA 17, a Black male, to work in the Shock Trauma Operating Room two months before Ms. Sims started.[6] Pl. Ex. 13 at PL3394. These are precisely the type of allegations rejected by the Fourth Circuit, because it would require the Court to "speculate that the persons hired were not better qualified, or did not perform better during their interviews, or were not better suited based on experience and personality for the positions." *See McCleary-Evans v. Md. Dep't of Transp.*, 780 F.3d 582, 585-86 (4th Cir. 2015) (rejecting the plaintiff's "naked," "formulaic," and "conclusory" claim that her employer did not select her because of her race).

Although Ms. Sims subjectively expected a position in the Shock Trauma Operating Room, she offers no evidence that she was the best person to be assigned there when positions were actually available. Nor did Ms. Sims show that personnel decisions were driven by the desires of the most experienced CRNAs or of those with the highest level of education. Rather, the Department's needs dictated the underlying personnel decisions, which cannot be second-

---

[6] Ms. Sims relies on statistics to "tell much" (Opp. 18), but the Fourth Circuit has cautioned against such use of statistics. *Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 753 (4th Cir. 1986); *Fulmore v. United Parcel Serv., Inc.*, No. 7:11-CV-18-F, 2013 WL 12430074, at *16-17 (E.D.N.C. Mar. 28, 2013) ("wholly" rejecting statistical evidence at the summary-judgment stage because of no expert to test or offer a standard deviation analysis and because sample sizes were "too small"). Here, Ms. Sims offers no evidence, expert or otherwise, regarding the validity of the underlying statistics. Ms. Sims also fails to provide any evidence about the Medical Center's hiring, promotion, or training processes, or the demographics of the Medical Center's applicant pool or of the offers actually made to applicants. Her evidence is speculative at best.

guessed. Op. Br. 20; *see Thorn v. Sebelius*, 766 F. Supp. 2d 585, 595-96 (D. Md. 2011) (courts do "not sit as a kind of super-personnel department" weighing employment decisions).

Ms. Sims attempts to show pretext by conflating "hiring qualifications" with the "individual skillset of a CRNA" (Opp. 18), but the two are not interchangeable. Rather, a supervisor may require all CRNAs to have a certain level of education and an active license but may decide that one CRNA is better suited for one operating room over another, assuming there are openings in both. That, too, is a personnel decision for management.

Above all, the fact that Ms. Sims was hired by Ms. Goetz – the same manager who she now claims acted discriminatorily – squarely rebuts any presumption of discriminatory intent. Op. Br. 21 (describing the "powerful" inference). As to Ms. Sims, she fails to explain why Ms. Goetz would hire her, keep her job open when she failed her board exam, nominate her for two awards, and then discriminate against her when it came to work assignments.

### C.      Summary Judgment is Warranted on Ms. Sims's Claim for the Allegedly Discriminatory Referral for a Fitness for Duty Evaluation (Count II).

#### 1.      The referral for a fitness for duty evaluation is not an adverse action.

Instead of claiming that the fitness for duty evaluation was an adverse action, Ms. Sims attempts to establish an adverse action by focusing on a series of events over the next several days *caused* by the fitness for duty evaluation, including a loss of two sick days, a loss of the differential between regular and weekend day pay and sick leave for two days, a loss of three shifts at Ms. Sims's job at Johns Hopkins, and medical issues. This, too, is insufficient.

Effects incidental to the fitness for duty referral are insufficient as a matter of law to establish an adverse action. *Walker v. Md. Dep't of Info. & Tech.*, No. CV CCB-20-219, 2020 WL 6393435, at *3 (D. Md. Nov. 2, 2020) (Blake, J.) (an adverse action is a discriminatory act that "adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment"). In

*Walker*, the plaintiff claimed that she was denied a telework arrangement, as well as the permanent use of a laptop and the ability to work from a satellite office. *Id.* at 4. She also claimed that she was forced to use sick leave and take leave without pay. *Id.*

This Court, after finding that the refusal to allow a flex schedule or telework arrangement was not an adverse employment action, explained that the plaintiff's other alleged adverse actions, including the "forced" use of sick leave and leave without pay, were "concomitant effects of the denial of teleworking privileges rather than independent acts of her employer." *Id.* at 3-4. Accordingly, the Court found that the plaintiff failed to adequately plead an adverse employment action and granted the defendant's motion to dismiss. *Id.* at 4-5. Similarly, here, the alleged adverse actions identified by Ms. Sims are all incidental to the fitness for duty referral. None are independent acts by Defendants, and they cannot establish an adverse action.

Moreover, any claimed loss by Ms. Sims cannot constitute a significant detrimental effect. Op. Br. 15; Opp. 29. Ms. Sims relies on *Shivers v. Saul*, but the plaintiff there was placed on a five-day unpaid suspension. No. CV JKB-19-2434, 2020 WL 7055503, at *4 (D. Md. Dec. 2, 2020). In contrast, Ms. Sims was not placed on an unpaid suspension. Op. Br. 10. She received paid administrative leave for the shifts she missed as part of the fitness for duty process, and any subsequent, temporary claimed loss in pay cannot constitute a significant detrimental effect.

The fitness for duty referral also did not alter any aspect of Ms. Sims's career. It was temporary (lasting from Thursday, June 18 to Monday, June 22) and it sought only to confirm that Ms. Sims was fit for duty (Ex. 19) rather than detrimentally altering the terms and conditions of Ms. Sims's employment. *See Verrier v. Sebelius*, No. CIV. CCB-09-402, 2010 WL 1222740, at *9-10 (D. Md. Mar. 23, 2010) (PIP was not an adverse action because it was temporary and focused on reconciliation).

9

### 2.    Ms. Sims cannot prove that the fitness for duty referral was discriminatory.

Although Ms. Sims's mischaracterizes the legitimate, nondiscriminatory reason articulated by Defendants (Op. Br. 20-21), Ms. Sims does not dispute that Defendants have satisfied their burden. Opp. 23. Accordingly, Ms. Sims must show "both that the reason was false, and that discrimination was the real reason for the challenged conduct." *See, supra*, at 6. To prove pretext, Ms. Sims disagrees with the reasons underlying the referral and she claims that Ms. Goetz failed to follow the Medical Center's policies. Both are insufficient as a matter of law.

Aside from summarily claiming that the underlying reasons were "false" and "fake" and spinning the "explosive confrontation" with anesthesia residents as "minor," Ms. Sims fails to show that the underlying reasons for the referral were false or did not exist. Her attempt to characterize the underlying reasons as inaccurate or exaggerated shows that she just disagrees with the information presented to Ms. Goetz—not that Ms. Goetz did not honestly believe it. *See, e.g.*, *Carson v. Giant Food, Inc.*, 187 F. Supp. 2d 462, 485 (D. Md. 2002) (plaintiff did not establish pretext because "although [plaintiff] disagrees with [the decisionmaker's] decision and with [plaintiff's manager's] version of the confrontation, he presents no evidence that [the decisionmaker] did not actually believe [the manager]"). It is the perception of the decisionmaker that counts, and Ms. Sims cannot show that the decisionmaker (*i.e.*, Ms. Goetz) did not genuinely believe the reasons behind her actions. *E.g.*, *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003).

There is no record evidence to suggest that Ms. Goetz did not genuinely believe the reasons underlying the fitness for duty referral, all of which came from observations from her colleagues (*e.g.*, "aggressive behavior" and "complaints from other employees") or Ms. Goetz herself (*e.g.*, working frequently and beyond the end of her shift when not needed and suspected drug diversion based on the AANA guidelines). Op. Br. 8-10. Ms. Sims's claim that Ms. Goetz

admitted that she never believed that Ms. Sims was diverting drugs (in conflict with the suspected drug diversion on the FFD form) (Opp. 23), but her claim lacks any supporting evidence. Ms. Goetz's selection of the "suspected drug diversion" option on the fitness for duty form relies on literature from the AANA (Op. Br. 4-5, 9), which does not conflict with Ms. Sims's cited evidence. *See* Pl. Ex. 83 ("I never said drug use"); Pl. Ex. 83/Ex. 13 at No. 6 (that Ms. Goetz "never formed a belief as to whether [Ms.] Sims was diverting drugs from [the Medical Center]"). Actual drug use differs from suspected drug diversion, and never forming a belief as to drug diversion is consistent with suspected drug diversion based on the AANA literature. Ms. Sims's attempt to extract an inconsistency with the term "observation" on a standard form fares no better:  multiple anesthesia providers provided information to Ms. Goetz about Ms. Sims, which partly formed the basis for the fitness for duty referral. Op. Br. 8-10.

Ms. Sims's narrow and unreasonable readings of the Medical Center's Fitness for Duty Policy and Guidelines for Suspicion of Drug Diversion similarly fail to establish pretext. Although Ms. Sims suggests that Ms. Goetz could only refer her for an evaluation when she reported for duty or was on duty and appeared to be unfit or under the influence, the Fitness for Duty Policy does not limit a manager's ability to refer employees for a fitness for duty evaluation in other circumstances. Rather, the Fitness for Duty Policy "provides a specific set of guidelines for supervisors when dealing with an employee who may be unfit for duty," and it does not purport to cover every scenario in which a referral may arise. When the guidelines are silent on the specific issue, managers are entitled to use their discretion in implementing the policy. For the Guidelines for Suspicion of Drug Diversion, Ms. Sims seems to argue that Defendants had to wait for the audit results before referring Ms. Sims for a fitness for duty evaluation. Ms. Goetz

requested an audit (Ex. 32 at UMMC422), but nothing required her to wait for the results,

especially given that suspected drug diversion was just one of many reasons for the referral.

Finally, Ms. Sims's lengthy recitation of behavior by supposed comparators and resulting

discipline fails to establish that any were similarly situated. Comparators must "engage[] in the

same conduct without such differentiating or mitigating circumstances that would distinguish

their conduct or the employer's treatment of them for it." *Walker*, 2020 WL 6393435, at *4.

Here, the alleged comparators did not engage in the same conduct as Ms. Sims (underline) and

some received "more" discipline than her (italics):

- CRNA 1 (*referred for a fitness for duty* after <u>sleeping while providing anesthesia care</u>, *issued final warning corrective action* after <u>additional performance issues</u>, and later *terminated*);

- CRNA 2 (*informally counseled* after <u>leaving the hospital with permission</u>); cf. CRNA 3 (*issued written warning* after <u>leaving the hospital without permission</u>);

- CRNA 5 (*received no discipline* after she, a contract worker (not a full-time employee), explained that the <u>anesthesia technician disposed of the anesthesia</u>, which Ms. Goetz corroborated with the anesthesia technician);

- CRNA 9 (*received a final written warning, placed on a performance improvement plan, and issued a formal supervisory referral to EAP* after <u>failing to cross-check blood, failing to effectively collaborate with colleagues, and failing to wear any personal protective equipment as required by policy</u>);

- CRNA 10 (*received coaching as a new CRNA* on <u>how to communicate effectively with the attending anesthesiologist</u>);

- CRNA 13 (*issued a final written warning, placed on a performance improvement plan, required to attend EAP and additional training* <u>after an argument with the attending anesthesiologist in the operating room before the entire perioperative team and patient</u>);

- CRNA 22 (*issued a verbal warning* <u>after improperly administering and labeling an antibiotic, not labeling a syringe containing anesthesia, and using an unprofessional and disrespectful communication style with Ms. Goetz</u>);

- CRNA 23 (*issued written warning* after <u>poor performance</u>); and

- CRNA 24 (*issued verbal warning* after <u>poor communication</u>).

As reflected above, the alleged comparators are not similarly situated, and Ms. Sims

again just disagrees with how Ms. Goetz handled the alleged comparators' discipline relative to

her fitness for duty referral and asks this Court to second-guess it. *See, supra*, at 7-8. As

explained above, there is absolutely no evidence that the referral had any connection to Ms.

Sims's race. Moreover, the same actor inference (*see, supra*, at 8) above applies equally here.[7]

Because of this, Ms. Sims is unable to show pretext.

### D. Summary Judgment Is Warranted on Ms. Sims's Claim of Disability Discrimination (Count III).

#### 1. The requested fitness for duty evaluation was job-related and consistent with business necessity.

As a preliminary matter, this Court can consider Defendants' argument that the fitness for

duty evaluation[8] was job-related and consistent with business necessity, because Ms. Sims

cannot prevail unless it was *not* job-related or *not* consistent with business necessity. Op. Br. 23.

Further, the Court may still consider the argument now because there is no prejudice. *See*

*Peterson v. Air Line Pilots Assoc., Int'l*, 759 F.2d 1161, 1164 (4th Cir. 1985). Ms. Sims

preemptively addressed the issue in her First Amended Complaint (*see, e.g.*, ECF No. 33 at ¶

220), explored it during discovery (*see, e.g.*, Pl. Ex. 90 at 121:2-20), and addressed it in her

Opposition (Opp. 31-34). *Abel v. Knickerbocker Realty Co.*, 846 F. Supp. 445, 449 (D. Md.

---

[7]     Ms. Sims's argument regarding the same-actor inference is muddled, but it appears that Ms. Sims argues that the inference does not apply based on *Dallas v. Giant Foods, Inc.*, 187 F. Supp. 2d 505, 510 (D. Md. 2002), *aff'd sub nom. Skipper v. Giant Food Inc.*, 68 F. App'x 393 (4th Cir. 2003). But *Dallas* involved a very different set of facts. There, the same supervisor hired the plaintiffs as vacation relief workers, a less desirable and lower paying job, while hiring white co-workers over the plaintiffs for another, more desirable permanent position. *Id.* at 509-510. Here, there is no evidence that the one operating room is more desirable than the other (except for Ms. Sims's own self-serving opinion).

[8]     Count III is limited to the fitness for duty evaluation on June 18. Opp. 31, n. 24.

1994); *Cornell v. Council of Unit Owners Hawaiian Vill. Condos. Inc.*, 983 F. Supp. 640, 643 (D. Md. 1997) (plaintiff filed "a comprehensive" MSJ response that demonstrated a "thorough understanding of the principles of law and facts involved."). Thus, no prejudice exists, and the Court may consider Defendants' argument.

An employer may lawfully require a medical examination if there are legitimate reasons to doubt the employee's ability to perform her duties; poor job performance is not required. Op. Br. 23-24; *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (a police department need not "forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries"); *Cody v. CIGNA Healthcare*, 139 F.3d 595, 599 (8th Cir. 1998) ("[e]mployers need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims.").

Aside from Ms. Sims's mischaracterization of the witnesses' testimony,[9] the objective evidence shows that legitimate reasons existed for the decision to refer Ms. Sims for the first fitness for duty evaluation on June 18. Op. Br. 7-10. In a "public safety" workplace like a hospital where a CRNA is putting people to sleep for surgery,[10] an employer may be justified in requesting an exam on slighter evidence than in other types of workplaces because employees are "in positions where they can do tremendous harm if they act irrationally," and thus they pose

---

[9]     For example, Dr. Frisch testified that she was "concerned that [Ms.] Sims needed a further assessment to determine if [Ms.] Sims was fit for duty" and that she had "concerns that [Ms.] Sims was not fit for duty, and that was the reason for the follow-up EAP evaluation." Pl. Ex. 90 at 86:1-3; 87:7-9. Dr. Frisch made clear that she "did not form an opinion" as to whether Ms. Sims might cause harm to patients. Pl. Ex. 90 at 86:4-16.

[10]     Ms. Sims's attempt to distinguish *Barnum*, *Flanary*, and *Tcheskidova* is unavailing. In all three cases, and here, the key is that each employer (*i.e.*, hospitals, a police department, and a defense contractor providing services in a then-active warzone) had a unique responsibility to safeguard the public, as described above.

a greater threat to themselves and others. Op. Br. 23-24; *Watson*, 177 F.3d at 935 (FFD lawful where a police department perceived an officer to be "mildly paranoid, hostile, or oppositional").

With this background, and considering that changes in behavior could be indicative of a broader issue for CRNAs and patient safety within the hospital setting, Defendants had objective reasons to require Ms. Sims to undergo a fitness for duty evaluation. The communications from Ms. Sims's colleagues paint a consistent picture of genuine concern that her behavior was uncharacteristic and concerning. *Id.* The decision to require an evaluation in response to changes in behavior and mood changes, especially for a CRNA, should not be second guessed. *Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98-99 (2d Cir. 2003) (noting that "what constitutes a business necessity will undoubtedly vary in different workplaces").

E.    **Summary Judgment is Warranted on Ms. Sims's Claim that She was "Regarded As" Disabled (Count IV).**

Ms. Sims summarily claims that Dr. Frisch and Ms. King (an HRBP) diagnosed Ms. Sims with a mental illness called "paranoia," but there is absolutely no evidence to support her claim. Opp. 34. Pl. Ex. 30 at 5174 and 5192 is not documentary or testimonial evidence from any witness; rather, it is merely a description of Ms. Sims's statements to Mr. Brown in layman's and nonmedical terms by the attorneys representing the Medical Center at the agency-stage. The cited testimony by Ms. King does not support Ms. Sims's claimed assertion. Ms. King testified that she did not remember ever determining that Ms. Sims had paranoia. Pl. Ex. 92 at 9:6-9. Moreover, Dr. Frisch testified that Ms. Sims was referred to EAP for an evaluation, which could then require a referral for a psychiatric evaluation, if indicated. Pl. Ex. 90 at 156:2-5.

Ms. Sims claims that *Babb v. Maryville Anesthesiologists P.C.* is instructive, but it is not. 942 F.3d 308, 322-23 (6th Cir. 2019). *Babb* involved an actual medical condition, not a fitness for duty evaluation. *Id.* (explaining that ADA claims based on fitness-for-duty examinations need

15

to be limited because the ADA is "not a sword enabling employees . . . to refuse reasonable [medical examination] requests by their employers and then use that statutorily-grounded request to plead a 'regarded as' claim"). Therefore, *Babb* fails to support Ms. Sims's claim that she was "regarded as" disabled.

In addition, Ms. Sims's theory that Mr. Brown was awarded a promotion in exchange for creating the June 30 memorandum weighs against any suggestion that Mr. Brown acted based on any purported disability. Her theory is only supported by her own speculation. While Mr. Brown's promotion was made effective on June 30, 2015, the promotion extended back to February 2015, when Mr. Brown started performing the duties of Assistant Director of Security. Pl. Ex. 23 at PL5164. As Mr. Brown's supervisor (Mr. Davis) testified, Mr. Brown's promotion to Assistant Director of Security occurred over a period of time beginning in 2014 until June 30, 2015 and involved approximately 25 conversations about the future of the Medical Center's Security Organization, including Mr. Brown's promotion. Pl. Ex. 23 at PL5164; Ex. 72 at 24:21-25:3, 27:3-17. Mr. Davis unequivocally testified that he would never condition a promotion based on the falsification of a report. Ex. 72 at 27:21-28:2 (Q. "Have you ever conditioned a promotion based on the falsification of a report? A. Absolutely not."). Ms. Sims's speculation about Mr. Brown's motives fails to prove pretext.

Accordingly, Defendants did not violate the ADA when they requested Ms. Sims attend an examination with EAP based on her statements to Mr. Brown and others.

**F.      Summary Judgment Is Warranted on Ms. Sims's Claim of Retaliation.**

Ms. Sims claims that Defendants retaliated against her by:  (i) creating the June 30 memorandum; (ii) regarding Ms. Sims as disabled by requiring her to undergo an additional EAP evaluation; (iii) terminating her employment; (iv) failing to provide her with a "normal appeal process"; and (v) failing to investigate her discrimination/retaliation claims.

16

The latter two do not constitute a materially adverse action sufficient for a retaliation claim. *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213-14 (4th Cir. 2019) (an adverse employment dissuades a reasonable worker from making or supporting a charge of discrimination.). Although Ms. Sims now claims that the Medical Center instituted that alternate appeal process to "conceal" the involvement of Ms. Goetz and Dr. Rowen, the Medical Center instituted the alternate appeal process pursuant to the Medical Center's Appeal Procedure because Ms. Sims raised concerns to Ms. King about Ms. Goetz's involvement. Ex. 57; Ex. 58 at UMMC21, § 4.5.1. An alternative appeal process, especially when requested by the employee, cannot be an adverse action. Likewise, even accepting Ms. Sims's claim that the Medical Center failed to conduct a full investigation into Ms. Sims's complaints, that cannot amount to an adverse action. *Jones v. Baltimore City Bd. of Sch. Comm'rs*, No. CV ADC-18-3002, 2021 WL 147033, at \*8 (D. Md. Jan. 14, 2021) ("Failure to investigate an internal complaint cannot be considered retaliatory [because it] leaves an employee no worse off than before the complaint was filed.").

Moreover, Ms. Sims cannot establish that her alleged protected activity was the "but for" cause of the June 30 memorandum, the additional EAP evaluation, and subsequent termination; or that Defendants' proffered legitimate explanations were pretextual. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); Op. 13-15 (legitimate, non-retaliatory reasons). Although Ms. Sims claims that she never made the statements attributed to her by Mr. Brown, she cannot ignore the email she sent to Ms. King that corroborates the June 30 memorandum. Op. Br. 13-14; Ex. 75 at UMMC624-625. And regardless of whether Ms. Sims actually attributed the statements to anyone at the Medical Center, she has no evidence to show that Dr. Frisch or Ms. King did not genuinely believe Mr. Brown when requiring her to undergo another EAP evaluation. Ms. Sims's speculative conclusion that her complaints of discrimination and

17

retaliation resulted in the referral to EAP cannot prevent summary judgment. *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (requiring "more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence," to defeat summary judgment). Similarly, Ms. Sims's separation from employment was a direct result of her refusal to attend the mandatory evaluation and unrelated to her claims of discrimination and retaliation.

As to pretext, Ms. Sims cannot rely on her unsupported conclusion that she was terminated in violation of the Medical Center's EAP Policy when the documentary and testimonial evidence shows otherwise. Op. Br. 13-15. While Ms. Sims attempts to prove her claim about a supervisory EAP referral, the form states, "[W]e want to ensure she is safe to return to work. In her role as a [CRNA], she controls care delivery for patients under anesthesia." Pl. Ex. 7; *DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.*, 268 F. App'x 236, 242 (4th Cir. 2008) ("[p]retext is a lie or cover-up, not merely a mistake," and "evidence that [an employer] erroneously or even purposely misapplied [its own] policy[] will not suffice to overcome summary judgment"). Ms. Sims's claim is further belied by the EAP Policy itself, which allows a supervisor to formally refer an employee "to the EAP when an employee's job performance has deteriorated and does not improve despite routine supervisory interaction." Ex. 21 at § 4.4.2; *but see* Ex. 19 (describing the purpose of the Fitness for Duty Policy as providing "a safe, efficient and optimum environment for employees to provide service and patient care."). In a supervisory EAP referral, the supervisor, not HR, then contacts the EAP directly to provide background on the case and to initiate the formal referral process. Ex. 21 at § 4.4.2.1. Here, there was no "routine supervisory interaction" and HR – not Ms. Goetz – contacted EAP to schedule the EAP evaluation. Pl. Ex. 7 (email from HR to EAP counselor). Even if Ms. Sims is correct, corrective

action can follow an employee's refusal of an EAP supervisory referral. Pl. Ex. 35 at § 4.4.3. For these reasons, Ms. Sims's retaliation claims are baseless.

### G.    Summary Judgment Is Warranted on Ms. Sims's Claim of Hostile Work Environment.

Ms. Sims raises every grievance she had during her entire employment at the Medical Center, but her claim still falls short. Complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's supervisor, or a routine difference of opinion and personality conflict with one's supervisor are not actionable. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). Here, Ms. Sims's grievances primarily pertain to Ms. Goetz's management style and conflicts within the Department, and such assertions cannot support a hostile work environment claim. Op. Br. 26-27.

Moreover, the "aggressive and argumentative" comment by Ms. Goetz, even if it were true, is insufficient as a matter of law to establish a hostile work environment. An isolated racial remark must be "extremely serious" to establish an abusive working environment. *Cf. Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 268 (4th Cir. 2015) (two uses of "porch monkey"). Nor do her claims related to working in the Shock Trauma Operating Room or the referral for the fitness for duty evaluation, as described above. Accordingly, Ms. Sims's claim for hostile working environment lacks merit.

### H.    Summary judgment is warranted on Ms. Sims's claimed damages.

Ms. Sims claims that Defendants cannot move for summary judgment regarding Ms. Sims's duty to mitigate damages, but she acknowledges that a duty to mitigate exists as an affirmative defense, and that a party may move for summary judgment on any claim or defense. Op. Br. 50. Accordingly, Defendants may move for summary judgment on her duty to mitigate her claimed damages.

It is undisputed that after Ms. Sims's employment at the Medical Center ended, she increased the number of shifts she worked at Johns Hopkins and made herself whole. While Ms. Sims claims she could have increased her compensation at both the Medical Center and Johns Hopkins (presumably by increasing her hours), it is unclear how Ms. Sims could have done so when there are only 24 hours in a day and only so many available shifts. Because Ms. Sims mitigated her damages in full by 2017 (Op. Br. 27), her claim for back pay is limited to $71,192, and Defendants are entitled to summary judgment as a matter of law.

## III.   **CONCLUSION**

For the reasons discussed above and in Defendants' Opening Brief, Defendants are entitled to summary judgment as a matter of law.

Dated:  September 13, 2021                     Respectfully submitted,

                                              MORGAN, LEWIS & BOCKIUS LLP

                                              /s/ Grace E. Speights
                                              Grace E. Speights (Fed. Bar No. 05254)
                                              Jocelyn R. Cuttino (Fed. Bar No. 21434)
                                              Andrea N. Threet (pro hac vice)
                                              1111 Pennsylvania Avenue NW
                                              Washington, D.C. 20004
                                              Telephone: (202) 739-3000
                                              Facsimile: (202) 739-3001
                                              grace.speights@morganlewis.com
                                              jocelyn.cuttino@morganlewis.com
                                              andrea.threet@morganlewis.com

                                              Vishal H. Shah (pro hac vice)
                                              1701 Market Street
                                              Philadelphia, Pennsylvania 19103
                                              Tel: (215) 963-5000
                                              Fax: (215) 963-5001
                                              vishal.shah@morganlewis.com

                                              *Attorneys for Defendants*