## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FARESHA SIMS

v.

UNIVERSITY OF MARYLAND MEDICAL
SYSTEM CORPORATION, *et al.*

Civil Action No. CCB-19-295

---

### MEMORANDUM

This employment discrimination action involves a dispute between Dr. Faresha Sims and

her former employer, the University of Maryland Medical Center ("Medical Center"). Dr. Sims, a

certified registered nurse anesthetist ("CRNA"), contends the Medical Center and her former

supervisors, Linda Goetz and Lisa Rowen (collectively, "the defendants"), racially discriminated

against her in several ways. Dr. Sims, who is representing herself, alleges Ms. Goetz refused to

hire Dr. Sims into her preferred department, targeted Dr. Sims with a racially motivated drug test,

and retaliated against her for filing a racial discrimination complaint. She also alleges the

defendants falsely regarded her as psychotic in violation of the Americans with Disabilities Act.

These incidents, according to Dr. Sims, were cultivated in the larger context of a hostile work

environment.

Now pending before the court is the defendants' Motion for Summary Judgment. (ECF

159, Defs.' Mot. Summ. J.) The issues have been fully briefed, with Dr. Sims filing an Opposition

(ECF 170, Pl.'s Opp.'n Summ. J.), and the defendants filing a Reply (ECF 186, Defs.' Reply Supp.

Summ. J.) The motion is ripe for disposition, and no hearing is necessary. Local Rule 105.6 (D.

1

Md. 2021). For the reasons set forth below, the court will grant the defendants' Motion for Summary Judgment on all counts.

## BACKGROUND[1]

The University of Maryland Medical Center ("Medical Center") offers a variety of health care services for the residents of Baltimore and beyond. (ECF 159-16, Defs.' Ex. 14, Goetz Decl. ¶ 7.) Every year, thousands of patients visit the Medical Center seeking critical medical assistance. (*Id.* at ¶ 9.) In the past, patients may have experienced significant amounts of pain during these procedures. But thanks to decades of scientific research, medical experts have found ways to alleviate discomfort during operations. To that end, the Medical Center's Anesthesia Department administers drugs that induce a patient's temporary loss of sensation or awareness during surgery. (*Id.* at ¶ 8.) Certified registered nurse anesthetists ("CRNAs") play an integral role in the Medical Center's Anesthesia Department. These highly-skilled medical professionals evaluate patients before surgery, collaborate with the surgical team, administer anesthesia, and monitor patients' recovery. (*Id.* ¶¶ 11–12; *see also* ECF 159-17, Defs.' Ex. 15.)

In the early months of 2012, Dr. Faresha Sims was studying to become a CRNA. (*See* ECF 172-1, Pl.'s Ex. 12 at PL990.) When Dr. Sims began thinking about post-graduation employment, she became interested in the Medical Center's Anesthesia Department. (*Id.*) On March 5, 2012, she sent her resume to Ms. Linda Goetz, the Director of Nurse Anesthetists at the Medical Center. (*Id.*) A few months later, on June 5, 2012, Ms. Goetz interviewed Dr. Sims for a CRNA position. (ECF 159-24, Defs.' Ex. 22 at UMMC39.)

During the application process, Dr. Sims expressed a specific interest in the Medical Center's Shock Trauma Center. (ECF 172-1, Pl.'s Ex. 12 at PL990; ECF 159-24, Defs.' Ex. 22 at

---

[1] The court recites the facts drawing reasonable inferences in favor of the non-movant, Dr. Faresha Sims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

UMMC39.) The Medical Center's Anesthesia Department is separated into two divisions: the General Operating Room ("GOR") and the Shock Trauma Center ("STC"). As the names suggest, CRNAs assigned to the GOR provide anesthetic support for a wide-variety of medical procedures, while those assigned to the STC specialize in treating trauma-related injuries.

On July 19, 2012, Ms. Goetz offered Dr. Sims a position in the GOR. (ECF 159-25, Defs.' Ex. 23; ECF 180-6, Sims Dep. 91:4-6.) Dr. Sims's offer letter required her to pass the national board examination for CRNAs within 60 days of completing her degree. (ECF 159-25, Defs.' Ex. 23.) Dr. Sims failed her first attempt at the board exam by two points. (ECF 177-6, Pl.'s Ex. 67; ECF 159-16, Goetz Decl. ¶ 17.) Ms. Goetz allegedly scolded Dr. Sims after learning of her unsuccessful attempt. (ECF 180-6, Pl.'s Ex. 97, Sims Dep. 102:8-20.) During this tense conversation, Ms. Goetz allegedly threatened to revoke Dr. Sims's employment offer based on her exam performance. (*Id.*) Ms. Goetz ultimately held open Dr. Sims's position so she could re-take the test. (ECF 159-16, Goetz Decl. ¶¶ 17–18.) After Dr. Sims passed the examination on her second attempt (Sims Dep. 332:4-14.), Ms. Goetz permitted Dr. Sims to begin working in the GOR on April 8, 2013. (ECF 159-29, Defs.' Ex. 27 at PL124.)

The conflict regarding Dr. Sims's board exam foreshadowed the ebbs and flows in her relationship with Ms. Goetz. (*See* Sims Dep. 106:20-21.) On the one hand, Ms. Goetz allegedly told Dr. Sims she was making "stupid" decisions (*id.* at 233:8-25), said Dr. Sims was "argumentative and aggressive like the average black woman" (ECF 180-5, Sims Decl. ¶ 16), and even kicked her in a bout of frustration within the first three months of her orientation (Sims Dep. 101:23–103:17). But in other instances, Ms. Goetz showered Dr. Sims with praise and public displays of gratitude. Ms. Goetz, who supervises all CRNAs at the Medical Center, nominated Dr. Sims for several awards. (*See, e.g.*, ECF 159-30, Defs.' Ex. 28; ECF 159-31, Defs.' Ex. 29; ECF

3

159-32, Defs.' Ex. 30; ECF 159-33, Defs.' Ex. 31.) In August 2014, Ms. Goetz awarded Dr. Sims

the Medical Center's "highest honor and award offered to an employee." (ECF 159-12, Defs.' Ex.

10 at ¶ 24; *see also* ECF 159-6, Defs.' Ex. 4, Rowen Dep. 131:5-9.) Ms. Goetz explained her

nomination in a selection memorandum:

> "[Dr. Sims] consistently maintains the highest level of professionalism in her role as a
> CRNA. She is committed to compassionate, safe, quality patient care. She maintains
> respectful working relationships with her colleagues and is always available to lend a
> helping hand. Additionally, [Dr. Sims] is always smiling, is positive and upbeat and
> readily volunteers for any assignment. This is a well deserved honor for Dr. Sims."

(ECF 159-33, Defs.' Ex. 31.) Ms. Goetz had given this award only one other time in her

fourteen-year career at the Medical Center. (ECF 159-16, Goetz Decl. ¶ 16.)

On February 9, 2015, after working at the Medical Center for over a year, Dr. Sims asked

Ms. Goetz for an update on the STC's hiring plans. (ECF 180-5, Sims Decl. ¶ 12.) Ms. Goetz

confirmed Dr. Sims was "still on the list," while promising that she "would let [Dr. Sims] know

as soon as [her] turn came." (*Id.*) Meanwhile, Ms. Goetz cross-trained and hired two non-black

CRNAs from the GOR into the STC during Dr. Sims's tenure at the Medical Center. (ECF 172-3,

Pl.'s Ex. 14.)

In May 2015, multiple employees at the Medical Center began expressing concerns about

Dr. Sims's behavior at work. Some noted she had recently become confrontational and aggressive

toward her colleagues. (ECF 159-34, Defs.' Ex. 32 at UMMC419.) Others complained that Dr.

Sims had become "explosive" and even "offensive." (*Id.* at UMMC419–20; ECF 159-35, Defs.'

Ex. 33.) Several more noted that she refused to learn the names of residents, despite working

together on multiple occasions, and would occasionally refer to residents as "almost doctors."

(ECF 159-34, Defs.' Ex. 32 at UMMC420.) Dr. Sims's direct manager, Wanda Walker-Hodges,

spoke with Dr. Sims about these complaints and discussed the importance of self-control and

professionalism in the workplace. (ECF 180-2, Pl.'s Ex. 93 at PL5877.) Dr. Sims received a

4

corrective action verbal warning for her misconduct. (ECF 159-34, Defs.' Ex. 32 at UMMC421; ECF 159-35, Defs.' Ex. 33.)

Many complaints noted this behavior from Dr. Sims was a recent phenomenon. One attending physician, for example, explained to Ms. Goetz that Dr. Sims looked "burnt out," "tired," and ultimately was "not the same Faresha that she was last year." (ECF 159-34, Defs.' Ex. 32 at UMMC421.) Dr. Sims's interpersonal difficulties with her coworkers were accompanied by multiple instances where Dr. Sims refused to leave work at the end of her shift. (*Id.* at UMMC421–22; ECF 159-14, Defs.' Ex. 12 at 4.) Dr. Sims's superiors had noticed and expressed concern about her significant change in behavior during this time. (*See, e.g.*, ECF 159-6, Defs.' Ex. 4, Rowen Dep. 131:1-20; ECF 180-2, Pl.'s Ex. 93, at 1–2.)

On June 18, 2015, Ms. Goetz shared these concerns with Dr. Peter Rock, the chair of the Anesthesiology Department. (ECF 159-15, Defs.' Ex. 13 at 4-5, 6, 9; ECF 159-34, Defs.' Ex. 32 at UMMC422.) Although Ms. Goetz possessed no actual knowledge that Dr. Sims had a drug abuse problem (ECF 180, Goetz Dep. 181:8–182:9), Dr. Rock and Ms. Goetz noted that Dr. Sims's behavior matched signs of substance abuse. (ECF 159-15, Defs.' Ex. 13 at 9.) According to research by the American Association of Nurse Anesthetists, behaviors suggesting possible substance abuse include mood swings; outbursts of anger, aggression, and hostility; and refusing to be relieved at the end of one's shift. (ECF 159-20, Defs.' Ex. 18 at PL3349.)

Ms. Goetz turned to the Medical Center's Fitness for Duty Policy for guidance. The policy provides a specific set of guidelines for supervisors when dealing with an employee who they suspect may be unfit for duty. (ECF 159-21, Defs.' Ex. 19 at UMMC7.) A supervisor may require an employee to report to Employee Health Services for a "fitness for duty" ("FFD") evaluation if

the employee "exhibits behaviors which indicate that the person may be unable to perform their job duties in a safe and effective manner." (*Id.* at UMMC7-8.)

A fitness for duty evaluation includes an interview, a physical examination, a drug test, and an evaluation by the Employee Assistance Program (EAP). (*Id.* at UMMC9-10.) An EAP evaluation "is mandatory" if it is part of the fitness for duty evaluation. (ECF 159-7, Defs.' Ex. 5, Frisch Dep. 43:8-11.) If Employee Health Services deems an employee fit for duty after the FFD exam, then an employee can return to work, assuming there were no other corrective actions deemed necessary. (ECF 159-22, Defs.' Ex. 20 at UMMC12-13.) If not fit for duty, the employee cannot return to work and may undergo additional measures, such as treatment. (ECF 159-21, Defs.' Ex. 19 at UMMC9; ECF 159-22, Defs.' Ex. 20 at UMMC13.)

After conferring with Dr. Rock, Ms. Goetz completed the necessary form to request that Dr. Sims take a fitness for duty examination. (ECF 159-36, Defs.' Ex. 34.) The referral form cites Dr. Sims's "aggressive behavior," "complaints from other employees," "suspected drug diversion," staying "well beyond the end of her shift," and suspicions that Dr. Sims was working full time at another hospital. (*Id.*)[2]

Once Ms. Goetz completed the referral, she called and texted Dr. Sims, who was on approved vacation leave that day. (ECF 159-34, Defs.' Ex. 32 at UMMC422.) Ms. Goetz let Dr. Sims know they needed to meet before Dr. Sims's next shift. (*Id.*) If Dr. Sims was unable to come in before 4 p.m., then Ms. Goetz said that Dr. Sims would have to forgo her weekend shifts. (*Id.* at UMMC422–23.) However, Ms. Goetz told Dr. Sims she would be paid in full for any missed

---

[2] Dr. Sims worked part-time at Johns Hopkins University between April 2014 and December 2015. (ECF 159-4, Sims Dep. 37:17-25.) During that time, Johns Hopkins permitted Dr. Sims to "work whenever [she] wanted to" and "as many hours as [she] wanted to." (*Id.* at 37:24–38:1.) Dr. Sims became a full-time employee at Johns Hopkins in December 2015. (*Id.* at 36:12-14.)

6

shifts. (ECF 159-16, Goetz Decl. ¶ 21.) Dr. Sims opted to meet with Ms. Goetz at 3:30 p.m. that same day. (ECF 159-34, Defs.' Ex. 32 at UMMC423.)

When Dr. Sims arrived at the Medical Center, Ms. Goetz explained that she wanted Dr. Sims to undergo a fitness for duty evaluation based on her recent conduct. (*Id.*) Ms. Goetz was accompanied by Wanda Walker-Hodges, Dr. Sims's direct manager in the GOR. (*Id.*) Dr. Sims signed a form consenting to the FFD exam. (ECF 159-38, Defs.' Ex. 36.) Dr. Sims was then escorted to the Medical Center's Employee Health Services department to take a drug test under observation. (ECF 159-34, Defs.' Ex. 32 at UMMC424.) Dr. Melissa Frisch, the Director of Employee Health Services, evaluated Dr. Sims based on her drug test, a physical examination, and an interview. (ECF 174-1, Pl.'s Ex. 32.) The drug and alcohol tests were negative. (ECF 174-2, Pl.'s Ex. 33.) Jan Buxton, a counselor in the Employee Assistance Program (EAP), performed the mental health component of the FFD exam. (ECF 174-1, Pl.'s Ex. 32 at PL392–95.) Both Dr. Frisch and Ms. Buxton found that Dr. Sims was fit for duty, and Dr. Sims was cleared to return to work on June 22, 2015. (*Id.* at UMMC67.)

Dr. Sims believed Ms. Goetz racially discriminated against her by mandating that she take the FFD exam. After finishing her FFD exam on June 18, 2015, Dr. Sims went to formally complain about Ms. Goetz's conduct to Dr. Lisa Rowen, Senior Vice President of Patient Care Services and Chief Nursing Officer. (ECF 172-8, Pl.'s Ex. 19 at UMMC174.) Although Dr. Rowen was not in her office, her assistant—Suzanne Leiter—memorialized and passed along Dr. Sims's complaint to Dr. Rowen. (*Id.*) Dr. Sims noted that she wanted to "go after Ms. Goetz's leadership" and asked to schedule a meeting with Dr. Rowen to "go up [the] chain of command." (*Id.*) When she eventually met with Dr. Rowen, Dr. Sims "perceived the meeting . . . to be threatening and hostile." (ECF 177-2, Pl.'s Ex. 63 at UMMC625; *see also* ECF 180-6, Sims Dep. 89:25-90:9.)

7

In the course of just five days (between June 19, 2015, and June 24, 2015), Dr. Sims emailed several members of the Medical Center's executive leadership team, including the CEO. (ECF 177-1, Pl.'s Ex. 62; ECF 159-51, Defs.' Ex. 49) Across multiple emails, she described how she had been impacted by the FFD exam, while also claiming she faced harassment, threats, and prank calls since Ms. Goetz's referral. (ECF 159-51, Defs.' Ex. 49.) Dr. Sims demanded the immediate termination of Ms. Goetz and Ms. Walker-Hodges. (*Id.* at PL2012.) Amidst these emails to the Medical Center's executives, Dr. Sims also reached out to Dr. Frisch on June 21, 2015. (ECF 159-44, Defs.' Ex. 42 at PL5683–84.) Dr. Sims informed her that she "was on the verge of a mental and emotional breakdown" after the FFD evaluation. (*Id.* at PL5684.) Dr. Sims explained that she was diagnosed with a situational acute anxiety reaction on June 21, 2015. (*Id.* at PL5683; *see also* ECF 175-8, Pl.'s Ex. 49.)

Although Dr. Sims was cleared to return to work on June 22, 2015 (ECF 174-1, Pl.'s Ex. 32 at 393–95), she called out sick for her next shifts on June 26 and June 28 (ECF 175-2, Pl.'s Ex. 43; ECF 175-9, Pl's Ex. 50). That week, Dr. Sims had tried to report several "unusual things" to local police departments, but the police told her to speak with the security department at the Medical Center. (ECF 176-5, Pl.'s Ex. 56.) Dr. Sims ultimately spoke with Walter Brown, an on-campus security officer, on June 29, 2015. (*Id.*) Mr. Brown drafted a summary of the conversation in a memorandum, and sent the document to his superior, Maurice Davis, and an HR employee, Ms. King. (ECF 159-53, Defs.' Ex. 51; ECF 179-6; Pl.'s Ex. 87, Brown Dep. 56:17–57:15.) Dr. Sims, according to the memorandum, alleged Ms. Goetz and other Medical Center leaders were "conspiring to hurt" her. Ms. Goetz, among other "high level" Medical Center employees,

8

allegedly followed Dr. Sims, attempted to run her off the road, invaded her apartment, and even contacted the IRS to harass her. (ECF 159-53, Defs.' Ex. 51.)[3]

On June 30, 2015, Dr. Sims emailed Neddra King, an HR employee, to discuss meeting with the HR department. (ECF 173-8, Pl.'s Ex. 29.) The meeting was originally scheduled for July 8, 2015, but Ms. King requested to have the meeting earlier if Dr. Sims was available. (*Id.*) Dr. Sims declined, explaining: "I must admit that I truly feel threatened and deem the need to secure protection more important than moving up our meeting." (*Id.*; ECF 159-48, Defs.' Ex. 46.) In the exchange, Dr. Sims communicated to Ms. King that she was "receiving prank phone calls and threats," and "needed [an] escort to enter [her] apartment" due to a "probable unauthorized invasion." (ECF 159-12, Defs.' Ex. 10, at 3; 159-53, Defs.' Ex. 51.)

Dr. Sims's apparent belief that her supervisors were orchestrating an elaborate conspiracy against her troubled Ms. King, who spoke with Dr. Frisch about the issue. (ECF 159-52, Defs.' Ex. 50; ECF 159-7, Defs.' Ex. 5, Frisch Dep. 49:16–50:10.) Dr. Frisch believed that Dr. Sims's allegations—such as her report that Medical Center employees were running her off the road and breaking into her house—called into question Dr. Sims's ability to provide safe patient care. (ECF 159-7, Defs.' Ex. 5, Frisch Dep. 49:1–50:10; ECF 159-52, Defs.' Ex. 50; ECF 159-14, Defs.' Ex. 12 at 5.) Dr. Frisch supported referring Dr. Sims to EAP for a second evaluation based on these new behaviors. (ECF 159-7, Defs.' Ex. 5, Frisch Dep. 49:17–50:1.)

On July 8, Dr. Sims met with Ms. King. (ECF 159-52, Defs.' Ex. 50.) Dr. Sims claimed that her statements to Mr. Brown were misinterpreted. (*Id.*) Dr. Sims alleges that Ms. King advised

---

[3] Dr. Sims contends Mr. Brown fabricated most of the memorandum and falsely attributed these statements to Dr. Sims. As described more thoroughly below, Dr. Sims's argument is not supported by any reasonable inference drawn from the record. Dr. Sims relies on a speculative theory that Mr. Brown engaged in a criminal conspiracy to fabricate the memorandum in exchange for a promotion. These facts are nonetheless recited with every reasonable inference drawn in Dr. Sims's favor, as is required with a motion for summary judgment.

her to drop her complaint and expressed an intention to retaliate against her when Dr. Sims refused. (ECF 180-5, Sims Decl. ¶ 15.)

Later that evening, Ms. King let Dr. Sims know that she needed to speak with her superior, Paula Henderson, before allowing Dr. Sims to work the following day. (ECF 173-4, Pl.'s Ex. 25.) Ms. King noted that Dr. Sims would be placed on paid leave in the meantime. (*Id.*) After consulting with Ms. Henderson, the Vice President of Human Resources, Ms. King informed Dr. Sims that EAP needed to evaluate her again before she could return to work. (ECF 171-8, Ex. 9 at UMMC563.) This second referral for evaluation was scheduled for July 13, 2015, and did not include a drug test. (ECF 171-8, Pl.'s Ex. 9.) Dr. Sims did not attend the evaluation. (ECF 159-52, Defs.' Ex. 50.) Instead, Dr. Sims emailed Ms. King on July 13 to argue that she interpreted the second EAP referral as a recommendation, not a requirement. (ECF 173-5, Pl.'s Ex. 26.) Dr. Sims also noted that she intended to use the Equal Employment Opportunity Commission to assist her in the dispute. (*Id.*)

The next day, July 14, 2015, Ms. Henderson responded to Dr. Sims's email and explained the Medical Center's justification for requiring that Dr. Sims speak with EAP once more. (ECF 159-52, Defs.' Ex. 50.) Ms. Henderson informed Dr. Sims that she will have effectively resigned if she did not reschedule her appointment with EAP. (*Id.*) Dr. Sims, through counsel, refused to reschedule her EAP appointment, and on August 19, 2015, the Medical Center notified Dr. Sims that she had effectively resigned as of August 17, 2015. (ECF 171-9, Pl.'s Ex. 10; ECF 159-58, Defs.' Ex. 56.)

Dr. Sims appealed her termination, which was upheld by Ms. Henderson on September 10, 2015. (ECF 159-57, Defs.' Ex. 55; ECF 159-58, Defs.' Ex. 56.) Dr. Sims sought a second appeal

of her termination. Keith Persinger, the Medical Center's Chief Operating Officer, also upheld the original decision to terminate Dr. Sims's employment. (ECF 159-62, Defs.' Ex. 60.)

Dr. Sims alleges that Ms. Goetz, Dr. Rowen, and the University of Maryland Medical Center ("UMMC") racially discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, by failing to hire or transfer her into the STC (Count I) and by making her take an FFD exam (Count II). Dr. Sims also contends UMMC violated the Americans with Disabilities Act ("ADA") by subjecting her to the FFD examination (Count III), and by further discriminating against her once the defendants "regarded" her as disabled (Count IV). She also claims that UMMC, Dr. Rowen, and Ms. Goetz retaliated against her in violation of Title VII and § 1981 (Count V). Finally, Dr. Sims alleges these actions occurred in the backdrop of a hostile work environment (Count VI).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment should be granted if the movant shows "there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 572 U.S. 650, 655 (2014) (per curiam), and draw all reasonable inferences in that party's favor, *Scott*

*v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted); *see also Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

While the Court liberally construes filings by *pro se* plaintiffs, at the summary judgment stage, a *pro se* plaintiff "may not rest on [her] pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue that must be tried before a jury." *Blair v. Ravenswood Village Health Ctr.*, 43 F. Supp. 2d 586, 586 (S.D. W. Va. 1998), *aff'd*, 173 F.3d 849 (4th Cir. 1999) (internal quotations and citation omitted).

## ANALYSIS

### I.    Failure to Hire or Transfer (Count I)

Dr. Sims claims the defendants violated Title VII and 42 U.S.C. § 1981 when Ms. Goetz failed to hire, transfer, or cross-train her into the STC because of her race.

Title VII makes it illegal for an employer to discriminate against an employee because of their race. 42 U.S.C. § 2000e-2(a). Section 1981 also prohibits such conduct, and courts apply the familiar burden-shifting framework to claims brought under either statute. *See Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016); *see also Bryant v. Aiken Reg'l Med. Ctrs. Inc.*, 333 F.3d 536, 545 n.3 (4th Cir. 2003) ("In failure-to-promote cases such as this, 'the framework of proof for disparate treatment claims . . . is the same for actions brought under Title VII, or § 1981, or both statutes.'") (quoting *Mallory v. Booth Refrig. Supply Co.*, 882 F.2d 908, 910 (4th Cir. 1989)).

The three-step burden-shifting framework, as originally described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), allows a plaintiff to bring an employment discrimination claim even when they lack direct evidence of intentional discrimination. *Guessous*, 828 F.3d at 216.[4] The plaintiff must first establish a *prima facie* case of employment discrimination. *Id.* If a plaintiff establishes a *prima facie* case, the "burden of production then shifts to the employer" to articulate a "legitimate, nondiscriminatory" reason for the adverse action. *Id.* If the defendants proffer such an explanation, the plaintiff must then show the stated justification is a pretext for impermissible discrimination. *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–56 (1981)).

### A. Timeliness

The court must first decide whether Dr. Sims's claim is timely before proceeding to the merits. The Medical Center extended Dr. Sims an offer to join the GOR on April 8, 2013. (ECF 159-4, Sims Dep. 91:1-6; ECF 159-29, Defs.' Ex. 27 at PL124.) Prior to filing a Title VII claim in federal court, a plaintiff must institute proceedings with a state or local agency within 300 days of the alleged act of discrimination. 42 U.S.C. § 2000e-5(e)(1). Dr. Sims filed a charge of discrimination against the defendants on December 9, 2015. (ECF 175, Pl.'s Ex. 41; *see also* ECF 180-5, Sims Decl. ¶ 10.) To the extent Dr. Sims contends her *initial* hiring into the GOR (rather than the STC) violated Title VII, any such claim expired on February 2, 2014, 300 days after her initial hiring on April 8, 2013.

---

[4] The *McDonnell Douglas* framework is one of two methods of proving discrimination under Title VII and § 1981. Plaintiffs may also offer "direct or indirect evidence of discrimination under ordinary principles of proof." *Weathersbee v. Baltimore City Fire Dep't*, 970 F. Supp. 2d 418, 430 (D. Md. 2013) (quoting *Burns v. AAF–McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996)) (internal punctuation omitted). Direct evidence demonstrates an explicit racial motivation tied directly to the adverse employment action. *Id.* at 430–31. No such proof has been offered in this case with respect to Dr. Sims's failure to hire claim, so the court will analyze this cause of action under the *McDonnell Douglas* framework.

Aspects of Dr. Sims's § 1981 claim are similarly time-barred. Section 1981 claims generally have a four-year statute of limitations period. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 291–92 (4th Cir. 2004).[5] Dr. Sims, therefore, needed to file any such claim involving her initial hiring (and departmental placement) before April 8, 2017.[6] She did not. Any claims based on Dr. Sims's initial rejection from the STC are thus not timely.

Dr. Sims also argues the "continuing violation doctrine" may resuscitate the time-barred aspects of her claim. The court disagrees. Under the continuing violation doctrine, courts may evaluate incidents contributing to a hostile work environment, including behavior outside the statutory time period, "so long as any act contributing to that hostile environment takes place within the statutory time period." *See Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 105 (2002). "[D]iscrete discriminatory acts," however, "are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. A "discrete act" includes "termination, failure to promote, *denial of transfer, or refusal to hire*." *Id.* at 114 (emphasis added). Accordingly, Dr. Sims's untimely allegations about her initial hiring cannot be bootstrapped to her timely claims concerning her failure to be hired off the waitlist. *See Etefia v. East Baltimore Community Corp.*, 2 F. Supp. 2d 751, 757 (D. Md. 1998) ("[U]nlike pattern and practice cases or harassment claims, the fact that a person *continues to seek promotion* does not mean that a continuing violation is present [because] . . . hold[ing] otherwise would ensure that every claim of denial of promotion to a higher paying position would toll the period to file one's charge as long as one merely continued to be employed in the lower position of employment.") (emphasis added).

---

[5] The § 1981 claims are subject to either a four-year statute of limitations, or the "most appropriate or analogous state statute of limitations" depending on whether the plaintiff complains of conduct before or after the formation of the contract. *Whitaker v. Ciena Corp.*, 2019 WL 1331438, at *3 (D. Md. March 25, 2019).

[6] April 8, 2017 is four years after April 8, 2013, the date Dr. Sims was hired to work in the Medical Center's GOR, rather than the STC. (ECF 159-4, Sims Dep. 91:1-6; ECF 159-29, Defs.' Ex. 27 at PL124.)

Dr. Sims's claim, however, does not depend entirely on her failure to be placed in the STC during her *initial* hiring process. When Dr. Sims began working at the Medical Center, Ms. Goetz purportedly placed Dr. Sims on a waitlist to eventually transfer her into the STC. (ECF 180-5, Sims Decl. ¶ 12.)[7] Each example of Ms. Goetz opting to transfer a non-black CRNA into the STC instead of Dr. Sims could, solely for the purpose of deciding the timeliness issue, constitute a discrete instance of the defendants treating Dr. Sims differently because of her race. Within 300 days of Dr. Sims filing her discrimination charge, two non-black CRNA's were transferred into the STC from the GOR. (*See* ECF 172-3, Pl.'s Ex. 14.) In that same period, Dr. Sims discovered a non-black CRNA had been hired into the STC. (ECF 180-5, Sims Decl. ¶ 13.) That same day, Dr. Sims followed up with Ms. Goetz about her potential transfer. (*Id.*) In response, Ms. Goetz told Dr. Sims "[she] may not be a good fit" for the unit. (*Id.*) These incidents occurred within the relevant period to be considered timely. The court will therefore address the merits of Dr. Sims's claim.

### B.  Lack of Pretext in Dr. Sims's Failure to Hire or Transfer Claim

To establish a *prima facie* case for failure to hire (or failure to transfer)[8] a plaintiff must show she: (1) is a member of a protected group; (2) applied to a specific position; (3) was qualified for that position; and (4) was rejected under circumstances that give rise to an inference of discrimination. *See Janey v. N. Hess Sons, Inc.*, 268 F. Supp. 2d 616, 623–24 (D. Md. 2003)

---

[7] The parties vigorously dispute whether there was, in fact, a waitlist for the STC. Dr. Sims has produced a handwritten note from Ms. Goetz suggesting there was some sort of waitlist or ranking system, either for the STC or the GOR. (*See* ECF 172-1, Pl.'s Ex. 12 at UMMC40.) Although not conclusive, the court will assume a waitlist existed given that such evidence must be viewed in a light most favorable for Dr. Sims.

[8] According to Dr. Sims, "[t]ransferring a GOR CRNA to [the] STC requires hiring into [the] STC, so transferring or hiring into [the] STC is the same." (ECF 170, Pl.'s Opp'n at 13 n.13.) Neither party takes a position on whether Dr. Sims's claim is a "failure to hire," "failure to transfer," or "failure to promote" claim. Any potential distinction is immaterial to this dispute.

(analyzing a "failure to transfer" claim in the same manner as "failure to hire" or "failure to promote" claims); *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir. 2004) (failure to promote).

The court will assume Dr. Sims can establish a *prima facie* case for the purpose of deciding the present motion. The burden then shifts to the defendants to "articulate a non-discriminatory" reason for the adverse action. *See Guessous*, 828 F.3d at 216. The defendants have carried their burden by establishing that CRNA assignments depend entirely on the needs of the Anesthesia Department at the time. (*See* ECF 186-4, Defs.' Ex. 71, Goetz Dep. 396:12–397:14.) In other words, Dr. Sims was not offered a position in the STC because no positions were available when she was hired. The defendants' justification is simple but nonetheless non-discriminatory. Dr. Sims presents no material evidence demonstrating that she should have been the top choice when positions *were* available.[9] The defendants' burden here is "one of production, not persuasion" and "involve[s] no credibility assessment." *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (internal quotations and citations omitted). Accordingly, the defendants have carried their "relatively modest" burden to articulate a non-discriminatory reason for their actions. *See Stiles v. Gen. Elec. Co.*, 986 F.2d 1415, 1993 WL 46889, at *3 (4th Cir. 1993) (unpublished per curiam opinion) (citing *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982)).[10]

In the final stage of the burden shifting framework, Dr. Sims must prove the defendants' justification was a mere pretext for racial discrimination. To do so, she must demonstrate "*both*

---

[9] When there *is* an open position, the Anesthesia Department does not appear to use a "first-come, first-served" system. The defendants still make hiring decisions based on departmental need, but in that scenario, they pay special attention to applicants that have "better skill set[s] and experience to fill that job." (*See* Goetz Dep. 397:3-15.)

[10] Unpublished opinions are cited for the soundness of their reasoning, not for any precedential value.

that the reason was false, *and that discrimination was the real reason.*" *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 516 (1993)). Dr. Sims has done neither.

The record indisputably establishes Ms. Goetz hired Dr. Sims for a position in the General Operating Room—not the Shock Trauma Center. (ECF 180-6, Sims Dep. 91:4-8 ["Q: And what position were you hired to fill? A: CRNA in GOR, general operating room."].) Dr. Sims provides no evidence suggesting the STC needed staffing when she was hired into the GOR.[11] Her own evidentiary submission reveals the opposite conclusion: to the extent Ms. Goetz wrote down notes suggesting the STC had a waitlist during Dr. Sims's interview, this supports the defendants' argument that no positions were available when Dr. Sims's application was under consideration. (*See* ECF 172-1, Pl.'s Ex. 12 at PL990.)

Dr. Sims focuses her argument on the fact that *after* she was hired, non-black CRNAs were hired into the STC. She points to two CRNAs in the GOR that started working in the STC during her tenure. (ECF 172-3, Pl.'s Ex. 14.) No evidence suggests the defendants' decision to transfer these individuals, instead of Dr. Sims, had anything to do with race. "While the allegation that non-Black decisionmakers hired non-Black applicants instead of the plaintiff is *consistent* with discrimination, it does not alone support a *reasonable inference* that the decisionmakers were motivated by bias." *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015) (dismissing Title VII discrimination claim where the plaintiff merely

---

[11] Some evidence suggests a position in the STC may have been available as of June 10, 2012. (ECF 172-1 at PL 997.) Ms. Goetz contends there was not a position available at the time. (ECF 159-5, Goetz Dep. 139:11-13 ["We were interviewing Dr. Sims for a position in the general operating room because that is the only area that we had openings."].) This fact, even if disputed, is not material because no evidence suggests a position in the STC was available when Dr. Sims was hired on July 19, 2012. (*See* ECF 159-25, Defs.' Ex. 23.)

"speculate[d] that the persons hired were not better qualified, or did not perform better during their interviews, or were not better suited based on experience and personality for the positions").

Dr. Sims argues she was a stronger candidate because she had more education than the GOR-CRNAs selected for an STC transfer. (Pl.'s Opp.'n at 17–18.) Her argument begins by simply highlighting the type of degrees her coworkers had at the time, and ends by concluding she was more qualified because she had an additional doctorate degree. Even if such a factual dispute existed, it would not be material. The defendants never claimed to make hiring decisions based on the type or number of degrees earned. When the STC did have open positions, Ms. Goetz made hiring decisions based on CRNAs' "skill set and experience." (See ECF 186-4, Goetz Dep. 397:3-15.) Dr. Sims provides no evidence regarding the transferred CRNAs' performance at the Medical Center, their respective skill sets, or any details regarding their employment background. Indeed, Dr. Sims does not mention that the transferred CRNAs had worked at the Medical Center longer than she had. (ECF 172-3, Pl.'s Ex. 14.)

Dr. Sims also points to CRNAs hired directly into the STC, but those individuals are even less similarly situated than the two CRNAs transferred from the GOR. The defendants hired each of these CRNAs several years after Dr. Sims was offered a position. Ms. Goetz attests that Dr. Sims "was not hired with the condition that when an opening would be available in the trauma ORs, that she would change the location of her primary workplace." (See ECF 186-4, Defs.' Ex. 71, Goetz Dep. 145:18-146:1.) Dr. Sims provides no information regarding the hiring details or work experience of the individuals directly placed into the STC. Regardless, there are significant differences between an outside hire and an internal transfer given that an outside hire would pose no opportunity cost in terms of work distribution in the GOR. This is especially true given the undisputed facts establishing that the Anesthesia Department faced staffing shortages during 2013

and 2014. (ECF 159-16, Goetz Decl. ¶ 19.) And Dr. Sims's own evidence suggests the GOR was so short staffed that the Medical Center requested STC CRNAs to cover GOR shifts. (*See* ECF 175-1, Pl.'s Ex. 42.)

The distinction between Dr. Sims and the outside hires and the lack of information about the qualifications of the outside hires undermine any inference of discrimination. *See Swaso v. Onslow Cty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir. 2017) (quoting *Lightner v. City of Wilmington, N.C.*, 545 F.3d 260, 265 (4th Cir. 2008)) (noting that "[w]here a plaintiff attempts to rely on comparator evidence to establish circumstances giving rise to an inference of unlawful discrimination," the similarity between comparators "must be clearly established"). Dr. Sims's own assertion that she was an obvious choice for an internal transfer is insufficient; the final stage of the burden shifting framework requires more. Despite drawing every reasonable inference in Dr. Sims's favor, the court must also keep in mind it does "not sit as a kind of super-personnel department" weighing employment decisions in unfamiliar industries. *See Thorn v. Sebelius*, 766 F. Supp. 2d 585, 595–96 (D. Md. 2011). Even if Dr. Sims were to demonstrate her supervisors "underestimate[d] [her] abilities, that would not render their belief pretextual." *Id.* at 604.

The defendants argued in the prior administrative proceeding that CRNAs do not "formally transfer" between the GOR and the STC. (ECF 173-2, Pl.'s Ex. 23, at PL5161.) According to Dr. Sims, the fact that two GOR-CRNAs ultimately ended up working in the STC demonstrates pretext. (Pl.'s Opp'n at 17.) But distinctions between the terms "hiring," "transferring," "promoting," and "cross-training"—especially as such terms relate to the GOR and the STC— suggest the defendants did not necessarily shift their justification. Dr. Sims even references the inherent imprecision of these terms in her own brief. (Pl.'s Opp'n at 13 n.13.) In any event, this minor linguistic discrepancy is not sufficient to defeat summary judgment. *See Hux v. City of*

*Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006) ("Once an employer has provided a nondiscriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.").

Dr. Sims also emphasizes the fact that "Goetz never hired, transferred, or cross-trained a black CRNA to work full-time in Shock Trauma during Dr. Sims's entire employment." (ECF 170, Pl.'s Opp.'n at 18.) She cites *Alabama v. United States*, 304 F.2d 583, 586 (5th Cir. 1962), *aff'd* 371 U.S. 37 (1962), to argue Ms. Goetz's hiring patterns provide statistical proof of discrimination. But a half-century old voting rights case from the Fifth Circuit has little analogy to Dr. Sims's claim, which relies on an extremely small sample size. *See Fulmore v. United Parcel Serv., Inc.*, 2013 WL 12430074, at *16–17 (E.D.N.C. Mar. 28, 2013) (rejecting statistical evidence based on small sample size in deciding a motion for summary judgment). Dr. Sims worked at the Medical Center for only two years, making it difficult to draw conclusions about motivations and hiring trends during such a limited time.

Dr. Sims next points to Ms. Goetz's racially charged comments as evidence of pretext. Specifically, Dr. Sims alleges Ms. Goetz described her as "argumentative and aggressive like the average Black woman." (ECF 180-5, Sims Decl. ¶ 16.) To be sure, these comments may be "probative evidence of her discriminatory animus." *Foster v. Summer Vill. Cmty. Ass'n, Inc.*, 520 F. Supp. 3d 734, 745 (D. Md. 2021). However, these allegations alone do not defeat summary judgment when considered in the context of the entire record. The discriminatory remarks are unrelated to the defendants' hiring process and are not sufficient to overcome the presumption afforded to Ms. Goetz as the individual that hired Dr. Sims. "The Fourth Circuit has held that when the same person hires an employee, and then takes an allegedly negative employment action, there

is a "powerful inference" that the alleged action was not motivated by discriminatory animus." *McCain v. Waste Mgmt., Inc.*, 115 F. Supp. 2d 568, 574 (D. Md. 2000) (citations omitted). "[T]he fact that the employee was hired and fired by the same person within a relatively short time span . . . creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991).[12] Indeed, "[f]rom the standpoint of the putative discriminator, it hardly makes sense to hire workers from a group one dislikes" only to subject them to discrimination once they are on the job. *Id.* at 797 (internal citation omitted). Ms. Goetz actions support this proposition. She not only held Dr. Sims's job offer open for her to re-take the board exam, but also awarded Dr. Sims the highest honor offered to Medical Center employees. (*See* ECF 159-16, Goetz Decl. ¶ 17; ECF 159-12, Defs.' Ex. 10 at ¶ 24.)

Dr. Sims argues the inference does not apply when the purported discriminator "was responsible for hiring for two distinct jobs" and that person hired non-white workers to "less desirable" positions. *See Dallas v. Giant Food, Inc.*, 187 F. Supp. 2d 505, 510 (D. Md. 2002). But Dr. Sims's allegations do not squarely rebut the fact that Ms. Goetz had hired and employed multiple Black CRNAs into the STC. (*See, e.g.*, ECF 172-2, Pl.'s Ex. 13; ECF 172-3, Pl.'s Ex. 14.) Nor has Dr. Sims provided any evidence suggesting the GOR was a "less desirable" position beyond her subjective view of "prestige" and, at best, a minor difference in pay. Accordingly, the court will grant the defendants' motion for summary judgment as to Dr. Sims's failure to hire claim.

## II.   Discriminatory Fitness for Duty Evaluation (Count II)

---

[12] This "same actor inference" applies equally to other adverse employment actions, not just discriminatory firing claims. *See, e.g.*, *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996).

Dr. Sims next contends the defendants racially discriminated against her by requiring that she take a fitness for duty ("FFD") evaluation. Dr. Sims brings this claim under the same statutes, Title VII and § 1981, and the court will apply the same burden shifting framework. The outcome is no different. The defendants are entitled to summary judgment as to this cause of action as well.

### A. Prima Facie Case

In the first step of the now-familiar burden shifting scheme, the plaintiff must establish a *prima facie* case of discrimination. *Guessous*, 828 F.3d at 216. To establish a *prima facie* case of discriminatory treatment, a plaintiff must show: (1) membership in a protected class; (2) adverse employment action; (3) satisfactory job performance; and (4) similarly situated employees outside the protected class received more favorable treatment. *Cepada v. Board of Educ. of Balt. Cnty.*, 814 F. Supp. 2d 500, 513 (D. Md. 2011). The defendants do not dispute Dr. Sims's membership in a protected class, nor her satisfactory job performance.[13] Instead, the defendants contend: (1) a FFD exam is not an adverse employment action (ECF 159-1, Defs.' Mem. at 19); and (2) Dr. Sims failed to establish her "similarly situated" coworkers were treated more favorably (*id.* at 22). The court will address each argument in turn.

As previously discussed, an adverse employment action is "a significant change in employment status . . . or a decision causing a significant change in benefits." *U.S. Equal Emp. Opportunity Comm'n v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 438 (D. Md. 2020) (citing *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011)) (internal quotation marks omitted); *see also Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999) ("Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment.").

---

[13] Dr. Sims's job performance "was not at issue" when Ms. Goetz mandated the initial FFD examination. (ECF 173-9, Pl.'s Ex. 30 at PL3288.)

Dr. Sims has not cited a single instance of a court finding that an FFD exam constitutes an adverse employment action. Indeed, many courts around the country have come to the opposite conclusion. *See Semsroth v. City of Wichita*, 548 F. Supp. 2d 1203, 1211 (D. Kan. 2008), *aff'd*, 555 F.3d 1182 (10th Cir. 2009) (collecting cases); *see also Sturdivant v. City of Salisbury*, 2011 WL 65970, at *5 (M.D.N.C. Jan. 10, 2011), *report & recommendation adopted*, 2011 WL 806381 (M.D.N.C. Mar. 2, 2011) (holding that a mandatory drug test did not constitute an "adverse action" under Fourth Circuit precedent).[14] The outcome in the present dispute is no different. Dr. Sims cannot show the FFD exam, standing alone, changed her employment status or otherwise affected her employment in any way.

In one of her examples, Dr. Sims contends she lost wages and sacrificed sick days to take the exam. Even with the court drawing all inferences in her favor, no evidence supports Dr. Sims's interpretation of the record. No evidence suggests Ms. Goetz *mandated* Dr. Sims to immediately report to the hospital for her exam. (ECF 159-34, Defs.' Ex. 32 at UMMC 422–23.) Dr. Sims chose to forgo shifts at her *second* job. The financial consequences of that decision have no bearing on whether the defendants' actions adversely impacted her employment at the Medical Center.[15]

Dr. Sims was not allowed to work until she completed her FFD evaluation, which resulted in her missing two shifts. Dr. Sims argues this suspension constitutes an adverse employment

---

[14] *See, e.g., Foster v. Texas Health Sys.*, 2002 WL 1461737, at *7 (N.D. Tex. June 30, 2002) (holding that a drug test cannot constitute an adverse employment action where it does not directly change an individual's pay, benefits, compensation, or employment status); *Keys v. Foamex, L.P.*, 264 F. App'x 507, 510–11 (7th Cir. 2008) (noting "adverse employment actions contemplate more than inconvenience or minor irritation" and drug tests only meet that test when they are designed to humiliate an employee and are not performed in accordance with employer practice); *Smith v. R.J. Reynolds Tobacco Co.-Packaging Div.*, 2003 WL 355646, at *4 (M.D.N.C. Feb. 11, 2003) (drug test not an adverse change in employment status); *Liggins v. G.A. & F.C. Wagman, Inc.*, 2019 WL 4039635, at *3 n.4 (W.D. Va. Aug. 27, 2019) (same).

[15] Courts in the District of Columbia have explicitly rejected arguments suggesting the loss of income from a *second* job constitutes an adverse employment action. *Hunter v. District of Columbia*, 905 F. Supp. 2d 364, 373 (D.D.C. 2012), *aff'd sub nom. Hunter v. D.C. Gov't*, 2013 WL 5610262 (D.C. Cir. Sept. 27, 2013) (a fitness for duty examination impacting an employee's *different* job is not an adverse employment action).

action. Several courts, however, have found that paid suspension due to an examination does not constitute an adverse employment action. *See, e.g., Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 786–87 (7th Cir. 2007) (affirming grant of summary judgment in favor of employer because the plaintiff did not suffer materially adverse action by being placed on paid leave while undergoing fitness for duty examination); *Breaux v. City of Garland,* 205 F.3d 150, 157–58 (5th Cir. 2000) (finding that an employer did not take an adverse employment action by requiring employee to undergo psychological examination and placing the employee on administrative leave).[16]

Dr. Sims also claims to have experienced severe anxiety from Goetz's FFD referral, requiring her to call out sick for an additional two days. (ECF 170, Pl.'s Opp.'n at 21; ECF 175-8, Pl.'s Ex. 49; ECF 159-44, Defs.' Ex. 42 at PL5683–84.) But those ailments are too disconnected from the examination itself. Her illness, and the resulting effect of her needing time off from work, were merely incidental consequences of the stressful circumstances *surrounding* the evaluation. Even if the exam was the proximate cause of her illness, Title VII does not generally provide relief for an increase in work-related stress. *See Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir. 1999).

Dr. Sims further contends the FFD examination eventually resulted in her termination. The exam, according to Dr. Sims, resulted in her "los[ing] millions of dollars when her termination was upheld." (ECF 170, Pl.'s Opp.'n at 22.) But Title VII does not permit employees to stretch the causal chain in this manner. The examination was simply a tool the defendants used to investigate Dr. Sims's conduct. For the defendants' investigation of Dr. Sims to "give rise to an independent

---

[16] It is undisputed that Dr. Sims received her standard pay during the period her evaluation was pending. Dr. Sims, however, claims she lost weekend incentive pay, and the pay she *did* receive was deducted from her accumulated sick leave. Even if Dr. Sims were correct, these minor deviations from her standard pay are not *significant* changes to her employment status rising to the level of an adverse employment action. *See Hunter,* 905 F. Supp. 2d at 374 (D.D.C. 2012) (minor expenses from a FFD exam were merely "indirect costs" which is not the type of actionable "direct economic harm resulting from a change in the terms, conditions, or privileges of employment").

claim," Dr. Sims "would need to allege some employment injury caused by the investigation *independent of [her] termination.*" *Hoffman v. Baltimore Police Dep't*, 379 F. Supp. 2d 778, 793 (D. Md. 2005). Dr. Sims has failed to do so.

Finally, Dr. Sims cites a single case, *Aro v. Legal Recovery Law Offices, Inc.*, No. D065422, 2015 WL 1577597, at *1 (Cal. Ct. App. Apr. 8, 2015), in rebuttal. That decision—an unpublished opinion from a California state court—merely stands for the proposition that *some* drug tests, if administered in a "unreasonable and outrageous manner," could constitute the tort of intentional infliction of emotional distress. *See id.* at *6–7. Whether certain drug tests are "unreasonable" under California tort law has no bearing on whether the defendants' FFD exam falls under Title VII's definition of an "adverse employment action."

There are no disputes of material fact that would qualify Dr. Sims's FFD evaluation as an adverse employment action. The court need not turn to the other elements of Dr. Sims's *prima facie* case, because the existence of an adverse employment action is an absolute precondition for Dr. Sims's claim. *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004).

### B.  Non-Discriminatory Justification & Pretext

Even assuming Dr. Sims could establish a *prima facie* case, the defendants would still be entitled to summary judgment. By pointing to signs of Dr. Sims's possible substance abuse, the defendants have articulated a non-discriminatory justification for Dr. Sims's fitness-for-duty examination. The burden thus shifts back to Dr. Sims to demonstrate this reason was a mere pretext for race discrimination. Dr. Sims has failed to do so.

No reasonable juror could conclude the examination was motivated by anything other than an interest in protecting patients. The primary question is not whether Dr. Sims actually had a substance abuse problem, or even whether Ms. Goetz actually believed Dr. Sims was diverting

drugs. If the FFD referral was based on the defendants' *perception* of Dr. Sims's *potential* substance abuse issues, then Dr. Sims cannot establish pretext.

Dr. Sims lacks evidence disputing the defendants' perception of her conduct. In the weeks leading to her FFD examination, numerous employees complained to Ms. Goetz about Dr. Sims's recent conduct. Some noted Dr. Sims had become confrontational and aggressive while at work, describing her as "explosive" and "offensive." (ECF 159-34, Defs.' Ex. 32 at UMMC419–20.) Several other colleagues explained that Dr. Sims disrespected medical residents on multiple occasions. (*Id.* at UMMC420; ECF 159-35, Defs.' Ex. 33; ECF 159-14, Defs.' Ex. 12 at 4–5.) These complaints are corroborated by multiple sources and by the fact Dr. Sims received a corrective action warning for her behavior. (ECF 159-34, Defs.' Ex. 32 at UMMC421; ECF 159-35, Defs.' Ex. 33; ECF 159-14, Defs.' Ex. 12 at 14.) Many of these complaints stated Dr. Sims had only recently turned to this type of behavior, with physicians reporting that she looked "burnt out," "tired," and ultimately was "not the same Faresha that she was last year." (ECF 159-34, Defs.' Ex. 32 at UMMC421.) Dr. Sims had also recently been refusing to leave work at the end of her shift. (*Id.*; ECF 159-35, Defs.' Ex. 33; ECF 159-14, Defs.' Ex. 12 at 4–6.)

Increased hostility, mood swings, and refusing leave at the end of a shift are textbook indications of potential substance abuse in the anesthesiology field. (ECF 159-20, Defs.' Ex. 18 at PL3349.) Dr. Sims does not deny most of the underlying allegations regarding her conduct. She instead attempts to *explain* her behavior.[17] The problem with Dr. Sims's strategy is that she cannot establish that Ms. Goetz did not honestly believe the fitness for duty evaluation was necessary. *See*

---

[17] For example, Dr. Sims points to several occasions where she was applauded for her overtime work. But Dr. Sims's examples are cherry-picked from times when the General Operating Room was facing staffing shortages. (*See* ECF 175-1, Pl.'s Ex. 42; ECF 159-16, Goetz Decl. ¶ 19; ECF 180, Goetz Dep. 341:13-16.) Furthermore, those examples refer to Dr. Sims's willingness to accept extra scheduled shifts, not staying *beyond* her planned shifts.

*Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (finding summary judgment proper where no reasonable juror could conclude the decisionmaker "did not honestly believe" the non-discriminatory justification). Dr. Sims's best evidence relies on examples of Ms. Goetz saying she "never formed a belief as to whether Dr. Sims was diverting drugs," (ECF 159-15, Defs.' Ex. 13 at 5; *see also* ECF 180, Goetz Dep. 299:15-21) or that she "never said drug use" was a motivating factor in the referral (ECF 179-2, Pl.'s Ex. 83 at PL5870). Dr. Sims contrasts these statements with the fact that Ms. Goetz noted "suspected drug diversion" on the FFD referral form. (ECF 159-36, Defs.' Ex. 34.)

Even in a light most favorable to Dr. Sims, these statements only suggest Ms. Goetz did not personally believe that Dr. Sims was *actually* diverting or using drugs. No evidence rebuts Ms. Goetz's reliance on the litany of complaints concerning Dr. Sims's abrasive interactions with her coworkers, or the examples of Dr. Sims staying past her scheduled shifts. Nor do these statements deny that Ms. Goetz perceived Dr. Sims's conduct was *consistent* with signs of substance abuse and warranted a FFD referral. A supervisor who personally believes an employee has no drug abuse issues may still take precautionary action.[18]

The defendants' justification is especially plausible given the unique rates of substance abuse in Dr. Sims's profession.[19] The Medical Center is no ordinary employer, and Dr. Sims has no average job. Anesthesia professionals have access to addictive pharmaceutical products and work under stressful situations nearly every day. (ECF 159-18, Defs.' Ex. 16 at PL3344.) Even the slightest misstep could be the difference between life and death for a patient. It is undisputed that

---

[18] As described above, Dr. Sims does not have a persuasive answer to the "same-actor" theory. The theory applies with equal force across Dr. Sims's claims.

[19] The American Association of Nurse Anesthetists (AANA) notes that "10 to 15 percent of practicing CRNAs will struggle with substance use disorders at some time during their career." (ECF 159-18, Defs.' Ex. 16 at PL3344.)

early indications of substance abuse by anesthesia professionals include mood swings; increased episodes of anger and hostility; volunteering for extra shifts; and generally spending more time at the hospital without being asked to do so. (ECF 159-20, Defs.' Ex. 18 at PL3349.) All of these factors are consistent with the defendants' explanation for Dr. Sims's FFD referral.

Dr. Sims attempts to resuscitate her claim by listing dozens of "comparators," employees outside the plaintiff's protected class who were treated more favorably than the plaintiff despite being similarly situated. When an employee relies on comparator evidence to demonstrate the existence of discrimination, the comparators must be "similarly situated in all relevant respects." *Sawyers v. United Parcel Service*, 946 F. Supp. 2d 432, 442 n.10 (D. Md. 2013) (citation and internal quotation marks omitted); *see also Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).

A showing of similarity "would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood*, 387 F. App'x at 359 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Comparators need not be identical, though they must be similar in all relevant aspects, including conduct, performance, and qualifications. *Id.*

Here, Dr. Sims merely recites a general list of her coworkers' misdeeds. Many of these incidents bear no relation to the type of behavior from Dr. Sims that originally inspired the FFD referral. Ms. Goetz referred Dr. Sims for an FFD examination as a precautionary measure to investigate signs of potential substance abuse. Most of Dr. Sims's comparators exhibited no such conduct. She points to dozens of CRNAs with misconduct including racially charged statements, leaving the hospital without permission, failing to follow the protective equipment policy, and

mislabeling syringes. (*See* ECF 170, Pl.'s Opp'n at 25–29.) A few of her comparators received an FFD referral, just as Dr. Sims had, and some were terminated for their misconduct. None are similarly situated. Dr. Sims simply catalogues misconduct by employees that did not receive a FFD examination, while ignoring the fact that most of them actually received punishment, not a referral.

Taking all the evidence into account, and drawing all inferences in favor of Dr. Sims, no reasonable jury could find the defendants' concern for patient safety was merely a pretext for discrimination. Accordingly, the defendants are entitled to summary judgment as to Dr. Sims's discriminatory treatment claim.

### III.    Disability Discrimination

#### A.    Impermissible Medical Examination (Count III)

Under the Americans with Disabilities Act ("ADA"), an employer may not require an employee to undergo a "medical examination," *inter alia*, unless the examination is "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). This provision "permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." *Porter v. U.S. Alumoweld Co.*, 125 F.3d 243, 246 (4th Cir. 1997) (quoting 29 C.F.R. pt. 1630, app. § 1630.14(c)).

This test is satisfied when an employer "reasonably believes" a medical condition impairs an employee's ability to do the "essential functions of the job" or the employee poses a "direct threat" to themselves or others. *Coffey v. Norfolk S. Ry. Co.*, 23 F.4th 332, 339 (4th Cir. 2022) (citation omitted). An employer's subjective motivation is irrelevant; whether legitimate reasons exist "is an objective inquiry." *Id.* (citing *Hannah P. v. Coats*, 916 F.3d 327, 339 (4th Cir. 2019));

29

*see also Pence v. Tenneco Auto. Operating Co., Inc.*, 169 F. App'x 808, 812 (4th Cir. 2006). Employers may have legitimate reasons to doubt an employee's ability to perform their job duties—and thus lawfully require a medical examination or make disability-related inquiries— even if the employee's job performance has not suffered. *See Leonard v. Electro-Mech. Corp.*, 36 F. Supp. 3d 679, 687 (W.D. Va. 2014).

Medical professionals provide an indispensable public service. Especially in the age of widespread public health emergencies, their labor can often be the difference between life and death. Employers "in positions affecting public safety" are especially justified in requesting employee information related to the use of drugs and other medications. *Coffey*, 23 F.4th at 339–40 (relying on EEOC guidelines in holding a railroad company was "more than justified" in its request for information related to employee's medication usage) As an employer in the business of protecting the public, the Medical Center must keep a watchful eye on their employees' drug use—especially given the substance abuse issues plaguing the field. (ECF 159-16, Goetz Decl. ¶ 13.)

Ms. Goetz authorized Dr. Sims's FFD exam based on an objectively reasonable business interest in maintaining a safe work environment, for all the reasons described previously. Dr. Sims would stay beyond her shift at times. (ECF 159-34, Defs.' Ex. 32 at UMMC421–22; ECF 159-14, Defs.' Ex. 12 at 4.) This, combined with evidence of Dr. Sims's sudden increase in interpersonal conflict, showed signs of potential substance abuse. (ECF 159-20, Defs.' Ex. 18 at PL3349.) Dr. Sims does not dispute that substance abuse by CRNAs poses a safety threat to patients, nor does she dispute that investigating potential threats to patient safety is a business necessity for medical enterprises.

Dr. Sims's rebuttal fails to generate a material issue of fact. She provides a litany of citations to the record suggesting the defendants never, in fact, believed Dr. Sims diverted or used drugs. (ECF 170, Pl.'s Opp.'n at 32.) Dr. Sims, however, conflates objective reasonableness and subjective motivation. The court "do[es] not resolve any dispute about what [Ms. Goetz's] subjective motivations were" for having Dr. Sims examined. *See Coats*, 916 F.3d at 339. Based on the evidence available to Ms. Goetz at the time—multiple first-person complaints, timecard records, and various treatises on the subject all generating suspicions of substance abuse—it would have been objectively reasonable to believe Dr. Sims may have had substance abuse troubles, and thus to believe there was a need to determine whether she could still perform the essential functions of her job.

In *Barnum v. Ohio State University Medical Center*, 642 F. App'x 525 (6th Cir. 2016), the Sixth Circuit addressed an analogous situation where several of a CRNA's coworkers expressed concerns about the CRNA's ability to concentrate and the fact that she had suicidal thoughts. *Id.* at 532–33. The CRNA's supervisors required her to undergo medical examinations, and the CRNA brought a claim against them under the ADA. *Id.* at 532. The Sixth Circuit affirmed a grant of summary judgment to the employers because the CRNA's behavior "could cause a reasonable person to inquire as to whether [the] employee is still capable of performing [her] job." *Id.* at 533 (quoting *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619 (6th Cir. 2014) (alterations in original, internal punctuation omitted).

Dr. Sims attempts to distinguish *Barnum* by pointing out that Ms. Goetz never questioned her job performance. This distinction is immaterial in professions, such as the practice of anesthesiology, where employees could pose a significant risk to the public due to substandard job performance. In those work environments, an employer need not wait until a tangible threat

materializes. *See Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (holding that police department need not "forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries"). For CRNAs who administer drugs during high-stake surgeries, any decline in attentiveness, focus, or general performance can have drastic consequences.[20] Accordingly, the defendants here were not required to wait until Dr. Sims exhibited performance issues; Dr. Sims's perceived substance abuse was sufficient to justify a FFD exam.

Finally, Dr. Sims contends the defendants cannot raise an affirmative defense based on business necessity or job-relatedness for the first time on a motion for summary judgment. (ECF 170, Pl.'s Opp.'n at 32.) Not so. A court need not give effect to a waiver of an affirmative defense "unless the failure to plead resulted in unfair surprise or prejudice." *S. Wallace Edwards & Sons, Inc. v. Cincinnati Ins. Co.*, 353 F.3d 367, 373 (4th Cir. 2003) (citing *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 612–13 (4th Cir. 1999)). "The Fourth Circuit and other Circuit Courts have found that affirmative defenses *raised for the first time in summary judgment motions* can provide the required notice, and therefore do not create an unfair surprise sufficient to apply waiver." *Wellin v. Wellin*, 430 F. Supp. 3d 84, 92 (D.S.C. 2019) (citing *Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455, 459 (4th Cir. 2010)) (emphasis added).

Here, Dr. Sims was not unfairly surprised by the business necessity defense given that she identified the issue in her First Amended Complaint. (ECF 33, First Am. Compl. ¶ 216). She also investigated the matter during discovery, even asking specific witnesses about the topic in

---

[20] Dr. Sims relies on *Equal Emp. Opportunity Comm'n v. McLeod Health, Inc.*, 914 F.3d 876, 882 (4th Cir. 2019), but that case is inapposite to the present dispute. A CRNA must maintain the health and safety of patients while administering anesthesia during medical operations. The plaintiff in *McLeod* worked as a newsletter editor, hardly carrying the same safety risks as that of a CRNA.

depositions. (ECF 179-9, Pl.'s Ex. 90, Frisch Dep. 121:2-18). Nor was Dr. Sims prejudiced considering she had an ample opportunity to respond to the argument in her Opposition brief, for which the court granted her an extension of time (ECF 167) and permission to exceed the standard page limits (ECF 190). Accordingly, the defendants have satisfied their burden of demonstrating the medical examination was based on an objectively reasonable belief of business necessity. No reasonable jury could find otherwise, necessitating summary judgment in the defendants' favor as to the impermissible medical examination claim.

### B.   "Regarded As" Disabled (Count IV)

Dr. Sims next argues the defendants fired her because they "regarded" Dr. Sims as disabled. The ADA prohibits covered employers from firing qualified employees because they are disabled. 42 U.S.C. § 12112(a). In order to prevail on such a claim, the plaintiff must demonstrate: (1) she was disabled; (2) she was a qualified individual; and (3) she suffered an adverse employment action based on her disability. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015). The ADA Amendments Act of 2008 defines "disability" to include not only *actual* physical or mental impairments, but also those who are "regarded as having such an impairment." *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014) (citing 42 U.S.C. § 12102(1)). Dr. Sims proceeds under this "regarded as" theory of liability. The defendants argue Dr. Sims was not "regarded as" disabled, and even if she was deemed as such, her termination was not based on the perception of her disability. The court agrees with the defendants for the following reasons.

First, no reasonable jury could conclude the defendants regarded Dr. Sims as disabled. Dr. Sims must establish she was terminated because of a *"perceived* physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *See* 42 U.S.C.

§ 12102(3)(A). But a plaintiff cannot ultimately succeed on a "regarded as" claim if the impairment is "transitory and minor." *Id.* § 12012(3)(B).

The record clearly establishes Dr. Sims was referred to EAP because she exhibited an extreme distrust of her supervisors based on her conversation with Mr. Brown. Dr. Sims, in response, submits statements made by the defendants' lawyers to demonstrate she was "regarded as" disabled.

Dr. Sims specifically points to a statement in a letter to the EEOC where the defendants' counsel explained that "[Dr]. Sims's concerning statements to Mr. Brown indicated paranoia and distrust toward her supervisors." (ECF 173-9, Pl.'s Ex. 30 at PL5192.)[21] Dr. Sims contends this is "smoking gun" evidence of discrimination, but the court is not so convinced. Correspondence drafted by outside counsel *three years* after Dr. Sims was fired is not probative of how the defendants "regarded" Dr. Sims at the time of her termination. Even the most generous inferences drawn in Dr. Sims's favor cannot rebut a plain reading of the statement. Nowhere do the defendants contend Dr. Sims has a mental illness. The statement simply notes Dr. Sims was "paranoid" in the sense that she did not trust her supervisors.

The defendants' request that Dr. Sims speak to an EAP counselor does not mean she was regarded as disabled. In *Coursey v. Univ. of Maryland E. Shore*, 577 F. App'x 167, 174–75 (4th Cir. 2014), the Fourth Circuit affirmed an award of summary judgment for the defendants where the plaintiff argued that a request for a medical examination "show[ed] that the employer regarded the employee as disabled" under the ADA. The *Coursey* panel noted that "of the courts of appeal to address this issue" all have concluded a request for examination is insufficient, in and of itself,

---

[21] Dr. Sims also relies on the following sentence in the same letter by the defendants' counsel: "Human Resources consulted with the Director of Employee Health, and together they determined that there were further questions regarding Ms. Sims's fitness for duty based on the apparent paranoia she had regarding her supervisors." (ECF 173-9, Pl.'s Ex. 30 at PL5174.)

to show an employee was "regarded" as disabled. *Id.* at 174; *but see West v. J.O. Stevenson, Inc.*, 164 F. Supp. 3d 751, 773 (E.D.N.C. 2016) (noting the Fourth Circuit may need to return to *Coursey* as being inconsistent with the amendments to the ADA).

In other words, Dr. Sims's only evidence on this issue is a *post facto* summary by counsel of what Dr. Sims allegedly told Mr. Brown. Dr. Sims has no evidence any employee of the Medical Center ever said or believed she had a mental illness.

Second, even if the defendants perceived Dr. Sims as disabled, no reasonable jury could conclude she was terminated or otherwise adversely affected on that basis. The EAP referral was not an act of termination; the defendants merely requested an investigative discussion consistent with their interest in protecting patients. From Dr. Frisch's perspective, Dr. Sims was making serious but unfounded allegations about her coworkers, such as contending her colleagues were threatening her physical safety, breaking into her house, and trying to run her off the road. Ms. King and Dr. Frisch supported Dr. Sims's referral to EAP based on serious questions about her ability to safely perform her job. Dr. Sims has no evidence establishing the discriminatory nature of this referral.

The evidence is clear that Dr. Sims lost her job because she refused to attend the EAP session, not because the defendants believed she was disabled. Even assuming the defendants believed Dr. Sims had a mental illness, the EAP referral process was an inquiry into whether she could perform the job. Here, the defendants' "passing reference[s]" to an employee's paranoia is not sufficient to infer that the employee was fired because of a perceived disability. *Pence v. Tenneco Auto. Operating Co.*, 169 F. App'x 808, 811 (4th Cir. 2006) (affirming summary judgment in favor of employer because "no rational factfinder could conclude that [a] passing reference to a belief that [the plaintiff] was paranoid was the reason for his termination"); *see also*

*Watson*, 177 F.3d at 935 (affirming summary judgment for employer where the plaintiff's coworkers "regarded him as 'paranoid'" and generally "difficult to work with" because those statements "merely show[ed] [the plaintiff] had serious personality conflicts with members of his department" and did "not rise to the level of a mental impairment under the ADA"). Accordingly, the defendants are entitled to summary judgment as to Dr. Sims's ADA claims.

## IV.    Retaliation (Count V)

Dr. Sims next argues the defendants retaliated against her for filing a discrimination complaint. In addition to its anti-discrimination provisions, Title VII also protects employees against certain types of retaliation. *See* 42 U.S.C. § 2000e-3. While the anti-discrimination provisions protect individuals based on who they are (i.e., membership in a protected class), the anti-retaliation provisions protect individuals based on what they do (i.e., engaging in a protected activity). *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). As with claims under the anti-discrimination provisions, plaintiffs may use the *McDonnell Douglas* burden-shifting framework for anti-retaliation claims. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015).

To establish a *prima facie* case of retaliation under either Title VII or § 1981, a plaintiff must show: (1) she engaged in protected activity; (2) her employer took adverse action against her; and (3) a causal relationship existed between the protected activity and the adverse employment activity. *Guessous*, 828 F.3d at 217.

"Employees engage in protected oppositional activity when, inter alia, they complain to their superiors about suspected violations of Title VII." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281–82 (4th Cir. 2015) (noting an employee merely "complain[ing] to their superiors about *suspected* violations of Title VII" is sufficient to constitute protected activity so long as the

36

employee "reasonably believes" the action to be unlawful) (internal citations and quotations omitted).

Adverse action, in the context of retaliation claims, means any action by an employer that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (internal citations and quotations omitted). The challenged action must be "materially adverse," not a mere "trivial" injury. *Id.* While some job-related adversity, such as being discharged or demoted, will clearly constitute adverse action, *Boone*, 178 F.3d at 255, the alleged harms supporting a claim of retaliation need not be "related to employment" or even "occur at the workplace." *Burlington*, 548 U.S. at 57.

Even assuming Dr. Sims engaged in protected activity by filing a racial discrimination complaint against Ms. Goetz, the defendants are still entitled to summary judgment. To survive summary judgment, a plaintiff must show "a causal relationship existed between the protected activity and the adverse employment activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (quoting *Foster*, 787 F.3d at 250, 253). That is, there must be evidence that an employer "took the adverse action *because* of the protected activity." *Id.* (quoting *Bryant*, 333 F.3d at 543). No reasonable jury could conclude Dr. Sims's protected activity caused any adverse action, or that the defendants' justifications were pretextual.

Dr. Sims provides several instances of alleged retaliation but fails to demonstrate any causal connection between her examples and her complaints of racial discrimination. Dr. Sims argues that Mr. Brown retaliated against her by attributing false statements to Dr. Sims in his June 30, 2015, memorandum. (ECF 170, Pl.'s Opp'n at 38–39.) No reasonable jury could find a causal connection between her complaint and Mr. Brown's memorandum. Dr. Sims has provided no evidence, beyond speculative and conclusory allegations, explaining why Mr. Brown would

fabricate the facts in his memorandum. To accept Dr. Sims's theory, a reasonable jury would have to infer Mr. Brown—a security officer that Dr. Sims had just met that day—concocted an elaborate scheme upon seeing that Dr. Sims had complained about racial discrimination.

Dr. Sims submits evidence that Mr. Brown happened to receive a promotion on the same day he wrote the memorandum at issue. (*Id.* at 39.) In this tale, Mr. Brown would have had to communicate with the HR department and negotiate a *quid pro quo* exchange where he would fabricate a conversation with Dr. Sims in exchange for a promotion more than doubling his salary. Mr. Brown's supervisor testified that Mr. Brown's promotion was initiated in 2014 and was simply finalized on June 30, 2015. (*See* ECF 186-5, Defs.' Ex. 72, Davis Dep. 24:21–25:3, 27:3-17; *see also* ECF 179-8, Pl.'s Ex. 89, Davis Dep. 10:1–13:5).

Dr. Sims's theory would require multiple employees across different departments, including Mr. Brown's supervisor, to work in unison while possibly violating various criminal laws including fraud and perjury.[22] The court need only draw *reasonable* inferences in favor of the non-moving party. *See* Fed. R. Civ. Proc. 56. Dr. Sims's version of events is anything but reasonable. Coincidences do not confer causation, nor do conspiracies create disputes of material fact. No rational jury could draw a causal inference between Dr. Sims's complaint and Mr. Brown's allegedly fabricated report.

Dr. Sims also contends the defendants intentionally painted her as having a mental illness as an act of retaliation. The court has already largely addressed this allegation with respect to Dr. Sims's ADA claim. In the context of her retaliation claim, Dr. Sims provides no evidence

---

[22] Dr. Sims does not dispute the fact that Mr. Brown received the promotion in 2014, approximately a year before the incident in question. Dr. Sims merely submits evidence contradicting Mr. Brown's deposition testimony about issues entirely unrelated to this litigation, such as Mr. Brown's bankruptcy, his other legal names, and whether he owns a business. The court need not evaluate such matters that extend far beyond the scope of this dispute. Dr. Sims argues that Mr. Brown's credibility is in question because he "committed perjury," but the court does not make credibility determinations at the summary judgment stage. *See Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022).

suggesting the individuals that referred her to EAP—Ms. King and Dr. Frisch—did not subjectively believe that Dr. Sims had made the statements attributed to her. Even if the court were to assume Mr. Brown fabricated the memorandum, nothing suggests Dr. Frisch *knew* Mr. Brown had done so. From Dr. Frisch's perspective:

> I had already assessed Dr. Sims. I had cleared Dr. Sims to return back to work. Dr. Sims did not return back to work. Dr. Sims displayed some concerning behaviors, and those behaviors were described to me, and based on that information the decision was made to refer Dr. Sims back to EAP.

(ECF 159-7, Frisch Dep. 49:17–50:1.) Dr. Sims provides no evidence rebutting Dr. Frisch or Ms. King's perception that they believed the statements in Mr. Brown's memorandum. There is no triable issue of fact on which the jury could conclude Dr. Sims was referred to the EAP for discriminatory reasons.

Although Dr. Sims contends her termination was an independent form of retaliation, she has not disputed the fact that she was fired because she ignored the defendants' request to speak with EAP. The defendants' request was based on serious—even if ultimately unfounded— allegations by Dr. Sims about her coworkers conspiring against her.

According to Dr. Sims, the defendants mistakenly applied the EAP policy by terminating her due to lack of compliance. Dr. Sims contends that employees may decline EAP referrals with no adverse consequences. This dispute of fact, however, is not material because it fails to suggest the defendants' *true* purpose for terminating her was discrimination. *See DAG Petroleum Suppliers, L.L.C. v. BP P.L.C.*, 268 F. App'x 236, 242 (4th Cir. 2008) (noting that "[p]retext is a lie or cover-up, not merely a mistake," and "evidence that [an employer] erroneously or even purposely misapplied [its own] policy[] will not suffice to overcome summary judgment") (citations omitted). Although Dr. Frisch and King testified that they never believed Dr. Sims was

ever unsafe to provide patient care, that does not negate the fact that she exhibited signs warranting a precautionary intervention.

Dr. Sims argues the defendants altered the appeal procedure to conceal the involvement of Ms. Goetz and Dr. Rowen, which was an independent form of retaliation. (ECF 170, Pl.'s Opp'n at 42–43.) But Dr. Sims cannot explain why removing Ms. Goetz and Dr. Rowen—the actors who Dr. Sims accused of discrimination in the first place—from the review process is evidence of discrimination. The fact that additional, third-party actors—entirely separate from the prior dispute—made the ultimate termination decision cuts against Dr. Sims's claim.[23]

The court will grant the defendants' motion for summary judgment as to Dr. Sims's retaliation claim.[24]

## V.     Hostile Work Environment (Count VI)

Title VII prohibits employers from discriminating against an employee based on race with respect to the terms, conditions, or privileges of employment. 42 U.S.C. § 2000e–2(a)(1). Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 73 (1986). The elements of a hostile work environment claim under Title VII or § 1981 are: the plaintiff experienced harassment that is (1) unwelcome; (2) based on race; (3) sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer. *Reed v. Airtran Airways*, 531 F. Supp. 2d

---

[23] Dr. Sims contends the defendants failed to diligently investigate her discrimination claims. Even if true, this argument fails. As explained by the Tenth Circuit, failure to investigate a complaint, unless it leads to demonstrable harm, leaves an employee no worse off than before the complaint was filed. *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 640 (10th Cir. 2012) (citing *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 721–22 (2d Cir. 2010)).

[24] Because Dr. Sims has failed to survive summary judgment on the merits, the court need not evaluate whether Ms. Goetz and Dr. Rowen could face individual liability for their actions.

660, 668–69 (D. Md. 2008) (Title VII); *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183–84 (4th Cir. 2001) (elements are the same under § 1981 and Title VII).

No material facts elevate Dr. Sims's allegations into a cognizable hostile work environment claim. Dr. Sims lists several concerns about her workplace unrelated to her race. For example, Ms. Goetz allegedly: (1) expressed anger toward Dr. Sims for failing the board exam (ECF 180-6, Pl.'s Ex. 97, Sims Dep. 102:8-20); (2) called Dr. Sims "stupid" based on Dr. Sims's interpretation of a workplace policy (*Id.* at 232:19–234:2); and (3) denied one of Dr. Sims's vacation requests while granting similar requests to her coworkers (ECF 178-1 Pl.'s Ex. 72).[25] Dr. Sims also points to an instance where one of her coworkers threw papers in her face because Dr. Sims was late to relieve her. (ECF 180-6, Sims Dep. 126:3–130:8.)

The common denominator between these incidents is that Dr. Sims provides no evidence "beyond [her] speculations, that any of the actions [s]he claims contributed to a hostile work environment were motivated by racial animus." *See Cepada v. Bd. of Educ. of Baltimore Cty.*, 974 F. Supp. 2d 772, 784 (D. Md. 2013). Dr. Sims relies entirely on "her own general statements" to conclude these incidents were motivated by race. *See Gilliam v. S.C. Dep't of Juvenile Justice*, 474 F.3d 134, 142 (4th Cir. 2007) (affirming grant of summary judgment to defendant where the plaintiff's allegations of hostile work environment "were not supported by any evidence other than her own general statements, which often lacked detail"). Nor is it clear that the alleged conduct, if proved, would be sufficiently severe and pervasive to sustain a claim *See, e.g., Linton v. Johns Hopkins Univ. Applied Physics Lab., LLC*, 2011 WL 4549177, at *13 (D. Md. Sept. 28, 2011) ("Occasional acts of frustration or anger, such as snatching papers from an employee's hands,

---

[25] Dr. Sims also contends the FFD referral independently contributes to a hostile work environment. (ECF 170, Pl.'s Opp.'n at 50.) The court has already analyzed why Dr. Sims's FFD referral was based on a non-discriminatory justification.

pointing, or banging on a table are, at least to some extent, part of the ordinary tribulations of many workplaces.").

The most egregious incident involves Ms. Goetz allegedly kicking Dr. Sims while calling her "argumentative and aggressive like the average Black woman." (ECF 180-5, Sims Decl. ¶ 16.) The court takes this allegation very seriously. Other jurisdictions have recognized the unique hostility at issue when workplace environments reinforce the stereotype of the "angry Black woman." *See, e.g., Young v. Control Solutions, LLC*, 2017 WL 2633679, at \*4 (N.D. Ill. Jun. 19, 2017) (describing the history and harm of the "angry black woman" stereotype, but ultimately granting summary judgment for employer); *Curry v. Devereux Foundation*, 541 F. Supp. 3d 555, 561–62 (E.D. Pa. 2021) (denying motion to dismiss while describing the damage of the "angry black woman" stereotype, yet noting a single statement would not necessarily establish a hostile work environment). In some circumstances, such a harmful remark could contribute to a hostile work environment claim. But Dr. Sims has failed to provide evidence demonstrating that the harassment she faced was sufficiently "severe or pervasive" after taking into account "all the circumstances." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019) (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). When evaluating the totality of the circumstances surrounding Dr. Sims's employment, the court must look to "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

The comment comparing Dr. Sims's aggressiveness to that of an "average Black woman" arose out of a single disagreement early in Dr. Sims's multi-year tenure at the Medical Center, which generally does not establish the existence of a hostile work environment. Although Dr. Sims

was perceived as "aggressive" in other contexts, there was only one instance in which that perception was explicitly tied to her status as a Black woman.

The physical aspect of this incident—Ms. Goetz's alleged kicking—is also not sufficient to create a hostile environment. Not all physical harassment necessarily establishes a hostile work environment. *See, e.g., Lissau v. Southern Food Serv.*, 159 F.3d 177, 183 (4th Cir. 1998) ("Title VII does not provide a remedy for every instance of verbal or physical harassment in the workplace."); *see also Khoury v. Meserve*, 268 F. Supp. 2d 600, 614 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004) (finding a supervisor yelling at an employee, pushing her down in a chair, and blocking her ability to leave was not severe or pervasive harassment under Title VII); *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022) ("We reject [the plaintiff's] contention that one episode of yelling and pounding the table, even considered with [the plaintiff's] other allegations, is sufficiently severe or pervasive to establish an abusive environment.").

Ms. Goetz's alleged conduct was certainly rude, callous, and even offensive.[26] But no reasonable jury could find the alleged incidents were sufficiently severe or pervasive to establish a hostile working environment under Title VII. *See Holloway*, 32 F.4th at 301 (quoting *Sunbelt Rentals*, 521 F.3d at 315) ("'[R]ude treatment,' 'callous behavior,' or 'routine difference of opinion and personality conflict,' without more, will not suffice."). Accordingly, summary judgment is appropriate as to Dr. Sims's hostile work environment claim.[27]

---

[26] The court keeps in mind, however, that certain undisputed facts paint Ms. Goetz in a different light. For example, Ms. Goetz allowed Dr. Sims to retake her board examinations while keeping Dr. Sims's job offer open despite having no obligation to do so. Ms. Goetz also awarded Dr. Sims the highest honor offered to Medical Center employees; an award that Ms. Goetz had only awarded one other time in her career. (ECF 159-16, Goetz Decl. ¶¶ 16–18.)

[27] Because the defendants are entitled to summary judgment as to each of their claims, the court need not determine whether summary judgment is appropriate as to the issue of damages.

## CONCLUSION

For the reasons discussed herein, the court will grant the defendants' Motion for Summary Judgment (ECF 159) on all counts. A separate Order follows.

6/23/22
Date

Catherine C. Blake
United States District Judge

44